Rafey Balabanian (SBN 315962)
rbalabanian@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370

Brandt Silverkorn (SBN 323530)
bsilverkorn@edelson.com
Aaron Lawson (SBN 319306)
alawson@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300

*Attorneys for Individual Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE TUMBLER RIDGE SHOOTING LITIGATION | Lead Case No.: 3:26-cv-3701-JSC<br><br>**INDIVIDUAL PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS FOR FORUM NON CONVENIENS**<br><br>Judge: Hon. Jacqueline Scott Corley<br>Courtroom 8–19th Floor |
| This Document Relates To:<br><br>All Individual Actions | |

## TABLE OF CONTENTS

**INTRODUCTION** ..... 1
**BACKGROUND** ..... 3
**ARGUMENT** ..... 8
**I. Whether There Is an Adequate, Alternative Forum** ..... 9
**II. Deference to Plaintiffs' Chosen Forum** ..... 10
**III. The Private Interest Factors** ..... 11
**IV. The Public Interest Factors** ..... 18
**CONCLUSION** ..... 24

## TABLE OF AUTHORITIES

### FEDERAL CASES


*Baird v. Bell Helicopter Textron*,
491 F. Supp. 1129 (N.D. Tex. 1980) .......... 22

*Boston Telecomms. Grp., Inc. v. Wood*,
588 F.3d 1201 (9th Cir. 2009) .......... *passim*

*Carijano v. Occidental Petroleum Corp.*,
643 F.3d 1216 (9th Cir. 2011) .......... *passim*

*Cooper v. Tokyo Elec. Power Co.*,
860 F.3d 1193 (9th Cir. 2017) .......... 24

*Cousins v. Sikorsky Aircraft Corp.*,
752 F. Supp. 3d 443 (E.D. Pa. 2024) .......... 10

*de Fontbrune v. Wofsy*,
838 F.3d 992 (9th Cir. 2016) .......... 18

*Fabricant v. Elavon, Inc.*,
No. 2:20-cv-2960-SVW-MMA, 2021 WL 1593238 (C.D. Cal. Mar. 8, 2021) .......... 10

*In re Cessna 208 Series Aircraft Prods. Liab. Litig.*,
546 F. Supp. 2d 1191 (D. Kan. 2008) .......... 11

*In re Paris Air Crash of Mar. 3, 1974*,
399 F. Supp. 732 (C.D. Cal. 1975) .......... 23

*Iragorri v. United Techs. Corp.*,
274 F.3d 65 (2d Cir. 2001) .......... 10, 11, 12

*Jackson v. Tesla, Inc.*,
772 F. Supp. 3d 1111 (N.D. Cal. 2025) .......... 22, 23

*Joshi v. OpenAI Found.*,
2026 No. 4:26-cv-00222 (N.D. Fla. 2026) .......... 6

*King.com, Ltd. v. 6 Waves LLC*,
No. C-13-3977 MMC, 2014 WL 1340574 (N.D. Cal. Mar. 31, 2014) .......... 18

*Lacey v. Cessna Aircraft Co.*,
932 F.2d 170 (3d Cir. 1991) .......... 16

*Magellan Real Estate Inv. Tr. v. Losch*,
109 F. Supp. 2d 1144 (D. Ariz. 2000) .......... 11, 13

*Musk v. Altman*,
No. 4:24-cv-4722 (N.D. Cal.) .......... 16

*Nemariam v. Fed. Democratic Republic of Ethiopia*,
315 F.3d 390 (D.C. Cir. 2003) .......... 10

*Ravelo Monegro v. Rosa*,
211 F.3d 509 (9th Cir. 2000) .......... 9, 10, 20

*Tuazon v. R.J. Reynolds, Inc.*,
433 F.3d 1163 (9th Cir. 2006) .......... 9, 14, 19, 23, 24

**STATE CASES**

*Gilead Tenofovir Cases*,
98 Cal. App. 5th 911 (2024) .......... 21

*Hurtado v. Superior Ct.*,
11 Cal. 3d 574 (1974) .......... 21, 23

*Java Oil Ltd. v. Sullivan*,
168 Cal. App. 4th 1178 (2008) .......... 17, 18

*McCann v. Foster Wheeler LLC*,
48 Cal. 4th 68 (2010) .......... 21

*Miller v. Mun. Ct. of City of Los Angeles*,
22 Cal. 2d 818 (1943) .......... 17

*Morris v. AGFA Corp.*,
144 Cal. App. 4th 1452 (2006) .......... 11

*Ortiz v. Daimler Truck N. Am. LLC*,
112 Cal. App. 5th 608 (2025) .......... 21

*Scott v. Ford Motor Co.*,
224 Cal. App. 4th 1492 (2014) .......... 22

*Stangvik v. Shiley Inc.*,
54 Cal. 3d 744 (1991) .......... 20, 22

*Wash. Mut. Bank, FA v. Superior Ct.*,
24 Cal. 4th 906 (2001) .......... 21

*Wycko v. Gnodtke*,
105 N.W.2d 118 (Mich. 1960) .......... 9

**CANADA CASES**

*Kim v. Murdoch*,
2023 BCSC 1647 (Can. B.C.) .......... 9

*Mustapha v. Culligan of Can. Ltd.*,
2008 SCC 27 (Can.) .......... 21

*R. v. Belcourt*,
2012 BCSC 2131 (Can. B.C.) .......... 15

*Riopelle v. Desjardins*,
1949 CanLII 123 (Can. ON HCJ) .......... 9

**STATUTES**

Cal. Civ. Proc. Code § 1715(b)(2) .......... 17

## INTRODUCTION

On [redacted], Jesse Van Rootselaar asked ChatGPT to [redacted]. During the ensuing exchange, Van Rootselaar admitted to [redacted] Upon being fed this information, as well as admissions about [redacted] ChatGPT acknowledged that [redacted] OpenAI did not act on this information—for reasons so far known only to Defendants and certain current and former employees or officers, it had not configured ChatGPT's systems to refer these types of conversations to human reviewers. OpenAI had also declined to act just days earlier, after safety team members, almost all of whom are based in California, twice attempted (and twice failed) to persuade OpenAI decisionmakers, all of whom are located in California, to refer Van Rootselaar's account to law enforcement, after they had reviewed her use of ChatGPT, and saw her using the bot to [redacted]. Compounding the danger, the company elected only to deactivate Van Rootselaar's principal account, made no changes to its product, and decided not to monitor its systems for further activity by Van Rootselaar, thus failing to notice that she continued to use ChatGPT [redacted]. And in this second account, the bot [redacted]

The operative complaints filed by the Individual Plaintiffs ("Plaintiffs") in these related actions sound principally in negligence, alleging that Defendants, various OpenAI entities and OpenAI CEO, Sam Altman (referred to collectively herein as "OpenAI"), unreasonably designed ChatGPT for general use, unreasonably failed to change how ChatGPT functioned once it became clear it was encouraging and assisting violence, and unreasonably elected to conceal the danger posed by Van Rootselaar from the Canadian authorities. The critical questions in this case, therefore, will be about choices OpenAI made, and the evidence relevant to assessing OpenAI's

conduct—both in the design choices it made and how it responded to the threat presented by Jesse Van Rootselaar—is predominantly located in this District.

Defendants' conduct produced deadly consequences in British Columbia, and Defendants contend that that Province's courts provide an available and more appropriate forum for these claims. For some of the Individual Plaintiffs, though, British Columbia does not provide an adequate forum: Due to the vagaries of Canadian law, parents of deceased children are afforded essentially no remedy for the loss of a child, except in circumstances not present here.

And for the remaining Individual Plaintiffs, consideration of the applicable private and public interest factors favors litigation in this forum. The motion focuses mainly on some of Defendants' anticipated defenses to causation, which it says will require evidence from Canadian sources. But, as just explained, the evidence relevant to Defendants' liability will come almost exclusively from domestic sources. More, there is every reason to think that any trial here will involve evidence from other Bay Area-based sources, such as Discord and Roblox, which will be difficult or impossible to obtain for use in Canada. And Defendants' concerns about accessing evidence from north of the border are largely hypothetical, or unpersuasive in light of the evidence that can be obtained from plaintiffs who have chosen to litigate here.

And while British Columbia has an interest in seeing justice done for the victims of OpenAI's negligence, so too does California have an interest in policing its corporate citizens. And this case isn't just about ChatGPT's dangerous design—it also involves the judgment, issued from OpenAI's California headquarters, that Jesse Van Rootselaar did not pose a credible threat to public safety, did not need to be referred to law enforcement, and that no measures needed to be taken to ensure that Van Rootselaar did not continue using ChatGPT. Further, California has a particular interest in this case, as just months before the shooting, OpenAI concluded around eighteen months of negotiations with the California attorney general as part of its transition to a for-profit entity and made a number of commitments about prioritizing safety.

In the end, California is an appropriate forum for claims that a California company acted negligently while operating in California. The motion to dismiss should be denied.

**BACKGROUND**

In 2024, OpenAI rolled out a new version of its flagship ChatGPT product—GPT-4o. The release of this new version of the product was extremely rushed after Altman learned that Google was planning to release a new version of its AI chatbot, Gemini, within days. Months of safety testing were "squeezed" (that is, scrapped) to facilitate this roll out. Compl. ¶ 186.[1] Public statements and testimony from former OpenAI insiders suggest that this was par for the course at OpenAI. *E.g.*, *id.* ¶ 186–87. The teams responsible for designing and programming ChatGPT, the Applied and Research teams, are based primarily in California: over three-fourths of those teams' members are based in California. Just 0.4% are based in Canada. Declaration of Brandt Silverkorn ("Silverkorn Decl."), Ex. 1 (Ex. A) ¶ 1.

GPT-4o quickly became known for its sycophantic conversational style. Compl. ¶ 191. That style, and other aspects of the updated product, were designed to keep users engaged—more active users meant a stronger valuation, and more use equaled more training data for OpenAI to continue to hone their models. *Id.* ¶¶ 25, 164, 200. But at its California headquarters, OpenAI also made several other adjustments to ChatGPT. For instance, prompts elaborating on or glorifying violence were removed from the set of topics ChatGPT was designed not to engage with, with new rules directing the bot to "assume best intentions" on the part of the user. *Id.* ¶¶ 171–72. Moreover, while OpenAI bruited ChatGPT's supposed compliance with the company's safety testing, later-released documentation admitted that, in fact, GPT-4o's refusal mechanisms were engaging just over half the time they should. *Id.* ¶¶ 174. This meant that ChatGPT would frequently engage with prompts that addressed mass violence, and other prohibited topics.

Jesse Van Rootselaar's use of ChatGPT highlights the dangers of these choices. Van Rootselaar [redacted] *Id.* ¶¶ 12, 46. [redacted]

[1] The allegations discussed here are common to all Individual Plaintiffs. Citations to "Compl." are to the operative complaint in the *Stacey* action. Dkt. No. 61 (*Stacey*).

[redacted] *Id.* ¶ 12. [redacted] *Id.* ¶¶ 42, 49–52. [redacted] *Id.* ¶¶ 53–54, 56. [redacted] *Id.* ¶ 57. [redacted] *Id.* ¶¶ 64–72. [redacted] *Id.* ¶ 73.

The Intelligence & Investigations Team tasked with reviewing automatically flagged ChatGPT usage numbers seventy-five individuals, none of whom are based in Canada. *Id.* ¶¶ 73–74; Silverkorn Decl., Ex. 1 (Ex. A) ¶ 2. 88% of the current team resides in the United States, and around 39% of the team lives in California, specifically. Silverkorn Decl., Ex. 1 (Ex. A) ¶ 2. Van Rootselaar's account specifically was reviewed by two people, one of whom lives in California. *Id.* Ex. 1 (Ex. A) ¶ 3. Van Rootselaar's use of the chatbot so alarmed this duo that they urgently recommended that OpenAI contact Canadian authorities and warn them about Van Rootselaar's dangerousness. Compl. ¶¶ 74. But two other individuals, both based in California, apparently rejected that recommendation. Silverkorn Decl., Ex. 1 (Ex. A) ¶ 4.

The Intelligence & Investigations Team subsequently asked for a second review of a handful of flagged accounts, including Van Rootselaar's. Compl. ¶ 77; Silverkorn Decl., Ex. 2. A working group of twelve, eleven of whom were based in California, was formed to reassess these accounts. Silverkorn Decl., Ex. 1 (Ex. A) ¶ 5. OpenAI again elected not to refer Van Rootselaar to law enforcement. Compl. ¶ 77. An OpenAI Vice President, Bay Area-based Ann O'Leary, later stated in an open letter to British Columbia that the decision not to make the referral came down to the determination that Van Rootselaar did not pose a credible or imminent threat to others. Silverkorn Decl., Ex. 3; Compl. ¶¶ 139–40. The people who developed the standards by which these determinations were made, and those who applied them in this case, nearly all of whom are in California, are material to Plaintiffs' case.

But this case is not just about OpenAI's failure to refer Van Rootselaar to law enforcement, or even, as explained below, not to ban her from using its product. When OpenAI reviewed Van Rootselaar's account, it was faced with hard evidence that particular design flaws allowed users to make use of ChatGPT to explore real-world violence. *E.g.*, Compl. ¶¶ 82–83.

Van Rootselaar's use of ChatGPT in particular raises serious questions about how the bot was programmed to engage with violent conversations. ChatGPT's public documents, [redacted], demonstrate that ChatGPT was designed not to engage with prompts covering certain prohibited topics, including mass violence. One issue, however, was that [redacted] *Id.* ¶¶ 84–87. It appears that one reason this is so is that ChatGPT would [redacted] *Id.* ¶ 162(a). This allowed Van Rootselaar to [redacted]

But another issue that will be analyzed at trial is [redacted]

[redacted] *Id.* ¶¶ 89–90. [redacted] *Id.* ¶ 162(c), (d). [redacted] *Id.* ¶¶ 165–66.

By June 2025, there were already several public examples of individuals using ChatGPT to assist with the commission of violent acts. In early 2025, Matthew Alan Livelsberger used ChatGPT to help plan and execute a car bombing outside of a hotel in Las Vegas, seeking from the bot information such as how to procure large amounts of an explosive, and how to detonate it. *Id.* ¶ 78; Silverkorn Decl., Ex. 4. In April 2025, Phoenix Ikner used ChatGPT to help him plan a mass shooting at Florida State University, investigating previous mass casualty events (like Oklahoma City and Columbine), showing off his arsenal of weapons, asking the bot questions about how to operate handguns and about their lethality at close range, asking about when mass shootings would gain the perpetrator notoriety, and asking about when Florida State's student union was busiest. Compl. ¶ 78; *see* Complaint, *Joshi v. OpenAI Found.*, No. 4:26-cv-00222 (N.D. Fla. May 10, 2026). And in May 2025, a Finnish teenager stabbed three girls at his school after emailing a manifesto to local news agencies which revealed that he had used ChatGPT to prepare the attack and write the manifesto. Compl. ¶ 78; Silverkorn Decl., Ex. 5.

The design choices that permitted Van Rootselaar and others to research and plan mass violence will be at the center of this case, explored through documents and testimony that will come almost exclusively from California: Defendants' document repositories are likely located in California, where over three-fourths of the team who developed ChatGPT resides. Silverkorn Decl., Ex. 1 (Ex. A) ¶ 1. OpenAI has represented in other proceedings that it has no employees or facilities at all in British Columbia. *Id.* Ex. 6, at 2–3.

Rather than make the necessary changes, OpenAI elected to quietly deactivate one of Van Rootselaar's ChatGPT accounts and conceal what it had seen. A [redacted] second account,

[redacted], was allowed to remain open. Compl. ¶ 93. The balance of Van Rootselaar's ChatGPT usage is even more horrifying. [redacted] Compl ¶¶ 96–97. [redacted] Van Rootselaar also told the bot that [redacted] *Id.* ¶¶ 98–100. [redacted] *Id.* ¶¶ 110, 131–38. [redacted] *Id.* ¶¶ 108–110. [redacted] *Id.* ¶¶ 101–05, 111–16, 119–22. [redacted] *E.g.*, *id.* ¶ 127. [redacted] *Id.* ¶¶ 19–21, 110–25.

Episodes like these will be another focus of the trial, as the jury probes whether ChatGPT was reasonably safe, and whether OpenAI reasonably determined that it had no responsibility to alert law enforcement. Thus, at its core, this is a case about a California company implementing product design decisions and making safety decisions in California.

Last, this case may well involve other tools or actors who assisted Van Rootselaar in preparing for and executing her heinous final act. [redacted] Federal prosecutors in Washington recently have indicted an individual living in Bellingham, Washington, who regularly communicated with Van Rootselaar via Discord (headquartered in San Francisco), and attempted to help her livestream the massacre via Twitch (another San Francisco company). Silverkorn Decl., Ex. 7. Finally, it has been reported that Van Rootselaar had an infrequently used account on Roblox (headquartered in San Mateo), in which she apparently simulated a mass shooting at a mall, and on YouTube (also San Mateo). Evidence relevant to this case is likely to come from these companies, as well. In fact, the Individual Plaintiffs already have served subpoenas on Discord, Twitch, and [redacted].

**ARGUMENT**

A litigant seeking dismissal on forum non conveniens grounds must show (1) the existence of an adequate, alternative forum, and (2) that consideration of various private and public interest factors strongly favors dismissal in favor of refiling in a foreign country. *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1224 (9th Cir. 2011).

"The doctrine of forum non conveniens is an exceptional tool to be employed sparingly." *Boston Telecomms. Grp., Inc. v. Wood*, 588 F.3d 1201, 1212 (9th Cir. 2009); *see also Carijano*, 643 F.3d at 1224 (same, noting that dismissal on forum non conveniens grounds "is a drastic exercise of the court's 'inherent power'"). The doctrine does not compel plaintiffs to choose the supposedly "optimal" forum for their claim but asks instead "whether . . . defendants have made a clear showing of facts which . . . establish" that the plaintiffs' choice of forum causes "such oppression and vexation . . . as to be out of proportion to plaintiff's convenience, which may be

shown to be slight or nonexistent." *Ravelo Monegro v. Rosa*, 211 F.3d 509, 514 (9th Cir. 2000) (holding that Dominican plaintiffs had appropriately sued California defendants in California).

Because Defendants cannot show that the facts here clearly favor trial in British Columbia, dismissal on forum non conveniens grounds is inappropriate.

## I. Whether There Is an Adequate, Alternative Forum

Defendants submit that British Columbia offers an adequate, alternative forum for all claims. But "a forum will be inadequate [if] the remedy provided is so clearly inadequate or unsatisfactory, that it is no remedy at all." *Tuazon v. R.J. Reynolds, Inc.*, 433 F.3d 1163, 1178 (9th Cir. 2006) (cleaned up).

Here, British Columbia is not an adequate forum for the claims brought by the parents and estates of the deceased minor victims. Under British Columbia law, in a wrongful death action, recoverable damages are essentially limited to replacing lost familial support; non-economic and punitive damages are unavailable. Declaration of Randal J. Kaardal ("Kaardal Decl.") ¶ 4. Cases in which British Columbian courts have awarded lost-support damages for the death of a child are by and large limited to scenarios involving cultural factors not present here, or cases in which the deceased child has an established employment history. *See Kim v. Murdoch*, 2023 BCSC 1647, ¶¶ 29–36 (Can. B.C.) (explaining cultural factors and noting that the task of calculating lost support "is much more difficult in the case of the death of a child, particularly one who has not yet established a steady stream of income, or a regular pattern of support for their parents. In such cases, with manifold future events and decisions that may make support more or less likely, and to what extent, the claim may be pressed to extinction by the weight of multiplied contingencies.") (quotations omitted).[2] None of the deceased minors here have an established history of employment on which an award of damages for wrongful death could be grounded.

---

[2] British Columbia's Family Compensation Act is based on Victorian England's landmark Fatal Accidents Act. *See Kim*, 2023 BCSC 1647, ¶ 25 n.3. In one famous statement regarding damages calculation under a similar law, the court wrote: "The authorities suggest that in the case of very young children one must, cold-blooded as it sounds—take into account the fact that for many years they will be a liability. . . . [B]alancing the losses against the gains, as one must do, the damages in the case of a very young child almost approach the vanishing point." *Riopelle v.*

Similarly, in a survival action, only pre-death economic damages are available, Kaardal Decl. ¶ 6, and there would be no such damages here. That would leave these grieving parents to recover only funeral expenses, an amount of money so clearly unsatisfactory as to render the jurisdiction an inadequate forum. This is not a case in which foreign law imposes a cap on recovery as a policy matter, but one in which the types of recovery permitted for the claims certain Individual Plaintiffs seek to litigate are unavailable on the facts alleged in the operative complaints. *See Nemariam v. Fed. Democratic Republic of Ethiopia*, 315 F.3d 390, 395 (D.C. Cir. 2003) (deeming proposed alternative forum inadequate because the plaintiff "has no certainty of getting any relief for a meritorious claim"). For at least five of these cases, therefore, British Columbia does *not* offer an adequate forum, and the motion may be denied as to those Plaintiffs without further consideration of the public and private interest factors. *See Fabricant v. Elavon, Inc.*, No. 2:20-cv-2960-SVW-MMA, 2021 WL 1593238, at *4 (C.D. Cal. Mar. 8, 2021) (ruling that Ontario did not provide adequate forum because existing Ontario statutory and common law would provide no remedy for the claimed injury).

## II. Deference to Plaintiffs' Chosen Forum

For the remaining Plaintiffs, Defendants contend that their burden on this motion is minimal because Plaintiffs are British Columbia residents. Though it is true that "[a] foreign plaintiff's choice is entitled to less deference, . . . 'less deference is not the same thing as no deference.'" *Carijano*, 643 F.3d at 1227 (quoting *Ravelo Monegro*, 211 F.3d at 514). Moreover, forum-shopping concerns "are muted in a case such as this where Plaintiffs' chosen forum is both the defendant's home jurisdiction, and a forum with a strong connection to the subject matter of the case." *Id.* at 1229; *see also Iragorri v. United Techs. Corp.*, 274 F.3d 65, 75 (2d Cir. 2001) ("the greater the degree to which the plaintiff has chosen a forum where the defendant's witnesses and evidence are to be found, the harder it should be for the defendant to demonstrate inconvenience"); *Cousins v. Sikorsky Aircraft Corp.*, 752 F. Supp. 3d 443, 456 (E.D. Pa. 2024) (Canadian plaintiff's choice to sue in Philadelphia "is entitled to more deference where relevant

---

*Desjardins*, 1949 CanLII 123 (Can. ON HCJ); *see also Wycko v. Gnodtke*, 105 N.W.2d 118, 120–21 (Mich. 1960) (recounting similar holdings).

evidence and the defendant are in the forum"); *In re Cessna 208 Series Aircraft Prods. Liab. Litig.*, 546 F. Supp. 2d 1191, 1195 (D. Kan. 2008) ("Even though defendant's burden is somewhat relaxed in the case of foreign plaintiffs, a defendant who is a forum resident, like Cessna, must make a stronger case than others for dismissal based on forum non conveniens."); *Morris v. AGFA Corp.*, 144 Cal. App. 4th 1452, 1465 (2006) ("[a] corporate defendant's state of incorporation and principal place of business is presumptively a convenient forum").

Thus, for the remaining Plaintiffs, Defendants must still show that the various factors significantly favor dismissal. *See, e.g.*, *Iragorri*, 274 F.3d at 74–75 ("[A] lesser degree of deference to the plaintiff's choice . . . does not guarantee dismissal. A defendant does not carry the day simply by showing the existence of an adequate alternative forum. The action should be dismissed only if the chosen forum is shown to be genuinely inconvenient and the selected forum significantly preferable."). As explained next, they do not.

## III. The Private Interest Factors

First, the private interest factors do not favor dismissal. "The private interest factors to be weighed in a forum non conveniens inquiry are: (1) the residence of the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) all other practical problems that make trial of a case easy, expeditious and inexpensive." *Boston Telecomms.*, 588 F.3d at 1206–07 (citation omitted).

***The Residence of the Parties and the Witnesses.*** As to the first private interest factor, Defendants are residents of this forum, a fact that "weighs heavily against dismissal on grounds of *forum non conveniens*." *Magellan Real Est. Inv. Tr. v. Losch*, 109 F. Supp. 2d 1144, 1151 (D. Ariz. 2000). And by filing here, Plaintiffs have "indicated a willingness to travel to the United States for trial." *Carijano*, 643 F.3d at 1230.

As to the remaining witnesses and evidence, most of Plaintiffs' case will turn on evidence located primarily in this District: evidence about how ChatGPT was designed, evidence about rushed safety testing, evidence about how the Intelligence & Investigations team evaluated Van

Rootselaar's account, evidence about why OpenAI leadership rejected that team's pleas to refer that account to law enforcement, and evidence about the design flaws that allowed Van Rootselaar to use ChatGPT to plan and execute the Tumbler Ridge shooting. Much of the team involved in designing ChatGPT is California-based, and nearly all of the individuals involved in reviewing Van Rootselaar's account are California-based, while none reside in British Columbia. Silverkorn Decl., Ex. 1 (Ex. A) ¶¶ 1, 3–5. *See Carijano*, 643 F.3d at 1230 (finding this factor weighed against dismissal of claims concerning contamination of Amazonian waterways because "[m]ost of Plaintiffs' claims turn not on the physical location of the injury but on the mental state of the Occidental managers who actually made the business decisions that allegedly resulted in the injury"). In fact, in two cases concerning how ChatGPT was programmed and trained, OpenAI has resisted jurisdiction in Canada, precisely because none of that evidence is located in Canada. Silverkorn Decl., Ex. 6; *id.* Ex. 8. And in an application to have litigation dismissed from British Columbia on jurisdiction and forum non conveniens grounds, an OpenAI declarant made clear that the company has no active presence in British Columbia, including no offices, no employees, and no servers. In both cases, OpenAI contended that California was the superior forum because, among other things, it would be comparatively easier and less expensive to produce or provide access to OpenAI's files here. *Id.* Ex. 6 ¶ 20.[3]

Defendants seek to neutralize this and related factors by offering to submit to Canadian jurisdiction. Though this may be relevant to document discovery, it accomplishes little in terms of obtaining discovery from witnesses. Most of the team involved in designing ChatGPT resides in California, as do nearly all of the individuals who reviewed Van Rootselaar's account. Even with Defendants' concession to Canadian jurisdiction, Plaintiffs would be afforded the ability to obtain testimony on behalf of the corporate defendants from just one person, and only for seven hours. And while there are a handful of individuals in Canada who may have evidence to offer in this

[3] As the Second Circuit has observed, "just as plaintiffs sometimes choose a forum for forum-shopping reasons, defendants also may move for dismissal under the doctrine of *forum non conveniens* not because of genuine concern with convenience but because of similar forum-shopping reasons." *Iragorri*, 274 F.3d at 75. That OpenAI has resisted litigation in Canada previously suggests a lack of "genuine concern with convenience" in this case.

case, they all appear to be located outside of British Columbia. Kaardal Decl. ¶ 22 (discussing inability of B.C. courts to compel appearance of witnesses in other provinces).) Moreover, many potential witnesses will be *former* employees or contractors, many of whom likely reside in California, and none of whom have been shown to reside in Canada. *See, e.g.*, Silverkorn Decl., Ex. 9 (detailing use of third-party contractors to help train ChatGPT); *id.* Ex. 10 (same).

Defendants' citations to other Canadian witnesses or entities who may have information relevant to their defenses, including the Canadian police, is insufficient to carry their burden on this motion. First, the focus is on the materiality of evidence, not its quantum. *See Boston Telecomms.*, 588 F.3d at 1209. As respects materiality, none of the evidence Defendants discuss bears on their own liability. That evidence—which will be the focus of these proceedings—is primarily located in this forum. *See Magellan Real Est. Inv. Tr.*, 109 F. Supp. 2d at 1152 (giving more weight to location of witnesses "with information about the alleged misconduct").

Second, when considering the location of witnesses, Ninth Circuit precedent instructs that the first question is whether any foreign witnesses "would be unwilling to testify." *Carijano*, 643 F.3d at 1231. Defendants need not "identify potentially unavailable witnesses in exact detail," but "here, [OpenAI has not shown, nor does it even represent, that any witness is unwilling to testify." *Id.* The public record, in fact, suggests otherwise: the Province has brought its own claims in this District, submitting to the authority of this Court, including for participation in discovery.

Third, Defendants do not persuasively show that they can obtain the information they desire only from Canadian sources. For instance, information about the crime scene—which will be relevant only to the extent it shows that [redacted]—can come not only from the police but also from the survivors, who have sued OpenAI in this Court.

The police's decision to return firearms to the Van Rootselaar household hasn't been shown to be relevant because Defendants cannot show that the firearms used in the shooting were the same guns returned by the police. Silverkorn Decl., Ex. 11 (weapons used by Van Rootselaar have "never been previously seized by police"). In fact, the evidence will show that the weapons used in the shooting [redacted]

[redacted] Compl. ¶¶ 111, 119, 124–25.

And as for Van Rootselaar's psychiatric history, again, evidence from OpenAI will be at least as material to this case as evidence from provincial sources: [redacted] *Id.* ¶¶ 43, 97.

Finally, Defendants notably do not say that, beyond their own actions, this litigation will be limited to trying to assign blame just to Van Rootselaar, or to other Canadian entities. Public reporting, for instance, indicates that Van Rootselaar had a Roblox account in which she simulated a mass shooting. Silverkorn Decl., Ex. 12. Roblox, of course, is headquartered in San Mateo, in this District. Van Rootselaar's interactions with ChatGPT also reveal [redacted] which is headquartered in this District. Van Rootselaar also reportedly had an account with YouTube, another San Mateo company, that the company deactivated after the shooting "in accordance with our Creator Responsibility Guidelines." *Id.* Ex. 13. And the U.S. government has recently initiated a prosecution of an alleged co-conspirator in the United States District Court for the Western District of Washington based in part on a review of Discord communications between the defendant and Van Rootselaar. Discord is headquartered in San Francisco. That prosecution also revealed that Van Rootselaar attempted to live stream the shooting on Twitch, yet another San Francisco company. Plaintiffs have begun the process of serving subpoenas on these companies for relevant documents.

Thus, the location of evidence and witnesses counsels in favor of litigation in this forum.

***Ease of Access to Sources of Proof.*** Relatedly, consideration of the ease of access to sources of proof likewise counsels against dismissal. This will be a cross-border dispute with a principal locus in California whether the case is litigated here or in British Columbia, and moving the case to British Columbia would present even greater hurdles to building the record. *See Boston Telecomms.*, 588 F.3d at 1208–10 (finding that private interest factors "weigh[ed] against dismissal" when proof would come from several countries, so there would be difficulties compiling a record in any forum); *Tuazon*, 433 F.3d at 1181 (similar).

For their part, Defendants focus on potential hurdles to procuring documents or testimony from unwilling witnesses in Canada, again without demonstrating that any given witness is unwilling. Defendants point out that obtaining discovery from unwilling Canadian witnesses requires the use of letters rogatory, and they further contend that enforcement is not automatic. Mot. at 18. But there is a presumption in favor of enforcement. Kaardal Decl. ¶ 23. Defendants' declarant observes that enforcement can be refused on relevance or burden grounds. Lockhart Decl. ¶¶ 10–11. But it makes little sense to dismiss this action on the assumption that Defendants will be unable to assist the Court in crafting an enforceable letter rogatory at some unknown point in the future.

As to discovery from government sources, the provincial government has filed their own lawsuit in this District, indicating a willingness to participate in discovery in this Court to the same extent that it would in Canada. Defendants complain that they "face a heightened risk of extensive delays and non-enforcement of letters rogatory" because much of the information they seek may implicate the Crown's ongoing criminal investigation, or other Canadian privacy laws. Mot. at 18. But what Defendants carefully avoid saying is that they would get additional discovery if this case were tried in Canada as opposed to here. Indeed, they identify no discovery they believe they could obtain in Canada that would be unavailable here. Moving this litigation to Canada would not result in any greater access to these sources of proof.

Further, Plaintiffs would face significant hurdles trying to compile a record in this case in Canada, given that many of the witnesses and documents they will need to rely upon are located in the United States. British Columbian law contains no provisions for compelling the pre-trial testimony, or the production of documents, from unwilling witnesses located outside the Province. Kaardal Decl. ¶ 20–24. As explained above, this case will likely involve documentary and testimonial evidence from numerous stateside witnesses and many Bay Area companies.

Defendants purport to solve that problem by consenting to jurisdiction in Canada, but this is not a panacea. Defendants' ostensible commitment may make some document discovery smoother, but as for witness testimony, apart from the individual designated to testify on behalf of the company, Defendants cannot compel any other employee's appearance in Canada. *See R. v.*

*Belcourt*, 2012 BCSC 2131, ¶ 9 (Can. B.C.) ("[T]here is also no legal obligation for a witness, or potential witness, to talk to anybody respecting their knowledge of the matters at issue except in response to a subpoena."). And, as explained above, there are likely many *former* employees, or perhaps contractors or former contractors, who have information relevant to the issues in this case. Indeed, the recent trial in *Musk v. Altman*, No. 4:24-cv-4722 (N.D. Cal.), featured testimony from two former OpenAI employees that covered safety decisions made by Altman and others at OpenAI. Compl. ¶¶ 195–97. These witnesses, too, would be beyond the authority of any British Columbia court. *See Lacey v. Cessna Aircraft Co.*, 932 F.2d 170, 185–86 (3d Cir. 1991) (suggesting that need to obtain testimony from former employees of American company counseled against litigation in British Columbia).

Thus, consideration of the ease of access to sources of proof counsels against dismissal.

***Whether Unwilling Witnesses Can Be Compelled to Testify.*** For similar reasons, consideration of the next factor, whether unwilling witnesses are subject to compulsory process, likewise militates against dismissal. The Individual Plaintiffs have committed to producing documents and testimony in this forum. And the record does not provide much reason to believe that there are other unwilling Canadian witnesses who would need to be compelled to provide documents or testimony. Moreover, while Defendants' commitment to accepting service in Canada perhaps smooths a path to compiling a documentary record, it offers nothing concerning non-party witnesses who will be material to Plaintiffs' case. And since, as explained above, there are likely a greater number of non-party witnesses in America, and likely in the Bay Area specifically, this factor cannot counsel in favor of dismissal.

***Cost of Bringing Witnesses to Trial.*** The cost of bringing witnesses to trial is far smaller in this District. The bulk of the witnesses here will be from OpenAI, and it is plainly far more convenient and less expensive for them to testify in a San Francisco courtroom. Similarly, former OpenAI employees are more likely to be located in California and can more easily travel to San Francisco for trial. And witnesses needed to authenticate records from other Bay Area companies also may more easily and cheaply testify in this forum, as opposed to British Columbia.

Furthermore, it bears noting that there are no courthouses in Tumbler Ridge; the nearest courthouse (in Dawson Creek, British Columbia) is around 1.5 hours from Tumbler Ridge, and about a thirteen-hour drive from Vancouver. Even the nearest general-aviation airport (in Fort St. John) is two hours from Tumbler Ridge. Thus, given the remoteness of Tumbler Ridge, it would be unusually expensive and difficult to get even willing witnesses from the Bay Area to courthouses close to Tumbler Ridge. And the cost of doing so would have to account for the fact that neither of the two closest courthouses is served permanently by a judge, and any trial schedule might be interrupted to deal with matters given priority by statute in such courts. Kaardal Decl. ¶¶ 7–18. *See also infra* at pp. 23–24.

Trial might be held instead in Vancouver. (One plaintiff, M.G., who is receiving medical treatment in Vancouver, originally filed there.) It still would be costly to bring California-based witnesses to Canada. For witnesses from Tumbler Ridge, there is little material difference between Vancouver and San Francisco—both journeys are long, and the difference is usually just a few hundred dollars. Thus, the cost of bringing witnesses to trial does not favor dismissal.

***The Enforceability of Any Judgment Rendered in Canada.*** It would be straightforward to enforce any money judgment issued in this forum against Defendants, who have assets in this District. But so far as is known, none of the Defendants has any assets in British Columbia. Thus, a British Columbian court could not exercise any authority over OpenAI assets for the purposes of satisfying any judgment. Kaardal Decl. ¶ 28.

In the main, a Canadian judgment may be enforced in a California court except to the extent it represents a "fine or other penalty." Cal. Civ. Proc. Code § 1715(b)(2). But suppose a Canadian court awarded punitive damages. It is an open question whether that portion of any judgment could be enforced here. The leading California case on the issue, *Java Oil Ltd. v. Sullivan*, 168 Cal. App. 4th 1178 (2008), says both that "treble damages [and] double damages" are "considered penalties," *id.* at 1187–88, and relies on a decision holding that "a 'penalty' includes any law compelling a defendant to pay a plaintiff other than what is necessary to compensate him for a legal damage done him by the former," *Miller v. Mun. Ct. of City of Los Angeles*, 22 Cal. 2d 818, 837 (1943), *and* that judgments awarding "multiple, punitive, or

exemplary damages . . . are not considered penal," *Java Oil*, 168 Cal. App. 4th at 1188. Case law sets forth a number of factors for determining whether a foreign punitive damages award is penal, which cut in different directions. *See de Fontbrune v. Wofsy*, 838 F.3d 992, 1001–02 (9th Cir. 2016) (discussing relevant factors, such as whether the judgment is compensatory or intended to make an example of the wrongdoer, and whether the judgment is paid to an individual or the government, observing that "the same factors may point in differing directions").

A dismissal in favor of litigation in British Columbia therefore opens up serious questions about the ability of the Individual Plaintiffs to enforce any judgment. This factor therefore counsels against dismissal. *See King.com, Ltd. v. 6 Waves LLC*, No. C-13-3977 MMC, 2014 WL 1340574, at *7–8 (N.D. Cal. Mar. 31, 2014) (concluding that doubts about ability to enforce Chinese judgment in United States weighed against dismissal).[4]

***Other Practical Problems.*** Last, as Defendants essentially concede, any issues that arise here do so because of the cross-border nature of this dispute. These issues are not resolved by moving the litigation to Canada—instead, they are magnified given the wealth of information available in the United States. And all of the major Canadian players (the victims of gunshot wounds, the surviving families of those who were murdered, the bystanders who were witnesses to serious gun violence, and the government agencies who responded to the tragedy) recognize that this District is an appropriate forum in which to hold Defendants responsible for their conduct.

Thus, the private interest factors do not favor dismissal.

## IV. The Public Interest Factors

Finally, the public interest factors do not counsel in favor of dismissal. The public factors related to the interests of the forums include: "(1) the local interest in the lawsuit, (2) the court's familiarity with the governing law, (3) the burden on local courts and juries, (4) congestion in the

---

[4] Defendants may well seek to neutralize this factor by offering to satisfy any judgment rendered in British Columbia. But as explained elsewhere, discovery proceeds into the knowledge and actions of other Bay Area companies. In the event the Individual Plaintiffs determine that there is cause to bring claims against these other companies, Defendants cannot guarantee that other potential defendants either have assets in British Columbia or would offer to satisfy any British Columbian judgment.

court, and (5) the costs of resolving a dispute unrelated to a particular forum." *Boston Telecomms.*, 588 F.3d at 1211 (citation omitted).

***Local Interest in the Lawsuit.*** Defendants make much of the fact that British Columbia has a strong interest in ensuring that OpenAI is held responsible for how it assisted Van Rootselaar to commit such a serious crime, pointing to the coroner's inquest, and recent administrative proceedings by the Province's Privacy Commissioner. Neither of these proceedings has any apparent relevance here. The inquest does not have any relevance to a civil proceeding—it has no bearing on what evidence the parties can seek, and no relevance to the ultimate outcome of any civil lawsuit. Kaardal Decl. ¶¶ 25–27. And the Privacy Commissioner's investigation proceeds under a statute that is not implicated at all by the claims in this case.

And by filing in this forum, the government of British Columbia has made clear that it views this District as an appropriate place to seek justice, broadly undermining Defendants' argument. Further, in the investigation of the individual who allegedly provided Van Rootselaar material support from their home in Bellingham, Washington, the Canadian government apparently agreed that the prosecution should go forward in the United States, even to the point of permitting the United States government to reveal previously confidential details about the crime in its charging document. Silverkorn Decl., Ex. 7. Each of these are strong signs that Canada itself does not view litigation in the United States to be corrosive of its interests in seeking justice for the victims of the Tumber Ridge massacre.[5]

Moreover, under the aegis of the local-interest factor, courts "ask only if there is an identifiable local interest in the controversy, not whether another forum also has an interest." *Tuazon*, 433 F.3d at 1182. There plainly are identifiable local interests here. For one thing, "California courts have repeatedly recognized the state's 'interest in deciding actions against resident corporations whose conduct in this state causes injury to persons in other jurisdictions.'"

---

[5] Defendants also cite the Canadian parliament's current consideration of a bill to address perceived harms stemming principally from social media use among teens, which also would cover harms from AI chatbots. Mot. at 21. But that citation counsels *against* dismissal: It makes clear that there is not some fleshed out system of regulation in Canada that would apply here, and which domestic litigation would undermine.

*Carijano*, 643 F.3d at 1232–33 (quoting *Stangvik v. Shiley Inc.*, 54 Cal. 3d 744, 756 n.10 (1991)). Defendants decry this interest as "generic," but the case law describes California's interest in policing the conduct of its corporate citizens as "significant," *see, e.g.*, *id*. at 1232 ("the district court undervalued California's significant interest in providing a forum for those harmed by the actions of its corporate citizens"), "meaningful," *Boston Telecomms.*, 588 F.3d at 1212 (holding that California was appropriate forum for case alleging multi-national course of fraud perpetrated by several actors including one headquartered in San Francisco), or "substantial," *Ravelo Monegro*, 211 F.3d at 514 (holding that California was appropriate forum for claims by Dominican plaintiffs against San Francisco Giants based on allegations of misconduct by their agent in the Dominican Republic).

For another, California retains a particular interest here. The California connection to this case does not rest exclusively on product design decisions made and executed in California. Instead, one key component of Defendants' liability is that OpenAI decisionmakers reviewed Van Rootselaar's account and elected to conceal what they knew about Van Rootselaar's dangerousness. Nearly all of this work was carried out by individuals in this forum. Moreover, there is no indication that this decision was made by reference to any kind of British Columbian standard of care but was instead made pursuant to a California-developed policy, and intended to obscure the ways in which ChatGPT was "exacerbating the threat environment," and in aid of OpenAI's pursuit of continued growth. Compl. ¶¶ 143–48.

Moreover, as Van Rootselaar was using ChatGPT [redacted], OpenAI was in active negotiations with the California attorney general regarding its transition to a for-profit company. And, in fact, several months prior to the shooting, OpenAI made several pledges regarding safety on its platform, including a commitment to make safety decisions in consideration only of the public-benefit "mission" of the corporation, and not the pecuniary interests of the shareholders, *and* to mitigate risks to teens. Silverkorn Decl., Ex. 14.

In other words, this case is not merely about a product designed in and released from California, and how it assisted and encouraged a troubled individual to cause serious harm. It is also about the decision of California-based employees and executives, when faced with hard

evidence of the potential harm, not to intervene, decisions that the State already has expressed keen interest in. That is, this is not a localized controversy of exclusive interest to British Columbia. This is a cross-jurisdictional controversy with deep roots in California.

***Familiarity with Governing Law.*** Next, the Court's familiarity with the governing law does not come close to justifying dismissal.

California's three-part governmental interest test will govern the choice-of-law inquiry here. At the first step, the proponent of foreign law must show that there is a material difference between foreign law and forum law; absent a material difference, the law of the forum governs. *See Hurtado v. Superior Ct.*, 11 Cal. 3d 574, 581 (1974). Second, if there is a difference, the court examines each jurisdiction's interest in the application of its own law given the circumstances of the dispute. If only one jurisdiction has an interest in applying its own law, then the law of the jurisdiction will furnish the rule of decision. *See id.* at 580. Third, assuming that both jurisdictions have a true interest in the application of their law, the court determines which jurisdiction's interests would be comparatively more impaired if its policies were subordinated to the other jurisdiction. *See McCann v. Foster Wheeler LLC*, 48 Cal. 4th 68, 88 (2010). "[A] separate conflict of laws inquiry must be made with respect to each issue in the case." *Wash. Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906, 920 (2001).

The principal issues here, which sound in negligence, are not likely to be burdened even by a first-stage conflict. First, the articulation of the basic negligence standard is identical. *Compare Gilead Tenofovir Cases*, 98 Cal. App. 5th 911, 920 (2024) (duty, breach, cause, injury), *with Mustapha v. Culligan of Can. Ltd.*, 2008 SCC 27, ¶ 3 (Can.) (same). Both jurisdictions apply similar causation rules, searching both for causation in fact (i.e., but for causation) and in law. Both jurisdictions impose outer limits on a tortfeasor's responsibility based primarily on the notion of what injuries are foreseeable. *See Ortiz v. Daimler Truck N. Am. LLC*, 112 Cal. App. 5th 608, 620 (2025) ("A central consideration in evaluating proximate cause is foreseeability."); *Mustapha*, 2008 SCC 27, ¶ 12 ("the principle has been that it is the foresight of the reasonable man which alone can determine responsibility") (cleaned up).

For those issues that do present a first-stage conflict, an interests analysis likely counsels in favor of application of California law. Canada's interest in this dispute largely concerns ensuring that its citizens can redress their injuries, and that OpenAI is held accountable. Neither of these goals is impaired by conducting this trial under California law. Canada also has, as a matter of policy, judicially implemented some liability-limiting rules that do not exist in California, but it has little interest in applying these rules to the out-of-state defendants here. *See Scott v. Ford Motor Co.*, 224 Cal. App. 4th 1492, 1506 (2014) ("While Michigan has a strong interest in seeing its view of the appropriate policy carried out in its own courts, it has a correspondingly minimal interest in seeing the same policy implemented in the courts of California."); *see also, e.g.*, *Baird v. Bell Helicopter Textron*, 491 F. Supp. 1129, 1151 (N.D. Tex. 1980) (observing that Canada's cap on the recovery of non-pecuniary damages "exhibited a policy of protecting its domiciliary defendants from excessive liability" and that Canada had separately "shown a desire to see that its injured plaintiffs are adequately cared for and able to live as tolerably as possible under the circumstances"). And California, by contrast, *does* have an interest in holding its own corporate citizens accountable for wrongdoing. *See Stangvik*, 54 Cal. 3d at 756 n.10 (articulating "California's interest in deciding actions against resident corporations whose conduct in this state causes injury to persons in other jurisdictions").

The recent case of *Jackson v. Tesla, Inc.*, 772 F. Supp. 3d 1111 (N.D. Cal. 2025), is instructive. In *Jackson*, a Maryland resident was injured in Maryland when a Tesla sedan, designed, manufactured, and updated in and from California, unexpectedly accelerated without input from the driver and pinned the woman between two cars. *Id.* at 1114. The court found that there were material differences between California and Maryland products liability law. The court reasoned that California had "a strong interest in regulating the conduct of manufacturers who produce products in this state which cause injury to persons in other jurisdictions" and "in regulating home-state manufacturers in order to deter negligent conduct; the likelihood of a substantial recovery . . . strengthens the deterrent effect." *Id.* at 1125 (discussing *Stangvik*, 54 Cal. 3d at 759) (ellipsis in original) (quotation omitted). Although Maryland also had some interest in the application of its law, the court reasoned that Maryland's interests were based only on the fact

that the accident occurred in Maryland, when it just as easily might have occurred elsewhere; California, by contrast, would be interested in holding the defendant liable wherever the accident occurred. *Id.* at 1128–29; *see also In re Paris Air Crash of Mar. 3, 1974*, 399 F. Supp. 732, 740 (C.D. Cal. 1975) ("[I]f the wrong is in defective design or manufacture, it occurred at the time and in the place of design and manufacture; the place where it came to fruition is purely fortuitous"). The court also observed that application of California's products liability rules would further Maryland's interests in protecting its own residents. *Jackson*, 772 F. Supp. 3d at 1129; *see also Hurtado*, 11 Cal. 3d at 580–81 (1974) (observing that limits on damages for wrongful death are intended to "protect [a state's] residents from the imposition of . . . excessive financial burdens," not to "reflect a preference that widows and orphans should be denied full recovery" and holding that California damages rules would apply to wrongful death action because "Mexico has no defendant residents to protect and has no interest in denying full recovery to its residents injured by non[-]Mexican defendants"). Meanwhile, conducting the trial in British Columbia *would* substantially impair Californian interests. The deterrent effect provided by Canadian law is weaker, particularly given that some plaintiffs would be effectively denied any remedy. (*See supra* Part I.) And a trial in Canada would also impair California's interest in holding its own corporate citizens liable for acts that occur in California.

Thus, it appears likely that most choice-of-law issues will resolve in favor of forum law, with which the Court is intimately familiar. If certain aspects of the case do favor the application of British Columbian law, though, the Court is well-equipped to handle these issues, as the basic substance of the two bodies of law do not differ greatly. Nor would it be an imposition to put issues to be decided under Canadian law before the jury. "Juries routinely address subjects that are totally foreign to them." *Tuazon*, 433 F.3d at 1181. Thus, this factor does not favor dismissal.

***Burden on Local Courts***. The burden on local courts likewise does not favor dismissal.

Defendants recite that this District sees many filings. But congestion in this District does not outweigh the issues faced by the B.C. Courts. As explained above, no judges sit permanently at the only courthouses within hours of Tumbler Ridge. Instead, judges rotate through, and priority of hearing is given to family and criminal law matters. Matters are scheduled by an "assize list,"

and parties must be ready to present their case whenever an opening arises. But civil trials such as this are routinely postponed so that criminal and family matters can be heard during the weeks when a judge rotates to sit at these courthouses. It is not even reasonably possible to determine when a trial of this case would occur at one of these courthouses. As of November 2, 2026, there were no open dates for a trial of this length. Kaardal Decl. ¶ 8.

Vancouver does not present much better options. As of November 2, 2026, there was one available trial date in a Vancouver-area court in 2028. *Id.* And while Vancouver at least has permanent judges, trials often are scheduled without an assigned judge and then postponed when no judge is available to preside over the trial. Moreover, difficulties in scheduling hearings on routine motions will also delay when trial can occur. *Id.* ¶ 11–17.

Indeed, the courts of British Columbia face many of the same issues faced by the courts of this District. That court system's own 2025 Annual Report identified a lack of judges and funding as contributing to severe delays, and barriers to access. Silverkorn Decl., Ex. 15. Thus, these trials would substantially burden the courts of British Columbia. Thus, at best for Defendants, this factor is neutral. *Carijano*, 643 F.3d at 1233 (deeming this factor neutral where "both Peruvian courts and the Central District have similarly crowded dockets"); *Cooper v. Tokyo Elec. Power Co.*, 860 F.3d 1193, 1211 (9th Cir. 2017) (finding this factor weighed against dismissal where "th[e] litigation would be burdensome to either country's courts").

***Costs of Resolving a Dispute Unrelated to the Forum.*** Because, as explained above, this dispute is intimately related to the forum, there are no costs unrelated to the forum that would justify dismissing this action. *See Tuazon*, 433 F.3d at 1182.

Thus, the public interest factors favor trial in California.

**CONCLUSION**

This is not a case in which Defendants can contend that ChatGPT conveyed to Van Rootselaar only information she could have gleaned herself from publicly available sources. Instead, [redacted]

Even worse, OpenAI had all of this information at its fingertips—[redacted] No doubt Jesse Van Rootselaar's unstable mind will play a role in the trial here, as will the actions of James Cody Bryant, and perhaps of Roblox or other companies. But the pivotal questions will revolve around OpenAI's conduct in designing and programming ChatGPT, and in concealing what it knew about the threat posed by Van Rootselaar. These issues are of deep concern to California, which has a meaningful interest in policing the conduct of its corporate citizens, and to whom OpenAI has made specific commitments about safety. And they will be answered by evidence that is largely found in California, only some of which is in the custody and control of OpenAI, and which is more efficiently produced here, in this forum. The motion to dismiss for forum non conveniens should be denied.

Respectfully submitted,

**INDIVIDUAL PLAINTIFFS,**

Dated: November 5, 2026

By: */s/ Rafey Balabanian*

Rafey Balabanian (SBN 315962)
rbalabanian@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370

Brandt Silverkorn (SBN 323530)
bsilverkorn@edelson.com
Aaron Lawson (SBN 319306)
alawson@edelson.com
EDELSON PC
150 California Street, 18th Floor
San Francisco, California 94111
Tel: 415.212.9300

*Attorneys for Individual Plaintiffs*