JONATHAN H. BLAVIN (State Bar No. 230269)
jonathan.blavin@mto.com
STEPHANIE G. HERRERA (State Bar No. 313887)
stephanie.herrera@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

BETHANY W. KRISTOVICH (State Bar No. 241891)
bethany.kristovich@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, Fiftieth Floor
Los Angeles, California 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Attorneys for Defendants
OpenAI Foundation, OpenAI OpCo, LLC,
OpenAI Group PBC, OpenAI Holdings, LLC,
and Samuel Altman

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE TUMBLER RIDGE SHOOTING | Lead Case No. 3:26-cv-03701-JSC<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM UNDER RULE 12(b)(6); MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Date: February 11, 2027<br>Time: 10:00 a.m.<br>Judge: Hon. Jacqueline S. Corley<br>Crtrm.: 8th (19th Floor)<br><br>[Filed concurrently: Decl. of V. Roman Leal; (Proposed) Order] |
| This Document Relates To: All Related Actions | |

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION TO DISMISS UNDER RULE 12(B)(6) .......... 1

I. INTRODUCTION .......... 1

II. BACKGROUND .......... 3

A. Plaintiffs' Claims .......... 3

B. Van Rootselaar's Use of ChatGPT .......... 4

C. Van Rootselaar's ChatGPT Account Is Reviewed and Deactivated .......... 7

D. Eight Months Later, Van Rootselaar Commits a Horrific Shooting .......... 9

III. LEGAL STANDARDS .......... 10

IV. ARGUMENT .......... 11

A. Choice of Law .......... 11

B. Plaintiffs Do Not Allege a Tort Duty to Warn Under California Law (Claim 1) .......... 12

*1. There Is No General Duty to Warn About Third-Party Conduct* .......... 12

*2. The Narrow* Tarasoff *Exception Is Limited to Psychotherapists and Doctors* .......... 13

*3. Even a Psychotherapist Would Not Have Had a Tort Duty to Warn Plaintiffs* .......... 16

C. Plaintiffs Do Not State a Misfeasance Claim Under California Law (Individual Plaintiffs' Claims 4, 6; B.C. Government Plaintiffs' Claim 5) .......... 17

D. Plaintiffs Do Not Allege Aiding and Abetting Under California Law (Claim 3) .......... 20

E. Plaintiffs Do Not Allege Causation as a Matter of California Law (All Claims) .......... 23

F. Plaintiffs' Miscellaneous State-Law Claims Fail Under California Law .......... 27

*1. The Negligent Entrustment Claim Fails as a Matter of Law (Claim 2)* .......... 27

*2. The Negligent Undertaking Claim Fails as a Matter of Law (Individual Plaintiffs' Claim 5; B.C. Government Plaintiffs' Claim 4)* .......... 28

3. *Plaintiffs Do Not Allege Cognizable Product Liability Claims (Individual Plaintiffs' Claims 7, 8; B.C. Government Plaintiffs' Claims 6, 7)* ........ 30

4. *The NIED Claim Fails (Claim 9 in Certain Individual Plaintiffs' Complaints)* ........ 33

G. The Wrongful Death and Survivor Action Claims Fail (Claims 9, 10 in Certain Individual Plaintiffs' Complaints) ........ 34

H. The British Columbia Government Plaintiffs Cannot Recover Any Damages ........ 34

1. *The Economic Loss Rule Bars the Damages Sought* ........ 34

2. *The Municipal Cost Recovery Rule Bars the Damages Sought* ........ 36

3. *The Remaining Forms of Relief Cannot Sustain the British Columbia Government Plaintiffs' Claims* ........ 37

I. The Doctrine of Constitutional Avoidance Supports Dismissal ........ 37

V. CONCLUSION ........ 42

# TABLE OF AUTHORITIES

**Page**

**FEDERAL CASES**

*Am. Amusement Mach. Ass'n v. Kendrick*,
244 F.3d 572 (7th Cir. 2001) ........................................ 40, 41

*Anderson v. City of Hermosa Beach*,
621 F.3d 1051 (9th Cir. 2010) ........................................ 38, 39

*Arno v. Club Med Inc.*,
22 F.3d 1464 (9th Cir. 1994) ........................................ 11

*Ashcroft v. Free Speech Coal.*,
535 U.S. 234 (2002) ........................................ 40

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........................................ 10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................ 11, 17, 25

*Brandenburg v. Ohio*,
395 U.S. 444 (1969) ........................................ 40

*Bridge Fund Cap. Corp. v. Fastbucks Franchise Corp.*,
622 F.3d 996 (9th Cir. 2010) ........................................ 11

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011) ........................................ 40, 41

*Camenisch v. Umpqua Bank*,
No. 20-CV-05905-RS, 2022 WL 17740285 (N.D. Cal. Dec. 16, 2022) ........................................ 21

*Castaldo v. Stone*,
192 F. Supp. 2d 1124 (D. Colo. 2001) ........................................ 25

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ........................................ 37

*Counterman v. Colorado*,
600 U.S. 66 (2023) ........................................ 40

*Courtright v. Epic Games, Inc.*,
795 F. Supp. 3d 1156 (W.D. Mo. 2025) ........................................ 41

*D'Ambrosio v. Rajala*,
783 F. Supp. 3d 1077 (N.D. Ill. 2025) ........................................ 27

*Doe v. Uber Techs., Inc.*,
No. 22-16562, 2025 WL 80365 (9th Cir. Jan. 13, 2025) .... 17

*Dyroff v. Ultimate Software Grp., Inc.*,
934 F.3d 1093 (9th Cir. 2019) .... 12

*Est. of B.H. v. Netflix, Inc.*,
No. 4:21-cv-06561-YGR, 2022 WL 551701 (N.D. Cal. Jan. 12, 2022) .... 20, 31, 32

*In re First All. Mortg. Co.*,
471 F.3d 977 (9th Cir. 2006) .... 21

*Garcia v. Character Techs., Inc.*,
785 F. Supp. 3d 1157 (M.D. Fla. 2025) .... 32, 39, 40

*Gen. Signal Corp. v. MCI Telecomms. Corp.*,
66 F.3d 1500 (9th Cir. 1995) .... 12

*In re Grand Jury Subpoena*,
875 F.3d 1179 (9th Cir. 2017) .... 39

*Hough v. Carroll*,
No. 2:24-CV-02886-WLH-SK, 2025 WL 1674425 (C.D. Cal. May 5, 2025) .... 21

*Hughes v. Apple, Inc.*,
No. 22-cv-07668-VC, 2024 WL 4828072 (N.D. Cal. Nov. 18, 2024) .... 30

*Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*,
12 F. Supp. 2d 1035 (C.D. Cal. 1998) .... 41

*Jackson v. Airbnb, Inc.*,
639 F. Supp. 3d 994 (C.D. Cal. 2022) .... 29

*James v. Meow Media, Inc.*,
300 F.3d 683 (6th Cir. 2002) .... 24, 31, 37, 38

*Jensen v. U.S. Tennis Ass'n*,
No. 23-15757, 2025 WL 707447 (9th Cir. Mar. 5, 2025) .... 11, 15, 19

*Keahole Point Fish LLC v. Skretting Can. Inc.*,
971 F. Supp. 2d 1017 (D. Haw. 2013) .... 35

*Kennedy v. Bank of Am., N.A.*,
No. 12-CV-952 YGR, 2012 WL 1458196 (N.D. Cal. Apr. 26, 2012) .... 30

*Kleindienst v. Mandel*,
408 U.S. 753 (1972) .... 39

*Lamont v. Postmaster Gen. of U.S.*,
381 U.S. 301 (1965) .... 39

*In re Lyondell Chem. Co.*,
567 B.R. 55 (Bankr. S.D.N.Y. 2017) .......... 11, 37

*Matsumoto v. Labrador*,
122 F.4th 787 (9th Cir. 2024) .......... 40

*McFall v. Stacy & Witbeck, Inc.*,
No. 14-CV-04150-JSC, 2016 WL 6248882 (N.D. Cal. Oct. 26, 2016) .......... 21

*McLaughlin v. Tesla, Inc.*,
No. 22-CV-07849-SVK, 2024 WL 4178676 (N.D. Cal. Sept. 11, 2024) .......... 30

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .......... 39

*NetChoice, LLC v. Bonta*,
113 F.4th 1101 (9th Cir. 2024) .......... 38

*Olvera v. Shafer*,
No. 214CV01298GMNNJK, 2016 WL 1384785 (D. Nev. Apr. 7, 2016) .......... 28

*Perez v. Mortg. Elec. Registration Sys., Inc.*,
959 F.3d 334 (9th Cir. 2020) .......... 11

*Petters Co. Inc. v. BLS Sales Inc.*,
No. C 04-02160 CRB, 2005 WL 2072109 (N.D. Cal. Aug. 26, 2005) .......... 12

*Phillips v. Lucky Gunner, LLC*,
84 F. Supp. 3d 1216 (D. Colo. 2015) .......... 25

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*,
413 U.S. 376 (1973) .......... 41

*Project Veritas v. Schmidt*,
125 F.4th 929 (9th Cir. 2025) .......... 39

*Red Lion Broad. Co. v. FCC*,
395 U.S. 367 (1969) .......... 39

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.*,
442 F.3d 741 (9th Cir. 2006) .......... 10

*S. A. Empresa De Viacao Aerea Rio Grandense v. Boeing Co.*,
641 F.2d 746 (9th Cir. 1981) .......... 11

*Sanders v. Acclaim Ent., Inc.*,
188 F. Supp. 2d 1264 (D. Colo. 2002) .......... 24, 38

*Snyder v. Phelps*,
562 U.S. 443 (2011) .......... 38

*In re Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809 (N.D. Cal. 2023) ....................31, 32

*Somers v. Apple, Inc.*, 729 F.3d 953 (9th Cir. 2013) ....................10, 17, 25

*Sprewell v. Golden State Warriors*, 266 F.3d 979 (9th Cir. 2001) .................... 7

*Stanley v. Georgia*, 394 U.S. 557 (1969) .................... 39

*Steinle v. City & Cnty. of San Francisco*, 919 F.3d 1154 (9th Cir. 2019) .................... 4

*Steinle v. United States*, 17 F.4th 819 (9th Cir. 2021) .................... 25

*SVB Fin. Tr. v. Fed. Deposit Ins. Corp.*, No. 5:24-CV-01321-BLF, 2026 WL 2547402 (N.D. Cal. Aug. 28, 2026) .................... 21

*Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) .................... 23

*In re Uber Techs., Inc., Passenger Sexual Assault Litig.*, 745 F. Supp. 3d 869 (N.D. Cal. 2024) .................... 33

*United States v. Al-Timimi*, 164 F.4th 292 (4th Cir. 2026) .................... 40

*United States v. Bryant*, No. 2:26-mj-00618 (W.D. Wash., filed Oct. 2, 2026) .................... 10

*United States v. Hansen*, 599 U.S. 762 (2023) .................... 40

*Van Hook v. Curry*, No. C 06-3148 PJH (PR), 2009 WL 773361 (N.D. Cal. Mar. 23, 2009) .................... 7

*Vocational Bike Rentals LLC v. Kitzuma Corp.*, No. 2:24-CV-07105-CAS-MAAx, 2026 WL 42589 (C.D. Cal. Jan. 6, 2026) .................... 27

*Watters v. TSR, Inc.*, 715 F. Supp. 819 (W.D. Ky. 1989) ....................38, 39

*Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167 (D. Conn. 2002) ....................31, 32

*Winter v. G.P. Putnam's Sons*, 938 F.3d 1033 (9th Cir. 1991) .................... 31

*Yniguez v. Arizonans for Off. Eng.*,
69 F.3d 920 (9th Cir. 1995) ........ 39

*Zamora v. Columbia Broad. Sys.*,
480 F. Supp. 199 (S.D. Fla. 1979) ........ 20, 38, 39

*Ziencik v. Snap, Inc.*,
No. CV 21-7292-DMG (PDX), 2023 WL 2638314 (C.D. Cal. Feb. 3, 2023) ........ 31

**STATE CASES**

*7735 Hollywood Blvd. Venture v. Superior Ct.*,
116 Cal. App. 3d 901 (1981) ........ 19

*Arthur Andersen LLP v. Superior Ct.*,
67 Cal. App. 4th 1481 (1998) ........ 16

*Barenborg v. Sigma Alpha Epsilon Fraternity*,
33 Cal. App. 5th 70 (2019) ........ 29

*Berkley v. Dowds*,
152 Cal. App. 4th 518 (2007) ........ 37

*Bom v. Superior Court*,
44 Cal. App. 5th 1 (2020) ........ 14

*Brown v. USA Taekwondo*,
11 Cal. 5th 204 (2021) ........ 28

*Burgess v. Superior Ct.*,
2 Cal. 4th 1064 (1992) ........ 33

*Casey v. U.S. Bank Nat'l Ass'n*,
127 Cal. App. 4th 1138 (2005) ........ 21

*Chen v. PayPal, Inc.*,
61 Cal. App. 5th 559 (2021) ........ 21

*Cnty. of San Luis Obispo v. Abalone All.*,
178 Cal. App. 3d 848 (1986) ........ 36

*Davidson v. City of Westminster*,
32 Cal. 3d 197 (1982) ........ 12

*Delgado v. Trax Bar & Grill*,
36 Cal. 4th 224 (2005) ........ 28, 29

*Dodge Ctr. v. Superior Ct.*,
199 Cal. App. 3d 332 (1988) ........ 27

*Downey v. City of Riverside*,
16 Cal. 5th 539 (2024)........................................................................................................ 33

*Fox Paine & Co., LLC v. Twin City Fire Ins. Co.*,
104 Cal. App. 5th 1034 (2024) ........................................................................................... 21

*George v. eBay, Inc.*,
71 Cal. App. 5th 620 (2021) ........................................................................................21, 23

*Golick v. California*,
82 Cal. App. 5th 1127 (2022) ............................................................................................ 18

*Hanouchian v. Steele*,
51 Cal. App. 5th 99 (2020)................................................................................................. 29

*Hansra v. Superior Ct.*,
7 Cal. App. 4th 630 (1992)..........................................................................................18, 20

*Hedlund v. Superior Ct.*,
34 Cal. 3d 695 (1983)...................................................................................................13, 14

*IIG Wireless, Inc. v. Yi*,
22 Cal. App. 5th 630 (2018) ............................................................................................. 21

*Intel Corp. v. Hamidi*,
30 Cal. 4th 1342 (2003)...................................................................................................... 37

*Ito v. Google*,
No. 24PSCV00061, 2024 WL 7035832 (Cal. Super. Ct. May 1, 2024) ................................ 30

*Jacobs v. Meta Platforms, Inc.*,
No. 22CV005233, 2023 WL 2655586 (Cal. Super. Ct. Mar. 10, 2023) ................................ 30

*Jacoves v. United Merch. Corp.*,
9 Cal. App. 4th 88 (1992)................................................................................................... 27

*Jimenez v. Superior Ct.*,
29 Cal. 4th 473 (2002)........................................................................................................ 34

*Kane v. Hartford Accident & Indem. Co.*,
98 Cal. App. 3d 350 (1979) ........................................................................................23, 24

*Koepke v. Loo*,
18 Cal. App. 4th 1444 (1993) ......................................................................................14, 15

*Kuciemba v. Victory Woodworks, Inc.*,
14 Cal. 5th 993 (2023)........................................................................................................ 20

*Landeros v. Flood*,
17 Cal. 3d 399 (1976)......................................................................................................... 25

*Long v. PKS, Inc.*,
12 Cal. App. 4th 1293 (1993) ........ 33

*Lopez v. McDonald's Corp.*,
193 Cal. App. 3d 495 (1987) ........ 24

*Lugtu v. Cal. Highway Patrol*,
26 Cal. 4th 703 (2001) ........ 17

*Mata v. Meta Platforms, Inc.*,
No. 24SMCV02494 (L.A. Super. Ct.) ........ 19, 23

*Mavroudis v. Superior Ct.*,
102 Cal. App. 3d 594 (1980) ........ 16

*McCollum v. CBS, Inc.*,
202 Cal. App. 3d 989 (1988) ........ 20, 38, 39

*McDowell v. County of Alameda*,
88 Cal. App. 3d 321 (1979) ........ 16, 17

*Modisette v. Apple Inc.*,
30 Cal. App. 5th 136 (2018) ........ 24, 25, 26

*Nally v. Grace Cmty. Church*,
47 Cal. 3d 278 (1988) ........ 14

*O'Neil v. Crane Co.*,
53 Cal. 4th 335 (2012) ........ 31

*Oh v. Tchrs. Ins. & Annuity Ass'n of Am.*,
53 Cal. App. 5th 71 (2020) ........ 34

*Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.*,
73 Ohio St. 3d 609 (1995) ........ 35

*Ra v. Superior Ct.*,
154 Cal. App. 4th 142 (2007) ........ 33

*Regents of Univ. of Cal. v. Superior Ct.*,
4 Cal. 5th 607 (2018) ........ 12, 15

*Rice v. Ctr. Point, Inc.*,
154 Cal. App. 4th 949 (2007) ........ 16

*S. Cal. Gas Leak Cases*,
7 Cal. 5th 391 (2019) ........ 34, 35

*Sacramento Mun. Util. Dist. v. Kwan*,
101 Cal. App. 5th 808 (2024) ........ 21

*Scherr v. Hilton Hotels Corp.*,
168 Cal. App. 3d 908 (1985) .......... 33

*Shamgochian v. Bank of Am., N.A.*,
No. F064231/F064480, 2013 WL 1098256 (Cal. Ct. App. Mar. 18, 2013) .......... 21, 22

*Sheen v. Wells Fargo Bank, N.A.*,
12 Cal. 5th 905 (2022) .......... 34

*Social Media Cases*,
No. B340661, -- Cal. Rptr. 3d --, 2026 WL 3347173 (Cal. Ct. App. 2026) .......... 35, 36

*Social Media Cases*,
No. 22STCV21355, 2023 WL 6847378 (Cal. Super. Oct. 13, 2023) .......... 31

*Tarasoff v. Regents of the Univ. of Cal.*,
17 Cal. 3d 425 (1976) .......... *passim*

*Thing v. La Chusa*,
48 Cal. 3d 644 (1989) .......... 33

*Thompson v. County of Alameda*,
27 Cal. 3d 741 (1980) .......... 16

*Univ. of S. Cal. v. Superior Ct.*,
30 Cal. App. 5th 429 (2018) .......... 28, 29

*Wash. Mut. Bank, FA v. Superior Ct.*,
24 Cal. 4th 906 (2001) .......... 11

*Wise v. Superior Court*,
222 Cal. App. 3d 1008 (1990) .......... 12, 18, 28

*Zelig v. County of Los Angeles*,
27 Cal. 4th 1112 (2002) .......... 26

**CANADIAN CASES**

*1688782 Ontario Inc. v. Maple Leaf Foods Inc.*,
2020 SCC 35 (2020) .......... 34

*British Columbia v. McKinsey & Co., Inc. United States*;
Vancouver Registry No. S-2111367 (B.C.S.C.) .......... 36

*Ding v. Prévost (A Division of Volvo Group Canada Inc.)*,
2022 BCSC 215 (2022) .......... 30

*Harrington v. Dow Corning Corp.*,
2000 BCCA 605 (2000) .......... 30

*Kosicki v. Toronto (City)*, 2025 SCC 28 (2025)........................................................................................ 16

*Thomas & Saik'uz First Nation v. Rio Tinto Alcan Inc.*, 2022 BCSC 15 (2022)........................................................................................ 37

**STATE STATUTES AND LEGISLATIVE MATERIALS**

A.B. 988, 2025–2026 Reg. Sess. § 3 (Cal. 2026)........................................................................ 15

Cal. Bus. & Prof. Code § 22587.2........................................................................................ 15

Cal. Civ. Code § 43.92........................................................................................ 14

Cal. Evid. Code § 1010........................................................................................ 14

**CANADIAN STATUTES AND LEGISLATIVE MATERIALS**

*Opioid Damages and Health Care Costs Recovery Act*, S.B.C. 2018, c 35 .................................. 36

*Safe Social Media Act*, Bill C-34, 45th Parl., 1st Sess. § 52 (Can. 2026)...................................... 15

*Tobacco Damages and Health Care Costs Recovery Act*, S.B.C. 2000, c 30; ............................. 30

*Vaping Product Damages and Health Care Costs Recovery Act*, S.B.C. 2025, c 29. .................. 36

**TREATISES**

Restatement (Second) of Torts § 390........................................................................................ 27

Restatement (Third) of Torts: Prods. Liab. § 19 ........................................................................ 30

Restatement (Third) of Torts § 41 ........................................................................................ 14

**OTHER AUTHORITIES**

*Chattel*, Black's Law Dictionary (12th ed. 2024) ........................................................................ 27

CACI 503A........................................................................................14, 16, 17

CACI 507 ........................................................................................14, 15

**NOTICE OF MOTION AND MOTION TO DISMISS UNDER RULE 12(b)(6)**

PLEASE TAKE NOTICE that on February 11, 2027, at 10:00 a.m., or as soon thereafter as the matter may be heard, Defendants OpenAI Foundation, OpenAI OpCo, LLC, OpenAI Group PBC, OpenAI Holdings, LLC, and Samuel Altman (collectively, "Defendants" or "OpenAI") will and hereby do move to dismiss these related actions ("Complaints") for failure to state a claim on which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). This Motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; all pleadings on file in this matter; and such argument as the Court may consider in connection with briefing and argument on this Motion.

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

The shooting at Tumbler Ridge Secondary School was a senseless act of violence by Jesse Van Rootselaar. OpenAI has the utmost sympathy for Van Rootselaar's victims, their families, and the entire community, and takes the allegations in these lawsuits seriously. OpenAI has led the industry in implementing voluntary safety measures to identify potential warning signals of serious violence in user conversations. Those efforts led to the detection and deactivation of Van Rootselaar's account eight months before the shooting. Plaintiffs allege that OpenAI should have taken additional steps, including warning law enforcement about Van Rootselaar and detecting a second account Van Rootselaar started using after her account was deactivated. In the aftermath of such a tragedy, it is understandable to examine what might have been done differently and how similar tragedies might be prevented in the future. This Motion, however, presents the narrow question of whether Plaintiffs' allegations state a legal claim for holding OpenAI responsible for Van Rootselaar's criminal acts. Under established California and British Columbia law, they do not.

Plaintiffs' main theory is that OpenAI should have the same special duty to warn as a psychotherapist whose patient makes a serious threat against a readily identifiable person. That special duty is an exception to the general rule under California law that there is no duty to prevent a third party's violent act. No authority supports extending the narrow psychotherapist exception

to the operator of an AI service. California courts repeatedly have rejected attempts to expand that duty to non-psychotherapists, and the California legislature has confirmed the duty's narrow scope. The Court should decline to expand a state-law duty that California has chosen to limit. Plaintiffs' failure-to-warn claims should be dismissed.

Plaintiffs' alternative theory is that OpenAI affirmatively contributed to the risk that Van Rootselaar would commit a mass shooting. Plaintiffs do not allege that OpenAI created a risk that otherwise did not exist, and they cannot, given Van Rootselaar's well-documented interactions with law enforcement, mental health problems, and access to guns. Plaintiffs instead rely on selective quotations of Van Rootselaar's conversations with ChatGPT that allegedly *deepened* her existing violent tendencies.[1] California courts repeatedly have rejected similar claims that a defendant increased a third party's propensity to commit a violent crime, particularly where, as here, the claims seek to impose liability for information and ideas. The Court should do the same.

All claims also fail for the independent reason that Plaintiffs fail to allege causation as a matter of law. Courts have long held that intentional criminal conduct is the superseding and sole proximate cause of the resulting harms. And California courts and others have long dismissed claims alleging that information and ideas, regardless of format (video games, music, movies, books), caused a third party's violent crime. Plaintiffs' claims here suffer from the same causal deficiency and should be dismissed for this reason alone.

Plaintiffs' miscellaneous other state-law claims and requests for relief fail as a matter of California and British Columbia law for the additional reasons below.

The Court, sitting in diversity, should decline to endorse Plaintiffs' novel expansions of state tort law and should dismiss Plaintiffs' claims based on established legal principles. The doctrine of constitutional avoidance also favors resolving these cases on state-law grounds because Plaintiffs' claims and sweeping requests for injunctive relief raise significant First Amendment issues concerning tort liability for conversational content.

[1] The contents of Van Rootselaar's conversations with ChatGPT are being provisionally filed under seal until the Court determines whether they should be filed on the public docket. OpenAI respectfully defers to the Court's determination.

OpenAI respectfully requests that the Court dismiss the Complaints in their entirety. If the Court grants OpenAI's pending motions to dismiss for forum non conveniens, it need not reach the issues raised by this Motion.

## II. BACKGROUND

### A. Plaintiffs' Claims

Plaintiffs are fifty-three individual British Columbians ("Individual Plaintiffs"), as well as the Province of British Columbia and a British Columbia school district ("British Columbia Government Plaintiffs"), who have filed forty-one separate actions arising from a mass shooting by a British Columbian at Tumbler Ridge Secondary School in British Columbia. The Individual Plaintiffs include six decedents and two injured students shot by Van Rootselaar (or their personal representatives or successors-in-interest). The rest are students and staff who were physically present at the school during the shooting,[2] and two individuals who were not physically present at the school but allege that they were "contemporaneously aware of the attack as it occurred."[3] One Individual Plaintiff initially sued in British Columbia but withdrew that case and refiled in this District, along with other Individual Plaintiffs, on April 29, 2026. Additional Individual Plaintiffs sued on September 2. The British Columbia Government Plaintiffs sued on September 21.[4] On October 29 and 30, all Plaintiffs filed amended complaints and three Individual Plaintiffs filed new complaints.[5]

Plaintiffs bring nearly identical negligence, product liability, and aiding and abetting claims, along with miscellaneous state-law claims, seeking to lay the blame for Van Rootselaar's heinous crime entirely on OpenAI. Plaintiffs advance essentially two theories of liability: that OpenAI failed to discharge a legal duty to warn law enforcement about the risk Van Rootselaar posed; and that OpenAI took affirmative actions in designing or operating ChatGPT that created

---

[2] Case Nos. 3:26-cv-09342 to -09356; -09358 to -09360; -09362 to -09363; -09366 to 09370; -09372 to -09373; and -09378.

[3] *Younge* Second Amended Compl. ("*Younge* SAC") ¶¶ 25, 317.

[4] Case No. 3:26-cv-10743.

[5] Case Nos. 3:26-cv-12820, 3:26-cv-12823, and 3:26-cv-12826.

or increased the risk that Van Rootselaar would commit a violent attack. *Stacey* First Amended Compl. ("*Stacey* FAC") ¶¶ 203–328; *British Columbia* First Amended Complaint ("*B.C.* FAC") ¶¶ 191–263.[6]

**B. <u>Van Rootselaar's Use of ChatGPT</u>**

Plaintiffs allege that Van Rootselaar's crimes were caused by the content of her messages with ChatGPT. OpenAI produced Van Rootselaar's ChatGPT conversations to Plaintiffs—nearly 29,000 messages in total. The British Columbia Government Plaintiffs filed, and explicitly "incorporated by reference" into their complaint, "all of" Van Rootselaar's conversations with ChatGPT. *B.C.* FAC ¶ 25 & Exhibit 1. The complete record of Van Rootselaar's ChatGPT messages is also incorporated by reference into the Individual Plaintiffs' complaints because it "forms the very basis of Plaintiffs' claims, and Plaintiffs refer[] extensively to it" and quote the messages liberally. *Steinle v. City & Cnty. of San Francisco*, 919 F.3d 1154, 1163 (9th Cir. 2019). The full set of messages is thus "appropriately considered" on a motion to dismiss. *Id.*

Van Rootselaar's ChatGPT messages reflect that she was a deeply "troubled individual." *Stacey* FAC ¶ 3. Plaintiffs point out that many of Van Rootselaar's messages "describ[e] scenarios involving gun violence." *Id.* ¶¶ 40, 94, 171; *B.C.* FAC ¶ 211. The bulk of Van Rootselaar's violence-related messages are in the context of [redacted] *Stacey* FAC ¶¶ 46, 48, 106, 137, 167, 209, 241; *B.C.* FAC ¶¶ 119, 125, 137. According to Plaintiffs, the content of these conversations "reinforce[d], elaborate[d], and normalize[d]" Van Rootselaar's "violent ideation." *Stacey* FAC ¶ 232; *B.C.* FAC ¶ 137. Plaintiffs also allege that the style and tone of ChatGPT's responses, including the use of "first-person pronouns" and "express[ions] of apparent empathy," amounted to "encourag[ement]" from a "co-conspirator." *Stacey* FAC ¶ 167.

There is no debating that Van Rootselaar's messages involve violent content. Defendants focus on the language quoted in the complaints for purposes of this Motion. But the Court should

[6] The forty operative complaints by the Individual Plaintiffs are nearly identical. Defendants cite the *Stacey* FAC where there is no material difference among the Individual Plaintiffs' complaints.

be aware that the complaints selectively quote and characterize certain of Van Rootselaar's interactions with ChatGPT, omitting messages that undermine Plaintiffs' allegations and have also been incorporated by reference into the Complaints. For example, the Individual Plaintiffs allege that "ChatGPT continually engaged and validated" Van Rootselaar's [redacted] *Id.* ¶ 66. The Individual Plaintiffs selectively quote excerpts from the relevant conversations, alleging that Van Rootselaar asked [redacted] and that ChatGPT allegedly [redacted] *Id.* ¶ 67. But the complete record of the quoted conversation shows that ChatGPT refused to engage with Van Rootselaar's [redacted] talk and implored her [redacted] *See* B.C. FAC Ex. 1, OAI_TR_0000001 ("Acct. 1 Log") at 3ac277a94f3b;[7] *see also id.* at 0e60c1fe83ff [redacted] *id.* at 9361164fe848 [redacted] There are over [redacted] and more than [redacted], which undermine Plaintiffs' allegations but are absent from the Complaints. *See* Decl. of V. Roman Leal in Support of Defs.' Rule 12(b)(6) Mot. to Dismiss ("Leal Decl.") ¶¶ 8–9 & Exs. A–B. In addition, none of Van Rootselaar's more than ten-thousand messages to ChatGPT reference Tumbler Ridge Secondary School or any of the Plaintiffs.

The complete record of Van Rootselaar's conversations with ChatGPT, which is properly considered by the Court on this Motion, shows that her use of ChatGPT plummeted in October 2025 and remained infrequent during the months leading up to the shooting in February 2026, as shown in this summary illustration[8]:

---

[7] This Motion cites messages from Van Rootselaar's ChatGPT chat logs using the last twelve characters of the "MESSAGE_ID" field (column D in OAI_TR_0000001 and OAI_TR_0000002). For the Court's convenience, running a search for the MESSAGE_ID characters in the chat log spreadsheets will identify the row where the cited message is located.

[8] Illustration 1 is provided solely for the Court's convenience as a summary of the voluminous messages, which, as explained above, have been incorporated by reference into the pleadings and filed in their entirety with the Court. *See supra*, p. 4.




*Illustration 1*

*See* Leal Decl. ¶ 4. This drop in use corresponds with OpenAI launching several new safety features for ChatGPT in fall 2025, including "safe-completions," a set of guardrails that direct ChatGPT to respond to potentially dangerous requests with "safe alternatives." *Stacey* FAC ¶ 106. Plaintiffs allege that these new features "made it easier for Van Rootselaar to get the violent content she wanted." *Id.*

But the records of Van Rootselaar's ChatGPT conversations—all of which are properly before the Court on this Motion—directly contradict these allegations and [redacted]. For example:

- After a string of safe-completion responses on October 28, 2025, Van Rootselaar wrote, [redacted] *B.C.* FAC Ex. 1, OAI_TR_0000002 ("Acct. 2 Log") at 2d10ae4b1ff5. The next day, she asked ChatGPT to [redacted] *Id.* at 4abdca806766. The rate of her messages with ChatGPT subsequently fell by over ninety percent.[9]

[9] From January 1 to October 31, 2025, Van Rootselaar sent an average of approximately 30 messages per day to ChatGPT; from November 1, 2025 to February 10, 2026, she sent an average of approximately 3 messages per day. Leal Decl. ¶¶ 6–7.

- Van Rootselaar later told ChatGPT that [redacted] *Id.* at 775c49271776 [redacted].

The Court may disregard the contrary allegations in Plaintiffs' complaints. *See Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001) (court need not "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit"); *Van Hook v. Curry*, No. C 06-3148 PJH (PR), 2009 WL 773361, at *3 (N.D. Cal. Mar. 23, 2009) ("When an attached exhibit contradicts the allegations in the pleadings, the contents of the exhibits trump the pleadings.").

**C. <u>Van Rootselaar's ChatGPT Account Is Reviewed and Deactivated</u>**

OpenAI has a "specialized pipeline" for reviewing the accounts of users who potentially are violating its Terms of Use, including by using ChatGPT to plan harm to others. *Stacey* FAC ¶ 40. OpenAI's review process includes "automated systems" that detect such activities, review by a team of "trained safety professionals," and internal escalation. *Id.* ¶¶ 40, 74.

The Complaints allege that, in June 2025, OpenAI's automated review system flagged Van Rootselaar's ChatGPT account for "scenarios involving gun violence." *Stacey* FAC ¶ 40; *B.C.* FAC ¶ 153. The Complaints further allege that OpenAI's "human reviewers" "recommended contacting the [Royal Canadian Mounted Police]" because they "identified what they believed was a credible threat of serious physical harm to real people." *Stacey* FAC ¶ 74; *B.C.* FAC ¶ 154. Besides alleging that Van Rootselaar generally "posed a danger to those around her," Plaintiffs allege that she referenced [redacted]. *Stacey* FAC ¶¶ 3–4, 9–10; *B.C.* FAC ¶¶ 20–21. *None* of Van Rootselaar's messages to ChatGPT reference Tumbler Ridge Secondary School or any of Plaintiffs.

After this review, OpenAI banned Van Rootselaar's ChatGPT account. *Stacey* FAC ¶ 15; *B.C.* FAC ¶ 154. Van Rootselaar later returned to ChatGPT using a different account. *Stacey* FAC ¶ 16; *B.C.* FAC ¶ 154. OpenAI's systems did not identify the second account as associated

with Van Rootselaar, and OpenAI did not know that she was continuing to use ChatGPT on this second account. *Stacey* FAC ¶ 95.[10]

The Complaints reference some (but not all) of OpenAI's public statements regarding the decision not to refer Van Rootselaar's account to law enforcement in June 2025, including OpenAI's public statements that disclosing a user's communications to law enforcement raises significant privacy concerns and risks "potential distress caused to individuals and families by getting police involved unnecessarily." *Stacey* FAC ¶ 140; *B.C.* FAC ¶ 166. The Complaints assert, without supporting factual allegations, that these concerns were "pretextual" and that OpenAI decided to "conceal[] its role in facilitating Van Rootselaar's violent acts in order to protect itself" and its "corporate reputation." *Stacey* FAC ¶¶ 143, 152. The theory that OpenAI considered "a law enforcement referral"—one single referral—to be an unacceptable "danger" to its "brand," *id.* ¶ 76, is implausible on Plaintiffs' own allegations. Plaintiffs acknowledge that OpenAI made referrals to law enforcement prior to June 2025 and continues to make referrals to law enforcement after June 2025 when OpenAI determines a user poses a "'credible and imminent' risk of physical harm" to others. *Id.* ¶¶ 76–77.

The Individual Plaintiffs' Complaints also allege (affirmatively, not on information and belief) that OpenAI's CEO, Samuel Altman, personally "chose not to alert or warn law enforcement" about Van Rootselaar. *Id.* ¶ 210. Those Complaints further allege (on information and belief) that Mr. Altman "decided against a referral on the basis of reputation and public relations considerations." *Id.* ¶ 211. Defendants recognize that the Court must assume the truth of pleaded allegations for purposes of this Motion, but OpenAI has informed Plaintiffs' counsel that discovery will show these allegations are baseless: Mr. Altman was not involved in the decision not to refer Van Rootselaar to law enforcement; the referral decision was not made to protect OpenAI's valuation, its public image, or an IPO; and *no one* at OpenAI knew Van Rootselaar was planning to commit a shooting in Tumbler Ridge.

[10] Individual Plaintiffs' original complaints alleged (without factual support) that Van Rootselaar registered for the second account using her real name. *See, e.g.*, *In re Tumbler Ridge Shooting Litig.*, Dkt. No. 1 ¶ 43. The amended complaints omit that false allegation.

**D. Eight Months Later, Van Rootselaar Commits a Horrific Shooting**

Eight months after OpenAI deactivated her known ChatGPT account, on February 10, 2026, Van Rootselaar committed the Tumbler Ridge shooting. *Id.* ¶ 209; *B.C.* FAC ¶ 195. The Complaints allege that, had OpenAI "warned law enforcement following the deactivation of Van Rootselaar's first account, law enforcement and others would have had the opportunity to monitor her and intervene before the Tumbler Ridge attack occurred." *Stacey* FAC ¶ 213; *B.C.* FAC ¶ 187. The Complaints acknowledge, however, that Van Rootselaar "was already known to local law enforcement before the attack." *Stacey* FAC ¶ 141; *B.C.* FAC ¶ 196. In fact, "Canadian authorities had visited [Van Rootselaar's] residence multiple times in connection with mental health concerns and had temporarily removed firearms from [her] home," and subsequently returned them. *Stacey* FAC ¶ 141; *B.C.* FAC ¶ 196.

The Complaints allege no other facts about Canadian law enforcement's prior interactions with Van Rootselaar, such as when and how many times police visited her home, the nature of the authorities' "mental health concerns," when and why firearms were seized from her home, and why the firearms were removed only temporarily. *See Stacey* FAC ¶ 141; *B.C.* FAC ¶ 196. The Complaints also are silent as to how Van Rootselaar obtained the firearms that she used in the shooting, whether she had a license to use them, or why Canadian law enforcement returned them to her home when it had "already recognized" that her "access to firearms warranted intervention." *See Stacey* FAC ¶ 141; *B.C.* FAC ¶ 196.

The Complaints note in passing that James Cody Bryant has been criminally charged for conspiring with Van Rootselaar to plan and execute the shooting. *Stacey* FAC ¶ 110; *B.C.* FAC ¶¶ 15 n.32, 57, 169–70. Van Rootselaar discussed with Bryant how "she had taken guns from her family's gun safe" and was considering "her old high school" as the target of her shooting. *Stacey* FAC ¶ 110; *B.C.* FAC ¶ 169. Van Rootselaar did not disclose that information to ChatGPT.

The Complaints fail to mention, as alleged in the criminal charges they cite, that Bryant "agreed to record [Van Rootselaar's] livestream of the planned murders and post it over the internet for the public to view," helped "test[] the quality of the livestream" for the shooting, sent Van Rootselaar money to purchase equipment for the shooting, helped Van Rootselaar start the car

enabling her to drive to Tumbler Ridge Secondary School to carry out the shooting, and tried to livestream the shooting after Van Rootselaar said she had killed her family and was "going now" to continue her spree. Compl. at 2, *United States v. Bryant*, No. 2:26-mj-00618 (W.D. Wash., filed Oct. 2, 2026).[11] Recognizing that Van Rootselaar's plans were real, Bryant expressed the need to "delete all our messages" to avoid "get[ting] in trouble [for] posting a shooting video online." *Id.* at 3 (alterations in original). By contrast, Van Rootselaar [redacted] in her messages to ChatGPT. *See, e.g.*, Acct. 2 Log at 218dbf9d535f [redacted]); *id.* at db9fb1572235 [redacted]

Plaintiffs seek to recover from OpenAI a variety of damages based on Van Rootselaar's shooting and conspiracy with Bryant. The Individual Plaintiffs variously seek emotional distress, physical injury, and wrongful death damages as applicable. *Stacey* FAC Prayer for Relief ¶ 1. The British Columbia Government Plaintiffs seek broad "economic damages, including but not limited to extraordinary policing response, acute and ongoing health care, victim services and trauma-informed mental-health care, educational continuity and staffing, facility remediation, demolition, and the construction of a replacement school and wellness center." *B.C.* FAC ¶ 187. Plaintiffs also seek broad injunctive relief regarding OpenAI's processes and the types of content available via ChatGPT. *Stacey* FAC Prayer for Relief ¶ 4; *B.C.* FAC Prayer for Relief ¶ f.

## III. <u>LEGAL STANDARDS</u>

"Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013). To survive a Rule 12(b)(6) motion, Plaintiffs must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Plausibility requires pleading

[11] The Court "may take judicial notice of court filings and other matters of public record" on a motion to dismiss, and thus may consider the criminal complaint against Bryant. *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006).

facts, as opposed to conclusory allegations or the 'formulaic recitation of the elements of a cause of action,' and must rise above the mere conceivability or possibility of unlawful conduct." *Id.* at 959–60 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

"[F]ederal courts sitting in diversity cases cannot initiate an alteration of California state law." *Perez v. Mortg. Elec. Registration Sys., Inc.*, 959 F.3d 334, 339 (9th Cir. 2020). Indeed, "[f]ederal courts sitting in diversity must proceed with caution when making pronouncements about state law, and are in a particularly poor position to endorse a policy innovation in a state's law absent an authoritative signal from the legislature or the courts." *Jensen v. U.S. Tennis Ass'n.*, No. 23-15757, 2025 WL 707447, at *2 (9th Cir. Mar. 5, 2025) (cleaned up). Likewise, the Court should not "extend [foreign] law where [foreign] statutes and case law have not done so." *In re Lyondell Chem. Co.*, 567 B.R. 55, 127 (Bankr. S.D.N.Y. 2017), *aff'd*, 585 B.R. 41 (S.D.N.Y. 2018).

## IV. ARGUMENT

### A. Choice of Law

Given the strong nexus to British Columbia, these actions raise substantial choice-of-law issues. If the actions were to proceed past the pleadings, the Court would need to decide whether California law or British Columbia law governs "each issue in the case[s]." *Wash. Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906, 920 (2001).

"A federal court sitting in diversity applies the forum state's choice of law rules." *Bridge Fund Cap. Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1002 (9th Cir. 2010). California applies a "three-part governmental interest test" to determine choice of law. The Court first "consider[s] whether the two states' laws actually differ"; second, determines "whether there is a 'true conflict'"; and third, if there is a true conflict, weighs the relative "impairment to each jurisdiction under the other's rule of law." *Arno v. Club Med Inc.*, 22 F.3d 1464, 1467 (9th Cir. 1994). If a true conflict would not impair a foreign forum's interests, California law applies. *S. A. Empresa De Viacao Aerea Rio Grandense v. Boeing Co.*, 641 F.2d 746, 749 (9th Cir. 1981).

The Complaints assume that California law governs. *See, e.g.*, *Stacey* FAC ¶¶ 207, 230, 328; *B.C.* FAC ¶¶ 131, 194, 200, 209, 212, 227, 235. For most issues relevant to this Motion,

Defendants are not aware of a true conflict between the laws of California and British Columbia and accept Plaintiffs' assumption that California law governs those issues for purposes of this Motion.[12] Known conflicts that are relevant to this Motion are identified and addressed below.

**B. Plaintiffs Do Not Allege a Tort Duty to Warn Under California Law (Claim 1)**

Plaintiffs' central claim faults OpenAI for not warning Canadian law enforcement about Van Rootselaar before the shooting. This theory fails for multiple reasons under California law.

*1. There Is No General Duty to Warn About Third-Party Conduct*

It is a foundational tort principle that "one owes no duty to control the conduct of another, nor to warn those endangered by such conduct." *Regents of Univ. of Cal. v. Superior Ct.*, 4 Cal. 5th 607, 619 (2018) (citation omitted). Courts have long rejected as a matter of law, including at the pleading stage, claims that seek to impose liability for failing to warn about a third party's criminal conduct. For example, in *Wise v. Superior Court*, 222 Cal. App. 3d 1008 (1990), the Court of Appeal affirmed dismissal of negligence claims against a woman whose husband committed a "mass shooting-suicide incident," holding that she had no duty to "warn others" or otherwise "prevent" his shooting spree. *Id.* at 1011–12, 1015; *see also Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1094–95, 1100–01 (9th Cir. 2019) (affirming dismissal of failure-to-warn claims against social networking platform, explaining that California law imposes no "duty to warn" about such "third-party acts"). Likewise, in *Davidson v. City of Westminster*, 32 Cal. 3d 197 (1982), the California Supreme Court affirmed dismissal of claims that police officers had failed to warn the plaintiff before the violent criminal they were surveilling stabbed

[12] Defendants reserve the right to argue that British Columbia law applies to some or all issues in any subsequent proceedings. *See Gen. Signal Corp. v. MCI Telecomms. Corp.*, 66 F.3d 1500, 1505 (9th Cir. 1995) (holding that choice of law argument for applying New York law was not estopped or waived where party "cited California law in earlier papers" but "never specifically asserted as a legal argument that California law was applicable"); *Petters Co. Inc. v. BLS Sales Inc.*, No. C 04-02160 CRB, 2005 WL 2072109, at *12 (N.D. Cal. Aug. 26, 2005) (accepting choice of law argument at summary judgment notwithstanding same party "citing only California law in its motion to dismiss"). Defendants take no position, and expressly reserve all rights, as to what law should govern if these actions are refiled in British Columbia, including whether British Columbia law permits the British Columbia Government Plaintiffs to pursue the damages sought in this litigation in the absence of explicit statutory authorization. *See British Columbia*, Dkt. No. 18 at 27 (OpenAI's Motion to Dismiss for Forum Non Conveniens).

her, explaining that "knowledge of [the plaintiff's] danger" did not give rise to a duty to warn her. *Id.* at 200–01, 208. These precedents foreclose Plaintiffs' claims seeking to hold OpenAI responsible for failing to warn law enforcement about the contents of Van Rootselaar's conversations with ChatGPT.

2. *The Narrow* Tarasoff *Exception Is Limited to Psychotherapists and Doctors*

To attempt to avoid the general no-duty rule, Plaintiffs invoke a narrow exception that California strictly cabins to psychotherapists and doctors. Plaintiffs allege that OpenAI had a tort duty to warn law enforcement that Van Rootselaar posed a threat of violence because it had a "special relationship" with her under *Tarasoff v. Regents of the University of California*, 17 Cal. 3d 425 (1976). *Stacey* FAC ¶ 207; *B.C.* FAC ¶¶ 136, 194. *Tarasoff* creates a special exception to the general no-duty rule for a "doctor or psychotherapist" whose patient makes a specific threat to a "readily identifiable" target. 17 Cal. 3d at 432, 436. Plaintiffs ask the Court to be the first to hold that the *Tarasoff* exception extends to the operator of an AI service (or any other online platform) because ChatGPT allegedly can function as a psychotherapist. *Stacey* FAC ¶ 208; *B.C.* FAC ¶ 136. No authority supports this novel expansion of state law.

The narrow *Tarasoff* exception has always been grounded in the special diagnostic relationship between a medical professional and a patient. The California Supreme Court explained that "the special relation that arises between a patient and his doctor or psychotherapist" and "the judgment of the therapist in diagnosing emotional disorders" can give rise to an "exception" to the "general rule" that a "person owe[s] no duty to control the conduct of another"—namely, an exception that requires warning the "threatened victim." 17 Cal. 3d at 435–36, 438–39, 458. The California Supreme Court later reaffirmed that professional "diagnosis and prediction is an essential element" of this exception: "*Tarasoff* recognizes a right to expect that a licensed psychotherapist will realize when a patient poses a serious danger to another and, if that potential victim is identifiable, will act reasonably to protect the victim." *Hedlund v. Superior Ct.*, 34 Cal. 3d 695, 703–04 (1983).

The California legislature has confirmed what the California Supreme Court held: the *Tarasoff* exception applies only to psychotherapists and similar medical professionals. When the

legislature enacted a statute limiting monetary liability for *Tarasoff* claims, it described such claims as arising against persons defined as a "psychotherapist" under Section 1010 of the Evidence Code. Cal. Civ. Code § 43.92. California's official jury instructions likewise describe a *Tarasoff* claim as a "cause of action for professional negligence against a psychotherapist." Directions for Use, CACI 503A. OpenAI has found nothing in case law or legislative history indicating that the *Tarasoff* exception applies beyond medical professionals.

California courts repeatedly reject efforts to extend *Tarasoff* beyond psychotherapists. In *Koepke v. Loo*, 18 Cal. App. 4th 1444 (1993), for example, the court affirmed summary judgment for a non-psychotherapist defendant, reasoning that because a psychotherapist's duty to warn "is based upon special professional expertise," it "is not extended to nonprofessionals attempting to assist friends or subjects with problems" as a matter of law. *Id.* at 1457; *see also* CACI 507 (citing *Koepke* and noting that the "obligation to third parties appears to be limited to healthcare professionals"). In *Bom v. Superior Court*, 44 Cal. App. 5th 1 (2020), the court dismissed at the pleading stage criminal charges against social workers who failed to prevent severe child abuse resulting in death, reasoning that the social workers did not have a civil *Tarasoff*-type duty to act (required under the relevant criminal statute) because they were not the abusers' "psychologists or physicians" and did not "provide[]" the abusers "with professional psychotherapeutic services." *Id.* at 14–15 & n.4 (citing Restatement (Third) of Torts § 41); *see also Nally v. Grace Cmty. Church*, 47 Cal. 3d 278, 293–96 (1988) ("nontherapist counselors" did not have a "special relationship" giving rise to a duty to act to prevent a suicide).

Applying these clear precedents here, Plaintiffs' *Tarasoff* theory fails as a matter of law because neither Defendants nor ChatGPT are "licensed psychotherapist[s]" under California law. *See Hedlund*, 34 Cal. 3d at 704. The statutory definition of "psychotherapist" includes a "person authorized to practice medicine" engaged in "the practice of psychiatry," a "person licensed as a psychologist," and similar professionals; it does not include AI services, the companies that operate them, or employees of such companies. *See* Cal. Evid. Code § 1010. The relationship between ChatGPT and users is not the "special relation that arises between a patient and his doctor or psychotherapist," and neither Defendants nor ChatGPT exercise "the judgment of the therapist

in diagnosing emotional disorders" on which the *Tarasoff* duty depends. *Tarasoff*, 17 Cal. 3d at 436, 438. Plaintiffs allege that, in one instance, ChatGPT responded to one of Van Rootselaar's messages that [redacted] *Stacey* FAC ¶ 17; *B.C.* FAC ¶ 12. That message merely confirms that [redacted] *Stacey* FAC ¶ 17; *B.C.* FAC ¶ 12. Indeed, ChatGPT, on numerous occasions, [redacted]. *See, e.g.*, Acct. 1 Log at 3fb92e5ba214, db69b0bd7c08, 8e42ded6cdd8; Acct. 2 Log at 99a2339ba35a, 7a8a52427d31; Leal Decl. ¶ 9 & Ex. B.

Whether people may use ChatGPT "as a therapist," or seek "deeply personal advice" from ChatGPT, as Plaintiffs allege, is legally irrelevant. *Stacey* FAC ¶ 208; *B.C.* FAC ¶¶ 4, 127. The defendant's professional status, not the nature of any specific interaction, is what matters. As a matter of California law, the *Tarasoff* exception does not "extend[] to nonprofessionals attempting to assist friends or subjects with problems." *Koepke*, 18 Cal. App. 4th at 1457; *see* CACI 507 (recognizing "obligation to third parties appears to be limited to healthcare professionals").

Plaintiffs' proposed expansion of the *Tarasoff* exception would expose a wide range of non-professionals to tort liability. It would require not only online platforms, but also friends, family, teachers, spiritual counselors, and other confidants to report confiders to law enforcement, swallowing the general rule that "one owes no duty to control the conduct of another, nor to warn those endangered by such conduct." *Regents*, 4 Cal. 5th at 619. The Court, sitting in diversity, should not adopt such a sea change in California tort law. *See Jensen*, 2025 WL 707447, at *2.[13]

---

[13] Both the California and Canadian legislatures are considering bills that could require AI service operators to warn authorities about threats by users in some circumstances. A.B. 1988, 2025–2026 Reg. Sess. § 3 (Cal. 2026) (proposal for Cal. Bus. & Prof. Code § 22587.2 requirement to warn "appropriate contacts or authorities" about expressed "desire to harm others"); *Safe Social Media Act*, Bill C-34, 45th Parl., 1st Sess. § 52 (Can. 2026) ("chatbot service must implement any measures that are provided for by regulations to address situations in which a user of the service expresses . . . an intention to commit an act that could cause death or serious bodily harm"). Because a legislature "is presumed to know existing law when it enacts a new statute, including the existing state of the common law," these proposals confirm there is no common law duty to

### 3. *Even a Psychotherapist Would Not Have Had a Tort Duty to Warn Plaintiffs*

In any event, even a psychotherapist would not have had a tort duty to warn Plaintiffs under California law. *Tarasoff* requires a psychotherapist to warn the "readily identifiable" target of a patient's imminent violent threat. 17 Cal. 3d at 432; *Mavroudis v. Superior Ct.*, 102 Cal. App. 3d 594, 601 (1980) (*Tarasoff* duty "arises" from patient's "serious and imminent danger of violence to a readily identifiable victim"). There is no legal duty to warn persons in "proximity" to a dangerous person, *Rice v. Ctr. Point, Inc.*, 154 Cal. App. 4th 949, 955 (2007), or a "group of potential targets" or "a broad segment of the population," *Thompson v. Cnty. of Alameda*, 27 Cal. 3d 741, 755, 758 (1980) (relying on *Tarasoff* in addressing the special duty to warn arising from a custodial relationship). General allegations that a person posed "a danger to himself and other people" are not sufficient. *McDowell v. Cnty. of Alameda*, 88 Cal. App. 3d 321, 324–25 (1979). Stating a cognizable claim requires an "allegation that [the perpetrator] was a threat to the decedent" specifically. *Id.*; *see also* CACI 503A ("plaintiff/decedent" must be "a reasonably identifiable victim of [*name of patient*]'s threat" (brackets in original)). Sound policy reasons underlie this requirement: While warnings to "specifically known and designated individuals" serve the goal of making them "aware of the danger to which they were uniquely exposed," more general warnings would pose both "practical" issues, *Thompson*, 27 Cal. 3d at 754–55, and "privacy" concerns, *see Tarasoff*, 17 Cal. 3d at 441.

Applying these authorities here, even a psychotherapist would not have had a cognizable tort duty to warn Plaintiffs. Although Plaintiffs possess all Van Rootselaar's conversations with ChatGPT, they do not allege that she ever threatened them or Tumbler Ridge Secondary School. The Individual Plaintiffs conclusorily allege on "information and belief" that Van Rootselaar "communicated to ChatGPT a serious threat of physical violence against reasonably identifiable victims." *Stacey* FAC ¶ 210. The Court should disregard this "formulaic recitation of the

---

warn. *Arthur Andersen LLP v. Superior Ct.*, 67 Cal. App. 4th 1481, 1500–01 (1998); *Kosicki v. Toronto (City)*, 2025 SCC 28, para. 43 (Can.) (same).

elements of [the] cause of action." *Somers*, 729 F.3d at 959–60 (quoting *Twombly*, 550 U.S. at 555). If Plaintiffs could cite such a threat, they would. They do not.

Plaintiffs instead allege that, eight months before the shooting, Van Rootselaar [redacted]. *Stacey* FAC ¶¶ 3–10; *B.C.* FAC ¶¶ 20–21. Plaintiffs also generally allege that Van Rootselaar [redacted]. *Stacey* FAC ¶ 19; *B.C.* FAC ¶ 208. At bottom, Plaintiffs' theory is that Van Rootselaar was "a danger to those around her," *Stacey* FAC ¶ 4, and that OpenAI should have warned the fifty-three Individual Plaintiffs (including those not physically present at the school); the school district; and the provincial government that Van Rootselaar was generally dangerous. Because those allegations do not reflect a threat against *Plaintiffs*, Plaintiffs could not state a *Tarasoff* claim as a matter of law even if Defendants were psychotherapists (they are not). *See Tarasoff*, 17 Cal. 3d at 432; *McDowell*, 88 Cal. App. 3d at 324–25; CACI 503A.

### C. <u>Plaintiffs Do Not State a Misfeasance Claim Under California Law (Individual Plaintiffs' Claims 4, 6; B.C. Government Plaintiffs' Claim 5)</u>

Plaintiffs' alternative misfeasance claims that OpenAI's affirmative conduct created or contributed to the risk that Van Rootselaar posed, *Stacey* FAC ¶¶ 252–67, 280–92; *B.C.* FAC ¶¶ 237–45, also fail as a matter of California law.

Plaintiffs do not plausibly allege that OpenAI *created* a risk that did not previously exist. As the Ninth Circuit has explained, a misfeasance duty exists under California law where a defendant's "affirmative conduct itself . . . placed plaintiffs in a dangerous position and created a serious risk of harm to which they otherwise would not have been exposed." *Doe v. Uber Techs., Inc.*, No. 22-16562, 2025 WL 80365, at *4 (9th Cir. Jan. 13, 2025) (quoting *Lugtu v. Cal. Highway Patrol,* 26 Cal. 4th 703, 717 (2001) (ellipsis in original)). In *Uber*, the plaintiff stated a misfeasance claim by alleging that the "risk at issue," i.e., the risk "that an Uber rider may be kidnapped and sexually assaulted by a predator posing as an Uber driver," "would simply not have existed without Uber's own conduct." *Id.*

Plaintiffs do not allege that the risk posed by Van Rootselaar "would simply not have existed without [OpenAI's] own conduct." *Id.* Plaintiffs allege that Van Rootselaar was "a troubled individual with ready access to firearms" and "an admitted history of [redacted]; she was "already known to local law enforcement" and "Canadian authorities had visited her residence multiple times in connection with mental health concerns and had temporarily removed firearms from the home."[14] *Stacey* FAC ¶¶ 3, 141; *B.C.* FAC ¶ 196. Plaintiffs also acknowledge that Van Rootselaar was aided and abetted by another person who has been criminally charged for their role in planning and executing the shooting. *Stacey* FAC ¶ 110. Plaintiffs' own allegations foreclose the notion that OpenAI *created* the risk here.

Nor do Plaintiffs plausibly allege that OpenAI *contributed* to an existing risk. Plaintiffs allege generally that ChatGPT "confirm[ed]" and "deepen[ed]" Van Rootselaar's "violent thoughts," *id.* ¶ 286, and "contributed to Van Rootselaar's spiraling mental state" and "fired [her] up," *B.C.* FAC ¶ 17. California courts repeatedly have rejected, as a matter of law, claims seeking to impose tort liability for allegedly fueling or triggering a third party's existing violent tendencies. In *Wise*, for example, the Court of Appeal affirmed dismissal at the pleadings stage of negligence claims against the wife of a man who committed a mass shooting, rejecting the theory that the wife had engaged in misfeasance by "set[ting] him off." 222 Cal. App. 3d at 1011–12. Similarly, in *Hansra v. Superior Court*, 7 Cal. App. 4th 630 (1992), the court affirmed judgment on the pleadings for family members of a "mentally and emotionally unstable" man from whom "law enforcement officers had been required to remove weapons . . . on previous occasions of threatened violence" and who ultimately murdered his wife. *Id.* at 635–36. The court rejected the theory that the family members had engaged in misfeasance by attempting to sow marital discord between the unstable man and his wife. *Id.* And in *Golick v. California*, 82 Cal. App. 5th 1127 (2022), the court affirmed dismissal of claims that a police officer "agitated and provoked" a hostage-taker, "exacerbat[ing] the problem" and leading to the death of hostages. *Id.* at 1148. The

[14] Van Rootselaar was so obsessed with violence that she had a public account on WatchPeopleDie.tv, a website devoted to videos of murders and other unspeakable content. *See* Opp. to Mot. to Dismiss for Forum Non Conveniens, *British Columbia*, Dkt. No. 32-1 at 24.

court held that the plaintiffs had failed to plead duty because they offered "little more than speculation" that the defendant's conduct had increased the risk, given that the hostage-taker had already "considered shooting" his victims. *Id.* at 1147.

Most recently, in *Mata v. Meta Platforms, Inc.*, No. 24SMCV02494 (L.A. Super. Ct.), the court dismissed misfeasance claims against Meta Platforms and Activision for allegedly causing the Uvalde school shooting. Am. Compl. *Mata*, No. 24SMCV02494 (filed Nov. 22, 2024). The plaintiffs asserted that these companies were liable because that the shooter had seen algorithmically-targeted gun-related advertisements on Facebook and Instagram and had played Activision's *Call of Duty* first-person-shooter video game—allegedly "a vividly realistic and addicting theater of violence in which teenage boys learn to kill with frightening skill and ease" that led to the shooter "reenact[ing] a violent fantasy." *Id.* ¶¶ 6–8, 17. The court dismissed the claims against Meta, explaining that the plaintiffs' duty theory would "stretch[] the bounds of tort law" given that "the harm they suffered was caused by the acts of a third person." Ruling on Submitted Matters, *Mata* (Sept. 5, 2025), slip op. at 18. The court granted judgment on the pleadings to Activision for the "same reasons." Minute Order, *Mata* (Jan. 28, 2026), slip op. at 2.

Plaintiffs' theory that Defendants contributed to the risk posed by Van Rootselaar fails for the same reasons. OpenAI takes safety efforts seriously. But tort law does not extend to users' conversations with ChatGPT any more than it does to other content, like films, music, video games, and social media posts, even where plaintiffs allege that the content "deepen[ed]" or "fir[ed] up" the preexisting violent fixations of a user. *Stacey* FAC ¶ 166; *B.C.* FAC ¶ 17. Defendants have identified no authority that suggests otherwise. Again, sound policy reasons underlie California's decision not to impose liability here: "No one really knows why people commit crime," *7735 Hollywood Blvd. Venture v. Superior Ct.*, 116 Cal. App. 3d 901, 905 (1981), let alone mass murder, so courts could not fashion, and juries could not apply, a workable rule of care for the broad range of actors who could be characterized as "deepening" or "firing up" a violent person. The Court, sitting in diversity, should not second-guess that determination. *See Jensen*, 2025 WL 707447, at *2.

Even if there were a legal duty under California law not to "deepen" a third party's violent ideations, California courts would not impose liability here because Plaintiffs' misfeasance claims arise from content. Plaintiffs refer to numerous [redacted]," which they characterize as "warning sign[s]." *Stacey* FAC ¶¶ 4, 46, 137; *B.C.* FAC ¶ 120. Courts must consider under the *Rowland* factors whether "compelling policy considerations" require an "exception[]" to a duty that might otherwise be imposed. *Kuciemba v. Victory Woodworks, Inc.*, 14 Cal. 5th 993, 1021 (2023). "California courts have declined to find a duty as a matter of law under the *Rowland* factors for claims implicating expression," including claims seeking to impose liability for information and ideas that allegedly influenced a third party to harm themselves or others. *Est. of B.H. v. Netflix, Inc.*, No. 4:21-cv-06561-YGR, 2022 WL 551701, at *3 (N.D. Cal. Jan. 12, 2022) (dismissing claims against creators of show that allegedly influenced a viewer to commit suicide); *McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989, 1003–06 (1988) (no duty under *Rowland* factors, including "perhaps most significantly" because duty would "limit and restrict" distribution of music that "may adversely affect emotionally troubled individuals"); *Hansra*, 7 Cal. App. 4th at 639–44 (analyzing *Rowland* factors in holding no duty not to sow "discord" in relationship of violent man); *see also Zamora v. Columbia Broad. Sys.*, 480 F. Supp. 199, 201–02 (S.D. Fla. 1979) (rejecting as "against public policy" a proposed Florida-law duty "to avoid making 'violent' [television] shows available for voluntary consumption"). The "compelling policy consideration[]" against imposing liability for claims implicating expression requires dismissal of the misfeasance claims.[15] *See Kuciemba*, 14 Cal. 5th at 1021, 1031 ("Some factors may be so weighty as to tip the balance one way or the other.").

### D. Plaintiffs Do Not Allege Aiding and Abetting Under California Law (Claim 3)

Plaintiffs also fail to state a claim for aiding and abetting under California law. California aiding and abetting liability requires that the defendant "(1) knows the other's conduct constitutes a breach of duty and (2) gives substantial assistance or encouragement to the other to so act."

[15] Other *Rowland* factors also weigh against recognizing the misfeasance duty Plaintiffs urge, including the lack of foreseeability, the lack of a close connection between Defendants and Plaintiffs' injuries, and the burden of making online platforms attempt to predict and prevent users' offline conduct. *See Kuciemba*, 14 Cal. 5th at 1021.

*McFall v. Stacy & Witbeck, Inc.*, No. 14-cv-04150-JSC, 2016 WL 6248882, at *5 (N.D. Cal. Oct. 26, 2016) (quoting *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1144 (2005)). The first element requires both "actual knowledge of the specific primary wrong," *In re First All. Mortg. Co.*, 471 F.3d 977, 993–95 (9th Cir. 2006), and "a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act," *George v. eBay, Inc.*, 71 Cal. App. 5th 620, 641 (2021) (citation omitted). Put differently, a plaintiff must "allege that the [defendant] actually knew of the *specific primary wrong*—the underlying tort—that the [defendant] intentionally aided."[16] *Shamgochian v. Bank of Am., N.A.*, No. F064231/F064480, 2013 WL 1098256, at *9 (Cal. Ct. App. Mar. 18, 2013) (citing *Casey*, 127 Cal. App. 4th at 1145). Knowledge of general "criminal and wrongful" conduct is insufficient, *Casey*, 127 Cal. App. 4th at 1153, because only with actual knowledge of the specific tort can a defendant "be said to have made a conscious decision to help facilitate the commission of the tort." *Camenisch v. Umpqua Bank*, No. 20-cv-05905-RS, 2022 WL 17740285, at *7 (N.D. Cal. Dec. 16, 2022). Plaintiffs do not allege either that OpenAI actually knew of Van Rootselaar's specific crime or consciously decided to assist her in committing that crime.[17]

First, Plaintiffs do not allege that Defendants had actual knowledge that Van Rootselaar was planning to commit a mass shooting at Tumbler Ridge Secondary School—the "specific primary wrong." *Shamgochian*, 2013 WL 1098256, at *9. Plaintiffs do not allege that Defendants had knowledge of Van Rootselaar at all until June 2025, when her first account was flagged,

---

[16] The Ninth Circuit has stated that aiding and abetting does not require "specific intent." *In re First All.*, 471 F.3d at 993. As subsequent cases have recognized, that holding does not dispense with the requirement of "a conscious decision to participate in tortious activity for the purpose of assisting another in performing a wrongful act." *Hough v. Carroll*, No. 2:24-cv-02886-WLH-SK, 2025 WL 1674425, at *8 (C.D. Cal. May 5, 2025) (citation omitted); *SVB Fin. Tr. v. Fed. Deposit Ins. Corp.*, No. 5:24-cv-01321-BLF, 2026 WL 2547402, at *105 (N.D. Cal. Aug. 28, 2026). Numerous recent decisions of California courts confirm this requirement. *E.g.*, *George*, 71 Cal. App. 5th at 641–42 (requiring specific knowledge and conscious decision to participate); *IIG Wireless, Inc. v. Yi*, 22 Cal. App. 5th 630, 653–54 (2018); *Fox Paine & Co., LLC v. Twin City Fire Ins. Co.*, 104 Cal. App. 5th 1034, 1059 (2024) (same), *rev'd and remanded on other grounds*, 20 Cal. 5th 188 (2026); *Sacramento Mun. Util. Dist. v. Kwan*, 101 Cal. App. 5th 808, 813 (2024) (same); *Chen v. PayPal, Inc.*, 61 Cal. App. 5th 559, 584 (2021) (affirming dismissal based on failure to allege that PayPal "*intended* to aid buyers in defrauding sellers").

[17] Defendants dispute the substantial assistance prong as well, but do not argue that element here.

reviewed, and deactivated. *See Stacey* FAC ¶ 40; *B.C.* FAC ¶ 23. That is the only time when Defendants are alleged to have acted with knowledge of Van Rootselaar's use of ChatGPT. Plaintiffs affirmatively allege that Defendants *did not know* Van Rootselaar had created or was using a second account until after the shooting. *Stacey* FAC ¶¶ 16–17; *B.C.* FAC ¶ 164. Thus, OpenAI did not have actual knowledge that *any* content on the second account was linked to Van Rootselaar—including [redacted]. *See, e.g.*, *Stacey* FAC ¶¶ 17–22, 96–97; *B.C.* FAC ¶¶ 155–160. Plaintiffs simply allege that OpenAI became aware of Van Rootselaar's account and banned it and found out after her crime that she had been using a second account. Plaintiffs do not allege that OpenAI acted with actual knowledge of Van Rootselaar's specific crime.

Second, Plaintiffs do not allege that Defendants made a "conscious decision" to facilitate Van Rootselaar's specific crime. Plaintiffs acknowledge that OpenAI has "automated systems" and "a specialized unit of experienced threat-assessment and counterterrorism professionals" to identify and review ChatGPT conversations for "credible and imminent" threats, and that this process led to OpenAI "deactivat[ing]" Van Rootselaar's known account. *Stacey* FAC ¶¶ 2, 40, 76, 209; *B.C.* FAC ¶¶ 23–24. While Plaintiffs allege that OpenAI should have taken *additional* steps to prevent Van Rootselaar from using ChatGPT again, that is a far cry from alleging that OpenAI *made a conscious decision to aid* Van Rootselaar in committing her specific crime. Similarly, any conscious decision by OpenAI to provide or allow types of content alleged by Plaintiffs to be harmful was not a conscious decision to "intentionally aid[]" Van Rootselaar's shooting. *Shamgochian*, 2013 WL 1098256, at *9.

The absence of a plausible allegation of a "conscious decision" by OpenAI to facilitate Van Rootselaar's crime is underscored by the fact that Plaintiffs do not offer any plausible reason *why* Defendants would decide to aid a user in committing a horrific shooting. The Individual Plaintiffs allege, without factual support, that ChatGPT was "engineered" "to maximize engagement, including engagement with violent ideation," and that this somehow reflects "specific intent to facilitate the conduct" of Van Rootselaar. *Stacey* FAC ¶ 247. That inferential

leap is unfounded, and it is belied by the (correct) allegation that OpenAI deactivated Van Rootselaar's account, which could not have been intended to maximize engagement. *Id.* ¶ 40. Even if the allegation were accurate, a general goal of "maximiz[ing] engagement," *id.*, is not "a conscious decision" to assist mass murder, *George*, 71 Cal. App. 5th at 641 (citation omitted). Were the rule otherwise, virtually every interactive online platform could be liable for users' off-platform conduct based on general-purpose, engagement-maximizing features. *Cf. Twitter, Inc. v. Taamneh*, 598 U.S. 471, 504–05 (2023) (providing "platforms and content-sorting algorithms [that] were generally available to the internet-using public" was not "consciously, voluntarily, and culpably participat[ing] in or support[ing] the relevant wrongdoing," which is "the fundamental question of aiding-and-abetting liability").

### E. <u>Plaintiffs Do Not Allege Causation as a Matter of California Law (All Claims)</u>

All Plaintiffs' claims fail as a matter of law for the additional reason that Plaintiffs fail to plead causation—an element of each claim—because Van Rootselaar's mass shooting is a superseding cause and the only legal cause of Plaintiffs' harms.

California courts routinely reject claims seeking to hold companies responsible for content that allegedly inspired or encouraged a third party's crime. "[A] criminal act will be deemed a superseding cause unless it involves a particular and foreseeable hazard inflicted upon a member of a foreseeable class." *Kane v. Hartford Accident & Indem. Co.*, 98 Cal. App. 3d 350, 360 (1979). Applying that rule, courts have rejected allegations that defendants' media caused or inspired shootings and other intentional criminal conduct, holding that such third-party acts are superseding causes that sever the chain of causation. For instance, in *Mata*, the court dismissed claims that Meta caused a school shooting by "expos[ing] the Shooter to . . . aggressive, combat-fetishizing" marketing through "radicalizing . . . algorithmic selection" of ads. Ruling on Submitted Matters, *Mata* (Sept. 5, 2025), slip op. at 9; Am. Compl. ¶ 742, *Mata* (Nov. 22, 2024). The court reasoned that Meta's conduct was "too far attenuated" from the shooting to be a proximate cause because the plaintiffs' "injuries were a result of the perpetrator's willful decisions to purchase a firearm, take it to [the school], and use it to attack and murder the students, faculty, and staff." *Id.* at 11. The same court rejected similar claims against Activision for the "same

reasons," Minute Order, *Mata* (Jan. 28, 2026), slip op. 2—i.e., because the shooter was a superseding cause even if the violent video game was "vividly realistic and addicting" and the shooter was "reenact[ing] a violent fantasy," Am. Compl. ¶¶ 6–8, 18, *Mata* (filed Nov. 22, 2024). Similarly, in *Modisette v. Apple Inc.*, 30 Cal. App. 5th 136 (2018), the court affirmed dismissal of claims that Apple failed to implement "lockout" technology to keep drivers from using an iPhone while driving. *Id.* at 152–55. The court explained that the plaintiffs' "injuries were not a result of Apple's conduct" as a matter of law, but rather were proximately caused by a driver who "willingly diverted his attention from the highway." *Id.* at 154.

Case law beyond California is in accord. In *Sanders v. Acclaim Entertainment, Inc.*, 188 F. Supp. 2d 1264 (D. Colo. 2002), the court dismissed claims that violent video games and movies caused a school shooting on the grounds that the shooters' criminal conduct was a superseding cause. *Id.* at 1275–76. The court explained the shooting was "extraordinary and unforeseeable" and thus "reliev[ed] the movie and video game defendants[] of liability." *Id.* at 1276 (capitalization altered). And in *James v. Meow Media, Inc.*, 300 F.3d 683 (6th Cir. 2002), the court affirmed dismissal of claims against creators and distributors of violent video games and a movie for a school shooting. The court explained that "the idiosyncratic nature of [the shooter's] reaction to the defendants' media" likely meant that "his action constitutes a superseding cause." *Id.* at 699–700 (affirming dismissal on other grounds).

Although the Complaints label Van Rootselaar's mass shooting as a "foreseeable harm," and Plaintiffs "foreseeable victims," *e.g.*, *Stacey* FAC ¶¶ 206, 207, 250, 283; *B.C.* FAC ¶¶ 194, 239, 248, these bare assertions do not satisfy the narrow exception to the superseding cause rule for where a criminal act is a "foreseeable hazard inflicted upon a member of a foreseeable class," *Kane*, 98 Cal. App. 3d at 360. That exception applies only where the specific crime was foreseeable; it is not enough to allege that a general risk of criminal or violent conduct was foreseeable. *See Lopez v. McDonald's Corp.*, 193 Cal. App. 3d 495, 509, 513–14 (1987) ("mass murderous assault" unforeseeable notwithstanding other crimes). Plaintiffs fail to allege that Van Rootselaar's specific crime, a school shooting, or her specific target, Tumbler Ridge Secondary School, was foreseeable to Defendants. An interest in violence does not make a horrific crime

foreseeable; violent content is pervasive—in movies, books, video games, and other media—and the overwhelming majority of people who consume and discuss such content are not mass shooters. *Cf. Landeros v. Flood*, 17 Cal. 3d 399, 412 (1976) ("an isolated, atypical event" would not be foreseeable). As explained, the Individual Plaintiffs' conclusory allegation on "information and belief" that Van Rootselaar "communicated to ChatGPT a serious threat of physical violence against reasonably identifiable victims," *Stacey* FAC ¶ 210, is a mere "formulaic recitation of the elements of [the] cause of action," *Somers*, 729 F.3d at 959–60 (quoting *Twombly*, 550 U.S. at 555). Plaintiffs fail to allege any such threat to them in Van Rootselaar's conversations with ChatGPT, which Plaintiffs possess and which are incorporated by reference in the Complaints.

Separately, Van Rootselaar's intentional criminal conduct is the sole legal cause of Plaintiffs' harms. Independent from the doctrine of superseding cause, courts recognize that intentional criminal conduct by a third party—including mass shootings at schools and elsewhere—is the "predominant" cause of harm such that a defendant other than the criminal cannot be a "substantial factor" or "legal cause." *Castaldo v. Stone*, 192 F. Supp. 2d 1124, 1170–71 (D. Colo. 2001) (dismissing claims arising out of school shooting); *Steinle v. United States*, 17 F.4th 819, 824 (9th Cir. 2021) (causation "simply too attenuated" under California law due to "chain of events" including "criminal act"). For instance, in *Phillips v. Lucky Gunner, LLC*, 84 F. Supp. 3d 1216 (D. Colo. 2015), the court rejected negligence and other claims against online stores that allegedly sold a shooter ammunition and other products and lacked "reasonable safeguards to prevent dangerous people . . . from purchasing the potentially harmful wares." *Id.* at 1220, 1228. The court explained that the shooter's "deliberate, premeditated criminal acts were the predominant cause" of his mass shooting in a movie theater, such that sale of the defendants' products used in the shooting could not be a "substantial factor." *Id.* at 1228. Similarly, in *Modisette*, the court dismissed product liability claims against Apple arising out of a crash by a distracted driver. 30 Cal. App. 5th at 154–55. The court explained that the plaintiffs had not alleged proximate cause, even if the distracted driving was foreseeable, because "the gap between Apple's design of the iPhone and the . . . injuries" of plaintiffs harmed by a driver who "willingly

diverted his attention from the highway" "is too great for the tort system to hold Apple responsible." *Id.*

The same reasoning applies here. Van Rootselaar was by far the predominant actor in the commission of her crimes, such that OpenAI (and its design of ChatGPT) cannot have proximately caused her mass shooting as a matter of law, let alone the attenuated downstream costs that the British Columbia Government Plaintiffs seek to recoup from OpenAI, such as the cost of constructing a new wellness center in Tumbler Ridge. These and other federal and provincial government investments in the community in the wake of the shooting are laudable, but have no conceivable causal connection to any alleged act of Defendants—one of many reasons the British Columbia Government Plaintiffs' asserted damages are not recoverable as a matter of law. *See infra*, pp. 34–37.

Finally, Plaintiffs fail to allege causation for their failure to warn theories for the independent reason that law enforcement was already aware of the risk posed by Van Rootselaar. A complaint fails to allege causation for failure to warn where "[i]t is apparent from the allegations . . . that a warning sign would have been superfluous." *Zelig v. Cnty. of Los Angeles*, 27 Cal. 4th 1112, 1140 (2002). In *Zelig*, the California Supreme Court affirmed dismissal of claims that a woman should have been warned about a risk that her ex-husband might harm her at a courthouse. *Id.* at 1121. The Court explained that it was "apparent from the allegations" that the "element of causation" was "missing" because the woman was "aware of the danger presented by her ex-husband" and the limited court security, even without a warning. *Id.* Here, as Plaintiffs themselves allege, Van Rootselaar "was already known to local law enforcement before the attack," and "Canadian authorities had visited her residence multiple times in connection with mental health concerns and . . . had already recognized her as someone whose access to firearms warranted intervention." *Stacey* FAC ¶ 141; *B.C.* FAC ¶ 196. Plaintiffs' own allegations thus show that the authorities were "aware of her risk without having received any formal warning" from OpenAI, *Zelig*, 27 Cal. 4th at 1140, negating their conclusory assertion that a warning from OpenAI would have given "law enforcement and others" an "opportunity to monitor" Van Rootselaar that they did not already have, *Stacey* FAC ¶ 213; *B.C.* FAC ¶ 196.

### F. <u>Plaintiffs' Miscellaneous State-Law Claims Fail Under California Law</u>

Plaintiffs' remaining state-law claims suffer from fundamental defects. In addition to lack of causation, each of these claims fails as a matter of California law for independent reasons and should be dismissed.

#### *1. The Negligent Entrustment Claim Fails as a Matter of Law (Claim 2)*

Plaintiffs assert a negligent entrustment claim based on Defendants allegedly failing to stop Van Rootselaar from using ChatGPT. *Stacey* FAC ¶¶ 216–34; *B.C.* FAC ¶¶ 202–13. This claim is facially untenable because ChatGPT is an intangible service, not tangible "chattels."

Under California law, negligent entrustment applies only to the provision of "chattel[s]," not an intangible service. *Jacoves v. United Merch. Corp.*, 9 Cal. App. 4th 88, 115 (1992); Restatement (Second) of Torts § 390 (negligent entrustment reaches "[o]ne who supplies . . . a chattel for the use of another"). A "chattel" is "[m]ovable or transferable property; personal property; esp., a physical object." *Chattel*, Black's Law Dictionary (12th ed. 2024). Courts have held that online services, like ChatGPT, are not "chattels" and therefore cannot give rise to negligent entrustment claims as a matter of law. In *D'Ambrosio v. Rajala*, 783 F. Supp. 3d 1077 (N.D. Ill. 2025), for instance, the court dismissed a negligent entrustment claim against Meta because "Meta did not entrust chattels to its users, it provided a service, in this case a social media network." *Id.* at 1101. Courts applying California law likewise have dismissed negligent entrustment claims that arise from the provision of services. *Vocational Bike Rentals LLC v. Kitzuma Corp.*, No. 2:24-cv-07105-CAS-MAAx, 2026 WL 42589, at *8 (C.D. Cal. Jan. 6, 2026) (dismissing negligent entrustment claim based on entrustment of the "transportation" of goods).

Even if ChatGPT were "chattels," Plaintiffs do not plausibly allege "knowing entrustment" of ChatGPT to Van Rootselaar by Defendants. *See Dodge Ctr. v. Superior Ct.*, 199 Cal. App. 3d 332, 338 (1988). As explained, Plaintiffs allege that Defendants became aware of Van Rootselaar, and how she was using ChatGPT, in June 2025, when her first account was flagged, reviewed, and deactivated. *See Stacey* FAC ¶ 40; *B.C.* FAC ¶ 23. Deactivating an account is the opposite of entrustment. Plaintiffs further allege that Defendants *did not know* Van Rootselaar had created or was using a second account until after the shooting. *Stacey* FAC ¶¶ 16–17; *B.C.* FAC ¶ 164.

Thus, there was not *knowing* entrustment of the second account. Plaintiffs' allegations that Defendants could or should have discovered that Van Rootselaar was still using ChatGPT, *Stacey* FAC ¶¶ 16, 221; *B.C.* FAC ¶ 164, do not support a negligent entrustment claim either; California courts have held that "*constructive* negligent entrustment" is not enough. *See Wise*, 222 Cal. App. 3d at 1015.

*2. The Negligent Undertaking Claim Fails as a Matter of Law (Individual Plaintiffs' Claim 5; B.C. Government Plaintiffs' Claim 4)*

Plaintiffs' negligent undertaking claim is defective because it attempts to recast OpenAI's safety efforts as the affirmative cause of Plaintiffs' harms. A negligent undertaking claim requires that the defendant voluntarily "undert[ook] to provide protective services to another" and "either (a) the volunteer[']s failure to exercise such care increase[d] the risk of harm to the other person, or (b) the other person reasonably relie[d] upon the volunteer[']s undertaking and suffer[ed] injury as a result." *Delgado v. Trax Bar & Grill*, 36 Cal. 4th 224, 249 (2005). Plaintiffs fail to allege any of these elements.

First, Plaintiffs fail to plead that OpenAI "undertook to render services *to Plaintiffs*," an essential element of negligent undertaking. *Olvera v. Shafer*, No. 2:14-cv-01298-GMN-NJK, 2016 WL 1384785, at *3 (D. Nev. Apr. 7, 2016) (emphasis added). Plaintiffs do not allege any relationship between themselves and OpenAI. Rather, Plaintiffs' theory is that OpenAI undertook to identify and refer to law enforcement users who may be "planning to harm others," and then failed to exercise care in doing so. *Stacey* FAC ¶ 241; *B.C.* Compl. ¶ 219. While OpenAI has put in place policies and practices to try to prevent harm to users or the general public, by "adopting [such] policies" about safety, OpenAI "did not assume a [legal] duty to protect" everyone, everywhere in the world from any conduct caused by any of ChatGPT's more than 1.2 billion users. Such a standard does not and should not apply to any general purpose tool, including search engines or online platforms. *See Univ. of S. Cal. v. Superior Ct.*, 30 Cal. App. 5th 429, 449 (2018), *disapproved of on other grounds by Brown v. USA Taekwondo*, 11 Cal. 5th 204 (2021). That is not the law and it should not be: such a rule would disincentivize online services from undertaking voluntary safety efforts, lest they be sued on a negligent undertaking theory.

Second, Plaintiffs fail to allege that OpenAI's safety efforts "increased the risk of harm beyond what existed without the undertaking" of such efforts—i.e., that a risk of harm came from the safety efforts themselves, rather than their alleged inadequacy. *Barenborg v. Sigma Alpha Epsilon Fraternity*, 33 Cal. App. 5th 70, 83 (2019). California courts have rejected claims, at the pleading stage, premised on alleged violations of "safety protocols" that did not themselves "*increase* the risk of harm." *Hanouchian v. Steele*, 51 Cal. App. 5th 99, 115 (2020) (emphasis added). "[M]erely failing to eliminate a preexisting risk" also is not sufficient. *Univ. of S. Cal.*, 30 Cal. App. 5th at 450; *see also Jackson v. Airbnb, Inc.*, 639 F. Supp. 3d 994, 1008–09 (C.D. Cal. 2022) (dismissing negligent undertaking claim premised on defendant's failing to "do more" to protect against third party's crime). Plaintiffs' theory that OpenAI should have done more to address the preexisting risk posed by Van Rootselaar, *see supra*, pp. 18–20, therefore fails. Likewise, Plaintiffs' allegations that OpenAI did not "adhere to [a] policy of referring to law enforcement" when it allegedly "overruled the safety team" and "declined to refer Van Rootselaar to the RCMP," *Stacey* FAC ¶¶ 272–73; *B.C.* FAC Prayer for Relief ¶ f(iii), do not state a claim because allegedly failing to follow "safety protocols" does not show that those protocols themselves "increase[d] the risk of harm." *Hanouchian*, 51 Cal. App. 5th at 115.

Third, Plaintiffs do not allege that they relied on OpenAI's safety efforts. *Delgado*, 36 Cal. 4th at 249. There is no allegation that any Plaintiff took, or declined to take, any action based on any awareness of OpenAI's safety efforts. Plaintiffs' allegations on "information and belief" that "Canadian authorities and the public reasonably relied upon" OpenAI's safety efforts and that those efforts "discourag[ed] other protective measures," *Stacey* FAC ¶ 276; *B.C.* FAC ¶ 234, are facially implausible. Just as under California law "it would be unrealistic for students . . . to rely on the college for protection" during "noncurricular, off campus activities" where "a college has little control," it would be unrealistic for law enforcement or others to rely on an online platform to prevent more than 1.2 billion members of the public from committing violence—and there is no indication that Canadian law enforcement did so. *See Univ. of S. Cal.*, 30 Cal. App. 5th at 449. To the contrary, Plaintiffs allege that Canadian law enforcement took steps to address the risk posed by Van Rootselaar. *Stacey* FAC ¶ 141; *B.C.* FAC ¶ 196. "[T]he Court need not accept

allegations that are contradicted by other allegations in the complaint." *Kennedy v. Bank of Am., N.A.*, No. 12-CV-952 YGR, 2012 WL 1458196, at *4 (N.D. Cal. Apr. 26, 2012).

### *3. Plaintiffs Do Not Allege Cognizable Product Liability Claims (Individual Plaintiffs' Claims 7, 8; B.C. Government Plaintiffs' Claims 6, 7)*

Plaintiffs' product liability theories do not fit their allegations. Plaintiffs invoke the wrong governing law; challenge an intangible online service not a tangible product; and seek to impose liability for expressive content. These reasons compel dismissal of these claims.

First, the correct governing law (British Columbia law) does not recognize strict product liability. British Columbia applies negligence principles to product liability claims, including negligent design and failure to warn. *See, e.g.*, *Ding v. Prévost (A Division of Volvo Group Canada Inc.)*, 2022 BCSC 215, paras. 205–207, *aff'd*, 2024 BCCA 102; *Harrington v. Dow Corning Corp.*, 2000 BCCA 605, para. 122 (Finch JA, dissenting, but not on this point). This is a true conflict under California's choice-of-law test, and British Columbia has the greater interest in applying its negligence regime to claims by British Columbians for injuries occurring in British Columbia—even if the alleged "product" was designed or manufactured in California. *See McLaughlin v. Tesla, Inc.*, No. 22-cv-07849-SVK, 2024 WL 4178676, at *4–8 (N.D. Cal. Sept. 11, 2024) (applying Virginia law, which does not recognize strict product liability, to claims by Virginians arising from an accident in Virginia). Where, as here, the jurisdiction where the injury occurred does not recognize strict product liability, such claims must be dismissed. *E.g.*, *Hughes v. Apple, Inc.*, No. 22-cv-07668-VC, 2024 WL 4828072, at *1–2 (N.D. Cal. Nov. 18, 2024) (dismissing claims of plaintiffs from states that do not recognize strict product liability).

Second, even if California law applied, strict product liability applies only to products, not services. ChatGPT is a dynamic online service, not a static tangible "product." *See* Restatement (Third) of Torts: Prods. Liab. § 19. Many courts have concluded that online platforms are not subject to strict product liability for this reason, even if a company colloquially uses the term "product" to describe their service. *E.g.*, *Ito v. Google*, No. 24PSCV00061, 2024 WL 7035832, at *5 (Cal. Super. Ct. May 1, 2024) (Google's AI service Bard not a "product"); *Jacobs v. Meta Platforms, Inc.*, No. 22CV005233, 2023 WL 2655586, at *3–4 & nn.1, 4 (Cal. Super. Ct. Mar. 10,

2023) (Facebook not a product; "the use by Facebook of the term 'product' does not resolve the question"); *Ziencik v. Snap, Inc.*, No. CV 21-7292-DMG (PDx), 2023 WL 2638314, at *4 (C.D. Cal. Feb. 3, 2023) (Snapchat not a product). As the California court overseeing the consolidated state court social media addiction litigation explained in holding that product liability law does not apply to social media platforms: the "platforms are not static things; they are programs that facilitate an interactive experience."[18] *Social Media Cases*, No. 22STCV21355, 2023 WL 6847378, at *15–21 (Cal. Super. Ct. Oct. 13, 2023). The same reasoning compels dismissal of Plaintiffs' claims arising from Van Rootselaar's conversations with the AI service ChatGPT.

Third, even if ChatGPT were a "product" under California law, a "strict liability law requires that the plaintiff's injury must have been caused by a 'defect' in the defendant's product." *O'Neil v. Crane Co.*, 53 Cal. 4th 335, 347 (2012) (cleaned up). But Plaintiffs' theory is that they were injured by Van Rootselaar's reaction to ChatGPT (and subsequent criminal acts), not by a defect in ChatGPT. Such a "reaction"-based theory of product liability is "deeply flawed" and would require extending existing "bystander jurisprudence." *See Meow Media*, 300 F.3d at 700 (applying Kentucky law); *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167, 173–74 (D. Conn. 2002) (dismissing Connecticut product liability claim alleging that user's "interact[ion]" with violent video game caused him to commit stabbing).

Fourth, strict product liability claims cannot be based on expressive content, the heart of Plaintiffs' allegations here. "There is no strict liability for books, movies, or other forms of media." *Est. of B.H.*, 2022 WL 551701, at *3; *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1036 (9th Cir. 1991) ("[W]e decline to expand products liability law to embrace the ideas and expression in a book."). Expressive media that convey intangible ideas are not "products" even if

---

[18] The federal court overseeing the social media addiction MDL took a different approach, holding that each challenged "functionality" of a social media platform should be analyzed independently to determine whether that aspect of the service is a "product." *In re Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 849 (N.D. Cal. 2023). Even if that approach were consistent with California law, it would not support applying product liability law here. The plaintiffs in the social media addiction MDL brought claims alleging harms from software features such as parental controls, age verification, screen time limits, and barriers to keep users from deactivating their own accounts. *See id.* at 849–54. At base, all Plaintiffs' claims here challenge the content of Van Rootselaar's conversations with ChatGPT. *Infra* pp. 31–32.

"wrapped" in an interactive or technologically sophisticated "container." *Wilson*, 198 F. Supp. 2d at 173–74 (video game not a product). For example, a court dismissed product liability claims alleging that Netflix's use of "data about its users" to "target vulnerable children" resulted in a suicide because "[w]ithout the content, there would be no claim." *Est. of B.H.*, 2022 WL 551701, at *2 n.3, *3. Even courts that have applied product liability law, or suggested it might apply, to certain features of online platforms have emphasized that such claims cannot be used to target features that are "akin to ideas, content, and free expression upon which products liability claims cannot be based." *E.g.*, *In re Social Media*, 702 F. Supp. 3d at 842; *Garcia v. Character Techs., Inc.*, 785 F. Supp. 3d 1157, 1180 (M.D. Fla. 2025) (product liability claims may not be based on "ideas or expressions within the [AI chatbot] app").

Because Plaintiffs' product liability claims fundamentally target expressive content, they must be dismissed. Plaintiffs allege that ChatGPT is a defective "content-generating product," pointing to alleged defects such as "sustaining, validating, and elaborating" conversations about violence, failing to "categorical[ly] refus[e] . . . violent premises," and generating "sycophantic" and "anthropomorphic" conversational responses. *E.g.*, *Stacey* FAC ¶ 300; *B.C.* FAC ¶¶ 211, 249. Although Plaintiffs purport to identify non-content "features," *Stacey* FAC ¶ 199, those alleged defects are repackaged objections to content. For instance, the Individual Plaintiffs say ChatGPT is defective because it did not always "decline to engage with . . . expressions of violent intent," because content guardrails allegedly "degrade[d]" in longer conversations, and because it used "memory" as part of "generat[ing] a response." *Id.* ¶¶ 164, 300–01. These alleged defects are simply proxies for the allegedly harmful content. The British Columbia Government Plaintiffs' theory fares no better. They allege that ChatGPT is defective because it has "a deactivation mechanism that did not prevent immediate reactivation," allowing Van Rootselaar to continue accessing violent content. *B.C.* FAC ¶ 249. Because "[w]ithout the content, there would be no claim," the product liability claims must be dismissed. *Est. of B.H.*, 2022 WL 551701, at *3.[19]

[19] The Individual Plaintiffs also suggest that ChatGPT is defective because it did not "conform to the legal requirements imposed on therapists." *Stacey* FAC ¶ 300. That repackages Plaintiffs' *Tarasoff* theory of negligence and fails for the same reasons. *Supra*, pp. 12–17. The British Columbia Government Plaintiffs also suggest that OpenAI's "process" for reviewing flagged accounts "is defective." *B.C.* FAC ¶ 259. A company's processes and procedures are not

*4. The NIED Claim Fails (Claim 9 in Certain Individual Plaintiffs' Complaints)*

Although Defendants recognize that the Individual Plaintiffs have suffered tremendously, they have not stated plausible claims for negligent infliction of emotional distress under California law. "The negligent causing of emotional distress is not an independent tort, but the tort of negligence," to which "the traditional elements of duty, breach of duty, causation, and damages apply." *Burgess v. Superior Ct.*, 2 Cal. 4th 1064, 1072 (1992) (cleaned up). All the NIED claims thus fail for the same reasons that Plaintiffs' duty to warn and misfeasance claims fail—lack of legal duty and lack of causation. *Supra*, pp. 12–20, 23–28.

The NIED claims brought by those Individual Plaintiffs who were not present at the school fail for additional reasons. *Thing v. La Chusa*, 48 Cal. 3d 644, 668 (1989). These Individual Plaintiffs allege that they spoke over the phone during the shooting with their child, who was not injured. *Younge* Second Amended Compl. ("*Younge* SAC") ¶ 205. In other words, they essentially allege that they were "virtually 'present'"—an NIED theory the California Supreme Court has not approved. *See Downey v. City of Riverside*, 16 Cal. 5th 539, 560 n.10 (2024). Even if this theory were viable, California law "limits" NIED claims for "bystander[s]" "who did not suffer physical injury and w[ere] not threatened with such injury." *Long v. PKS, Inc.*, 12 Cal. App. 4th 1293, 1298 (1993). Such claims require, and Plaintiffs Younge and Geary do not allege, contemporaneous perception of the actual "infliction of injuries" on a close relative. *Scherr v. Hilton Hotels Corp.*, 168 Cal. App. 3d 908, 910 (1985) (emphasis omitted); *Ra v. Super. Ct.*, 154 Cal. App. 4th 142, 150–51 & n.8 (2007). These NIED claims, and those of the other Plaintiffs, must be dismissed.

---

"products." *See In re Uber Techs., Inc., Passenger Sexual Assault Litig.*, 745 F. Supp. 3d 869, 907 (N.D. Cal. 2024) (challenge to "customer support and hiring practices" not subject to strict products liability).

### G. The Wrongful Death and Survivor Action Claims Fail (Claims 9, 10 in Certain Individual Plaintiffs' Complaints)

Plaintiffs' "wrongful death and survival claims are derivative of the negligence" and other claims, and "cannot succeed" for the same reasons. *Oh v. Tchrs. Ins. & Annuity Ass'n of Am.*, 53 Cal. App. 5th 71, 82 (2020).

### H. The British Columbia Government Plaintiffs Cannot Recover Any Damages

The negligence and product liability claims by British Columbia Government Plaintiffs fail for the additional, independent reason that those Plaintiffs seek purely "economic damages." *B.C.* FAC at 1 & ¶ 187. Those damages are barred by both the economic loss rule and the municipal cost recovery doctrine. Without compensable damages, the British Columbia Government Plaintiffs cannot seek punitive damages or injunctive relief either, and their claims fail.

#### *1. The Economic Loss Rule Bars the Damages Sought*

The British Columbia Government Plaintiffs' damages are barred by the economic loss rule. "In general, there is no recovery in tort for negligently inflicted 'purely economic losses,' meaning financial harm unaccompanied by physical or property damage." *Sheen v. Wells Fargo Bank, N.A.*, 12 Cal. 5th 905, 922 (2022) (citation omitted). Economic loss is compensable only if it "arise[s] from actionable physical, emotional or reputational injury to persons or physical injury to property." *See S. Cal. Gas Leak Cases*, 7 Cal. 5th 391, 398 (2019) (citation omitted). Likewise, "[d]amages available under strict products liability do not include economic loss." *Jimenez v. Superior Ct.*, 29 Cal. 4th 473, 482 (2002). Canadian law similarly bars negligence claims for "economic loss that is unconnected to a physical or mental injury to the plaintiff's person, or to physical damage to property." *1688782 Ontario Inc. v. Maple Leaf Foods Inc.*, 2020 SCC 35 (CanLII) [2020], at para. 17.

The damages sought by the British Columbia Government Plaintiffs are precisely the kind of non-compensable damages barred by the economic loss rule: "economic damages, including but not limited to extraordinary policing response, acute and ongoing health care, victim services and trauma-informed mental-health care, educational continuity and staffing, facility remediation, demolition, and the construction of a replacement school and wellness center." *B.C.* FAC ¶ 187.

The centerpiece of their damages demand is the cost of a "new secondary school and the modernization of the community's health-care facilities as a combined wellness and healing project." *Id.* ¶ 184. The decision to "demolish[]" and replace the school building was made "to avoid further and ongoing traumatization." *Id.* ¶¶ 184–85. The British Columbia Government Plaintiffs also seek to recover various costs from responding to the shooting, including "mental-health clinicians," "RCMP Victim Services staff," and an ongoing "Child & Youth Mental Health team." *Id.* ¶¶ 183–85.

These expenditures to support mental health and "to provide a strong sense of safety to the school community," *id.* ¶ 189, while laudable, are purely economic and do not arise from physical injury or property damage. The same is also true of the costs incurred to demolish and rebuild the school. Although the British Columbia Government Plaintiffs assert generally that school facilities were "damaged and rendered unusable" by the shooting, *id.* ¶¶ 31, 44, 248, Plaintiffs allege that they decided the school was "rendered unusable" and would be "demolished" not because of property damage, but out of a concern about "further and ongoing traumatization," *id.* ¶¶ 31, 184–85. Plaintiffs cannot point to property damage to a school they demolished for other reasons as a basis for recovering any and all expenditures they saw fit to incur after the shooting. Nor does the cost of a new "community wellness center" relate to any such property damage. *See id.* ¶ 187. Because all of these costs do not "arise from" any property damage, they are barred by the economic loss rule. *See S. Cal. Gas Leak Cases*, 7 Cal. 5th at 398. "Indirect economic damages" are not recoverable unless they "arose from a direct and continuous causal chain of events" connecting the economic loss to any alleged property damage. *Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.*, 73 Ohio St. 3d 609, 616 (1995); *Keahole Point Fish LLC v. Skretting Can. Inc.*, 971 F. Supp. 2d 1017, 1030 (D. Haw. 2013) (no recovery for "financial losses" or "additional costs incurred" independent of alleged property damage).

Indeed, just this month, the California Court of Appeal held that the economic loss rule barred similar claims by a school district against social media platforms. *Social Media Cases*, No. B340661, -- Cal. Rptr. 3d --, 2026 WL 3347173, at *6 (Cal. Ct. App. Nov. 5, 2026). The school district alleged that "addictive and compulsive use" of the platforms required the district to

"respond," including by "hiring additional personnel," "developing additional resources," "increasing training for teachers and staff," "spend[ing] more time addressing issues . . . and less time teaching." *Id.* at *2–3. The Court of Appeal affirmed dismissal of the school district's negligence claims, explaining that because the district "failed to allege cognizable physical or property damage, its negligence cause of action fails." *Id.* at *6.[20] Just so here.

2. *The Municipal Cost Recovery Rule Bars the Damages Sought*

Separately, under either California law or British Columbia law, government entities are precluded from recovering the damages sought here.

Under California law, "a government entity may not . . . recover the costs of law enforcement absent authorizing legislation" or "a tort that would entitle it to compensatory damages that are not based upon expenditures for the benefit of the public." *Cnty. of San Luis Obispo v. Abalone All.*, 178 Cal. App. 3d 848, 859 (1986). Applying this rule, the court in *Abalone Alliance* affirmed dismissal of claims by a county against anti-nuclear protestors to "recover its costs incurred in its exercise of police power during the[ir] blockade." *Id.* at 858–62. The British Columbia Government Plaintiffs' demand to be reimbursed for "policing response, acute and ongoing health care, victim services," a "combined wellness and healing project," and other response expenditures, *B.C.* FAC ¶¶ 184, 187, are similarly legally impermissible demands to recoup "the costs of law enforcement" and other "expenditures for the benefit of the public." *Abalone All.*, 178 Cal. App. 3d at 859.

Under British Columbian law, certain statutes expressly authorize recovering aggregate healthcare costs in the specific contexts of tobacco, opioid, and vaping harms. *See Tobacco Damages and Health Care Costs Recovery Act*, S.B.C. 2000, c 30; *Opioid Damages and Health Care Costs Recovery Act*, S.B.C. 2018, c 35; *Vaping Product Damages and Health Care Costs Recovery Act*, S.B.C. 2025, c 29. British Columbia can sue under those laws to recover

[20] While the court in *Social Media Cases* separately held that claims of damage to "restroom fixtures" were barred by Section 230, 2026 WL 3347173 at *3, *12–13, that makes no difference. The British Columbia Government Plaintiffs cannot get around the economic loss rule by purporting to recover based on property damage to a school that they voluntarily decided to demolish. *B.C.* FAC ¶ 184–85.

expenditures to address *those* harms. *See, e.g.*, *British Columbia v. McKinsey & Co., Inc. United States*; Vancouver Registry No. S-2111367 (B.C.S.C.) (case involving claims under British Columbia's Opioid Damages and Health Care Costs Recovery Act). There is no comparable statute for harms from mass shootings that the British Columbia Government Plaintiffs can invoke here. Such recovery, "in the absence of express statutory authorization, would be a question of first impression under British Columbian law." Declaration of Julia K. Lockhart ¶ 5, *B.C.*, Dkt. No. 18-1. The Court should not "extend [foreign] law where statutes and case law have not done so." *In re Lyondell Chem. Co.*, 567 B.R. at 127.

#### *3. The Remaining Forms of Relief Cannot Sustain the British Columbia Government Plaintiffs' Claims*

Without compensable actual damages, the British Columbia Government Plaintiffs cannot pursue any of the other remedies they seek. Punitive damages cannot be recovered without actual damages. *Berkley v. Dowds*, 152 Cal. App. 4th 518, 532 (2007). Similarly, a claim for injunctive relief requires that the anticipated future harm be compensable. *See Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1352–53 (2003); *Thomas & Saik'uz First Nation v. Rio Tinto Alcan Inc.*, 2022 BCSC 15, at para. 630. In any event, the British Columbia Government Plaintiffs lack standing for injunctive relief, which requires "a sufficient likelihood that [a plaintiff] will again be wronged in a similar way. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). Here, the British Columbia Government Plaintiffs allege that Van Rootselaar's shooting was "one of the deadliest mass shootings in Canadian history" and that the government response was "extraordinary" and involved "extraordinary, non-recurring measures." *B.C.* FAC ¶¶ 29, 187–88, 199, 243, 261, Prayer for Relief ¶ b. The British Columbia Government Plaintiffs do not plausibly allege that they are likely to be "wronged in a similar way" in the future. *Lyons*, 461 U.S. at 111.

### I. <u>The Doctrine of Constitutional Avoidance Supports Dismissal</u>

The doctrine of constitutional avoidance provides an additional reason to dismiss many of Plaintiffs' claims: "Attaching . . . tort liability to the ideas and images" allegedly conveyed by ChatGPT would "raise significant constitutional problems under the First Amendment that ought

to be avoided." *Meow Media*, 300 F.3d at 695, 699. If the Court does not dismiss on the state-law grounds above, it will have to confront these weighty First Amendment issues.

The First Amendment bars liability for the content of speech, including in private tort suits. *See Snyder v. Phelps*, 562 U.S. 443, 451 (2011). For decades, courts have dismissed tort claims under the First Amendment that seek to hold media and technology companies liable for content that allegedly inspired or catalyzed harmful conduct, including mass shootings. For instance, in *McCollum*, the court affirmed dismissal of claims that the Ozzy Osbourne song "Suicide Solution," with the lyrics "[g]et the gun and try it," caused a teenager's suicide. 202 Cal. App. 3d at 996–1003. In *Sanders*, the court dismissed claims that a school shooting was caused by violent media content that the shooters were "act[ing] out," including video games that "trained [them] how to point and shoot a gun" and a movie scene in which "a student massacres his classmates with a shotgun." 188 F. Supp. 2d at 1268–69, 1279–81. In *Watters v. TSR, Inc.*, 715 F. Supp. 819 (W.D. Ky. 1989), the court dismissed claims that the roleplaying game Dungeons & Dragons caused a minor's suicide, explaining that such claims would "have a devastatingly broad chilling effect on expression of all forms." *Id.* at 822. In *Zamora*, the court dismissed claims that violent television programming caused a minor to commit murder. 480 F. Supp. at 200, 205. And in *Meow Media*, the court affirmed dismissal of claims that video games, movies, and internet sites caused a school shooting because "attaching tort liability to the effect that such ideas have on a criminal actor would raise significant constitutional problems under the First Amendment that ought to be avoided." 300 F.3d at 695; *see also NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1116–17 (9th Cir. 2024) (statutory provision requiring online platforms to identify and disclose risk of potentially harmful content implicated First Amendment).

Plaintiffs' claims implicate the First Amendment because they challenge speech. Plaintiffs allege, for instance, that ChatGPT uses "first-person pronouns," "affirm[s]" users, engages in "conversations glorifying or elaborating on violence" or "conversations involving violence," "describ[es] scenarios involving gun violence," discusses "violent content," and does not "challenge" users discussing "violent thoughts." *Stacey* FAC ¶¶ 13, 167, 172, 241, 285; *B.C.* FAC ¶¶ 137, 153, 211, 239. And Plaintiffs allege that Van Rootselaar used ChatGPT to generate

[redacted] *Stacey* FAC ¶¶ 4, 137; *B.C.* FAC ¶ 120. These allegations about the content of users' conversations with ChatGPT challenge speech. As the Ninth Circuit has held, "words" are a "form[] of pure expression" protected by the First Amendment, *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1058–59, 1061 (9th Cir. 2010), and "language is by definition speech," *Yniguez v. Arizonans for Off. Eng.*, 69 F.3d 920, 935 (9th Cir. 1995), *vacated on other grounds*, 520 U.S. 43 (1997).

Plaintiffs' claims and requested injunctive relief would infringe ChatGPT users' First Amendment "right to receive information and ideas."[21] *Stanley v. Georgia*, 394 U.S. 557, 564 (1969). The rights of "viewers and listeners" to receive information and ideas are "paramount," *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 390 (1969), and courts have long dismissed similar tort claims out of concern for such listener rights, *e.g.*, *Zamora*, 480 F. Supp. at 205 (emphasizing "the right of the public to have broad access to programming"); *McCollum*, 202 Cal. App. 3d at 997–1003 ("[t]he rights protected" include "those of the listener to receive"); *Watters*, 715 F. Supp. at 822 (First Amendment does not permit the "misfits of society" to determine "what the rest of the country can and cannot read, watch, and hear"). The Court need not wrestle at this juncture with the novel question of who should be deemed the speaker of AI-generated speech because listeners[22]—here, ChatGPT users—have a right to receive information and ideas, whether or not the source of the information and ideas is protected by the First Amendment. *Kleindienst v. Mandel*, 408 U.S. 753, 762–65 (1972) (First Amendment interest in receiving speech of foreign professor who lacked First Amendment rights); *Lamont v. Postmaster Gen. of U.S.*, 381 U.S. 301,

[21] OpenAI may assert "the First Amendment rights of its users." *Garcia*, 785 F. Supp. 3d at 1176 (AI service operator may assert users' rights in defending a personal injury suit); *In re Grand Jury Subpoena, No. 16-03-217*, 875 F.3d 1179, 1183 & n.2 (9th Cir. 2017) (website had standing to raise users' First Amendment rights).

[22] Plaintiffs' claims may also implicate First Amendment speech rights of users, who use ChatGPT as part of their own protected "speech-creation processes." *See Project Veritas v. Schmidt*, 125 F.4th 929, 943 (9th Cir. 2025) (en banc) ("speech-creation processes" protected). And Plaintiffs' claims may implicate OpenAI's own speech rights to decide what "speech environment" to allow on ChatGPT. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 734, 739–40 (2024) (online platforms' decisions about what "speech environment" to allow protected by First Amendment).

307 (1965) (First Amendment right to receive foreign speech that was not itself protected by First Amendment).

Plaintiffs cannot sidestep the First Amendment by arguing that the words here are not "speech" because AI is involved. Plaintiffs may rely on an out-of-circuit district court decision which declined to decide a First Amendment defense to claims based on AI service output at the pleading stage because it was a novel issue, suggesting that such a defense might present a factual question regarding whether the output reflects human "expressive choice." *Garcia*, 785 F. Supp. 3d at 1175–79 (citation omitted). The Court should not follow the *Garcia* court's suggestion: It is contrary to the Ninth Circuit's decision in *Anderson* that "words" are a "form[] of pure expression" protected by the First Amendment. 621 F.3d at 1058–59, 1061. It is also contrary to Supreme Court precedent holding that the First Amendment protects the right to receive information and ideas independent of the source. *See supra*, p. 39.

Nor have Plaintiffs pled facts that implicate any exception to the First Amendment. There is no allegation that any statements by ChatGPT to Van Rootselaar were "'directed [at] producing imminent lawless action,' and likely to do so." *Counterman v. Colorado*, 600 U.S. 66, 73 (2023) (quoting *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969)). "The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it"; there is no First Amendment exception for speech that is alleged to "whet[] the appetite[]" for criminal conduct. *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002). Nor was the alleged speech "integral to unlawful conduct." *United States v. Hansen*, 599 U.S. 762, 783 (2023). That exception applies narrowly to speech "done in furtherance of the commission of an underlying criminal offense," *Matsumoto v. Labrador*, 122 F.4th 787, 813–14 (9th Cir. 2024), i.e., intentional solicitation or aiding and abetting, *United States v. Al-Timimi*, 164 F.4th 292, 304 (4th Cir. 2026).

Nor does any exception to the First Amendment exist for speech depicting or describing violence, which is pervasive; even children's books "contain no shortage of gore." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790–99 (2011). "Classic literature and art, and not merely today's popular culture, are saturated with graphic scenes of violence, whether narrated or pictorial," because "[v]iolence has always been and remains a central interest of humankind and a recurrent,

even obsessive theme of culture both high and low." *Am. Amusement Mach. Ass'n v. Kendrick*, 244 F.3d 572, 575, 577 (7th Cir. 2001) (Posner, J.) (enjoining law restricting violent video games). "[W]hatever the challenges of applying the Constitution to ever-advancing technology, the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary when a new and different medium for communication appears." *Brown*, 564 U.S. at 790 (internal quotation marks and citation omitted). That is so even if a new medium provides for imaginative "participation in the violent action," because "all literature is interactive." *Id.* at 798. "Literature when it is successful draws the reader into the story, makes him identify with the characters, invites him to judge them and quarrel with them, to experience their joys and sufferings as the reader's own." *Id.* (quoting *Kendrick*, 244 F.3d at 577). Thus, conversations with AI are entitled to First Amendment protection to the same extent as traditional forms of media.

The Court should dismiss on the state law grounds argued above to avoid these significant First Amendment issues.

And the Court must dismiss Plaintiffs' demand for injunctive relief. They request an injunction requiring OpenAI to, among other things: "interrupt, terminate, or escalate" certain conversations but "de-escalate" others; warn that ChatGPT "can reinforce and escalate violent ideation"; restore prior content policies and "risk classifications"; "prohibit [ChatGPT] from proposing or accepting fictional, roleplay, 'educational,' or 'research' framings" for certain types of content; and "display clear, prominent warnings" regarding certain types of "content" that ChatGPT may generate. *Stacey* FAC Prayer for Relief ¶ 4; *B.C.* FAC Prayer for Relief ¶ f. Such relief seeks to control what content is available to ChatGPT users around the globe—including obviously protected information, ideas, and fiction. *See Courtright v. Epic Games, Inc.*, 795 F. Supp. 3d 1156, 1166–67 (W.D. Mo. 2025) (noting "long history of courts rejecting" requirements to "warn of dangerous ideas or content contained in protected speech"; there, in video games). Such a sweeping global injunction would be an impermissible prior restraint that would cause "communication [to] be suppressed, either directly or by inducing excessive caution in the speaker, before an adequate determination that it is unprotected by the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 390 (1973). The

demands for this injunctive relief should therefore be dismissed. *Isuzu Motors Ltd. v. Consumers Union of U.S., Inc.*, 12 F. Supp. 2d 1035, 1049 (C.D. Cal. 1998) (demand for injunctive relief "dismissed with prejudice to the extent it seeks relief beyond enjoining defendant from making specific statements determined to be unprotected by the First Amendment").

## V. CONCLUSION

The Court should grant Defendants' motion to dismiss for failure to state a claim.

DATED: November 18, 2026 MUNGER, TOLLES & OLSON LLP

By: */s/ Bethany W. Kristovich*
BETHANY W. KRISTOVICH
JONATHAN H. BLAVIN
STEPHANIE G. HERRERA
Attorneys for Defendants
OpenAI Foundation, OpenAI OpCo, LLC, OpenAI Group PBC, OpenAI Holdings, LLC, and Samuel Altman