# EXHIBIT C

Electronically Received 11/22/2024 09:31 PM

KOSKOFF KOSKOFF & BIEDER, PC
KATHERINE MESNER-HAGE, State Bar No. 350216
kmesnerhage@koskoff.com
350 Fairfield Avenue, Suite 501
Bridgeport, CT 06604
Telephone: (203) 336-4421
Facsimile: (203) 368-3244

Attorneys for Plaintiffs

FILED
Superior Court of California
County of Los Angeles
11/22/2024
David W. Slayton, Executive Officer / Clerk of Court
By: R. Sanchez Deputy

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF LOS ANGELES – CENTRAL DISTRICT**

VERONICA MATA, Individually;
VERONICA MATA, as Successor-In-Interest to Tess Marie Mata, deceased minor;
JERRY MATA, Individually;
JERRY MATA, as Successor-In-Interest to Tess Marie Mata, deceased minor;
SANTA GLORIA CAZARES, Individually;
SANTA GLORIA CAZARES, as Successor-In-Interest to Jacklyn Jaylen Cazares, deceased minor;
JAVIER CAZARES, Individually;
JAVIER CAZARES, as Successor-In-Interest to Jacklyn Jaylen Cazares, deceased minor;
RACHEL GARZA, Esq., as Successor-in-Interest to Amerie Jo Garza, deceased minor;
KIMBERLY GARCIA, Individually;
KIMBERLY GARCIA as Successor-In-Interest to Amerie Jo Garza, deceased minor;
ANA RODRIGUEZ, Individually;
ANA RODRIGUEZ, as Successor-In-Interest to Maite Yuleana Rodriguez, deceased minor;
MONICA GALLEGOS, Individually;
MONICA GALLEGOS, as Successor-In-Interest to Annabell Guadalupe Rodriguez, deceased minor;
JESSIE RODRIGUEZ, Individually;
JESSIE RODRIGUEZ, as Successor-In-Interest to Annabell Guadalupe Rodriguez, deceased minor;
DEANNA GORNTO, Individually;

Case No. 24SMCV02494

**AMENDED COMPLAINT FOR DAMAGES**

1. **NEGLIGENCE**
2. **GROSS NEGLIGENCE**
3. **STRICT PRODUCT LIABILITY – DESIGN DEFECT**
4. **STRICT PRODUCT LIABILITY – FAILURE TO WARN**
5. **PRODUCT LIABILITY – NEGLIGENCE**
6. **NEGLIGENT FAILURE TO WARN**
7. **UNJUST ENRICHMENT**
8. **VIOLATION OF UNFAIR COMPETITION LAW (UCL), CAL. BUS. & PROF. CODE § 17200**
9. **NEGLIGENCE**
10. **GROSS NEGLIGENCE**
11. **STRICT PRODUCT LIABILITY – DESIGN DEFECT**
12. **STRICT PRODUCT LIABILITY – FAILURE TO WARN**
13. **PRODUCT LIABILITY – NEGLIGENCE**
14. **NEGLIGENT FAILURE TO WARN**
15. **UNJUST ENRICHMENT**
16. **VIOLATION OF UNFAIR COMPETITION LAW (UCL), CAL. BUS. & PROF. CODE § 17200**
17. **AIDING AND ABETTING**
18. **WRONGFUL DEATH**
19. **SURVIVAL ACTION**

**DEMAND FOR JURY TRIAL**

DEANNA GORNTO, as Successor-In-Interest to Maranda Gail Mathis, deceased minor;
MARIA MAGDALENE GARCIA, Individually;
MARIA MAGDALENE GARCIA, as Successor-In-Interest to Nevaeh Alyssa Bravo, deceased minor;
JUAN JULIAN BRAVO, Individually;
JUAN JULIAN BRAVO, as Successor-In-Interest to Nevaeh Alyssa Bravo, deceased minor;
VERONICA LUEVANOS, Individually;
VERONICA LUEVANOS, as Successor-In-Interest to Jailah Nicole Silguero, deceased minor;
JACOB SILGUERO, Individually;
JACOB SILGUERO, as Successor-In-Interest to Jailah Nicole Silguero, deceased minor;
APRIL ELROD, Individually;
APRIL ELROD, as Successor-In-Interest to Makenna Lee Elrod, deceased minor;
KIMBERLY RUBIO, Individually;
KIMBERLY RUBIO, as Successor-In-Interest to Alexandria Aniyah Rubio, deceased minor;
FELIX RUBIO, Individually;
FELIX RUBIO, as Successor-In-Interest to Alexandria Aniyah Rubio, deceased minor;
JOSE LUEVANOS, Individually;
JOSE LUEVANOS, as Successor-In-Interest to Jayce Carmelo Luevanos, deceased minor;
CHRISTINA LUEVANOS, Individually;
CHRISTINA LUEVANOS, as Successor-In-Interest to Jayce Carmelo Luevanos, deceased minor;
JENNIFER LUGO, Individually;
JENNIFER LUGO, as Successor-In-Interest to Eliahna Amyah Garcia, deceased minor;
STEVEN GARCIA, Individually;
STEVEN GARCIA, as Successor-In-Interest to Eliahna Amyah Garcia, deceased minor;
JOSE MANUEL FLORES, SR., Individually;
JOSE MANUEL FLORES, SR. as Successor-In-Interest to Jose Manuel Flores, Jr., deceased minor;
ALYSSA RODRIGUEZ, Individually;

ALYSSA RODRIGUEZ, as Successor-In-Interest to Jose Manuel Flores, Jr., deceased minor;
EVADULIA ORTA, Individually;
EVADULIA ORTA, as Successor-In-Interest to Rojelio Fernandez Torres, deceased minor;
DAVID BALMER, ESQ., as Successor-in-Interest to Uziyah Sergio Garcia, deceased minor;
MANDY MARIE RENFRO, Individually;
MANDY MARIE RENFRO, as Successor-In-Interest to Uziyah Sergio Garcia, deceased minor;
ELI TORRES, Individually;
ELI TORRES, as Successor-In-Interest to Eliahna Torres, deceased minor;
SANDRA TORRES, Individually;
SANDRA TORRES, as Successor-In-Interest to Eliahna Torres, deceased;
VINCENT SALAZAR, III, Individually;
VINCENT SALAZAR III, as Successor-In-Interest to Layla Marie Salazar, deceased minor;
MELINDA ALEJANDRO, Individually;
MELINDA ALEJANDRO, as Successor-In-Interest to Layla Marie Salazar, deceased minor;
FELICHA NICOLE MARTINEZ, Individually;
FELICHA NICOLE MARTINEZ, as Successor-In-Interest to Xavier Lopez, deceased minor;
ABEL CUELLAR LOPEZ, Individually;
ABEL CUELLAR LOPEZ, as Successor-In-Interest to Xavier Lopez, deceased minor;
RYAN RAMIREZ, Individually;
RYAN RAMIREZ, as Successor-In-Interest to Alithia Haven Ramirez, deceased minor;
JESSICA HERNANDEZ, Individually;
JESSICA HERNANDEZ, as Successor-In-Interest to Alithia Haven Ramirez, deceased minor;
ALEJANDRO GARCIA, Individually;
ALEJANDRO GARCIA, as Successor-In-Interest to of Irma Garcia, deceased;
LYLIANA GARCIA, Individually;

LYLIANA GARCIA, as Successor-In-Interest to Irma Garcia, deceased;
MANUEL LOZANO, Individually;
MANUEL LOZANO, as Successor-in-Interest to Irma Garcia, deceased;
PAULA MIRELES, Individually;
PAULA MIRELES, as Successor-In-Interest to Eva Mireles, deceased;
ADALYNN RUIZ, Individually;
ADALYNN RUIZ, as Successor-In-Interest to Eva Mireles, deceased;
MIAH ISABEL CERRILLO, a minor, by Abigale Veloz, her guardian ad litem;
ABIGALE VELOZ, Individually;
MIGUEL CERRILLO, Individually;
A.J. MARTINEZ, a minor, by Kassandra Chavez, his guardian ad litem;
KASSANDRA CHAVEZ, Individually;
JOSE MARTINEZ, Individually;
KENDALL OLIVAREZ, a minor, by Christina Olivarez, her guardian ad litem;
CHRISTINA OLIVAREZ, Individually;
NOAH ORONA, a minor, by Oscar Orona, his guardian ad litem;
OSCAR ORONA, Individually;
LEANN GARCIA, a minor, by Angelica Rodriguez, her guardian ad litem;
ANGELICA RODRIGUEZ, Individually;
ELSA AVILA, Individually;
KHLOIE TORRES, a minor, by Jamie Torres, her guardian ad litem;
JAMIE TORRES, Individually;
MAYAH ZAMORA, a minor, by Christina Zamora, her guardian ad litem; and
CHRISTINA ZAMORA, Individually,

Plaintiffs,

v.

META PLATFORMS, INC., a corporation;
INSTAGRAM, LLC, a business entity;
ACTIVISION BLIZZARD, INC., a corporation;
ACTIVISION PUBLISHING, INC., a corporation;
MICROSOFT CORPORATION, a corporation

INFINITY WARD, INC., a business entity;
TREYARCH CORPORATION, a business entity;
SLEDGEHAMMER GAMES, INC., a business entity;
BRANDON LEE ELROD, a Nominal Defendant;
BRIAN MATHIS, a Nominal Defendant;
CHRISTIAN GARCIA, a Nominal Defendant; and
DOES 1 through 50, inclusive,

Defendants.

Plaintiffs, VERONICA MATA, Individually, and as Successor-In-Interest to TESS MARIE MATA, deceased minor; JERRY MATA, Individually, and as Successor-In-Interest to TESS MARIE MATA, deceased minor; SANTA GLORIA CAZARES, Individually, and as Successor-In-Interest to JACKLYN JAYLEN CAZARES, deceased minor; JAVIER CAZARES, Individually, and as Successor-In-Interest to JACKLYN JAYLEN CAZARES, deceased minor; RACHEL GARZA, Esq., as Successor-in-Interest to AMERIE JO GARZA, deceased minor; KIMBERLY GARCIA, Individually, and as Successor-In-Interest to AMERIE JO GARZA, deceased minor; ANA RODRIGUEZ, Individually, and as Successor-In-Interest to MAITE YULEANA RODRIGUEZ, deceased minor; MONICA GALLEGOS, Individually, and as Successor-In-Interest to ANNABELL GUADALUPE RODRIGUEZ, deceased minor; JESSIE RODRIGUEZ, Individually, and as Successor-In-Interest to ANNABELL GUADALUPE RODRIGUEZ, deceased minor; DEANNA GORNTO, Individually, and as Successor-In-Interest to MARANDA GAIL MATHIS, deceased minor; MARIA MAGDALENE GARCIA, Individually, and as Successor-In-Interest to NEVAEH ALYSSA BRAVO, deceased minor; JUAN JULIAN BRAVO, Individually, and as Successor-In-Interest to NEVAEH ALYSSA BRAVO, deceased minor; VERONICA LUEVANOS, Individually, and as Successor-In-Interest to JAILAH NICOLE SILGUERO,

deceased minor; JACOB SILGUERO, Individually, and as Successor-In-Interest to JAILAH NICOLE SILGUERO, deceased minor; APRIL ELROD, Individually, and as Successor-In-Interest to MAKENNA LEE ELROD, deceased minor; KIMBERLY RUBIO, Individually, and as Successor-In-Interest to ALEXANDRIA ANIYAH RUBIO, deceased minor; FELIX RUBIO, Individually, and as Successor-In-Interest to ALEXANDRIA ANIYAH RUBIO, deceased minor; JOSE LUEVANOS, Individually, and as Successor-In-Interest to JAYCE CARMELO LUEVANOS, deceased minor; CHRISTINA LUEVANOS, Individually, and as Successor-In-Interest to JAYCE CARMELO LUEVANOS, deceased minor; JENNIFER LUGO, Individually, and as Successor-In-Interest to ELIAHNA AMYAH GARCIA, deceased minor; STEVEN GARCIA, Individually, and as Successor-In-Interest to ELIAHNA AMYAH GARCIA, deceased minor; JOSE MANUEL FLORES, SR., Individually, and as Successor-In-Interest to JOSE MANUEL FLORES, JR., deceased minor; ALYSSA RODRIGUEZ, Individually, and as Successor-In-Interest to JOSE MANUEL FLORES, JR., deceased minor; EVADULIA ORTA, Individually, and as Successor-In-Interest to ROJELIO FERNANDEZ TORRES, deceased minor; DAVID BALMER, Esq., as Successor-in-Interest to UZIYAH SERGIO GARCIA, deceased minor; MANDY MARIE RENFRO, Individually, and as Successor-In-Interest to UZIYAH SERGIO GARCIA, deceased minor; ELI TORRES, Individually, and as Successor-In-Interest to ELIAHNA TORRES, deceased minor; SANDRA TORRES, Individually, and as Successor-In-Interest to ELIAHNA TORRES, deceased minor; VINCENT SALAZAR, III, Individually, and as Successor-In-Interest to LAYLA MARIE SALAZAR, deceased minor; MELINDA ALEJANDRO, Individually, and as Successor-In-Interest to LAYLA MARIE SALAZAR, deceased minor; FELICHA NICOLE MARTINEZ, Individually, and as Successor-In-Interest to XAVIER LOPEZ, deceased minor; ABEL CUELLAR LOPEZ, Individually, and as Successor-In-Interest to XAVIER LOPEZ, deceased minor; RYAN RAMIREZ, Individually, and as Successor-In-Interest to

ALITHIA HAVEN RAMIREZ, deceased minor; JESSICA HERNANDEZ, Individually, and as Successor-In-Interest to ALITHIA HAVEN RAMIREZ, deceased minor; ALEJANDRO GARCIA, Individually, and as Successor-In-Interest to of IRMA GARCIA, deceased; LYLIANA GARCIA, Individually, and as Successor-In-Interest to IRMA GARCIA, deceased; MANUEL LOZANO, Individually and as Successor-in-Interest to IRMA GARCIA, deceased; PAULA MIRELES, Individually, and as Successor-In-Interest to EVA MIRELES, deceased; ADALYNN RUIZ Individually, and as Successor-In-Interest to EVA MIRELES, deceased; MIAH ISABEL CERRILLO, a minor, by Abigale Veloz, her guardian ad litem; ABIGALE VELOZ, Individually; MIGUEL CERRILLO, Individually; A.J. MARTINEZ, a minor, by Kassandra Chavez, his guardian ad litem; KASSANDRA CHAVEZ, Individually; JOSE MARTINEZ, Individually; KENDALL OLIVAREZ, a minor, by Christina Olivarez, her guardian ad litem; CHRISTINA OLIVEREZ, Individually; NOAH ORONA, a minor, by Oscar Orona, his guardian ad litem; OSCAR ORONA, Individually; LEANN GARCIA, a minor, by Angelica Rodriguez, her guardian ad litem; ANGELICA RODRIGUEZ, Individually; ELSA AVILA, Individually; KHLOIE TORRES, a minor, by Jamie Torres, her guardian ad litem; JAMIE TORRES, Individually; MAYAH ZAMORA, a minor, by Christina Zamora, her guardian ad litem; and CHRISTINA ZAMORA, Individually ("Plaintiffs") allege the following upon personal knowledge and information and belief, based upon, inter alia, the investigation made by and through their attorneys as to all other matters.

**INTRODUCTION**

1. In 1997, children's health advocates released a statement applauding the federal government's decision to take action against "an insidious advertising campaign" designed to "prey upon America's children."

2. The insidious campaign in question was a series of posters and billboards featuring a cartoon camel smoking a cigarette.

3. Gone are the halcyon days of Joe Camel.

4. Over the last 15 years, two of America's largest technology companies—Defendants Activision and Meta—have collaborated with the firearms industry in a scheme that makes the Joe Camel campaign look laughably harmless, even quaint.

5. Defendants, through products that count millions of teenagers and pre-teens among their users, have aided and abetted firearms manufacturers' efforts to expand the market for their weapons by granting unprecedented, direct, 24/7 access to children.

6. Activision is in the wildly lucrative business of training adolescents to become gunmen. Its first-person shooter franchise, *Call of Duty*, creates a vividly realistic and addicting theater of violence in which teenage boys learn to kill with frightening skill and ease. *Call of Duty* is a simulation, not a game. It teaches players how to aim, reload, and fire accurately, while habituating the teenage nervous system to inflict repeated, graphic violence. And though the killing is virtual, the weapons are authentic; they are designed to perfectly imitate their real-life counterparts in look, feel, recoil, and accuracy. This cunning form of marketing has helped cultivate a new, youthful consumer base for the AR-15 assault rifle, the weapon of choice for most *Call of Duty* players—and mass shooters.

7. Meanwhile, Meta's social media app Instagram, now an essential accessory for children still in middle school, offers firearms manufacturers something even *Call of Duty* cannot: an unsupervised channel to speak directly to minors in their homes, at school, even in the middle of the night.

8. The platform knowingly promulgates flimsy, easily circumvented rules that ostensibly prohibit firearm advertising; in fact, these rules function as a playbook for the gun industry. With Instagram's blessing and material assistance, purveyors of assault weapons can inundate children and adolescents with content that promotes crime, exalts the lone gunman, exploits

tropes of hypermasculinity and revenge, and directs them where to buy their *Call of Duty*-tested weapon of choice.

9. Parents don't stand a chance. This hijacking of children's lives has sidelined them, obliterating their ability to serve as either gatekeeper or protector.

10. It was not so long ago that children's vocabularies did not include the word "AR-15"—the generic term for the world's superlative assault rifle—despite the weapon's availability to civilians for half a century.

11. Now, before an American teenager turns 18, there is a good chance he knows the AR-15's superlative qualities (remarkable accuracy and lethality in a lightweight package) and how it feels to handle the weapon. He has a sense of how much trigger pressure to apply; his body instinctively braces for recoil; and he's learned how many shots it will take to kill.

12. He has not learned the principles of basic rifle marksmanship, let alone the strict rules of engagement that govern wartime combat. He has not received training on escalation of force or self-defense. His relationship with guns is built on the premise that their primary use is to seek out and kill others, and that doing so brings pleasure and exhilaration.

13. The Defendants bear responsibility for this profound corruption of our children. In concert with certain firearms manufacturers, they have groomed a generation of adolescents who are socially vulnerable, insecure about their masculinity, and eager to assert strength and dominance. Defendants have spent years positioning their counterparts in the gun industry as the answer to those problems.

14. To put a finer point on it: Defendants are chewing up alienated teenage boys and spitting out mass shooters. Before the Uvalde school shooter, there was the Parkland school shooter, and before him, the Sandy Hook school shooter. These were the three most deadly K-12 school shootings in American history. In each one, the shooter was between the ages of 18 and 21 years

old; in each one, the shooter was a devoted player of *Call of Duty*; and in each one, the shooter committed their attack in tactical gear, wielding an AR-15.

15. There are others, of course; so many that our collective memory cannot possibly hold space for all of them. There was the El Paso Walmart shooter and the Highland Park parade shooter. And who among us remembers the 15-year-old who murdered his entire family in New Mexico and then chatted with the police about *Call of Duty*?

16. There is a direct line, as set forth in this Amended Complaint, between the conduct of these California corporations—who rake in billions from the comfort of Menlo Park and Santa Monica—and the deaths, injuries, and trauma suffered at Robb Elementary School on May 24, 2022, in the tightknit but threadbare town of Uvalde, Texas.

17. We already know how the story goes: another adolescent found solace and strength in a combat weapon and reenacted a violent fantasy in another American town. Only the particulars vary.

18. The weapon this time was a DDM4V7, an AR-15 assault rifle manufactured by Daniel Defense. Daniel Defense is a privately held company with a market share of less than one percent and a reputation for well-crafted, military grade AR-15s that sell for more than double what their competitors charge.

19. How, then, did the Uvalde Shooter—a poor and isolated teenager in a small town in Texas—select the Daniel Defense brand among the hundreds of options on the market? How, for that matter, did he learn what an AR-15 is and what it excels at?

20. The answer lies in the conduct of Defendants, who introduced the Shooter to the weapon, conditioned him to see it as the solution to his problems, and trained him to use it to commit unspeakable violence.

21. The Shooter was a prolific player of *Call of Duty* from an early age. In November of 2021, the Shooter downloaded the 2019 version of *Call of Duty: Modern Warfare*, a wildly popular offshoot of the franchise that introduced him, and millions of other teenage boys, to the Daniel Defense brand. Players that downloaded the game shortly after its release saw a soldier carrying the DDM4V7 on the opening title page. But the real marketing coup was embedded in the game: the most popular weapon in the *Call of Duty* universe was pre-equipped with a unique and highly recognizable Daniel Defense rail system.

22. Simultaneously, on Instagram, the Shooter was being courted through explicit, aggressive marketing. In addition to hundreds of images depicting and glorifying the thrill of combat, Daniel Defense used Instagram to extol the illegal, murderous use of its weapons.

23. In one image of soldiers on patrol, with no animal in sight, the caption reads: "Hunters Hunt." Another advertisement shows a Daniel Defense rifle equipped with a holographic battle sight—the same brand used by the Shooter—and dubs the configuration "totally murdered out." Yet another depicts the view through a rifle's scope, looking down from a rooftop; the setting looks like an urban American street and the windshield of a parked car is in the crosshairs.

24. The Shooter was watching, listening, absorbing, training. Within weeks of downloading *Modern Warfare*, the Shooter was browsing assault weapons, acquiring firearm accessories popularized by the game, and returning repeatedly to Daniel Defense's website.

25. Mere minutes after midnight on May 16, the Shooter's 18th birthday, he completed the purchase of a Daniel Defense M4V7 assault rifle.

26. Eight days later, the Shooter inflicted unspeakable violence at Robb Elementary School, killing 21 and injuring and traumatizing many more.

27. Daniel Defense's marketing and sales strategy is contemptible, reckless, and at times unlawful; but it cannot reach its target demographic, adolescent males, without the substantial and critical assistance of the Defendants.

28. It is the Defendants who gave Daniel Defense a direct line into children's homes and heads, who wrote a playbook for how to peddle firearms while circumventing parents and the law, and who created a simulation with real-life weapons and applauded children for their proficiency at killing.

29. Defendants made those choices with full knowledge of the close relationship between the dominance of their products and the national epidemic of mass shootings, the dramatic drop in the average age of mass shooters, and the consistent use by those young assailants of assault weapons.

30. Plaintiffs seek nothing more and nothing less than accountability for the consequences of those choices.

## JURISDICTION AND VENUE

31. This Court has jurisdiction because this case is a civil action wherein the matter in controversy, exclusive of interest and costs, exceeds the jurisdictional minimum of the Court.

32. This Court has personal jurisdiction over Defendants because they have their principal places of business in California and/or because they have contacts with California that are so continuous and systematic that they are essentially at home in this state.

33. Venue is proper because this case was deemed complex and assigned to this Court at the direction of the Assistant Supervising Judge of Complex Civil Litigation.

## PARTIES

34. Plaintiff, VERONICA MATA, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. She is the biological mother and surviving heir of Decedent,

TESS MARIE MATA. Plaintiff VERONICA MATA was appointed by the Texas Probate Court, County of Uvalde, as the Representative of the Estate of Decedent TESS MARIE MATA and is the Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff VERONICA MATA will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

35. Plaintiff, JERRY MATA, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. He is the biological father and surviving heir of Decedent, TESS MARIE MATA. Plaintiff JERRY MATA is Decedent TESSA MARIE MATA's Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff JERRY MATA will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

36. Plaintiff, SANTA GLORIA CAZARES, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. She is the biological mother and surviving heir of Decedent, JACKLYN JAYLEN CAZARES. Plaintiff SANTA GLORIA CAZARES was appointed by the Texas Probate Court, County of Uvalde, as the Representative of the Estate of Decedent JACKLYN JAYLEN CAZARES and is the Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff SANTA GLORIA CAZARES will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

37. Plaintiff, JAVIER CAZARES, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. He is the biological father and surviving heir of Decedent, JACKLYN JAYLEN CAZARES. Plaintiff JAVIER CAZARES is Decedent JACKLYN JAYLEN CAZARES's Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff JAVIER CAZARES will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

38. Plaintiff, KIMBERLY GARCIA, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. She is the biological mother and surviving heir of Decedent, AMERIE JO GARZA. Plaintiff KIMBERLY GARCIA is Decedent AMERIE JO GARZA's Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff KIMBERLY GARCIA will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

39. Plaintiff, RACHEL GARZA, is, and at all times mentioned herein was, an individual residing in San Antonio, Texas. She is the Texas Probate Court Appointed Representative of Decedent, AMERIE JO GARZA. Plaintiff RACHEL GARZA is Decedent AMERIE JO GARZA's Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff RACHEL GARZA will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

40. Plaintiff, ANA RODRIGUEZ, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. She is the biological mother and surviving heir of Decedent, MAITE YULEANA RODRIGUEZ. Plaintiff ANA RODRIGUEZ was appointed by the Texas Probate Court, County of Uvalde, as the Representative of the Estate of Decedent MAITE YULEANA RODRIGUEZ and is the Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff ANA RODRIGUEZ will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

41. Plaintiff, MONICA GALLEGOS, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. She is the biological mother and surviving heir of Decedent, ANNABELL GUADALUPE RODRIGUEZ. Plaintiff MONICA GALLEGOS has filed an application with the Texas Probate Court to be appointed as the Representative of the Estate of Decedent ANNABELL GUADALUPE RODRIGUEZ and is the Successor-in-Interest pursuant to

Code of Civil Procedure section 377.11. Plaintiff MONICA GALLEGOS will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

42. Plaintiff, JESSIE RODRIGUEZ, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. He is the biological father and surviving heir of Decedent, ANNABELL GUADALUPE RODRIGUEZ. Plaintiff JESSIE RODRIGUEZ is Decedent ANNABELL GUADALUPE RODRIGUEZ's Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff JESSIE RODRIGUEZ will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

43. Plaintiff, DEANNA GORNTO, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. She is the biological mother and surviving heir of Decedent, MARANDA GAIL MATHIS. Plaintiff DEANNA GORNTO was appointed by the Texas Probate Court, County of Uvalde, as the Representative of the Estate of Decedent MARANDA GAIL MATHIS and is the Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff DEANNA GORNTO will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

44. Plaintiffs are informed that additional potential wrongful death heirs of Decedent MARANDA GAIL MATHIS may exist, named BRIAN MATHIS. Upon information and belief, consent could not be obtained from these potential heirs to join in this action prior to filing of this lawsuit. Pursuant to Code of Civil Procedure § 382, BRIAN MATHIS is hereby named as Nominal Defendant.

45. Plaintiff, MARIA MAGDALENE GARCIA, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. She is the biological mother and surviving heir of Decedent, NEVAEH ALYSSA BRAVO. Plaintiff MARIA MAGDALENE GARCIA was appointed by the Texas Probate Court, County of Uvalde, as the Representative of the Estate of

Decedent NEVAEH ALYSSA BRAVO and is the Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff MARIA MAGDALENE GARCIA will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

46. Plaintiff, JUAN JULIAN BRAVO, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. He is the biological father and surviving heir of Decedent, NEVAEH ALYSSA BRAVO. Plaintiff JUAN JULIAN BRAVO is Decedent NEVAEH ALYSSA BRAVO's Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff JUAN JULIAN BRAVO will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

47. Plaintiff, VERONICA LUEVANOS, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. She is the biological mother and surviving heir of Decedent, JAILAH NICOLE SILGUERO. VERONICA LUEVANOS was appointed by the Texas Probate Court, County of Uvalde, as the Representative of the Estate of Decedent JAILAH NICOLE SILGUERO and is the Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff VERONICA LUEVANOS will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

48. Plaintiff, JACOB SILGUERO, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. He is the biological father and surviving heir of Decedent, JAILAH NICOLE SILGUERO. Plaintiff JACOB SILGUERO is Decedent JAILAH NICOLE SILGUERO's Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff JACOB SILGUERO will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

49. Plaintiff, APRIL ELROD, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. She is the biological mother and surviving heir of Decedent, MAKENNA

LEE ELROD. Plaintiff APRIL ELROD was appointed by the Texas Probate Court, County of Uvalde, as the Representative of the Estate of Decedent MAKENNA LEE ELROD and is the Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff APRIL ELROD will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

50. Plaintiffs are informed that additional potential wrongful death heirs of Decedent MAKENNA LEE ELROD may exist, named BRANDON LEE ELROD. Upon information and belief, consent could not be obtained from these potential heirs to join in this action prior to filing of this lawsuit. Pursuant to Code of Civil Procedure § 382, BRANDON LEE ELROD is hereby named as a Nominal Defendant.

51. Plaintiff, KIMBERLY RUBIO, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. She is the biological mother and surviving heir of Decedent, ALEXANDRIA ANIYAH RUBIO. Plaintiff KIMBERLY RUBIO was appointed by the Texas Probate Court, County of Uvalde, as the Representative of the Estate of Decedent ALEXANDRIA ANIYAH RUBIO and is the Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff KIMBERLY RUBIO will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

52. Plaintiff, FELIX RUBIO, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. He is the biological father and surviving heir of Decedent, ALEXANDRIA ANIYAH RUBIO. Plaintiff FELIX RUBIO is Decedent ALEXANDRIA ANIYAH RUBIO's Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff FELIX RUBIO will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

53. Plaintiff, CHRISTINA LUEVANOS, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. She is the biological mother and surviving heir of Decedent, JAYCE CARMELO LUEVANOS. Plaintiff CHRISTINA LUEVANOS is Decedent JAYCE CARMELO LUEVANOS's Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff CHRISTINA LUEVANOS will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

54. Plaintiff, JOSE LUEVANOS, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. He is the biological father and surviving heir of Decedent, JAYCE CARMELO LUEVANOS. Plaintiff JOSE LUEVANOS was appointed by the Texas Probate Court, County of Uvalde, as the Representative of the Estate of Decedent JAYCE CARMELO LUEVANOS and is the Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff JOSE LUEVANOS will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

55. Plaintiff, JENNIFER LUGO, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. She is the biological mother and surviving heir of Decedent, ELIAHNA AMYAH GARCIA. Plaintiff JENNIFER LUGO was appointed by the Texas Probate Court, County of Uvalde, as the Representative of the Estate of Decedent ELIAHNA AMYAH GARCIA and is the Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff JENNIFER LUGO will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

56. Plaintiff, STEVEN GARCIA, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. He is the biological father and surviving heir of Decedent, ELIAHNA AMYAH GARCIA. Plaintiff STEVEN GARCIA is Decedent ELIAHNA AMYAH GARCIA's Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff STEVEN

GARCIA will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

57. Plaintiff, ALYSSA RODRIGUEZ, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. She is the biological mother and surviving heir of Decedent, JOSE MANUEL FLORES, JR. Plaintiff ALYSSA RODRIGUEZ is Decedent JOSE MANUEL FLORES, JR.'s Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff ALYSSA RODRIGUEZ will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

58. Plaintiff, JOSE MANUEL FLORES, SR., is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. He is the biological father and surviving heir of Decedent, JOSE MANUEL FLORES, JR. Plaintiff JOSE MANUEL FLORES, SR. was appointed by the Texas Probate Court, County of Uvalde, as the Representative of the Estate of Decedent JOSE MANUEL FLORES, JR. and is the Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff JOSE MANUEL FLORES, SR. will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

59. Plaintiff, EVADULIA ORTA, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. She is the biological mother and surviving heir of Decedent, ROJELIO FERNANDEZ TORRES. EVADULIA ORTA was appointed by the Texas Probate Court, County of Uvalde, as the Representative of the Estate of Decedent ROJELIO FERNANDEZ TORRES and is the Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff EVADULIA ORTA will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

60. Plaintiff, MANDY MARIE RENFRO, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. She is the biological mother and surviving heir of Decedent,

UZIYAH SERGIO GARCIA. Plaintiff MANDY MARIE RENFRO is Decedent UZIYAH SERGIO GARCIA's Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff MANDY MARIE RENFRO will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

61. Plaintiff, DAVID BALMER, is, and at all times mentioned herein was, an individual residing in San Antonio, Texas. He is the Texas Probate Court Appointed Representative of Decedent, UZIYAH SERGIO GARCIA. Plaintiff DAVID BALMER is Decedent UZIYAH SERGIO GARCIA's Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff DAVID BALMER will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

62. Plaintiff, ELI TORRES, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. He is the biological father and surviving heir of Decedent, ELIAHNA TORRES. Plaintiff ELI TORRES is Decedent ELIAHNA TORRES's Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff ELI TORRES will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

63. Plaintiff, SANDRA TORRES, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. She is the biological mother and surviving heir of Decedent, ELIAHNA TORRES. Plaintiff SANDRA TORRES is Decedent ELIAHNA TORRES's Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff SANDRA TORRES will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

64. Plaintiff, MELINDA ALEJANDRO, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. She is the biological mother and surviving heir of Decedent, LAYLA MARIE SALAZAR. Plaintiff MELINDA ALEJANDRO is Decedent LAYLA MARIE

SALAZAR's Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff MELINDA ALEJANDRO will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

65. Plaintiff, VINCENT SALAZAR III, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. He is the biological father and surviving heir of Decedent, LAYLA MARIE SALAZAR. Plaintiff VINCENT SALAZAR III was appointed by the Texas Probate Court, County of Uvalde, as the Representative of the Estate of Decedent LAYLA MARIE SALAZAR and is the Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff VINCENT SALAZAR III will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

66. Plaintiff, FELICHA NICOLE MARTINEZ, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. She is the biological mother and surviving heir of Decedent, XAVIER LOPEZ. Plaintiff FELICHA NICOLE MARTINEZ was appointed by the Texas Probate Court, County of Uvalde, as the Representative of the Estate of Decedent XAVIER LOPEZ and is the Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff FELICHA NICOLE MARTINEZ will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

67. Plaintiff, ABEL CUELLAR LOPEZ, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. He is the biological father and surviving heir of Decedent, XAVIER LOPEZ. Plaintiff ABEL CUELLAR LOPEZ is Decedent XAVIER LOPEZ's Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff ABEL CUELLAR LOPEZ will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

68. Plaintiff, JESSICA HERNANDEZ, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. She is the biological mother and surviving heir of Decedent, ALITHIA HAVEN RAMIREZ. Plaintiff JESSICA HERNANDEZ is Decedent ALITHIA HAVEN RAMIREZ's Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff JESSICA HERNANDEZ will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

69. Plaintiff, RYAN RAMIREZ, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. He is the biological father and surviving heir of Decedent, ALITHIA HAVEN RAMIREZ. Plaintiff RYAN RAMIREZ was appointed by the Texas Probate Court, County of Uvalde, as the Representative of the Estate of Decedent ALITHIA HAVEN RAMIREZ and is the Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff RYAN RAMIREZ will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

70. Plaintiff, ALEJANDRO GARCIA, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. He is the biological son and surviving heir of Decedent, IRMA GARCIA. Plaintiff ALEJANDRO GARCIA was appointed by the Texas Probate Court, County of Uvalde, as the Representative of the Estate of Decedent IRMA GARCIA and is the Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff ALEJANDRO GARCIA will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

71. Plaintiff, LYLIANA GARCIA, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. She is the biological daughter and surviving heir of Decedent, IRMA GARCIA. Plaintiff LYLIANA GARCIA is Decedent IRMA GARCIA's Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff LYLIANA GARCIA will

execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

72. Plaintiff, MANUEL LOZANO, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. He is the biological father and surviving heir of Decedent, IRMA GARCIA. Plaintiff MANUEL LOZANO is Decedent IRMA GARCIA's Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff MANUEL LOZANO will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

73. Plaintiffs are informed and believe, and thereon allege, that Nominal Defendant CHRISTIAN GARCIA, is a competent adult living in the City of Uvalde, County of Uvalde, State of Texas. Nominal Defendant CHRISTIAN GARCIA was the son of the Decedent IRMA GARCIA and is therefore a necessary party to this action under Cal. Code Civ. Proc. § 377.60(a). Nominal Defendant CHRISTIAN GARCIA is a party whose interest is so aligned and united with those of Plaintiffs that he is a proper plaintiff; however, Nominal Defendant CHRISTIAN GARCIA has exercised his option to not join as a plaintiff in this action and has not filed a separate lawsuit. Therefore, Plaintiffs name and serve CHRISTIAN GARCIA as a Nominal Defendant pursuant to Cal. Code Civ. Proc. § 382.

74. Plaintiff, PAULA MIRELES, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. She is the biological mother and surviving heir of Decedent, EVA MIRELES. Plaintiff PAULA MIRELES was appointed by the Texas Probate Court, County of Uvalde, as the Representative of the Estate of Deceased EVA MIRELES and is the Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff PAULA MIRELES will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

75. Plaintiff, ADALYNN RUIZ, is, and at all times mentioned herein was, an individual residing in Uvalde, Texas. She is the biological daughter and surviving heir of Decedent, EVA MIRELES. Plaintiff ADALYNN RUIZ is Decedent EVA MIRELES's Successor-in-Interest pursuant to Code of Civil Procedure section 377.11. Plaintiff ADALYNN RUIZ will execute and file a declaration under penalty of perjury pursuant to Code of Civil Procedure section 377.32.

76. Plaintiff AJ MARTINEZ, a minor, brings claims by Kassandra Chavez, his guardian ad litem.

77. Plaintiff KASSANDRA CHAVEZ brings claims Individually.

78. Plaintiff JOSE MARTINEZ brings claims Individually.

79. Plaintiff MIAH ISABEL CERRILLO, a minor, bring claims by Abigale Veloz, her guardian ad litem.

80. Plaintiff ABIGALE VELOZ brings claims Individually.

81. Plaintiff MIGUEL CERRILLO brings claims Individually.

82. Plaintiff LEANN GARCIA, a minor, brings claims by Angelica Rodriguez, her guardian ad litem.

83. Plaintiff ANGELICA RODRIGUEZ brings claims Individually.

84. Plaintiff KENDALL OLIVAREZ, a minor, brings claims by Christina Olivarez, her guardian ad litem.

85. Plaintiff CHRISTINA OLIVAREZ brings claims Individually.

86. Plaintiff NOAH ORONA, a minor, brings claims by Oscar Orona, his guardian ad litem.

87. Plaintiff OSCAR ORONA bring claims Individually.

88. Plaintiff ELSA AVILA brings claims Individually.

89. Plaintiff KHLOIE TORRES, a minor, brings claims by Jamie Torres, her guardian ad litem.

90. Plaintiff JAMIE TORRES brings claims Individually.

91. Plaintiff MAYAH ZAMORA, a minor, brings claims by Christina Zamora, her guardian ad litem.

92. Plaintiff CHRISTINA ZAMORA brings claims Individually.

93. Defendant Meta Platforms, Inc. ("Meta") is a Delaware corporation and multinational technology conglomerate. Meta is registered to transact business in the state of California, and its principal place of business is located at 1 Meta Way, Menlo Park, California 94025.

94. Defendant Instagram, LLC ("Instagram") launched an app called Instagram in October 2010. On or around April 7, 2012, Meta Platforms purchased Instagram, LLC for over one billion dollars and reincorporated the company in Delaware. Meta Platforms is the sole member of this LLC, whose principal place of business is also located at 1 Meta Way, Menlo Park, California 94025. Instagram is registered to transact business in the state of California.

95. The term "Meta" or "Meta Defendants," as used in this Amended Complaint, refers to Defendants Meta and Instagram.

96. Defendant Activision Blizzard, Inc. ("Activision Blizzard") is a Delaware corporation, with a principal place of business located at 1 Microsoft Way, Redmond, Washington 98052. Activision Blizzard is registered to conduct business in the state of California and is a wholly owned subsidiary of Microsoft.

97. Defendant Activision Publishing, Inc. ("Activision") is a Delaware corporation, with a principal place of business located at 2701 Olympic Blvd., Building B, Santa Monica, California 90404. Activision is registered to conduct business in the state of California. Activision was formerly

known as Activision, Inc. prior to the merger with Blizzard Entertainment, and is the entity responsible for developing, producing, and distributing games for Activision Blizzard. It is a wholly owned subsidiary of Activision Blizzard.

98. Defendant Microsoft Corporation ("Microsoft") is a Washington corporation, with a principal place of business located at 1 Microsoft Way, Redmond, Washington 98052.

99. Defendant Infinity Ward, Inc. ("Infinity Ward") is a Delaware corporation, with a principal place of business located at 21255 Burbank Blvd., Ste. 600, Woodland Hills, California 91367. Infinity Ward is registered to conduct business in the state of California and is a wholly owned subsidiary of Activision. Infinity Ward created the original *Call of Duty* first-person shooter game and at least eight subsequent titles in the series, including *Call of Duty: Modern Warfare*.

100. Defendant Treyarch Corporation ("Treyarch") is a Delaware corporation, with a principal place of business located at 3420 Ocean Park Blvd., Santa Monica, California 90405. Treyarch is registered to conduct business in the state of California and is a wholly owned subsidiary of Activision. Treyarch was involved in the production of approximately seven *Call of Duty* titles, most notably the five titles of the *Call of Duty: Black Ops* series.

101. Defendant Sledgehammer Games, Inc. ("Sledgehammer") is a Delaware corporation, with a principal place of business located at 1001 E. Hillsdale Blvd., Ste. 610, Foster City, California 94404. Sledgehammer is registered to conduct business in the state of California and is a wholly owned subsidiary of Activision. Sledgehammer was involved in the production of at least five *Call of Duty* titles.

102. The term "Activision" or "Activision Defendants," as used in this Amended Complaint, refers to Defendants Activision Blizzard, Activision, Microsoft, Infinity Ward, Treyarch, and Sledgehammer.

103. The true names and capacities, whether individual, plural, corporate, partnership, associate, or otherwise, of DOES 1 through 50, Inclusive, are unknown to Plaintiffs, who therefore sue said defendants by such fictitious names. The full extent of the facts linking such fictitiously sued defendants is unknown to Plaintiffs. Plaintiffs are informed and believe, and thereon allege, that each of the defendants designated herein as a DOE was, and is, negligent, or in some other actionable manner, responsible for the events and happenings hereafter referred to, and thereby negligently, or in some other actionable manner, legally, actually, and proximately caused the hereafter described injuries and damages to Plaintiffs. Plaintiffs will hereafter seek leave of the Court to amend this Complaint to show the defendants' true names and capacities after the same has been ascertained.

104. Plaintiffs are informed and believe, and thereon allege, that at all times mentioned herein, Defendants META PLATFORMS, INC., INSTAGRAM, LLC, ACTIVISION BLIZZARD, INC., ACTIVISION PUBLISHING, INC., MICROSOFT CORPORATION, INFINITY WARD, INC., TREYARCH CORPORATION, SLEDGEHAMMER GAMES, INC., Nominal Defendants BRANDON LEE ELROD, BRIAN MATHIS, and CHRISTIAN GARCIA, and DOES 1 through 50, inclusive, and each of them, were agents, servants, employees, successors in interest, and/or joint venturers of their co-defendants, and were, as such, acting within the course, scope, and authority of said agency, employment, and/or venture, and that each and every defendant, as aforesaid, when acting as a principal, was negligent in the selection and hiring of each and every other defendant as an agent, servant, employee, successor in interest, and/or joint venturer.

**FACTUAL ALLEGATIONS**

105. Generation Z, those Americans born between roughly 1997 and 2012, holds the unique and tragic distinction of having grown up exclusively in the era of mass shootings. Bookended by Columbine and Sandy Hook, Gen Z has never known a time when schools, movie

theaters, offices, stores, and places of worship were safe, when they did not routinely become sites of mass death.

106. Gen Z's version of the fire drill is the active shooter drill. Children are now taught to prepare for the day when an assailant wielding a combat rifle walks into their school with the goal of killing as many of them as possible. An entire generation has been conditioned to accept this madness as the status quo, an unfathomable betrayal.

107. But though our children do not know another world, we do. We know that it was not always this way. Sandy Hook and Parkland and Uvalde were not predestined tragedies; they were the foreseeable outcome of reckless choices, of corporate greed, and of a callous disregard for public safety, particularly the safety of children.

108. The AR-15, a weapon developed for America's armed forces after WWII and its standard-issue combat rifle ever since, has been available to civilians since the 1960s. Yet decades passed before it became synonymous with the routine, senseless slaughter of Americans.

109. This Complaint seeks to explain how and why that occurred. The answer lies in Defendants' harnessing of technology and the internet to revolutionize a wholly new kind of marketing—one with no scruples about celebrating violence, exalting combat weapons, and targeting children and adolescents while preying upon the vulnerabilities of youth.

110. In Greek mythology, Cerberus is the three-headed dog that guards the gates of the underworld, admitting the dead but permitting no one to leave. This Complaint seeks to unmask the three heads of our modern-day Cerberus—the Activision Defendants, the Meta Defendants, and their gun industry accomplices—and hold two of them to account.

## CALL OF DUTY: TRAINING CAMP FOR MASS SHOOTERS

“It is probably the best military simulator out there and it’s one of the hottest. I see *MW2* [*Modern Warfare*] more as part of my training-simulation than anything else.”
--Anders Breivik, who killed 77 people in a single shooting, eleven years before Uvalde

### I. The Evolution of Call of Duty

111. Activision was founded in 1979, but commercial success eluded it until the launch of *Call of Duty* in 2003. (The AR-15 followed a similar trajectory: the patent for the AR-15, once held by Colt, expired in 1978, but it wasn’t until about 2006 that private-equity-backed gun companies developed marketing schemes that made the AR-15 commercially popular.)

112. *Call of Duty* revolutionized the “first-person shooter” or “FPS” genre of video games. Whereas previous video games allowed a player to manipulate a character on screen, in *Call of Duty* the player assumes the field of vision of the protagonist, centering the players’ screen on the barrel of the weapon he is holding.

113. The original *Call of Duty* was set in 1944. It featured the Allied invasion of Normandy, as well as a Soviet soldier fighting in the Battle of Stalingrad. The game introduced features that are now synonymous with the series: cinematic set-pieces, multiple playable characters, and sensory distortion effects designed to mimic the combat experience.

114. The next two installments of the game continued to tell the story of WWII. *Call of Duty 2* featured the battlegrounds of Stalingrad and El Alamein and ended with the Allied push into Germany. *Call of Duty 3* jumped ahead, tracking European and U.S. forces across France after Normandy.

115. The games invited and fostered immersion—startling at the sound of explosions or instinctively ducking at enemy fire. But the line between game and reality was not blurred. And while enemy soldiers were gunned down, the level of gore was minimal.

116. These first three installments of *Call of Duty* were given a "T" (for "teen") rating by the Entertainment Software Rating Board (ESRB), the self-regulatory body for the video game industry. Games may also be rated "M" for Mature (aged 17+) or AO for Adults Only (aged 18+).

117. The ESRB assigns ratings to video games to inform sellers, consumers, and parents of the content and age-appropriateness of a game. Although adhering to ESRB ratings has always been voluntary, the brick-and-mortar retailers that previously dominated the video game market, such as GameStop and Walmart, employed age verification policies to enforce the ratings.

118. In a 2009 court filing, Activision cited data that all major video game retailers employed age verification policies and were very effective at "preventing the sale of M-rated games to minors."

119. *Call of Duty 4: Modern Warfare*, which launched in 2007, marked the beginning of a shift in the franchise toward more realistic and darker content. For the first time, game developers took players out of WWII and dropped them into the Middle East, where American military operations were ongoing, as well as a fictitious civil war in Russia.

120. Among other developments, 2007's *Modern Warfare* introduced the concept of rewarding players for "killstreaks." Players could call in increasing levels of assistance based on securing three, five, or seven kills. At the time, the game was described as the "new standard" by which military-based shooter games would be judged.

121. The game also added real-life combat touches, such as replicating night vision and thermal imaging devices.

122. According to Activision's 2008 Annual Report, *Call of Duty 4: Modern Warfare* "was the #1 best-selling title worldwide in calendar [year] 2007."

123. *Call of Duty: Modern Warfare* was rated "M" for "Mature-17+" by the ESRB. No *Call of Duty* game would ever again be rated appropriate for all teens.

124. In 2009, buoyed by the success of *Modern Warfare*, Activision pushed players into disturbing new territory.

125. *Call of Duty: Modern Warfare 2*, released in 2009, contained a level known as the "No Russian" mission. In the mission, the player controls an undercover CIA operative tasked with infiltrating a Russian ultranationalist terrorist organization. To do so, he must participate in the mass shooting of unarmed civilians at an airport.

126. "No Russian" was not only grotesque from a narrative standpoint; it was also considerably more graphic than any level in the game's history. Civilians' screams can be heard throughout, and the wounded are shown crawling away, leaving blood-trails behind them. Players can follow the injured and execute them. A baby cries at one point if a player approaches the airport's restroom.

127. The lead writer for "No Russian" stated that the reality of mass shootings influenced the decision to create the scene, including the Columbine school shooting. He has been quoted as saying: "We all wanted to make it something that would be upsetting, disturbing, but also something people relate to."

128. It turns out disturbing violence sells; *Call of Duty: Modern Warfare 2* was the first video game ever to surpass $550 million in retail sales in its first five days of release. It generated more than $1 billion in global retail sales in nine weeks.

129. Activision, realizing it had a golden ticket, doubled down. It has released at least 17 different versions of *Call of Duty* since *Modern Warfare 2*, the majority of which have been best sellers.

130. But retaining the loyalty of teen boys—one of *Call of Duty*'s core demographics—is no easy task. Activision has noted in its Annual Reports that it must "continuously develop new

products or new content for, or other enhancements to, our existing products" to "remain competitive and maximize the chances that consumers select our products."

131. In striving to maintain sales, the creators of *Call of Duty* have continuously pushed the boundaries of realism and escalated the violent intensity of the player experience, addicting adolescents and habituating them to unspeakable violence in the process.

## II. The Modern Era of Call of Duty

> <u>Video Game</u> *(noun)*: An electronic game in which players control images on a video screen. (Merriam-Webster)
>
> <u>Simulator</u> *(noun)*: A device that enables the operator to reproduce or represent under test conditions phenomena likely to occur in actual performance. (Merriam-Webster)

132. The evolution of *Call of Duty* is best described as the transformation from a video game into a simulation. This transformation involved two key shifts.

133. First, *Call of Duty* has become a 360-degree, full body immersive experience. It allows the teenager behind the screen to feel as though he is truly in the building, holding, aiming, and shooting the gun, feeling the game controller vibrate to replicate the weapon's recoil, scanning for human targets and eliminating them. The desensitization associated with that level of realism has been further heightened by the breakdown of the concept of "good guys v. bad guys" (today, players can kill each other), as well as a significant shift in where the violence takes place (now, it is often familiar, civilian settings, not the theater of war).

134. Second, *Call of Duty* has integrated real-life, readily available weapons into the franchise that players, a valuable cohort of potential firearm consumers, can practice with and aspire to own.

### A. <u>Unparalleled Realism</u>

135. In 2019, Activision released another revamped version of *Call of Duty: Modern Warfare*, marking another inflection point in the franchise.

136. The 2019 version of *Modern Warfare* took advantage of every technological development to enhance the realism of the experience. According to one Activision engineer, "it became clear that it would have been impossible with the previous technology to build a game with this ambition."

137. The ambition was to transform *Call of Duty* into a true simulation—to train players how to handle real weapons, under varying conditions, and still be effective at killing.

138. The studio employed, for the first time, a technique called photogrammetry, a process that captures high-resolution photos of an object from every angle, then stitches them together to generate a three-dimensional digital replica. The end result is a photo-realistic digital item that is far more lifelike than any computer-generated object.

139. Photogrammetry is a powerful technology; the Army uses it to turn aerial images into accurate 3D surface maps in near real time without any human oversight. It was tested by the 101st Airborne Division and was deployed for the first time in Iraq.

140. Extensive work was done to mimic real-life night vision and thermal imaging devices; engineers said they "decided to go all the way and replicate the physics behind it" in order to "translat[e] the experience to our player."

141. Other advancements allowed designers to scale the theater of action from tiny backyard alleys all the way to city-scale maps without sacrificing any level of detail or realism. According to an article in the Washington Post, the quality is the same whether the player is in "a massive battle on a wide-open field [or in] a claustrophobic, close-quarters encounter."

142. In reality, the wide-open battlefield is now something of a rarity in *Call of Duty*. Over time, its creators have increasingly rejected the theater of war in favor of settings that evoke everyday American life. Pitched battles take place in malls, airports, and restaurants. Characters are

blown apart on the streets of suburban neighborhoods and excessive blood stains the walls of government buildings.

143. This not only serves to blur the line between fantasy and reality; it introduces players to the idea of fighting a "civilian war," and it desensitizes them to killing and death in a familiar environment.

144. For the first time, the 2019 *Modern Warfare* also permits players to angle their weapons independently of the direction the character's body so they can make better use of available cover while firing. This is a real-life tactic used by special forces when breaching a room.

145. The addition of this new and tactically sound firing capability is not coincidental. Defendants brought in retired Navy SEALs to act as consultants on *Modern Warfare*, who they kept "practically on speed dial."

146. The SEALs helped the developers create the most realistic combat characters and scenarios. They also assisted in crafting narrative arcs and choices that are, by design, "morally gray." The goal, according to an article with extensive interviews with *Modern Warfare*'s creators, was to create "a complex and confusing battleground in which life-and-death decisions must be rendered in seconds and where morality is continually questioned."

147. There is some irony here. The creators endeavor to teach the American public about the "realities" of modern war, where seemingly innocuous figures turn out to be deadly threats. What has played out is the inverse: American citizens now attempt to go about innocuous activities—going to school, seeing a movie, shopping for groceries—and are met with deadly mass shooters systematically desensitized to violence.

148. The *Call of Duty* creators and their special forces consultants are self-congratulatory about "morally gray" scenarios—such as when a player is confronted with a civilian woman who is believed to be reaching for a gun, but then grabs her baby from a crib—touting the parallels to the

real world of war. They are, in turn, dismissive of FPS entertainment that is more fantasy than reality, or where "it's perfect and clean."

149. There is no discussion of whether there might be a meaningful difference between trained members of the armed forces and high-school-aged boys with developing brains—particularly when it comes to navigating morally complex situations with an assault weapon.

150. *Modern Warfare*'s creators have tried to suggest that their commitment to realism is about restraint as well as violence. In an interview, their SEAL consultants reflected that "it's just as important to know when not to pull the trigger as to know when to pull the trigger." After all, real world decisions in combat "are made with extremely high stakes on the line" and "violating the rules of engagement could lead to problems both during the mission or well after."

151. This is good PR, but it doesn't jive with the experience of being in the simulation. Players of *Call of Duty* do not experience "high stakes" consequences for excessive killing, nor is there an upside to *not* pulling the trigger. The franchise is based on the premise that there is no such thing as disproportionate, unnecessary, unjustified, or immoral killing.

152. It is difficult to describe the astonishing level of violence that players are exposed to, and required to inflict, in *Call of Duty*.

153. The ESRB's summary of *Modern Warfare* describes the action as follows: "Characters use machine guns, shotguns, sniper rifles, and explosives to kill enemies in frenetic combat. . . . Combat is highlighted by realistic gunfire, screams of pain, and large blood-splatter effects. A sniper rifle causes increased damage (e.g., decapitation, dismemberment)."

154. The ESRB summary goes on to describe other, specific disturbing elements—the player's character being tortured via waterboarding, watching a bound prisoner be executed, children being killed by a gas attack, watching a terrorist shoot a young boy, and so on.

155. But no matter how graphic, there is no description that can do justice to the player experience. Words simply can't capture the adrenaline rush of stalking someone down a hallway in an abandoned building; the thrill of turning a corner and opening fire; the rush when a shot hits; and the dopamine hit for every successful kill, every head shot, every blood splatter across the screen.

156. This is not hyperbole. An adolescent boy's navigation of the *Call of Duty* world—every movement, every shot fired, every kill streak, every reward—is accompanied by real-life physical and neurological responses. The player's muscles tighten, his pulse quickens, and his brain's prefrontal cortex, its pleasure center, is activated.

157. One study published in *Nature*, a leading scientific journal, demonstrated that video games raise the level of dopamine in the brain by about 100 percent, roughly the same increase triggered by sex.

158. That study is more than 25 years old. In other words, these findings were established when the level of immersion and realism in video games was a fraction of what *Call of Duty* has since accomplished.

159. Defendants maximally exploit the connection between killing and pleasure. Players do not kill merely to survive and fight on; they kill because the game rewards them for killing—killing more, killing faster, killing more efficiently.

160. *Call of Duty*'s exploitation of the dopamine reward system is particularly alarming in the context of the game's "multiplayer mode," which has become the mainstay of player engagement in the modern versions. In multiplayer mode, players are matched with real people from all over the world, typically on a team of 6, to face off against another team.

161. The composition of these teams is purportedly determined by an algorithm that matches players based on their proficiency at killing. *Call of Duty* tracks this statistic; it is known

as the k/d ratio, shorthand for kill/death, and it measures how many kills the player has accomplished compared to the number of times he has been killed.

162. The multiplayer experience has multiple types of engagement; the most popular is called "Team Deathmatch," in which players attempt to rack up as many kills as possible for their team. The cooperation is nominal; individual killing prowess is the point. The team that achieves a certain number of collective kills first wins the match. The "maps" used in multiplayer are, as alleged above, strikingly realistic and evocative of everyday settings.

163. The upshot of all this is that players are no longer primarily killing "bad guys;" they are not squaring off against a fictitious enemy army or terrorist organization. Players are killing each other, and they are doing so in malls, office buildings, and on residential streets.

164. Tellingly, *Call of Duty* contains one nod to fantasy, one concession that this simulation is not real life: the dead can come back to life, or "respawn" in game lingo.

165. The contrast between the sensory, hyper realistic experience of killing with the fantastical element of respawning is a unique—and uniquely dangerous—aspect of the modern iterations of *Call of Duty*. Killing is fun and addictive and rewarding, but death is not real.

166. This juxtaposition deepens players' desensitization to violence.

**B. <u>Real Life Weapons</u>**

167. The other essential component of *Call of Duty*'s transformation into a simulation—and its success at winning the loyalty of its young male consumer base—is its relentless focus on realistic weaponry.

168. This development has moved Activision steadily and unmistakably into the realm of commercial firearms marketing.

169. Beginning in the late 2000s and early 2010s, just as *Modern Warfare* was revealing itself to be a moneymaker, Activision began working directly with the firearms industry to place real-life weapons into *Call of Duty.*

170. At least some of those product placements were the result of explicit licensing agreements between Activision and firearms manufacturers that benefitted and enriched Activison.

171. Documents unearthed in a lawsuit brought by the undersigned Connecticut counsel on behalf of families who lost loved ones in the Sandy Hook Elementary School shooting in 2012 sheds light on what the deals looked like—and what each side stood to gain from them.

172. Beginning in the 1990s, gun companies began to face an uncomfortable reality: their customer base was aging, gun ownership was dropping nationally, and young people were less interested in shooting and purchasing firearms.

173. The rise in popularity of FPS games—and *Call of Duty* in particular—presented an irresistible solution. For gun manufacturers, placement in the franchise delivered unparalleled brand exposure among a younger demographic.

174. For Activison, dropping real, identifiable assault weapons into *Call of Duty* had multiple commercial benefits. It would enhance the authenticity of the simulation, setting it apart from competitors; draw in users primarily enticed by the opportunity to experiment with real weapons; and generate discussion and engagement outside of gameplay.

175. As alleged below, Activision's use of replica weapons and weapon parts has given rise to a robust, parallel world. In this world, players and gun enthusiasts discuss the manufacturers, attributes, and prices of the weapons and weapon parts depicted. They crowdsource questions about how a favorite weapon from *Call of Duty* can be bought or built in real life. YouTube Channels have cropped up that are devoted solely to the weapons from *Call of Duty*, some of which are run by

savvy gun sellers who show the *Call of Duty* weapons being fired in real life and occasionally give weapons away as a promotional.

176. The robust use of online platforms by *Call of Duty* enthusiasts also serves to extend the relevance of popular or controversial *Call of Duty* content. Users often share screenshots from the game when starting a discussion thread and those threads can stay active for months or even years.

177. This parallel world is propped up and reinforced by social media platforms, including Instagram, where, as alleged below, gun manufacturers advertise their weapons and use hashtags to call out and draw in the *Call of Duty* community—which in turn drives more interest and engagement from players. This creates a mutually reinforcing loop that inures to Activision's benefit.

178. The deal struck between Activision and Freedom Group—the maker of the Bushmaster AR-15 used at Sandy Hook Elementary School—is illustrative of this symbiotic relationship.

179. Freedom Group was a private-equity-backed gun conglomerate formed in 2007 with a big idea: it would unite several firearm brands under one umbrella, introduce sophisticated marketing and business practices to a relatively unsavvy industry, and reignite America's passion for guns, with a particular focus on the dormant AR-15 market.

180. By 2010, Freedom Group had acquired enough brands to corner 48% of the market for AR-15-style rifles. At the time, it was an interesting choice of specialization.

181. The AR-15 dates back to the 1950s. Built in response to the military's specifications for a new combat rifle after WWII, it was field tested to great acclaim in Vietnam and subsequently adopted by the military as its standard-issue weapon.

182. But though versions of the AR-15 had been available for civilian purchase since the mid-1960s, there had been scant interest in the intervening 40 years. Freedom Group sought to change that by appealing to soldiers returning home from the war in Iraq—who possessed first-hand knowledge of the weapon's attributes—and by exploiting fear among gun owners that the election of President Obama would lead to restrictive firearm regulation.

183. This strategy was effective for a time, but it could not sustain sales volume when a federal assault on gun rights failed to materialize. Freedom Group understood that to stave off obsolescence, it would have to ensnare a wholly new demographic: impressionable teens.

184. That's where Activision came in.

185. A memo produced by Freedom Group explained the rationale succinctly: "With increasing urbanization and access to shooting/hunting areas in decline, a primary means for young potential shooters to come into contact with firearms and ammunition is through virtual gaming scenarios."

186. The memo was explicit that fostering brand loyalty at a young age was the goal; inserting their weapons into first-person shooter games would "help create brand preference among the next generation," and allow the company to "win our fair-share of these young consumers."

187. Not all video game creators thought marketing weapons to children was a good or moral business.

188. In an internal company email from 2011, a vice president in the defense division at Remington—one of Freedom Groups' brands—wrote to a marketing executive that his pitch to Red Storm, a video game creator in the FPS genre, was unsuccessful. Red Storm was, understandably and reasonably, "reluctant to 'market guns to kids.'"

189. Activision, however, had no such compunction. According to the same 2011 email, *Call of Duty*'s creators were "excited about working something out."

190. Some executives at Remington were troubled by the agreement. The head of commercial licensing testified that if he had not been sidelined on the Activision deal, he would have "done my power to nix it" because it "was going to portray our product for killing."

191. The eventual agreement allowed for the placement of two of Freedom Group's rifles in *Call of Duty*, including Remington's Adaptive Combat Rifle (or ACR for short)

192. The ACR gained a devoted following among players of *Call of Duty*. And Activision's commitment to authenticity—i.e., ensuring that the weapon looked and functioned exactly like its real-life counterpart—meant players' use of the weapon in the game became a form of training.

193. When a Remington executive learned of the ACR's popularity among FPS gamers, he reported gleefully to a colleague: "The reason the guys love it is because of its 'low recoil' in the game, which allows the player to maintain target acquisition." The colleague responded: "It's amazing how a game can sell a real world product attribute."

194. Upon information and belief, Activision entered into a similar agreement with Barrett Firearms for placement of the M82, a large and exceptionally powerful rifle designed to penetrate military equipment at long range. It has been called the "weapon of choice" by Mexican drug cartels.

195. The M82 was featured in C*all of Duty 4: Modern Warfare*, *Call of Duty: Modern Warfare 2*, *Call of Duty: Modern Warfare 3*, *Call of Duty: Modern Warfare 3: Defiance*, *Call of Duty: Black Ops II*, *Call of Duty: Modern Warfare* (Remastered) and *Call of Duty: Black Ops Cold War*.

196. Though the M82 is an anti-material rifle, meaning it was traditionally designed to destroy or debilitate equipment, in *Call of Duty* it is repurposed primarily as a sniper rifle. A weapon that isn't used to kill has no place in the *Call of Duty* franchise.

197. In an article published in 2012, a Barrett employee who negotiates deals with game developers is quoted as saying: "video games expose our brand to a young audience who are considered possible future owners."

198. These examples represent a small fraction of the assault weapon brands that Activison has featured and marketed over the years.

199. Upon information and belief, Activision has entered into licensing agreements with other firearm companies for the purpose of using replicas of their weapons or distinctive weapon components and accessories and/or Activision has used replicas of certain weapons or distinctive weapon components and accessories without a licensing agreement.

200. Upon information and belief, Activision either entered into a licensing agreement with Daniel Defense or replicated their rifles and distinctive rifle components without a formal agreement.

201. When Defendants launched the rebooted *Modern Warfare* on October 25, 2019, the image that splashed across millions of screens in America as teenagers rushed to download the game was of a soldier in silhouette holding the Daniel Defense M4V7S ("DDM4V7"), a nearly identical version of the weapon used by the Uvalde Shooter.

202. Daniel Defense exploited the high-profile exposure, posting a still of the splash screen on Instagram with the caption, "@callofduty Modern Warfare launched today! Anyone else had a chance to play it yet? The title screen pictured here features a Daniel Defense DDM4V7S 💥us".

203. The splash screen was a marketing coup for Daniel Defense. But brand familiarity and preference are cultivated through repeat exposure, which the splash screen could not accomplish alone. The more significant product placement was the seamless integration of Daniel Defense's

highly recognizable rail system into the most popular weapon platform in the Call of Duty franchise, the M4A1.

204. This placement resulted in broad and repetitious exposure to the Daniel Defense brand among players of *Modern Warfare*.

205. As context for the significance and savvy of this marketing tactic, *Modern Warfare* contains ten types of weapons available to players, which are classified as either a primary or secondary weapon. Primary firearms fall into one of six categories: assault rifles, submachineguns, shotguns, light machineguns, marksman rifles, and sniper rifles; secondary weapons include handguns and launchers. These options are standard and available to all players following their download of the game. Players may also purchase "add ons," which unlock even more weaponry options.

206. Within each category, players face a bevy of choices; the assault rifle category alone contains some thirty variants, including replicas of real-life firearms.

207. Despite this cornucopia of choice, one weapon rises above the rest for its widespread popularity and versatility: the M4A1, an AR-15 platform that takes its name from the U.S. military's primary service weapon.

208. An online forum devoted to the weapons of *Modern Warfare* describes the M4A1 as "without a doubt the most popular weapon in the game." Among its assets: "its time-to-kill is low, it fires quite accurately and brings with it a lot of mobility," "it works for close-range combat, mid-range combat and, with the right attachments, long-range combat."

209. Another online forum describes the M4A1 as "a king among kings."

210. A 2021[1] article published on a gaming website even waxed poetic that that "[y]ears down the line when *Call of Duty: Modern Warfare* is a distant memory, players will immediately think of the M4A1 when reminiscing about the game."

211. When players select the M4A1 as their primary weapon, there is usually a metal or polymer covering over the barrel of the rifle—a real and ubiquitous feature of AR-15s to protect the user from the extreme heat generated by firing. This not only prevents burns; it enables the user to hold the barrel for better control and aim.

212. This covering is referred to as both a handguard and a rail. Technically, the terms are not synonymous—a rail serves the same purpose as a handguard, but also contains holes to which accessories can be attached—but in practice, they are often used interchangeably.

213. In the 2019 version of *Modern Warfare*, the M4A1 is depicted with a unique, distinctive rail: raised, evenly spaced, rectangular ridges run along the sides and top of the rail (like tracks), and a row of circular holes fill the space in between. The image below is a close up of the M4A1 from *Modern Warfare*:



[1] Activision released *Modern Warfare II*, a new version of the game, on October 28, 2022. Prior to that date, the 2019 version was the newest iteration of *Modern Warfare* and was therefore the version the Shooter downloaded in 2021.

214. Players of the game knew immediately what they were looking at: the Daniel Defense Rail Interface System known as the RIS II. The Daniel Defense RIS II was designed in 2005 to meet a very specific request by the United States' elite Special Operations Command (SOCOM)—a rail that could "free float" a M203 grenade launcher without additional parts. This "revolutionary product," as Daniel Defense calls the RIS II, is pictured below.



215. The RIS II is not the only rail system made by Daniel Defense, but it is the most distinctive and well known. Its prominence in the firearm and gaming community springs from its connection to U.S. Special Forces, as well as its association with two popular Daniel Defense rifles: the M4A1 and the MK18 (a shorter version of the M4A1). Both weapons are AR-15s.

216. Daniel Defense markets both rifles by highlighting that they feature the RIS II, "which has been in use by US Special Operations Command (SOCOM)" since 2005.

217. On Reddit, a social media platform that hosts hundreds of threads (or subreddits, as they are called) devoted to *Call of Duty* and *Modern Warfare*, the RIS II became an immediate topic of discussion following the release of the 2019 version of the game.

218. On October 28, 2019, three days after the game premiered, a user posted a screen shot to the *Modern Warfare* subreddit of the bolts holding the rail to the M4A1 and asked what they were. Multiple players responded the same day:

- "It's the RIS2 rail system from Daniel defense. Used on modern m4 and mk18."
- "They are the bolts that hold the rail system on. . . . I have the same rail system on my AR 15 made by Daniel Defense."
- "They're the bolts that hold the Daniel Defense rail to the gun. Just a different rail than you're likely use to seeing."

219. In May 2020, a player posted on Reddit to ask which gun the M4A1 was based on. After some people responded that the M4 is a generic platform, another user jumped in: "the base gun in game is an M4a1 that has a free float Daniel Defense quad rail." He elaborated: "I'm seeing a lot of misinformation here. It is an m4a1 with a free float quad rail. . . . [I]t is reflective of an m4 variant someone in special forces would be using."

220. This response was echoed by several others, including one who confirmed that the M4A1 is "*by default* [] equipped with a Daniel Defense RIS II handguard."

221. In November 2020, a player posted on Reddit to ask the same question (which real-life gun was the M4A1 replicating). Two people noted that the rail was Daniel Defense's, with one commenting that this was what set the gun apart and made it recognizable: "[T]he upper/lower [receivers] used in the base variant are made by hundreds of companies at this point. The more unique items are the Daniel Defense RIS II handguard."

222. In another thread from 2020, a user complains that the DDM4V7 teased in the splash screen was not a new weapon in *Modern Warfare*. Attempts are made to mollify this person by pointing out that "the standard m4a1 in the game is a daniel defense, at least the rail is."

223. In a similar thread prompted by the splash screen, a user notes that "they use their [Daniel Defense] ris II rail system for the m4a1." Someone else responds that they are "excited for the RIS II being in MW [Modern Warfare]."

224. Players continued to discuss the origin and authenticity of the rail long after *Modern Warfare*'s release. In June of 2021, someone on Reddit crowdsourced how to recreate the look of the "m4a1 from modern warfare." When two people suggested the MK18 (the shorter-barreled M4), they were immediately corrected: "Don't listen to him. The gun in MW2019 is a Block II m4 . . . [with] appropriate Daniel defense rail." And another: it's "[l]ike an mk18 but with a 14.5 inch barrel and appropriate longer DD quadrail." Similarly, in February 2022, a debate broke out on Reddit about the rail, which was settled when a user sent a link to Daniel Defense's website.

225. The integration of the RIS II into the default M4A1 was brilliant marketing by Daniel Defense and Activision. It maximized players' exposure to the distinctive rail and, by extension, the Daniel Defense brand; it generated extensive discussion about *Modern Warfare* and Daniel Defense; and it emphasized the coveted association with U.S. Special Forces.

226. As one Reddit user aptly put it: "Good advertising strategy for ol Marty Daniel."

227. Daniel Defense is a privately held company and small player in the gun market, a fraction of the size of rivals like Smith & Wesson or Colt. It manufactured around 53,000 guns in 2020, giving it a less than one percent (1%) share of a market where hundreds of companies now manufacture AR-15s.

228. Daniel Defense has attempted to carve out a niche position within the industry—a smaller company that specializes in a high-quality product worth paying a premium for. The average cost of an AR-15 is between $800-$1,200, but a Daniel Defense AR-15 starts at around $2,000 and goes up from there.

229. Adult firearm enthusiasts who are knowledgeable about the market and already own an AR-15 are most likely to be receptive to Daniel Defense's pitch that the hefty price tag connotes quality and craftsmanship. But that messaging falls flat with an adolescent being courted to the brand as a first-time purchaser.

230. The benefit to Daniel Defense of product and brand placement in *Call of Duty*—particularly with the wildly popular M4A1 assault rifle platform—was therefore incalculable. Not only would millions of adolescents be introduced to their product, it would come with the imprimatur of the *Call of Duty* franchise and the implication that Daniel Defense products are exceptional and battle tested. The RIS II, after all, was designed specifically for Special Forces and, as of 2019, had been used by them for almost 15 years.

231. In the last ten years, Activision has, through relationships like the ones described above, become a prolific and effective marketer of assault weapons in the United States.

232. Upon information and belief, players of *Call of Duty*: *Warzone*, which was released in 2020 and cross-marketed with *Modern Warfare* as a free-to-play add on, also contained the M4A1 integrated with the Daniel Defense RIS II rail.

233. Upon information and belief, at last one version of *Call of Duty: Mobile* also contained the M4A1 integrated with the Daniel Defense RIS II rail.

234. Years ago, *Call of Duty* used brand names on weapons in their arsenal, then abandoned the practice. But, as the Freedom Group documents from the Sandy Hook litigation confirm, branding is unnecessary: "Previous experience tells us people will seek out the brands of the guns."

235. As exemplified by the threads alleged above regarding the Daniel Defense RIS II rail, there are hundreds, if not thousands, of threads and articles on the internet dedicated to the topic of identifying each *Call of Duty* weapon and weapon part by its true brand name and discussing the various pros and cons of each (in the game and in real life—which, by design, are one and the same).

236. In addition to content on various online gaming forums, fans have created a *Call of Duty*-specific version of Wikipedia, a massive database containing detailed information on every weapon that has ever appeared in the game.

237. YouTube is also a hotbed of *Call of Duty* weapon fetishization.

238. To date, there are multiple YouTube channels with videos devoted entirely to teaching viewers how to build and accessorize the Daniel Defense M4A1 in *Modern Warfare* and *Modern Warfare II*, for example, by using the game's "Gunsmith" feature. This feature, first introduced in 2019, allows users to customize their weapons and add accessories like holographic optics. Because these accessories and build options replicate real world products, the Gunsmith is more or less an interactive catalog of mimicked products.

239. In other YouTube videos, gun enthusiasts assemble a subset of the most popular weapons from *Call of Duty* and show viewers what it's like to shoot them—usually by rapidly emptying a large magazine. These videos narrate the experience of using the weapons, often commenting on how similar they feel and operate in real life as compared to the game.

240. In one such video, the host fires all of the sample weapons at a bulletproof vest and combat shield, noting that only the *Call of Duty* M4 (the AR-15) is able to penetrate both. The narrator describes the rifle as "the most balanced gun," "really controllable," and reports that it penetrates the vest "with ease."

241. Other videos teach players how to take advantage of *Call of Duty*'s extensive customization system to build a perfect replica of their preferred weapon—including Daniel Defense rifles, and in particular, the DDM4V7.

242. Unsurprisingly, gun sellers have eagerly entered the fray as well, using *Call of Duty* as a hook to sell real firearms. Classic Firearms, for example, an online retailer of firearms and ammunition, promotes videos on its website of an employee shooting (or "mag dumping") weapons featured in *Call of Duty*, particularly *Modern Warfare*. For each weapon, the video host first identifies the name of the weapon in *Call of Duty*, then names the "real" weapon it mimics.

243. Several of the weapons are identified as ones the seller has given away in the past as a promotional, and others are teased as potential future giveaways.

244. Replicating weapons in *Call of Duty* without explicit branding offers Activison and their gun industry counterparts plausible deniability. According to the Freedom Group memo previously cited, "[a] lack of direct branding helps to shield us from implications of a direct endorsement while still receiving benefit from inclusion in the game."

245. In the absence of explicit branding, how does Activision achieve such a high degree of realism in weaponry?

246. More than a decade ago, when the Remington ACR was depicted in *Call of Duty*, Freedom Group was responsible for providing "the guns, pictures, models, sound shoots, and expertise."

247. According to the Barrett Firearms employee who was quoted in 2012, Barrett insists that a game developer purchases one of the company's guns so that the depiction is as true to life as possible. "[The gun must] perform to the standards that our rifles do in the real world," he stated. "Barrett firearms is known for its quality and the brand must always be placed on that foundation."

248. Since 2019, Activision has also used photogrammetry to heighten realism, a process that generates a three-dimensional digital replica of any object. With sample weapons provided by manufacturers, creating perfect replicas would be feasible and significantly easier than in the past.

249. Activision also looks for unusual credentials for some of its employees; for the position of weapons artist, for example, job postings have stated a preference for applicants with "outstanding knowledge of weapons and equipment" and "outstanding knowledge of general military application and authenticity."

250. In addition to the extensive selection of weapons in *Modern Warfare*, players have still more options to build the gun of their dreams. The 2019 version introduced an extensive

weapons customization system, presenting most guns with a range of up to 60 attachments to choose from. These include holographic sights, lasers, mounted lights, silencers, grips, and so forth.

251. One of the most popular attachments in *Call of Duty* is the EOTech Sight, a holographic sight that has appeared in multiple versions of the game.

252. Holographic sights are state-of-the art combat sights, used by military operators and special forces. By using a laser and a series of mirrors, holographic sights project a three-dimensional hologram back to the user, superimposed on their field of view. This type of sight allows the user to aim and fire with both eyes open, allowing an unrestricted field of view and peripheral vision.

253. The EOTech Sight is a real product that can be purchased online, as the Uvalde Shooter did a month before his assault. The sight appears in some versions of *Call of Duty* with the brand name visible, and in others without. Even without, the sight is easily recognizable, and fans refer to it as the "EOTech" even in versions where it is unbranded.

254. On its website, EOTech describes the sight as "[a]n operator-grade Holographic Weapon Sight built for close-quarter engagements with fast-moving targets" that "allow[s] the shooter to quickly pick up and lock on a target."

255. On its FAQ page, EOTech touts the sight as ensuring "incredible accuracy, which provides the operator with controlled confidence in his shooting ability.

256. EOTech describes the outer ring in its sight's reticle as the "donut of death."

257. The Daniel Defense AR-15 featured on the loading screen of the 2019 version of *Modern Warfare* was shown equipped with an EOTech holographic sight.

258. *Call of Duty*'s focus on weapons attachments and accessories mimics real trends in the firearms market. According to Shooting Industry magazine, "One of the most significant [trends]

is the increasing demand for accessories, allowing users to tailor their firearms to their specific needs and preferences."

259. The NSSF, the shooting industry's trade association, echoes this. It notes that, with the rise in sales of long guns (like AR-15s), there has been a "a concomitant rise in the sale of accessories[,] . . . ***especially with high-tech products***. Retailers across the country are seeing their bottom lines benefit when they have lots of accessories in stock." Retailers interviewed for the article discuss a rise in demand for sights, weapon-mounted lights, and thermal optics—all attachments that are promoted in *Call of Duty.*

260. In 2012, a gun industry executive marveled that "just a decade ago, [video games] were considered the number one threat to gaining new shooters." Such games are "perhaps now the number one draw."

261. His observation is astute. When *Call of Duty* transported players to Normandy and Stalingrad, immersing them in a re-created and idealized past, there was no logical or intuitive connection between gaming enthusiasts and firearm ownership. If anything, as the above email suggests, FPS games were an impediment to cultivating a new generation of gun owners because they offered teenagers a fun and cheap alternative to the real thing.

262. Activision changed that calculus profoundly when they got into bed with the firearms industry and into the business of marketing assault weapons. By the time the revamped *Modern Warfare* was released in 2019, Activision's use of real-life weapons had become a straightforward and shrewd form of advertising.

263. The benefit to the gun industry of this arrangement is obvious. As a Remington executive wrote in 2011, placement in *Call of Duty* would bring "exposure from two of the best-selling game series of all time." Given years of declining interest in firearms among youth, this exposure was a lifeline for the entire industry.

264. Freedom Group was ahead of its time. Today, a firearm company that wants to compete in the AR-15 market cannot afford to ignore *Call of Duty*. Every connection between a manufacturer's product and the game is an opportunity to cultivate brand loyalty among the next generation of purchasers.

265. Firearm companies, including Daniel Defense, frequently reference *Call of Duty* in social media posts about their products, often with a #cod hashtag. This is an acknowledgment of the obvious: Activision is turning players into customers and driving new business through in-game marketing.

266. The Reddit threads discussed above also reinforce this point: many of the players discussing the real-life counterparts of the weapons and weapon parts in *Call of Duty* are doing so in order to identify and purchase a firearm.

267. This is openly acknowledged, with people posting comments on Reddit such as: "Myself and a large number of my friends have COD to thank for our shooting hobby," "I have dropped thousands of dollars on real guns, and I can't deny that video games have contributed to that interest," and "I may or might not have gotten the RIS II because Call of Duty…" (ellipsis in original).

268. Activision does not market weapons and assist companies in driving sales out of charity. They do it because it is good for Activision's bottom line.

269. In service of this goal, Activision created a firearm showroom for its millions of users—one where adults and adolescents alike could browse, test, covet, and compare each weapon's capacity to kill.

270. Marketing real life weapons and promoting brands like Daniel Defense through the *Call of Duty* franchise is a deliberate choice made by Activision. Activision decides which brands to include, and among those brands, which models and parts to feature.

271. Upon information and belief, Activision monitors trends in the firearm industry to assist it in making those decisions, including determining which products will have the greatest impact on consumer engagement.

272. Upon information and belief, Activision monitors online forums popular with *Call of Duty* players to assist it in making those decisions, including determining which products will have the greatest impact on consumer engagement.

273. On the same day this lawsuit was filed, a former Daniel Defense employee who served as the company's Brand Manager for 2 years, acknowledged the marketing relationship between Daniel Defense and Activision.

274. This former employee joined a Reddit thread initiated the same day plaintiffs filed their Complaint and identified himself as Daniel Defense's "social media manager from 2019-2021." He did not quibble with the facts as alleged. Rather, he thought the lawsuit was "funny" because, when it came to marketing weapons through *Call of Duty*: "every single other company was doing the same."

**III. Activision Knows that Younger Teens are Playing.**

275. Since the 2007 launch of *Call of Duty 4: Modern Warfare*, every iteration of *Call of Duty* has been rated "M," meaning the ESRB deems it inappropriate for teens or children under the age of 17.

276. But Activision knows, or should know, that a substantial percentage of players, like the Uvalde Shooter, begin engaging with *Call of Duty* prior to turning 17.

277. Activision represents in its annual reports: "We collect and store information about our consumers, including consumers who play these games."

278. The reports also discuss Activision's compliance with certain data privacy laws, such as COPPA, which regulates the collection, use, and disclosure of personal information from children under 13 years of age. This is a tacit acknowledgment that Activision collects data on players' ages.

279. Publicly available data suggests that roughly 25-30% of *Call of Duty* players are under the age of 21. Only Activision knows how many players are younger than 17, but the number is likely substantial.

280. In 2010, Activision submitted an amicus brief to the United States Supreme Court opposing a California law that restricted the sale of violent video games to minors.

281. Activision did not contest California's position that children under 17 should be protected from the extreme violence in games like *Call of Duty*. Rather, it argued that the ESRB's rating system was extremely effective at blocking minors' access to such games because, at that time, minors overwhelmingly bought games in retail stores that verified age.

282. Defendants' brief cites substantial evidence to that effect. For example: "In December 2009, the FTC reported that all eight of the major video game retailers it surveyed, which today represent 84% of the total market for games sold in the United States, employ policies preventing the sale of M-rated games to minors." Most retailers also participate in what's called a "mystery shop" audit, in which customers under age 17, apparently unaccompanied by an adult, attempt to purchase or rent M-rated games in order to test the effectiveness of a retailer's enforcement policy. Activision's brief reports that these audits prove broad, effective compliance with ESRB ratings—in the range of 80-91%.

283. Activision's arguments were persuasive at the time they were written nearly 15 years ago; but they have very little application to the modern gaming world. In 2018, only 17% of video games were purchased in retail stores; today, the number is closer to 10%.

284. In other words, the vast majority of *Call of Duty* players, like all video game consumers, are purchasing the game digitally—with no need to enter a store or interact with an adult. In this new digital age, there are no gatekeepers or other meaningful checks in place to prevent children and teens from playing *Call of Duty* long before they turn 17, as the Uvalde Shooter did.

285. *Call of Duty: Mobile*, a smartphone app released in 2019, can be downloaded to any phone, with no age verification. The user must agree to the Terms of Use, which state that the user is an adult or has obtained parental consent, but any teen or pre-teen with a phone can check the box and continue to download.

286. *Call of Duty: Mobile* was downloaded 250 million times in the first year.

287. For those playing on consoles, such as PlayStation or Xbox, physical copies of video games are no longer necessary; they can be instantly downloaded without age verification.

**IV. Activision Knows that *Call of Duty* Trains Mass Shooters.**

288. The link between *Call of Duty* and mass shooters has been undeniable for years. At least a decade before the Uvalde Shooter's massacre at Robb Elementary School, Activision was on notice that its training simulation was inspiring and training mass shooters.

289. In 2011, Anders Breivik rampaged through a summer youth camp in Norway, killing 77. The manifesto he left behind included a chilling description of his preparation for the attack: "I just bought *Modern Warfare 2*, the game. It is probably the best military simulator out there and it's one of the hottest. I see *MW2* more as part of my training-simulation than anything else."

290. A year later, 20-year-old Adam Lanza gunned down 20 children and six educators at Sandy Hook Elementary School in Connecticut with an AR-15. Lanza was a shut in who also trained on *Call of Duty*. A crime scene photograph from the school showed two 30-round magazines duct-taped together, a "taped reload," which he had learned from *Call of Duty* as a tactic to reduce reloading time.

291. Activision knew of the connection between Lanza's attack and *Call of Duty*, which was publicized in national media outlets. Moreover, it has been reported that employees at Infinity Ward, a subsidiary of Activision, were instructed to not discuss the shooting on social media to avoid drawing scrutiny.

292. Nikolas Cruz, the 19-year-old who, in 2018, killed 17 students at Marjory Stoneman Douglas High School in Parkland, Florida with an AR-15 was a devotee of *Call of Duty* as well; neighbors reported that he played up to 15 hours a day.

293. Cruz had at least two Instagram accounts that were fixated on guns. One profile was named "NikolasCruzMakarov." Makarov is the name of the terrorist who leads the mass shooting of civilians in the "No Russian" level of *Call of Duty: Modern Warfare 2*.

294. *Call of Duty* was also linked to Patrick Crusius, the 21-year-old who opened fire with an AK-47-style rifle at a Walmart in El Paso, Texas in 2019, killing 23 people. The shooter left behind a manifesto that included the line: "Don't attack heavily guarded areas to fulfill your super soldier COD [*Call of Duty*] fantasy. Attack low security targets."

295. And just six weeks after the shooting in Uvalde, 23-year-old Robert Crimo III turned an AR-15 on crowds at a July 4 parade in Highland Park, Illinois from the rooftop of an office building. Crimo was an obsessive *Call of Duty* player and had posted videos online of himself emulating *Call of Duty* scenarios.

296. In all of these shootings, the connection between the shooter and *Call of Duty* was nationally publicized.

297. These are some of the national tragedies that have entered the American lexicon: Sandy Hook mass shooting, Parkland mass shooting, El Paso mass shooting, Highland Park mass shooting. But they don't tell the whole story.

298. Across the country, smaller tragedies and averted acts of violence have piled up over the years, confirming that *Call of Duty*'s prominent role in the epidemic of mass shootings is not coincidental.

299. Take 2013, for example, the year after the mass shooting at Sandy Hook Elementary School.

300. In January of 2013, two minor high-school students in Orlando, Florida were arrested after posting a threat on Facebook to shoot up their high school with weapons stolen from a parent. According to the sheriff's investigative report, the pair bonded in part over a shared love of *Call of Duty*.

301. That same month, 15-year-old Nehemiah Griego used an AR-15 and a handgun to murder his mother, father, and three siblings, aged 9, 5, and 2. It was reported that Griego was "heavily involved" in violent video games and that, when questioned by law enforcement, he mentioned *Call of Duty: Modern Warfare* by name.

302. In May of 2013, a 17-year-old named Grant Acord was arrested for planning a shooting at his school in Albany, Oregon. The teenager had written a dramatic, almost cinematic, plan for his attack—which featured the same music that plays during *Call of Duty*'s "No Russian" mass shooting.

303. Then, in September 2013, Aaron Alexis went on a killing spree at the Washington, D.C. Navy Yard, killing 12. Friends described the shooter as being "really into" *Call of Duty*, noting that he would play all day and night, sometimes up to 18 hours a day.

304. At all relevant times, Activision knew or should have known of the connection between the rise of mass shootings, and of school shootings in particular, and the increasing popularity and ubiquity of *Call of Duty*.

305. At all relevant times, Activision knew or should have known that multiple mass shooters were devoted fans of *Call of Duty* and played obsessively.

306. At all relevant times, Activision knew or should have known that their product was habituating and desensitizing young men to acts of mass violence and training them as gunmen.

307. At all relevant times, Activision knew or should have known that their product was manipulating players' brain chemistry so that killing was associated with dopamine release, reward, and/or pleasure.

308. At all relevant times, Activision knew or should have known that their product was designed to exploit and deepen addictive behaviors, particularly in adolescents with developing brains.

309. At all relevant times, Activision knew or should have known that their product was conditioning young men to become fixated on the type of assaultive violence glamorized in *Call of Duty.*

310. At all relevant times, Activision knew or should have known that their product was fetishizing assault weapons and conditioning young men to see the weapons marketed in *Call of Duty* as a solution to their problems.

311. At all relevant times, Activision knew or should have known that it was using *Call of Duty* to market certain weapons and brands directly to consumers and did so for a commercial purpose.

312. At all relevant times, Activision knew or should have known that, through the *Call of Duty* franchise, it was channeling minors to firearm companies for the purpose of purchasing the real-life weapons from the games.

313. At all relevant times, Activision knew or should have known that their product was encouraging and/or inciting minors to seek out and purchase the real-life counterparts of the

weapons marketed in *Call of Duty* and/or assisting in channeling minors to firearm companies for that purpose.

314. At all relevant times, Activision knew or should have known that they were materially contributing to the negligent, reckless, wrongful and illegal marketing of firearms to minors.

315. At all relevant times, Activision knew or should have known that they have contributed substantially to the creation and training of multiple mass shooters, including Anders Breivik, Adam Lanza, Nikolas Cruz, and Patrick Crusius.

316. At all relevant times, Activision knew or should have known that their product serves to encourage, facilitate, and/or incite young men to seek attention and notoriety through mass shootings.

317. The question was not if, but when and where, the next *Call of Duty*-trained shooter would strike.

318. In 2011, two jurists wrote with startling prescience about how the conduct of companies like Activision might lead us to the exact place we now find ourselves:

> If the technological characteristics of the sophisticated games that are likely to be available in the near future are combined with the characteristics of the most violent games already marketed, **the result will be games that allow troubled teens to experience in an extraordinarily personal and vivid way what it would be like to carry out unspeakable acts of violence**.

319. Those jurists are Supreme Court Chief Justice John Roberts and Associate Justice Samuel Alito. If only Activision had listened.

## INSTAGRAM: THE FIREARM INDUSTRY'S BEST ADVERTISER

320. Instagram launched in 2010 as a photo-sharing social media app. In 2012, it was purchased by Meta (then known as Facebook) for $1 billion in cash and stock.

321. Instagram is no longer just a photo-sharing app. Today, Instagram enables users to broadcast videos live, send direct messages to other users, create "stories" that curate users' content for their followers, consume news, view advertisements from nearly every commercial brand on the planet, and shop.

322. It is also the most prolific marketing arm of the firearm industry.

323. As one firearms marketing agency explains, "Instagram is the place to be for firearms-related companies. . . . This is where your company will want to focus its marketing efforts as it will offer the highest return on your efforts."

324. According to another: "Instagram continues to remain the number one place for firearms-industry companies to grow their online presence."

325. This praise, which is well deserved, comes despite Instagram's official, published policy that "[a]ds must not promote the sale or use of weapons, ammunition or explosives."

326. The explanation for this seeming disconnect is simple. Instagram's guidelines prohibiting firearms marketing serve instead as a playbook for companies looking to target Instagram's millions of users, including minors; and Instagram fails to enforce firearm guidelines as a matter of company policy, while rigorously enforcing other types of content guidelines.

327. Through this conduct, Instagram assists and facilitates the negligent, unscrupulous, reckless, and illegal targeting of minors by firearm companies, including Daniel Defense.

**I. Instagram's Business Model: Data is Money**

328. Instagram's business model is simple: monetizing its users by selling advertising placements to businesses. Instagram's appeal to advertisers is two-fold.

329. First, Instagram has an enormous user base for advertisers to access; in 2022, two billion users worldwide were active on Instagram each month.

330. Second, Instagram collects an astonishing amount of data from its users. According to Instagram's data policy, the data it collects from users includes:

a. "the content, communications and other information you provide when you use our Products;"
b. "information in or about the content that you provide (e.g. metadata), such as the location of a photo or the date a file was created;"
c. "what you see through features that we provide, such as our camera;"
d. "information about the people, accounts, hashtags, Facebook groups and Pages that you are connected to and how you interact with them across our Products;"
e. "contact information" from users' devices;
f. "information about how you use our Products, such as the types of content that you view or engage with, the features you use, the actions you take, the people or accounts you interact with and the time, frequency and duration of your activities;"
g. "information about transactions made on our Products"; and
h. "content, communications and information that other people provide when they use our Products. This can include information about you, such as when others share or comment on a photo of you, send a message to you or upload, sync or import your contact information."

331. In other words, Instagram knows where you are, what you're doing, who you're with, what you like, what you're thinking about buying, some or all of your medical problems, if your brother's birthday is coming up, your favorite color, the identities of your friends and colleagues, and on and on.

332. This trove of data, which allows Instagram to profile users on hundreds of metrics, is an advertisers' dream. Based on a company's preferences, Instagram puts its algorithm to use, mining the vast universe of user data to customize an audience for a given ad. This includes demographic characteristics (like age, gender, and location); interests (like hobbies, entertainment, preferred brands, family, and friends); and behaviors (like engagement with other content on Instagram, interactions with ads, and past purchases).

333. Instagram is very, very good at this. The precision of its targeted advertisements is uncanny, even eerie. Most women with children can tell you that the app knew they were pregnant before almost anyone else in their life did—including possibly their partner. And because the app knew, a deluge of ads for prenatal vitamins and maternity wear followed immediately.

334. The level of intrusion necessary for this to work as well as it does is unsettling—particularly because Instagram's most coveted, and valuable, users are teenagers.

335. Approximately 62% of American teens aged 13-17 use Instagram, with 10% of users reporting that they use it "almost constantly."

336. According to internal Instagram documents, it views the potential loss of teenage users to other platforms as an "existential threat."

337. Beginning in 2018, Instagram earmarked nearly its entire global annual marketing budget to targeting teenagers—a number in the range of hundreds of millions of dollars.

338. If your child uses Instagram, there's no question that Meta knows more about your child's habits, interests, preferences, whereabouts, and social network than you do.

339. And knowing those things is a very good business. Instagram's advertising business reaps astronomical profits. The platform brought in $32.4 billion in advertising revenue in 2021 alone. One industry analyst has forecasted that Instagram's ad revenue will total $71 billion in 2024.

**II. Instagram's Monopoly on Teenagers**

340. Instagram's value to advertisers—and therefore its earning potential—is directly correlated with the number of users and the extent of their engagement. Every new user generates more data for Instagram, as does every extra hour spent on the app by an existing user. Every page viewed, every link clicked, and every location logged helps Instagram better understand its users and therefore better sell an advertiser's product.

341. Adam Mosseri, the Head of Instagram, expressed this logic succinctly in his testimony before the Senate Committee on Commerce, Science, and Transportation in 2021: "we make more money when people spend more time on our platform because we are an advertising business."

342. Put another way, Instagram has every incentive to addict users—particularly the young users who Instagram views as essential to its success—and it knowingly does so.

343. In its efforts to dominate the teenage market and maximize users' time spent on the platform, Instagram makes two conscious, calculated choices.

344. First, Instagram chooses not to implement age-verification measures to keep pre-teen children off Instagram or to otherwise enforce their stated policy of blocking children under 13 from creating accounts.

345. Second, Instagram exploits basic known facts about brain chemistry, particularly teenagers' susceptibility to dopamine, in order to maximize the amount of time that teenagers spend on the platform.

### A. <u>Instagram Refuses to Enforce Age Guidelines.</u>

346. Instagram purports to prohibit children under the age of 13 from using its product. This is not merely a "best practices" policy; federal law prohibits online services from gathering even basic data on children under 13 (like names and email addresses) without verifiable permission from a parent.

347. Instagram has made a mockery of this law and its own internal policy, which are designed to protect children.

348. Instagram has known for more than a decade that millions of children under thirteen use its product. Meta's *own algorithm* has estimated that it has as many as four million underage users.

349. This is a choice. Instagram has chosen not to implement reasonably available age-verification measures that are plainly feasible and used by other companies.

350. Other online products employ a variety of more effective and reliable age-verification systems to prevent children from using their products, including connecting new users

to parents' accounts or insisting on verification through an identification card (or other government-issued document) listing date of birth.

351. Indeed, Meta uses an age verification technique for its Facebook Dating product that it claims can verify ages without identifying users—but does not use the same technology at account startup for Instagram.

352. Instagram did not even ask for the age of new users until December 2019; and even then, it ignored existing users so that hundreds of thousands of underage users were simply grandfathered in.

353. Moreover, when Instagram began asking new users to report their ages in December 2019, it did so in a manner that was easily and obviously circumventable. The system, if you can call it that, simply asked new users to self-report their date of birth. If the user entered a birthdate indicating that they were under 13, they were informed they could not create an account. But if that same child *immediately* re-entered a different birthdate, Instagram opened the doors to the app.

354. Normally, this would be called willful ignorance. But Instagram is not ignorant of anything; it knows more about its users than they know about themselves.

355. This knowledge has now been confirmed several times over.

356. According to documents cited in a lawsuit brought by a coalition of state attorneys general ("Coalition lawsuit"), Meta created charts tracking Instagram's penetration into 11- and 12-year-old demographic cohorts.

357. And Facebook whistleblower Frances Haugen described in congressional testimony how Meta knows that "10 to 15 percent" of children as young as 10 are on Facebook and/or Instagram.

358. Instagram's failure to act as an effective gatekeeper is not sloppiness or error; it is by design. Keeping underage children off Instagram would substantially diminish its user base and its

value to advertisers. Every 10-year-old hooked on Instagram is a current user, a future user, and a valuable collection of data points that can be exploited once that child has purchasing power.

359. Indeed, according to the Coalition lawsuit referenced above, Meta has made efforts to identify underage users—but in the service of company growth, not child safety and well-being. In a 2019 email, Meta's head of global safety asked the company's president of global affairs to clarify whether the goal for identifying users under the age of 13 was to remove them "or whether we are waiting to test growth impact before committing to anything." The answer appears to have been the latter.

360. Upon information and belief, Meta has intentionally stalled the implementation of automated age detection systems and fails to properly staff the team that reviews user reports of underage activity.

361. According to the Coalition lawsuit, Meta has received more than 1.1 million reports of users under the age of 13 on its Instagram platform since 2019, yet it "disabled only a fraction" of those accounts.

362. Hooking kids before they turn 13 is critical to Meta's business because it ensures a steady stream of the platform's most valuable demographic: teens.

363. According to internal Instagram documents, it views the potential loss of teenage users to other platforms as an "existential threat." In Instagram's words: "if we lose the teen foothold in the U.S, we lose the pipeline" for growth.

364. Beginning in 2018, Instagram earmarked nearly its entire global annual marketing budget to targeting teenagers—a number in the range of hundreds of millions of dollars.

365. Teenagers' time, attention, and data is so valuable to Instagram that it has developed an internal metric, "teen time spent," that measures how many hours per day teenagers spend on the platform.

### B. Teens are "insatiable when it comes to 'feel good' dopamine effects."

366. Dopamine is a neurotransmitter that is central to the brain's reward system; it is released when we experience pleasurable stimuli. Our brains are wired to seek out stimuli that result in dopamine release.

367. Instagram revolves around the giving and withholding of approval by a user's community. Every post or story is judged by the number of likes collected, the quantity of comments, the number of reposts, and so on. This feeds into teenagers' need for social approval and validation, and users experience dopamine rushes when the app rewards them.

368. Instagram's exploitation of the brain's dopamine pathways is not unlike the effects of substance abuse. As New York University professor and social psychologist Adam Alter has explained: "The minute you take a drug, drink alcohol, smoke a cigarette . . . when you get a like on social media, all of those experiences produce dopamine, which is a chemical that's associated with pleasure. When someone likes an Instagram post, or any content that you share, it's a little bit like taking a drug. As far as your brain is concerned, it's a very similar experience."

369. Or as Meta put it in an internal 2020 presentation: "Teens are insatiable when it comes to 'feel good' dopamine effects. . . . And every time one of our teen users finds something unexpected their brains deliver them a dopamine hit."

370. But Instagram does not simply inundate users with rewards likely to result in a dopamine hit. Relying on lessons from behavioral science and research dating back decades, Instagram instead uses a concept known as intermittent variable rewards ("IVR").

371. IVR works by spacing out dopamine-triggering stimuli with dopamine gaps in an unpredictable manner. Put more simply, when you don't know when the next hit of dopamine is coming, the anticipation makes the next hit even sweeter.

372. IVR has been shown to alter neural pathways in the brain to create much stronger associations than fixed, predictable rewards. The dopamine gaps allow craving and anticipation to build, which strengthens the desire to engage in the activity with each release of dopamine.

373. Instagram goes to great lengths to keep those "insatiable teens" engaged, delivering IVR on a tailored schedule that the algorithm predicts will be most effective in keeping a particular user engaged.

374. For example, Instagram's notification algorithm will at times determine that a particular user's engagement will be maximized if the app withholds "Likes" on their posts and then later delivers them in a large burst of notifications.

375. A user never knows what they'll find when they open the Instagram app, so each time offers the possibility of a new dopamine reward. In fact, this uncertainty itself makes the experience more addictive—similar to the way in which people can become addicted to pulling the lever on a slot machine.

376. To ensure perpetual use is possible, Instagram is designed to facilitate and encourage a user to stay on the app and continue consuming content *ad infinitum*.

377. First, Instagram's product features work in combination to create and maintain a user's "flow-state": a hyper-focused, almost hypnotic state where the user is totally immersed in smoothly rotating through aspects of the product.

378. In the early days of the app, Instagram's main feed could actually come to an end, saying "you're all caught up" after you'd seen everything shared by your friends. But over time, the company realized that friends alone aren't enough to keep users on the platform for hours on end.

379. In 2020, Instagram started adding algorithmically-selected content to the user's feed that he or she didn't request. This is known as the "infinite scroll." Now, the app will never tell you that you've seen enough; it will always give you more.

380. This has the effect of lulling users into a flow state in which they scroll endlessly in search of a dopamine release, oftentimes despite a desire to put their phone down and move on to other activities.

381. The upshot is that Instagram is incredibly successful at getting users to check the app repeatedly, even compulsively, throughout the day. Adolescents and children are especially vulnerable to these dopamine-driven urges because they lack the fully developed executive decision-making, and impulse control, of adults.

382. This is nothing short of a gold mine for Instagram and its advertisers. Instagram offers direct access into the hooked minds of its youngest users, and advertisers are all too ready to pay-to-play.

383. Second, Instagram keeps users engaged by amplifying extreme content. This content is more likely to be upsetting, disturbing, jarring, and/or controversial.

384. Even when users dislike the content Instagram shows them, that content often elicits some kind of reaction—even one as small as pausing on the post. Instagram takes note of these minute reactions, and every pause tells the app the user is engaged, which in turn leads to more extreme content.

385. The type of aggressive marketing preferred by certain firearm companies, as described below, is one type of extreme content that Instagram is designed and engineered to amplify.

## III. Firearm Companies Need Instagram to Reach Customers—Especially Minors.

386. Around 2010, the firearm industry began to panic over two, interconnected problems: (1) the decline of print media and a growing reticence among traditional outlets to publish firearms marketing; and (2) the existential need to court youth and cultivate their interest in firearms.

387. Instagram offered a solution to both these dilemmas. As other forms of marketing, like newspaper and television, were shutting the industry out, Instagram offered gun companies tens of millions of active users—many of whom belonged to the younger demographic the industry was chasing. Today, that number is more like 2 billion.

**A. <u>The Disappearance of Print and Broadcast Marketing</u>**

388. For decades, firearms manufacturers advertised through traditional media, such as magazines, newspapers, and television commercials.

389. A 1999 *New York Times* article reported that "gun magazines remain the firearm industry's favorite, and most uniformly supportive, marketing tool."

390. At that time, the most popular magazine, *Guns & Ammo*, had an estimated readership of 5.8 million.

391. In 2013, *Guns & Ammo*'s circulation was reported to be 416,224. *Ad Week* characterized this number, a 7% jump from the previous year, as a "beacon of hope for the American publishing industry"—a telling comment on the future of print, niche magazines.

392. Compounding the disappearance of print media in the digital age, many traditional media outlets began prohibiting gun advertisements.

393. In the early 2000s, newspapers began to limit or ban gun advertisements. Today, firearm advertising in newspapers has been all but eliminated.

394. Television followed suit. Following the 2012 Sandy Hook Elementary School Shooting, Comcast, the nation's largest cable operator, joined Time Warner and Cox Communications in banning firearms advertisements.

## B. The Critical Demand for Youth

395. The Firearm industry has not been reticent in acknowledging that American youth is the answer—the only answer—to its feared obsolescence. This has led the industry to openly discuss and implement strategies to court children and teens through marketing.

396. In 2012, a "comprehensive consumer study" published by the National Shooting Sports Foundation advised that "managers and manufacturers should target programs toward youth *12 years old and younger*" because "[t]his is the time that youth are being targeted with competing activities" other than shooting.

397. In an editorial published the same year in *Junior Shooters* magazine, the editor in chief warned: "All the companies involved in the shooting industry need to realize our youth are the future of the shooting industry."

398. America's gun companies heeded the call.

399. Freedom Group, the firearm conglomerate that included Remington, wrote in an SEC filing that increased interest in the long gun market with "a younger demographic of users" would have "significant long-term benefits."

400. Privately, Remington executives lamented that there were fewer opportunities for youth to come into contact with firearms. In an internal memo, company execs posited that placing their weapons in first person shooter video games would "help create brand preference among the next generation," and allow the company to "win our fair-share of these young consumers."

401. In 2012, an employee of Barrett Firearms explained the company's interest in partnering with video game makers: "video games expose our brand to a young audience who are considered possible future owners."

402. The CEO of Smith & Wesson told investors that Smith & Wesson saw opportunities for expanding the market for assault rifles by targeting “a younger demographic” that “grew up playing videogames” and was “very interested in firearms.”

403. Some companies have even begun manufacturing .22 caliber assault rifles specifically for children, using plastic to keep the weight manageable for a child.

404. An Illinois-based company called Wee 1 Tactical began marketing its “JR-15,” a child-sized AR-15, in 2022. The JR-15 is not a toy gun; it can shoot and kill.

405. Wee 1 Tactical has described the JR-15 as “operat[ing] just like Mom and Dad’s gun.” The company has stated: “We are so excited to start capturing the imagination of the next generation[.]”

406. Of the firearms manufacturers that have expressed a desire to cultivate interest in firearms among younger Americans, Daniel Defense has worked to groom kids and teens with particular zeal.

407. The founder of Daniel Defense and the Executive Chairman of its board testified to Congress that “getting young people interested in firearm ownership” is good for business.

408. As alleged above, one of Daniel Defense’s rifles, the DDM4V7S, was displayed on the loading page of *Call of Duty: Modern Warfare* and the company’s distinctive rail system (the RIS II) was integrated into the popular M4A1 platform. These placements were guaranteed to reach millions of teens.

409. Daniel Defense is behind the “Double D Foundation,” which purports to “protect the Second Amendment by growing the number of Americans involved in shooting sports ….” The more likely purpose of the foundation is to provide a tax-exempt marketing wing to target children.

410. The Double D Foundation's website is explicit that its purpose is to reach children without previous exposure to firearms: "These young Americans have never felt the surge of adrenaline that comes with that first real trigger pull [or] smelled gunpowder . . ."

411. Daniel Defense has also repeatedly posted content that explicitly links their weapons to youth, including children. For example, Daniel Defense has posted the following images: a man dressed as Santa Claus holding an assault rifle; a young woman, possibly a teenager, sitting next to an assault rifle and looking at a night sky; a father at the shooting range with a young boy, no older than 12, who is aiming an assault rifle; and a mother with a boy under the age of 10 standing behind a rifle scope.

412. In one particularly memorable, and disturbing, example, Daniel Defense posted an image of a toddler holding an assault rifle with the biblical caption: "Train up a child in the way he should go, and when he is old, he will not depart from it."

413. That image was posted on May 16, the same day the Uvalde Shooter purchased his assault rifle from Daniel Defense, and eight days before he used it to kill 19 children and two adults at Robb Elementary School.

**IV. Instagram Purports to Prohibit Firearm Marketing but Actually Facilitates It.**

414. According to Meta's published "Advertising Standards," which apply to Instagram, "[a]ds must not promote the sale or use of weapons, ammunition or explosives," including "[f]irearms, ... firearms parts, [and] ammunition."

415. Instagram's de facto policy, however, is that only *paid* firearm advertisements are prohibited. If firearm companies bypass Instagram's formal advertising channels and rely instead on "organic posts" from their own account, firearms marketing is freely permitted.

416. The firearm industry learned quickly how to navigate this flimsy rule and does so in two ways: (1) creating advertisements in the form of organic posts; and (2) using influencers to sell their products.

417. With respect to the former, firearm companies figured out years ago that minor tweaks to an advertisement will bring it into compliance with Instagram's stated policy—avoiding the words "buy" and "sell" and omitting both price and a direct link to purchase.

418. This laughably easy workaround is an openly discussed topic in the industry.

419. According to one firearms marketing agency: Instagram "may not allow gun and ammunition brands to use paid advertising to promote their products," but "there are no restrictions against organic social posts." "**[T]here are some major loopholes in . . . advertising regulations for Facebook and Instagram**." Thus, "organic posts" that promote firearms will not be prohibited if they avoid "linking to any page that sells firearms or ammunition."

420. The National Shooting Sports Foundation, the firearm industry's trade association, advises firearms sellers: "My biggest advice for somebody on social media is do not (under any circumstances) put pricing in your posts — ever. When we put pricing in a post, we get nailed."

421. Another marketing agency recommends, "[y]ou must pay attention to the wording of your posts. . . . If [someone] ask[s] for the price on Instagram, have them message the page."

422. Even when following this advice, firearm companies often exhibit a certain smugness at how easy it is to skirt the rules. On one Instagram post featuring a Daniel Defense rifle, a user commented, "$$?" Daniel Defense replied with their official account: "Please visit our website. Instagram doesn't like when we post prices. FYI, this Delta 5 Pro 16" is available!"

423. The idea that advertising can be reduced to such formulaic terms is specious. The most iconic advertisements in history—Nike, Coke, and Apple come to mind, among many others—didn't urge consumers to "buy" or list a price. They employed powerful imagery and/or catchy

verbiage and memorably linked it to a brand. As with many things in life, "show don't tell" carries the day.

424. Nothing prevents firearm companies from employing this strategy on Instagram—and they do.

425. Another popular workaround is the use of the so-called influencer. Influencers are Instagram users with a large and established audience who companies use to promote products, usually in their everyday life and with the veneer of authenticity. Influencers excel at creating content that is visually appealing and designed to look genuine instead of scripted.

426. This type of soft marketing is extremely effective, particularly with teens; according to a Morning Consult report, 72% of teens follow at least one influencer.

427. Gen Z, who represent today's current teenage population, is the biggest and most profitable target market for influencer content.

428. More than 75% of brands now have a dedicated budget for influencer marketing. In 2022, the influencer industry was valued at $16.4 billion.

429. Influencers are considered "branded content" under Instagram's policies if they received anything of value from the company whose product they are promoting. This includes gifts and other free things.

430. Instagram's Community Guidelines prohibit any "branded content," which includes influencers, from promoting firearms.

431. But once again, this rule is easy to skirt: influencers simply do not disclose their posts as branded content.

432. Influencers have become a wildly effective marketing tool for the firearm industry.

433. One firearms marketing agency explains that firearms sellers should "partner with influencers to 'white label' ads through the influencer accounts." The agency notes that while

Instagram prohibits direct advertising, "influencers can pay to promote their content that reviews a firearms product but doesn't link to a website where guns and ammunition are sold. **This strategy is incredibly effective and every marketing leader in the shooting sports industry should consider it**."

434. According to a Vox article, influencers have "done something that the companies in the firearm industry cannot do on their own: make the gun lifestyle as attractive and aspirational as all the others on Instagram."

435. An employee of a gun range interviewed for the article put it this way: "[Influencers] can promote our product better than we can. That's the sad part, because they're not a gun company. We can pay them to promote our product, but we can't promote our own. In regard to Facebook and Instagram, it really is the only way for gun companies to grow."

436. One marketing executive in the firearms industry has referred to influencers as "the goose laying the golden egg."

437. Influencers have become so ubiquitous in firearms marketing that there are now consultants offering to manage portfolios of influencers for firearms companies.

**V. Firearm Companies like Daniel Defense Rely on Instagram's Guidance to Structure their Assault Weapons Marketing to Teens.**

438. Certain firearm companies, including Daniel Defense, have been emboldened by Instagram's policy—and the corresponding cheat sheet for how to evade it.

439. Daniel Defense has carved out a niche in the firearms market. It sells a single model of handgun and a bolt-action rifle, but its bread and butter is the AR-15. At least 80 percent of Daniel Defense's revenue comes from selling AR-15-style rifles.

440. Daniel Defense's website lists twenty-seven models of AR-15-style rifles for sale. The most popular is the DDM4 model, which is meant to evoke and mimic the "the iconic M4

carbine used by U.S. military forces." The Shooter used a variant of the DDM4 to commit his attack at Robb Elementary School.

441. All of Daniel Defense's AR-15 rifles are, like their military progenitor, designed to kill in combat. Every feature of the weapon serves this end, particularly its weight, ergonomics, rate of fire, low recoil, and capacity to hold large capacity magazines.

442. Daniel Defense's marketing leans heavily on military themes, continually seeking new ways to link their product to the thrill of combat and the dominance associated with the military's standard-issue assault rifle.

443. The company's Instagram posts routinely depict scenarios featuring, or appearing to feature, real military operators—not, for example, civilians in fatigues. Soldiers are shown on patrol, entering an unidentified building with weapons drawn, or ascending the stairs of a freight ship in a stacked formation. Special forces are shown emerging from water in the middle of the night.

444. These posts often feature a single soldier dressed for battle, evoking the trope of the brave, lone gunman.

445. In 2017, Daniel Defense published a video advertisement called "Daniel Defense MILE (Military & Law Enforcement) Brand Video," which shows a pitched gun battle taking place inside the dark and cinder-blocked-lined halls of an unidentified building, which could easily be a school or other public building.

446. Military imagery is sometimes juxtaposed with ordinary, even banal, characterizations of civilian life—an intentional blurring of the line between combat in war and combat "at home."

447. For example, one of Daniel Defense's Instagram posts shows four soldiers entering an unknown building in formation; they are decked out in full combat gear, hundreds of rounds of ammunition strapped to their chests, holding assault rifles in the high ready position. The caption

reads: "Heading out of the office like..." The hashtags include #gunsofinstagram, #operators, and #gunporn.

448. Other posts create a jarring contrast between the violence of the weapon and the domesticity of the surroundings. In one such advertisement, an AR-15 is seen leaning against the refrigerator in a home kitchen, with the text "Let's normalize kitchen Daniels. What Daniel do you use to protect your family and home? 🔥DDM4 V7 in Tornado." In another, a rifle sits next to a mug with the caption "The perfect way to enjoy #sundaygunday. What's your Daniel and Drink of choice for today?"

449. The former post, advertising the exact weapon used by the Uvalde Shooter, was published on May 13, 2022—three days before the Shooter purchased his own.

450. Daniel Defense also explicitly links its weapons to *Call of Duty*, where rifles identical and similar to its own are used to commit mass murder.

451. As alleged above, Daniel Defense took to Instagram to boast when the DDM4V7S was featured on the *Modern Warfare* loading page.

452. Daniel Defense's Instagram advertising routinely references *Call of Duty* in an attempt to draw an association between the famous first-person-shooter franchise and its assault rifles.

453. These advertisements, which usually feature soldiers armed with Daniel Defense AR-15-style rifles and dressed to appear like players from *Call of Duty*, include *Call of Duty* hashtags such as "#callofduty," "#cod," (an abbreviation for Call of Duty regularly used by gamers), "#warzone" (a game in the Call of Duty franchise), "#callofdutywarzone," "#codwarzone," "#callofdutymodernwarfare," and "#videogames."

454. Daniel Defense has referenced *Call of Duty* game features and game modes, with phrases like "Final circle in solos, what's your move?", "How many wins do you and your squad

have in Warzone?", "When you're the number one team in plunder, what's your move?!", "Where we dropping boys? ✈️", "Eliminate all enemies or capture the overtime flag to win!"

455. To harness the power of Instagram, Daniel Defense has also used posts as a form of crowdsourced advertising. It frequently calls on users to "tag" the people with whom they play *Call of Duty*, which brings the ads to the social media feeds of the gaming partners. For example, Daniel Defense urged users: "Tag your Gunfight partner below!🎮🎮", "Who is your warzone partner? Tag em below!", and "Tag your Duos buddy below."

456. In April 2021, Daniel Defense posted a picture of the DDM4V7 with video game controllers lying casually around it and the caption "Game time! 🎮"

457. These invocations of *Call of Duty* are part of Daniel Defense's efforts to appeal to the young, male demographic that dominates the franchise. But it is not the only tactic. Daniel Defense also exploits tropes of sex and masculinity in an effort to reach teenage boys.

458. The company works with social media influencers, generally young and attractive women, who pose with Daniel Defense weapons—sometimes in lingerie or revealing clothing. The ads all convey a common message: owning an assault rifle is masculine and sexy and will earn the attention and respect of women. In one particularly unsubtle post, a gun influencer poses in black lingerie holding a Daniel Defense rifle. The caption reads, "fuller hips, tits, and lips." Daniel Defense is tagged by name in the caption, removing any doubt as to what is being sold.

459. These types of messages are designed to appeal to teenage boys who are navigating puberty, masculinity, and intense vacillations of self-esteem.

460. Upon information and belief, Daniel Defense has collaborated with multiple influencers on Instagram and paid them to promote Daniel Defense weapons. In some cases, Daniel Defense may have paid for influencers' service by gifting free weapons and/or accessories.

461. Some or all of these influencers fail to disclose their posts as branded content and instead attempt to make their posts appear "organic."

462. Instagram knows that companies like Daniel Defense violate Instagram's stated polices by marketing firearms in this way.

463. Indeed, Daniel Defense employees openly describe this work as part of their job description. For example, the former Brand Manager for Daniel Defense from November 2018-June 2021 wrote on LinkedIn, the professional networking site, that his key duties included "overs[seeing] production of social media content" on Instagram and "manag[ing] and develop[ing] relationships with Social Media Influencers and third-party content creators."

464. Yet another tactic Daniel Defense employs to appeal to younger users on Instagram is the use of pop culture references and, on occasion, actual celebrities.

465. In a January 2020 post—two months after the release of the new *Modern Warfare*, Daniel Defense posted a picture of musician and rapper Post Malone holding its MK18 assault rifle (which features the RIS II rail). The caption reads, "MK18 got me feeling like a rock star," a reference to Post Malone's #1 hit, Rockstar, which includes lyrics glorifying a drive by shooting.

466. Other Daniel Defense posts on Instagram have referenced movies such as Star Wars, Scarface, and Gladiator, as well as the popular and highly violent Netflix show, Squid Game. In the latter, Daniel Defense's ad shows an executioner character from the show holding a Daniel Defense AR-15. The obvious implication is that the routine murder that occurs on the show would be more effective—or perhaps more fun—with a Daniel Defense weapon.

467. Daniel Defense's Instagram marketing also plays into themes of power and revenge. Specifically, that the ownership and use of an assault rifle is, by itself, a triumph over powerlessness and/or the answer to victimization. Ad copy refers to Daniel Defense weapons as "a force to be

reckoned with" and as something "bad" that "comes in a small package." Another ad directs the viewer: "Refuse to be a victim🤘🏼"

468. And in April of 2021, Daniel Defense re-published on its own page the message of an Instagram user explicitly linking AR-15 proficiency with masculinity and power. The post features the user wearing a ballistic helmet, night-vision gear, a gas mask, and a plate carrier—a combination that has no legitimate use in the civilian market. The caption reads:

> When will we realize as a collective that there is nothing glamorous, enticing, or desirable about being powerless? Masculinity is NOT a toxic social concept that weakens the mind, body or spirit. . . Be deliberate, meticulous and calculated in your thoughts and actions. I will be ramping it up, enhancing my proficiency. You should too. Or don't and suffer the consequences. Everything has a price. What are you willing to pay?

Daniel Defense dubbed this unsettling screed, "weekend vibes."

469. Finally, and most disturbingly, Daniel Defense uses Instagram to extol and glamorize the unlawful use of its weapons.

470. One post in this genre shows two soldiers in combat gear on patrol, rifles at the ready. The imagery does not evoke hunting or sporting in any sense, and there is not an animal in sight. Yet the caption reads: "Hunters Hunt."

471. Another advertisement shows a Daniel Defense rifle equipped with a holographic battle sight—the exact same brand used by the Shooter—and dubs the configuration "totally murdered out."

472. Yet another depicts the view through a rifle scope, the color slightly tinged to evoke the scope's effect. City lights can be seen in the distance. The rifle is looking down on a street below, as if from a rooftop. The setting could be any American street at night; you can see streetlights, a parked car, and other cars driving by. The rifle's crosshairs are fixed on the parked car. The caption reads, "rooftop ready, even at midnight."

473. Many Instagram users noted that this post unambiguously promotes unlawful use. The comments included the following:

- “So y’all really just out here aiming rifles at the street?😳”
- “This is a strange ad lol telling people to snipe people…”
- “danielassination”
- “I know the Uber was late but y’all don’t think this was too far?😂”
- “Ayo imagine driving by and getting glassed like jfk.”
- “What’d the guy in that little car do to you?”
- “How tf [“the fuck”] did you guys pull off this photoshoot without someone calling the National Guard on your?! 😂😂😂”
- “Some poor fella had a gun pointed at his dome and didnt even know it.”
- “So we’re pointing guns at civilians off a rooftop for a photo shoot now??? 😂”

474. Indeed, simply the placement of this weapon—even for marketing purposes—may have violated state criminal statutes. In Texas, for example, a person commits the offense of disorderly conduct if he “intentionally or knowingly … displays a firearm or other deadly weapon in a public place in a manner calculated to alarm.”

475. Daniel Defense’s advertising is designed to appeal to minors, and targeting minors is one of the company’s explicit goals. Cultivating brand exposure and loyalty among a younger demographic is the only way the company can remain relevant and profitable—particularly in an era where millions of potential customers are exposed to AR-15 brands through the *Call of Duty* franchise. In other words, competition is tight.

476. Just as Activision uses violence, gore, and realistic weaponry to keep teenage boys hooked, Daniel Defense relies on advertising that is aggressive, combat-fetishizing, irresponsible,

reckless, and sometimes unlawful. Like all good marketing, Daniel Defense is selling something aspirational: the allure of power, the promise of being feared and respected.

477. It does this on a platform where millions of users are minors, with the intent and expectation that those minors will be exposed to their advertising and influenced by it.

478. By relying on Instagram for advertising, Daniel Defense knows that it can bypass parents and speak directly to children and adolescents.

479. After the Uvalde mass shooting, a local paper operating near Daniel Defense headquarters in Georgia had this to say about the company: "A not-so-secret fact about product marketing is the pitch often says more about the company than the good or service it provides. Judging by Daniel Defense's marketing strategy, the locally based firearms manufacturer is the sociopath next door."

### VI. Instagram Leverages Unlawful Firearm Advertising to Engage and Retain Minor Users.

480. Daniel Defense relies on Instagram to advance a reckless, unethical, and unlawful marketing strategy. The company courts children and teenagers long before they can legally purchase firearms and does so by linking its weapons to glamorized violence, lone gunman missions, revenge, female influencers, pop culture references, and the *Call of Duty* franchise, among other tactics.

481. Daniel Defense cannot advance that strategy, nor reach large numbers of children and teens, without Instagram's assistance.

482. Instagram makes choices about whether and how to regulate content it deems dangerous or harmful. It uses various tools at its disposal to prevent minors from seeing, or being harmed by, certain kinds of content.

483. In the context of paid advertising, Instagram forces companies to submit to a formal review process. Advertisers that try to comply with the letter but not the spirit of Instagram's policies will usually be rebuffed.

484. "When an ad is submitted, it goes through a pretty extensive review process before it's approved," a spokesperson for Instagram explained in 2019. That includes a review of the ad itself, the landing page the ad redirects to, and links to outside websites. Even if the ad doesn't promote the sale of guns, leading to a page that does will result in rejection. And the caption is just as important as the image. "If the image was a firearm safe — this is purely hypothetical — and then the caption was 'I love using guns, you should all use guns, here's a safe,' that would be disapproved."

485. Outside the context of paid advertising, Instagram takes steps to protect minors from content considered harmful, even if it comes in the form of "organic" posts. This includes content that is overly sexualized or that concerns suicide or eating disorders. Those tools are far from perfect and, even with sophisticated algorithms, content slips through the cracks.

486. But in the case of firearms marketing, Instagram has chosen an approach that involves no scrutiny or tools whatsoever. According to Instagram, a paid advertisement for a gun safe cannot say "I love guns," because that would amount to promotion of firearms. But Daniel Defense can hawk AR-15s using celebrity influencers and post glibly about the unlawful use of a sniper rifle so long as it doesn't pay Instagram to do so.

487. Instagram's written policies are a stalking horse. They conceal Instagram's actual position on firearms marketing, which is very simple. Instagram has no desire or intention to restrict firearms marketing on the platform; Instagram cares only about preserving its ability to tell parents and regulators that they do not get paid for firearm advertising.

488. Ultimately, Instagram assists companies like Daniel Defense in distributing firearms marketing and targeting minors because it is good for business. Daniel Defense is good at producing extreme content, which attracts minors, drives engagement, and therefore powers the platform's data-driven bottom line.

489. In other words, it does not benefit Instagram financially to protect children from reckless, unconscionable, or even illegal marketing. The factors that render that marketing unfit to be shown to children are the very same factors that make it good for Instagram: it catches the eye, makes a user pause, elicits a reaction (whether positive or negative doesn't matter), and provides a gateway to other extreme content involving firearms, violent first-person-shooter games, gun bunnies in lingerie, and so on.

490. Instagram is content to throw open its doors to companies that negligently, recklessly, unconscionably, and/or illegally market assault weapons ***because it is good for Instagram.***

491. Instagram knows that so-called organic posts from firearm companies are thinly veiled advertisements.

492. Instagram knows that firearm companies are following the advertising playbook it laid out for them: no prices, no links, and no sales terms.

493. This playbook is tailored to Instagram's internal definition of what constitutes advertising; that is, what causes Instagram to flag a post as a prohibited ad.

494. Instagram could take a broader view of advertising in order to keep aggressive, militaristic, reckless, and unlawful firearms marketing off of the platform.

495. Instagram has chosen not to do this, even though it counts millions of teens and preteens among its users.

496. Instagram could treat firearm posts as a content issue, rather than as an advertising issue, as it does with other forms of harmful content.

497. Instagram has chosen not to do this, even though it counts millions of teens and preteens among its users.

498. Instagram knows that firearm companies are laundering advertisements through influencers.

499. Instagram knows that gun influencer posts are actually firearm advertisements.

500. Instagram knows that gun influencers are failing to disclose their posts as branded content in order to continue pushing firearms marketing to Instagram users.

501. Instagram could easily identify hundreds of gun influencers on the platform and disable their accounts if they are in violation of Instagram's branded content policy.

502. Instagram has chosen not to do this, even though it counts millions of teens and preteens among its users.

503. Instagram's acts and omissions to facilitate and contribute to firearm advertising are part of a broader policy or custom at Meta to treat firearm sellers more leniently than other users who violate Meta policies.

504. Meta employs a "10-strike" rule for firearm sellers, wherein firearm sellers can violate a Meta prohibition 10 times before their accounts are removed.

505. Before 2020, the number of strikes was even higher.

506. Meta even allows five strikes for gun sellers who actively call for violence or praise a known dangerous organization.

507. This policy stands in stark contrast to Meta's commitment to removing accounts that post child pornography or terrorist images, which are removed immediately.

508. Adam Mosseri, the Head of Instagram, told Congress in December of 2021 that Instagram "already prohibit[s]" "advertising and marketing to teens for products that are illegal for them to consume."

509. This is plainly false.

## THE MAKING OF A MASS SHOOTER



510. The 18-year-old who took so many lives on May 24, 2022, at Robb Elementary School was named Salvador Ramos. He is referred to elsewhere in this Complaint as simply the Shooter—partly to avoid conferring notoriety, but also because this case is not really about him.

511. It is tempting to say that certain crimes are so heinous, so unfathomable, so outside the bounds of human comprehension that only the person who committed them could help us to understand.

512. Certainly, the senseless murder and terrorizing of children is such a crime—whether in Uvalde, Texas, Newtown, Connecticut, Parkland, Florida, or any other community that has been fractured by our country's epidemic of school shootings.

513. But if mass shooters are an inexplicable mystery, an unfathomable manifestation of madness, why does our country keep making them?

514. Do we really think that it is something in the American water that produces this particular kind of monster? One who worships battlefield weapons and assembles an arsenal; who eagerly awaits the day when he will walk into a classroom and open fire; who demonstrates no understanding of the horror he is prepared to inflict; who inflicts that horror with indifference or

numbness; who is apparently unable to see his victims—even young children—as human; who walks in prepared to die and usually does.

515. These shooters were recently children themselves. This is not a ploy for sympathy; it is simply a fact. The shooters won't tell us what we want to know.

516. But the Defendants can.

517. Set forth below are the facts we know about how Defendants helped to make one American mass shooter. We will continue calling him the Shooter, because yesterday he had another name, and tomorrow, he will have another.

**I. The Shooter's Childhood Primed Him for Later Grooming.**

518. The Shooter was born in Fargo, North Dakota in 2004, but moved with his mother to Uvalde as a baby. He rarely saw his father from that point forward.

519. The Shooter's early life was difficult and disadvantaged. It was marked by his mother's drug use, poverty, and social and academic struggle. He was identified as "at risk" by the time he reached third grade. It is unclear if the Shooter had a learning disability, but he believed himself to be dyslexic.

520. As is often the case, traumas compounded. The Shooter was sexually assaulted by one of his mother's boyfriends, but she did not believe him when he disclosed it. Bullying started and never ended; the Shooter was taunted over his stutter, clothing, and haircut.

521. Years later, the Shooter wrote notes recounting the bullying he experienced in middle school and beyond. He described being slapped, tripped, punched, pushed down stairs, yelled at, and told he was ugly.

522. He wrote that he missed weeks and even months of school at a time because of bullying. "I used to cry almost every day when I went home…. I USED TO WALK HOME AND CRY IN 8th grade cuz I was getting bullied. There's so much [sic] times I walked home crying."

523. The Shooter's notes reveal depression, profound loneliness, and social isolation. He talks about crying himself to sleep, being scared to report bullying to his counselor, fear of losing his only friend, and being terrified when his mother left him home alone.

524. He also described severe disordered eating. "I was sickly skinny because I would never eat because my Ed [eating disorder] was so bad. I had to go to the hospital because I would barely eat. I was anorexic back in late 2020. I was sticking a finger in my mouth and throwing up all my food back in January."

525. But he also showed streaks of rage and seemed fixated on taking revenge on those who had hurt him. Many of his screen names and email addresses were iterations of the word "revenge" with a number substituted for a letter.

526. The Shooter seemed eager to reclaim the label of "antisocial" from those who had wielded it against him. His expressions of anger sometimes veered into terrifying threats of sexual violence.

527. Beginning in 2018, the year the Shooter turned 14, his school attendance and performance declined precipitously. He received failing grades, performed dismally on standardized tests, and was reported absent more than 100 times each school year.

528. At the beginning of the 2021 school year, when the Shooter was 17, he had only completed the ninth grade. Shortly thereafter, Uvalde High School involuntarily withdrew him due to his failing academic performance and lack of attendance.

529. The Shooter was a prime target for Defendants. His lack of family and social support made him susceptible to use Defendants' products compulsively; and his eagerness to take revenge for bullying and shed the role of victim made him the perfect mark to sell a fantasy of power and dominance through violence.

**II. The Shooter's Descent into Defendants' Products**

530. The Shooter's isolation deepened between 2020 and the end of 2021. His involuntary withdrawal from school severed any remaining tie to a social life or community.

531. According to the Shooter's former girlfriend, the Shooter "didn't have any friends" and in terms of close family relationships, "he had no one."

532. The Shooter retreated into the world of Defendants' Products.

533. He spent copious amounts of time playing *Call of Duty*. This habit began in 2019, if not earlier, and escalated in the year prior to the shooting at Robb Elementary School.

534. The Shooter downloaded *Call of Duty: Mobile* within two days of its release in October of 2019. He was only 15 at the time. Despite the ESRB's "M" (17+) rating, nothing prevented him from downloading and playing the game. When the Shooter obtained a new iPhone in 2022, he immediately downloaded *Call of Duty: Mobile*.

535. The Shooter also frequently played *Call of Duty* games on his PlayStation console, including *Call of Duty: Black Ops Cold War*, *Call of Duty: Warzone*, and *Call of Duty: Black Ops III*. Prior to downloading the game, he had assembled a library of *Call of Duty* discs.

536. Upon information and belief, the Shooter also downloaded and began playing these variations on *Call of Duty*, which are all rated "M," before he turned 17.

537. Throughout his adolescence and up until the time of the shooting, the Shooter played *Call of Duty* obsessively. He developed skill as a prolific killer and obtained rewards that become available only after a substantial time investment.

538. In October 2020, for example, the then-16-year-old Shooter sent a YouTube video to a Discord user that shows the Shooter playing *Black Ops III* with another player online. In the video, the Shooter shows tremendous skill. He fires accurately, reloads and fires from cover, scores headshots, and repeatedly kills the other player.

539. The Shooter also boasted over instant message that he had "almost all the dlc [downloadable content] weapons" for *Black Ops III*. This was no small feat; there are multiple threads and forums online devoted to the topic of how to achieve this. The consensus, as summarized by one user online, is "grind for hours on end." In other words, don't stop playing.

540. On November 5, 2021, the Shooter purchased the 2019 version of *Call of Duty: Modern Warfare* by direct download onto his PlayStation. The Shooter was so excited that he took a picture of the download screen with his iPhone.

541. As previously alleged, the original loading screen for this version of *Modern Warfare* featured a soldier in combat gear carrying a DDM4V7S equipped with a holographic sight. Within the game, the M4A1 assault rifle—the most popular weapon in *Modern Warfare*—was designed to mimic a recognizable Daniel Defense rifle.

542. Upon information and belief, the Activision Defendants repeatedly exposed the Shooter to the Daniel Defense brand through various levels and features in *Call of Duty* where the Daniel Defense assault rifle was prominently featured and promoted as a superlative weapon for assaultive violence.

543. Upon information and belief, the Activision Defendants materially influenced the Shooter in choosing the DDM4V7 equipped with the EOTech holographic combat sight to carry out his attack.

544. On the same day that the Shooter downloaded *Modern Warfare*, Instagram abetted Daniel Defense's marketing of the DDM4V7 on the platform. The rifle is seen leaning against a truck wheel and the caption reads, "11.5" [a reference to barrel length] for 11/5 ⚡ Where's my V7S crew!?" The post is tagged with the #ddm4v7s hashtag. Daniel Defense pushed the product again on Instagram on November 16, accompanied by the #ddm4v7s hashtag.

545. The Shooter had an unhealthy, likely obsessive, relationship with Instagram. He created and used at least 20 different Instagram accounts. And his pattern of engagement with the platform indicates a degree of compulsion, if not addiction.

546. On December 1, a day that Daniel Defense promoted the DDM4V7 on Instagram, the Shooter opened the app at least twenty times, including five times between midnight and 3:30 a.m.

547. On another day that Daniel Defense took to Instagram to promote the DDM4V7, the Shooter opened or looked at Instagram ***more than 100 times***.

548. The Shooter routinely engaged with Instagram in the early hours of the morning, often between 2:00 and 4:00 in the morning. On May 21, for example, three days before the shooting, the Shooter opened Instagram more than 20 times between midnight and 5:30 a.m.

549. Consistent with this usage, the Shooter's former girlfriend stated that the Shooter would either "stay up all night or sometimes he would sleep barely."

550. Upon information and belief, Instagram exposed the Shooter to Daniel Defense's aggressive, combat-fetishizing, and unlawful marketing on the platform—all before he turned 18.

551. The Shooter is a textbook example of how alienated minors can become ensnared in the web that binds Activision, Instagram, and their gun industry partners like Daniel Defense.

552. In 2021, the Shooter was an isolated, vulnerable teenager living in a small town in Texas. He had no experience with firearms outside of *Call of Duty*; he had never shot a gun in real life.

553. In less than a year, Defendants had groomed the Shooter and transformed him from a troubled, bullied teen into a mass shooter looking for notoriety and salvation in a *Call of Duty*-approved assault rifle.

**III. The Shooter's Preparation for May 24**

554. Within a week of downloading *Modern Warfare* on November 5, 2021, the Shooter's phone indicates a growing obsession with weapons and accessories associated with the game.

555. Between November 12 and April 16, the Shooter browsed online for the following items: a Red Dot Sight, a smoke grenade, an AR-15 weapon skin, and an EOTech holographic battle sight.

556. At first glance, these choices seem odd. Why would the Shooter need two different sights? For what purpose would he use a smoke grenade? The answer is that the fantasy the Shooter was fulfilling was created inside the world of *Call of Duty*.

557. The Red Dot Sight is a firearm accessory featured in *Call of Duty: Modern Warfare*.

558. Smoke grenades are featured in nearly every version of *Call of Duty*, including *Modern Warfare*.

559. Gun skins are a feature of *Modern Warfare* that players can use to change the appearance of their firearms. Players earn gun skins by completing various challenges, such as killing with headshots; getting "double kills;" killing with firearms equipped with attachments; or getting kills "shortly after reloading."

560. The EOTech Sight, as previously alleged, is one of the most popular firearm attachments in *Call of Duty.* It appears branded and unbranded in the game, but players refer to it by name even when the EOTech label is not visible. The DDM4V7S assault rifle featured on the *Modern Warfare* loading screen was also equipped with a holographic sight resembling the EOTech.

561. Daniel Defense capitalized on this connection on Instagram; in multiple posts, the weapon being promoted is equipped with an EOTech sight. By linking its weapons with this particular sight, Daniel Defense echoes EOTech's promise of "incredible accuracy" for "close-

quarter engagements with fast-moving targets," and solidifies its bona fides as a *Call of Duty*-approved brand.

562. The Shooter downloaded *Modern Warfare* in November of 2021; by December, the Shooter was showing a strong preference for a Daniel Defense rifle despite hundreds of brands on the market. The Shooter first googled "Daniel Defense," then browsed Daniel Defense's page devoted to AR-15 rifles, and ultimately began to search specifically for the DDM4V7. He viewed the rifle multiple times—on Daniel Defense's website, as well as on the websites of other online firearm retailers—and saved screenshots of the weapon.

563. On December 23, 2021, the Shooter made what appears to be a homemade first-person-shooter (FPS) video, which replicates the point of view from *Call of Duty* and shows his extended arm pointing a gold pistol at an unsuspecting, unidentified male.

564. By March, the Shooter had clearly settled on his decision to buy a DDM4V7. He visited Daniel Defense's website so frequently that the Safari browser on his iPhone automatically created a bookmark for Daniel Defense's website as a "frequently visited site."

565. By mid-April, the Shooter was ready to assemble his combat weapon. The only remaining hurdle was his age—17. He was four weeks away from his 18th birthday and, by extension, his ability to purchase his assault weapon of choice.

566. On April 16, the Shooter ordered the EOTech holographic sight.

567. On April 17, he created and saved another, more involved FPS video that also attempts to replicate the vantage point from *Call of Duty*. In the video, the Shooter is holding his iPhone with one hand and training the camera on his other arm, which is outstretched and pointing a toy gun. An unidentified child—presumably a relative—runs away from him.

568. The child runs to the bed and asks for the game to be over. The Shooter follows the child—deliberately, as if stalking prey—while continuing to aim the gun. The child hides beneath

the bed. The Shooter, following his arm with his phone, shifts his weapon to another young girl at the edge of the bed, takes aim, and pauses. The Shooter is silent. Then the video ends. There is no laughter or signs of play.

569. The video is a rehearsal for the horror to come in a few weeks. It may also be the Shooter's homage to a specific *Call of Duty* fantasy.

570. In 2019, Call of Duty Modern Warfare featured a mission called "Clean House," an overwhelming favorite among fans of the franchise. The mission is led by the *Call of Duty* character Captain Prince, and the goal is to "clear" a residential London home at nighttime. Some devotees of this particular mission have uploaded videos of their exploits.

571. In one particularly disturbing example, the player (here, "the shooter") enters the bedroom of the house, where he encounters a civilian female being choked by a man. The shooter kills the woman's attacker and then takes aim at her. She appears unarmed, wearing a bathrobe, and screams "No, don't shoot! Don't shoot! Don't kill me, please!" The shooter blasts her chest with his weapon, spraying the wall behind her with blood. She stumbles and collapses in a heap. Groans of the wounded fill the background. The moans are soon drowned out by the sound of a baby crying.

572. The shooter then enters a nursery, his weapon trained on a woman who dashes over to her child, shielding his face with her hands. The shooter spares her life. He then moves into the next bedroom, encountering "the enemy" hiding under a bed as the infant continues to wail in the background. The enemy is eliminated.

573. The effect this "mission" had on users is reflected in the comments section:

- "[T]he baby crying was a brilliant touch. biologically and instinctively hearing a baby cry like that is unnerving. putting you at an elevated sense of presence, heart rate starts beating faster, hyper aware of potential stress and incoming danger. There's a reason why tapes of babies crying that hard are used in SERE training

[the military program Survival, Evasion, Resistance, and Escape] and in some forms of torture. everything got turned up to 11 once i heard the baby crying during this mission."

- "What makes this mission so realistic is how your targets beg for mercy when they know there about to die… It's horrific and dope at the same time."
- "Bro I had a elevated heart rate and goosebumps while watching this and I've played this mission multiple times. The baby cries are just heartbreaking."

574. Comments like "elevated heart rate," "hyper aware," and "horrific and dope" are music to the Defendants' ears. It means they have successfully upped the ante, maintaining their users' high stakes rush without any of the high stakes consequences. Only the American public suffers the consequences.

575. On the left is the Shooter's personal FPS video; on the right is *Modern Warfare*'s "Clean House."



576. The Shooter's video is the ultimate testament to the power of marketing. The "game" is turned off, but it doesn't matter; the Shooter is now living in the simulation. Only one thing is

missing—the weapon that Defendants have conditioned him to believe will transform him into the dominant and feared character he wishes to be. That was soon to come.

577. On April 20, the Shooter googled "how long until may 16"—his 18th birthday.

578. On April 23, the Shooter created an account on Daniel Defense's website.

579. On April 27, the Shooter added the DDM4V7 to his cart.

580. On May 12, the Shooter visited a webpage counting down the days until May 16.

581. On May 16 at 12:23 a.m., the Shooter received confirmation of his purchase of a Daniel Defense DDM4V7 assault rifle. He was 18 years and 23 minutes old.

582. It is unlikely the Defendants had ever produced a mass shooter with such ruthless efficiency.

## THE ROAD TO UVALDE

583. On the morning of May 24, 2022, Tess Marie Mata, aged 10, was just starting to get into softball—following in the steps of her big sister, Faith. Faith was in college, and they spoke on the phone almost every night. Tess loved dancing, making videos with her best friends, and watching her mom cook. Tess was honest and opinionated, and her mother loved that about her. Tess's dad Jerry loved her one-of-a-kind laugh.

584. Nine-year-old Jacklyn Jaylen Cazares had plans to help as many people as she could in her life. She didn't want the school year to end because she wouldn't be able to see her friends every day. In the last few days, Jacklyn had had one-on-one talks with her mom about her future and growing up.

585. Amerie Jo Garza, aged 10, was looking forward to a summer of swimming, playing outside, and spending time with her mom, Kimberly, and her little brother. Amerie Jo was a friend and a protector by nature. She was creative, artistic, and loving. For Mother's Day, just sixteen days

earlier, Amerie Jo had surprised her mom with a poem called "Five Things I Love About My Mom." The poem was a work of art written on popsicle sticks, one line per stick.

586. Miah Isabel Cerrillo, aged 11, loved school and being around people. She loved spending time with both of her parents, especially camping, going to the river, hiking, and being outside with her dad, Miguel. Miah wanted to be a doctor.

587. Ten-year-old Maite Yuleana Rodriguez was curious, competitive, interested in learning (science in particular), and did not hesitate to figure things out on her own. Even though she loved to go on trips, Maite's very favorite place to be was at home with her mom. They laughed together, talked about everything, and supported each other. Maite was the youngest of three and looked up to her two big brothers.

588. Annabell Rodriguez, aged 10, was a bright student who enjoyed school, music, and dancing. Annabell had a twin sister named Angeli and an older sister named Annastasha. Her cousin Jackie Cazares was in the same classroom.

589. On the morning of May 24, 2022, ten-year-old Nevaeh Bravo's mom brought her to school, like she did every day. Nevaeh came from a big family; she had two brothers and one sister. Just the week before, Nevaeh had visited her grandpa in Mexico so that he could take her horseback riding. And the day before, her dad had taken Nevaeh and all of her siblings on a long walk with their dog, Toby. Nevaeh was always with her family. On Friday nights, they always went out to eat and then got ice cream afterwards.

590. Maranda Mathis, aged 11, loved animals and playing outside, just like her mom, Deanna. Maranda was shy until she got to know someone—then her silly side came out. Maranda had a little brother and together they liked to find treasures like feathers, rocks, and shells, to give to their mom.

591. Jailah Silguero, aged 10, talked to her mom, Veronica, all the way to school that Tuesday, then hugged and kissed her goodbye. Jailah loved to spend time playing outside with her dad, Jacob. Jailah was the youngest of four. She had spent her last weekend at the river with her family. Jailah was best friends with Tess Mata and Maite Rodriguez.

592. On the morning of May 24, 2022, ten-year-old Makenna Elrod looked forward to school. It was a place of comfort and familiarity because her mom, April, was a teacher there. Makenna loved cheerleading and gymnastics and looked forward to being a Uvalde High School cheerleader like her big sister. She loved to play outside with her two sisters and little brother, ride go carts, ride horses, and perform dance routines. Makenna loved her family hard, with lots of hugs and kisses.

593. Alexandria Aniyah Rubio, aged 10, began that morning at home with her mom, dad, three brothers and two sisters. She adored her teacher. Like her mom, she looked up to strong female leaders and was interested in politics. Alexandria had spent time the last few days practicing softball with her dad and watching movies with her family.

594. On the morning of May 24, 2022, Jayce Carmelo Luevanos, aged 10, walked to school with his dad, Jose. Jayce was the youngest of four. He spoke two languages. He loved to walk barefoot and preferred to be outside. His mom Christina had taken Jayce to play kickball with family and neighborhood friends over the weekend. Every day after school, Jayce's dad met him at school, and they walked home together. Jayce was Jailah's cousin.

595. Nine-year-old Eliahna Garcia, known as Ellie, loved to go to the radio station with her dad Steven, where he worked as a DJ. They shared a passion for music. Her dad would play music, and they would dance and sing into the microphone together. Ellie liked to make slime with her big sister and hide it around the house for her mom to find. In the last few days, Ellie had spent

time with her parents, siblings, and grandparents laughing, playing, and riding the lawnmower down the street together.

596. Jose Flores, aged 10, was an honor roll student who helped his dad with his work around the ranch. Jose loved baseball. He had a big family: his mom Alyssa, dad Jose Sr., three brothers, and two sisters. He loved his family and was a particularly protective brother. Jose had a giggly laugh and sweet smile that his mother loved.

597. On the morning of May 24, 2022, Rojelio Torres's mom Evadulia watched him get on the bus with his big brother and little sister and head off to school. Rojelio, aged 10, loved to play games and spend time at the park with his mom. He enjoyed school, particularly math. Rojelio was very close to his teacher, Mr. Reyes.

598. Ten-year-old Uziyah Garcia had only recently joined the community; this was his first year in school in Uvalde. One of his very best friends was Jayce Luevanos. Uziyah was thriving in Mr. Reyes's class. He was known as a jokester who made people laugh.

599. Eliahna Torres, aged 10, was the baby of five kids. She was joyful and full of smiles. Like several of her friends who died that day, Eliahna loved softball and she practiced all the time. She spoke to her mother, Sandra, before school and told her that she loved her. Eliahna was planning a visit to see her father Eli in the summer of 2022. The last time that she had spoken to her dad, she told him how much she loved both him and her mother.

600. AJ Martinez, aged 10, was an outgoing sports nut with a wild sense of humor. He loved football and making his friends and family laugh with jokes and funny faces.

601. On the morning of May 24, 2022, eleven-year-old Layla Salazar and her dad Vincent listened to "Sweet Child O' Mine" as he drove her to school. Layla was the youngest of the family, with two big brothers. She loved running, and track was in her future. Layla had her own style—her mom Melinda loved to see what outfits she put together every day. Layla and Melinda liked to go

to the river and the park and feed the ducks together. Layla was close with her dad Vincent too, who had stayed home to take care of Layla when she was born.

602. Irma Garcia was a devoted mother and a dedicated teacher. She was married to her high school sweetheart and raising a family that she adored. She loved her students and wanted to see them thrive.

603. Eva Mireles was a passionate educator who dedicated 17 years to teaching in Uvalde, with a focus on Special Education and Bilingual Education. Her commitment to her students and community was unwavering. Outside of the classroom, Eva was an avid fitness enthusiast, a lover of karaoke and baking, and a loving wife and mother.

604. Elsa Avila taught in the Uvalde School district for over twenty years. She loved teaching and loved her children. On May 24, 2022, she huddled her children against a back wall of the classroom, as she had been trained to do.

605. Leann Garcia, aged 11, was a vibrant and outgoing child who loved school.

606. Nine-year-old Kendall Olivarez was known for being bubbly and funny. She was looking forward to summer and spending time with her family.

607. Noah Orona, aged 10, was not shy in the least; he was a talker and a jokester, and he loved to make people laugh.

608. Xavier Lopez, aged 10, had a love for three things: his family, his friends, and baseball. Like every other day, Xavier was excited to go to Robb Elementary on May 24, 2022 so he could see his friends. His bright smile lit up a room and made everyone around him feel loved.

609. Alithia Ramirez, aged 10, was precocious. Her not-so-hidden talent was her artistic ability, and her drawings and paintings brightened the walls of her Uvalde home. Alithia loved spending time with her family—especially her siblings—and her classmates.

610. Khloie Torres, aged 10, was looking forward to the awards ceremony at the school and her class's plans had to blow bubbles and fly paper airplanes outside. Khloie was new in town, but she had made a good friend in her fourth-grade class, and she was worried that her friend wouldn't have her own bubbles, so Khloie's grandmother stopped at the store on the way to school so they could buy her friend extra bubbles. At the ceremony, Khloie was happy and proud to be given an "Outstanding Citizen" award even though she was so new to her class.

611. Ten-year-old Mayah Zamora woke up on May 24, 2022, excited for the day to come—it was awards day at Robb Elementary and she knew that she would receive several awards. Her father, Ruben, treated her to a special breakfast on the way to school: a Starbucks Vanilla Bean Frappuccino and two bacon, egg, and gouda breakfast sandwiches. Mayah had so much fun at awards day with her friends that instead of leaving afterwards to spend time with Ruben as planned, she changed her mind and decided to stay at school.

***

612. With the end of the school year approaching, the morning of May 24 was supposed to be a day of celebration and recognition at Robb Elementary School. Students gathered grade by grade for assemblies to celebrate the year's hard work and cheer for classmates receiving awards.

613. Many proud parents were in attendance. The kids dressed up for the occasion and posed for pictures afterwards.

614. Jacklyn Cazares blew her dad Javier a kiss goodbye in the hallway after the assembly. He wondered how much longer it would be before she was embarrassed to blow kisses to her dad in front of her friends. He never got to find out.

615. At 11:28 a.m., the Shooter crashed his truck in a ditch approximately 100 yards from Robb Elementary School. He got out of the truck and started firing.

616. When he entered the school, children were already hiding in their classrooms, dutifully following the rules they had been taught during active shooter drills.

617. Inside Classroom 102, children lay flat on the floor.

618. In Classroom 106, the teacher hid her students and prayed.

619. In Classroom 111, Teacher Arnulfo Reyes told the children to get under the table and act like they were asleep. He saw shrapnel come through the sheetrock walls of his classroom.

620. A teacher in Classroom 112 told her students to hide, and they hid behind their teacher's desk, behind the backpacks, and under a table.

621. The Shooter entered both Classroom 111 and Classroom 112 and opened fire on the children where they hid. Nineteen children and two teachers were killed. Many other children were maimed, and all were profoundly traumatized.

622. There are, of course, many more details of that horrible day, some too excruciating to contemplate.

623. A child in Classroom 111 called 911 and whispered, "help me." That help never came.

624. The Shooter sat at Teacher Reyes' desk in Classroom 111. Sometimes he kicked children's bodies.

625. In Classroom 112, Plaintiff Miah Cerrillo covered herself in her friend's blood so the Shooter would believe she was dead. Plaintiff Khloie Torres called 911 and pleaded for help.

626. Parents arrived at the school and fought to get inside to their children. They were forcibly restrained by police.

627. Police, in turn, were paralyzed by the prospect that the young Shooter had acquired an AR-15. More than 350 officers law enforcement officers from multiple agencies were held at bay

for 77 minutes as the Shooter rampaged through the school because, as one officer shouted over radio, the Shooter had a "battle rifle."

628. And then there is this detail: when the Shooter entered Classroom 112, he approached one of the teachers, said "good night," and shot her in the head.

629. "Good night" is a catch phrase from *Call of Duty: Modern Warfare*. Captain Price, a famous and recurring character in the franchise, is known to say "good night" when the player kills an enemy.

**FIRST CAUSE OF ACTION:**
**NEGLIGENCE**
**(ALL PLAINTIFFS AGAINST ACTIVISION DEFENDANTS AND DOES 1 THROUGH 50, INCLUSIVE)**

630. Plaintiffs reallege and incorporate by reference each of the preceding and succeeding paragraphs as though fully set forth herein.

631. As previously alleged, the Activision Defendants are in the business of creating, designing, producing, marketing, and selling the *Call of Duty* game franchise. The Activision Defendants also profit from advertising revenue and revenue from sales of user data derived from that franchise. The *Call of Duty* games at issue in this Complaint are *Call of Duty: Mobile*; *Call of Duty: Black Ops Cold War*; *Call of Duty: Warzone*; *Call of Duty: Black Ops III*; and *Call of Duty: Modern Warfare*, hereafter the "*Call of Duty* Products" or the "*Call of Duty* franchise."

632. At all relevant times, the Activision Defendants owed all persons, including Plaintiffs, a duty to exercise reasonable care in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of their *Call of Duty* Products and gaming franchise so as not to create an unreasonable risk of harm to any person, including Plaintiffs.

633. The Activision Defendants were responsible not only for the result of their willful acts, but also for injuries occasioned to Plaintiffs by their want of ordinary care and/or skill in the management of their property or person. *See*, *e.g.*, Cal. Civ. Code § 1714(a).

634. The Activision Defendants knew or should have known that troubled minors like the Shooter would use their *Call of Duty* Products.

635. The Activision Defendants breached their duties of care owed to all persons, including Plaintiffs, through their affirmative malfeasance, policies, actions, and business decisions, including agreements with third parties, in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of the *Call of Duty* franchise. These breaches are based on the Activision Defendants' own actions, independent of any actions taken by a third party. Those breaches include any and all of the following, in combination or separately:

a. Promoting and selling *Call of Duty* Products to minor users, when they were not appropriate for minors;

b. Knowingly disregarding a pattern of use of the *Call of Duty* Products by minors;

c. Using addictive features to promote and sell the *Call of Duty* Products;

d. Knowingly, and/or negligently allowing for the circumvention of age-verification measures, parental controls, and other restrictions designed to prevent minors' use of the *Call of Duty* Products;

e. Failing to design and/or implement effective age-verification measures for the *Call of Duty* Products;

f. Desensitizing minor users to the use of firearms to kill, and thereby increasing the risk of illegal firearms use, including for assaultive purposes and/or to commit a mass shooting;

g. Habituating minor users to the use of firearms to kill, and thereby increasing the risk of illegal firearms use, including for assaultive purposes and/or to commit a mass shooting;

h. Training minor users in how to use firearms to kill, and thereby increasing the risk of illegal firearms use, including for assaultive purposes and/or to commit a mass shooting;

i. Exploiting the dopamine reward system and other similar tactics to reward users of the *Call of Duty* franchise for killing and thereby condition users, including minors, to associate killing with dopamine, rewards, and/or pleasure;

j. Employing a hyper-realistic and violent simulation/video game to market assault weapons to users of the *Call of Duty* franchise, including minors;

k. Negligently using replicas or near-replicas of real-life assault weapons and assault weapon parts in the *Call of Duty* franchise;

l. Knowingly and/or negligently exposing users of the *Call of Duty* franchise, including minors, to specific assault weapon brands and models;

m. Continuing to use replicas or near-replicas of real-life assault weapons and assault weapon parts in the *Call of Duty* franchise despite actual or constructive knowledge that multiple mass shooters had been trained on *Call of Duty* Products and committed their assaults with weapons that are the same or similar as those that appear in the *Call of Duty* franchise;

n. Enabling and assisting firearms manufacturers, including Daniel Defense, to market their weapons to minors over the Internet, in violation of statutes such as the Privacy Rights for California Minors in the Digital World Act, Cal. Bus. & Prof. § 22580 (prohibiting "[a]n operator of an Internet Web site, online service, online application or mobile application directed to minors" from marketing, inter alia, "[f]irearms or handguns" and "[a]mmunition or reloaded ammunition");

o. Enabling and assisting firearms manufacturers, including Daniel Defense, to market their weapons to minors and increasing the risk of illegal and attempted illegal sales to minors in violation of statutes such as Cal. Penal Code § 27505 and/or attempted illegal offers to sell or sales to minors in violation of Texas Penal Code § 46.06; and

p. Enabling and assisting firearms manufacturers, including Daniel Defense, to market their weapons to minors and increasing the risk of illegal and attempted illegal sales to minors in violation of statutes such as Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, the California Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200, and the Children's Online Privacy Protection Act, 15 U.S.C. §§ 6501-6505.

636. As a direct and proximate result of the Activision Defendants' breach of one or more of their duties, Plaintiffs were harmed. The Activision Defendants' breach(es) increased the likelihood that the May 24, 2022, shooting at Robb Elementary School would occur, amplified the

lethality of the assault, and increased the risk that victims, including Plaintiffs, would be shot and seriously injured or killed.

637. The Activision Defendants' breach of one or more of their duties was a substantial factor in causing the harms and injuries to the Plaintiffs.

638. Plaintiffs demand judgment against each Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**SECOND CAUSE OF ACTION:**
**GROSS NEGLIGENCE**
**(ALL PLAINTIFFS AGAINST ACTIVISION DEFENDANTS AND DOES 1 THROUGH 50, INCLUSIVE)**

639. Plaintiffs reallege and incorporate by reference each of the preceding and succeeding paragraphs as though fully set forth herein.

640. The Activision Defendants acted with gross negligence in that they disregarded extreme risks that they knew or should have known could result in extreme harm.

641. As a direct and proximate result of the Activision Defendants' gross negligence, Plaintiffs were harmed. The Activision Defendants' breach(es) increased the likelihood that the May 24, 2022, shooting would occur, amplified the lethality of the assault, and increased the risk that victims, including Plaintiffs, would be shot and seriously injured or killed.

642. The Activision Defendants' breach of one or more of their duties was a substantial factor in causing harms and injuries to the Plaintiffs.

643. Plaintiffs demand judgment against each Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**THIRD CAUSE OF ACTION:**
**STRICT PRODUCT LIABILITY – DESIGN DEFECT**
**(ALL PLAINTIFFS AGAINST ACTIVISION DEFENDANTS AND DOES 1 THROUGH 50, INCLUSIVE)**

644. Plaintiffs reallege and incorporate by reference each of the preceding and succeeding paragraphs as though fully set forth herein.

645. The Activision Defendants design and produce the *Call of Duty* Products.

646. At all relevant times, a high probability existed that, as designed, the *Call of Duty* Products posed an unreasonable risk of injury, as previously set forth above.

647. A safer design exists, through which any and all of the above-described risks and dangers would be reduced, but the Activision Defendants chose to ignore or disregard any such alternative, or purposefully chose to implement and maintain their defective design to attract more users and attain higher profits.

648. The Shooter began using the *Call of Duty* Products as a minor and, as a result, lacked a mature ability to discern the destructive and dangerous attributes of the *Call of Duty* Products as previously described.

649. At all relevant times, the Activision Defendants' *Call of Duty* Products were defective because they contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous, particularly for minor users, and are implemented solely to attract more users and increase profits.

650. The *Call of Duty* Products are defective and not reasonably safe because there was a substantial likelihood that they would cause harm, and it was feasible to design the products in a safer manner.

651. The defects in the design of the *Call of Duty* products existed prior to their release to the public, and there was no substantial change to the *Call of Duty* products before they were distributed to the Shooter.

652. The foreseeable risks of harm posed by the Activision products' design could have been reduced or avoided by the adoption of a reasonable alternative design and the failure to use an alternative design renders the products not reasonably safe and/or defective. If the design defects in the *Call of Duty* Products were known and/or fully understood at the time of manufacture and distribution, a reasonable person would conclude that the utility of those products did not outweigh the risk inherent in designing them in that manner.

653. There is a substantial likelihood that the *Call of Duty* Products—as currently designed, distributed, and operated by the Activision Defendants—will cause injury to a significant number of individual users and the public. The risk of such injuries occurring can be substantially reduced through implementation of readily available design changes that will not adversely impact the functionality of the *Call of Duty* Products or unreasonably impact their price.

654. The Activision Defendants know that product features of the *Call of Duty* Products, as previously alleged, cause significant risks to minor users.

655. Further, the Activision Defendants have intentionally designed some or all of the *Call of Duty* Products to frustrate the exercise of parental responsibility. Some or all of the *Call of Duty* Products are now designed, marketed, and sold in a manner that makes it difficult, if not impossible, for parents to exercise parental responsibility.

656. The Activision Defendants' products are also defective for lack of the type of parental controls, permission, and monitoring capabilities available on many other devices and applications, as well as the lack of notifications to parents when minors are engaged in inherently harmful activities.

657. It is feasible for the Activision Defendants to make products that are less addictive to minor users or to otherwise restrict minor users' access to certain games. Instead, Activision has

developed highly addictive products that are accessible to minors and used by a substantial number of minors.

658. It is highly foreseeable that the addictive and hyper-realistic content of *Call of Duty* Products will lead some users, including minors, to attempt or achieve the real-life enactment of what the *Call of Duty* Products simulate so effectively, including the use of firearms for mass killing.

659. The notorious history of recent mass shootings, including school shootings at Sandy Hook, Parkland, and Uvalde, among others, confirms this.

660. The *Call of Duty* Products are not reasonably safe as designed because, despite numerous reported instances of the connection between the *Call of Duty* Products and mass shooters, and despite the fact that the *Call of Duty* Products simulate the experience of the use of firearms to kill, the Activision Defendants have not undertaken reasonable design changes to mitigate harms or protect users and the public from these harms.

661. The *Call of Duty* Products are not reasonably safe as designed because, despite numerous reported instances of the connection between the *Call of Duty* Products and mass shooters, and despite the fact that the *Call of Duty* Products simulate the experience of the use of firearms to kill, the Activision Defendants have continued to use and market replicas and near-replicas of assault weapons, including weapons used by prior mass shooters, with the knowledge that users will seek out those weapons in real life.

662. As a result of these dangerous and defective design attributes of the *Call of Duty* Products, the Shooter was desensitized to violence and killing, including the use of firearms to kill; habituated to violence and killing, including the use of firearms to kill; and trained in how to use firearms to kill, including mass killing, and did so on May 24, 2022.

663. As a result of these dangerous and defective design attributes of the *Call of Duty* Products, the Shooter was exposed and introduced to the Daniel Defense brand and its weapons,

including the DDM4V7 assault rifle and the RIS II rail system, which influenced him in seeking out and eventually purchasing and using a Daniel Defense assault rifle in his attack on May 24, 2022.

664. As a result of these dangerous and defective design attributes of the *Call of Duty* Products, Daniel Defense weapons, including the DDM4V7 assault rifle and the RIS II rail system, were marketed, promoted, glorified, and associated with mass killing, which directly influenced the Shooter in choosing a Daniel Defense assault rifle for his attack on May 24, 2022.

665. As a result of these dangerous and defective design attributes of the *Call of Duty* Products, the Shooter was exposed and introduced to the EOTech holographic sight, which influenced him in seeking out and eventually purchasing and using an EOTech holographic sight in his attack on May 24, 2022.

666. As a result of these dangerous and defective design attributes of the Activision Defendants' products, Plaintiffs suffered emotional distress, physical harm and/or death, and pecuniary loss.

667. The Activision Defendants are further liable to Plaintiffs for punitive damages based upon the willful and wanton design of the *Call of Duty* Products, which were intentionally marketed and sold to underage users, despite knowing that users and/or the public would be seriously harmed.

668. The Activision Defendants are further liable to Plaintiffs for punitive damages based upon the willful and wanton design of the *Call of Duty* Products, which intentionally marketed and promoted specific assault weapons and assault weapon parts to users, including minors, despite knowing that users and/or the public would be seriously harmed.

669. Plaintiffs demand judgment against each Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FOURTH CAUSE OF ACTION:**
**STRICT PRODUCT LIABILITY – FAILURE TO WARN**
**(ALL PLAINTIFFS AGAINST ACTIVISION DEFENDANTS**
**AND DOES 1 THROUGH 50, INCLUSIVE)**

670. Plaintiffs reallege and incorporate by reference each of the preceding and succeeding paragraphs as though fully set forth herein.

671. The *Call of Duty* Products are defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by these products could have been reduced or avoided by the provision of reasonable instructions or warnings by the Activision Defendants and the omission of the instructions or warnings renders their products not reasonably safe.

672. A high probability existed that, as designed, the *Call of Duty* Products posed a likelihood of causing injury to minors, and through them, to others, as previously alleged.

673. The Activision Defendants' products are defective and not reasonably safe because they contain no adequate warning to minor users or parents regarding these risks to minors, and through them, to others.

674. As previously alleged, the Activision Defendants had actual knowledge of these product hazards.

675. It is feasible for the Activision Defendants to provide warnings and to make other product related modifications that would prevent many of these hazards at negligible cost.

676. The Activision Defendants knew about these hazards, knew that its users and their parents would not be able to safely use their products without warnings, and failed to provide warnings that were adequate to make the product reasonably safe during ordinary and foreseeable use by minors.

677. As a result of these dangerous and defective design attributes of the *Call of Duty* Products, the Shooter, while still a minor, was desensitized to violence and killing, including the use

of firearms to kill; habituated to violence and killing, including the use of firearms to kill; and trained in how to use firearms to kill, including mass killing, and did so on May 24, 2022.

678. As a result of these dangerous and defective design attributes of the *Call of Duty* Products, Daniel Defense weapons, including the DDM4V7 assault rifle and the RIS II rail system, were marketed, promoted, glorified, and associated with mass killing, which directly influenced the Shooter in choosing a Daniel Defense assault rifle for his attack on May 24, 2022.

679. As a result of the Activision Defendants' failure to warn, Plaintiffs have suffered emotional distress, physical harm and/or death, and pecuniary loss.

680. Plaintiffs demand judgment against each Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FIFTH CAUSE OF ACTION:**
**PRODUCT LIABILITY – NEGLIGENCE**
**(ALL PLAINTIFFS AGAINST ACTIVISION DEFENDANTS**
**AND DOES 1 THROUGH 50, INCLUSIVE)**

681. Plaintiffs reallege and incorporate by reference each of the preceding and succeeding paragraphs as though fully set forth herein.

682. A high probability existed that, as designed, the *Call of Duty* Products posed a likelihood of causing injury to minors, and through them, to others, as previously alleged.

683. At all relevant times, the Activision Defendants had a duty to exercise reasonable care and caution in the design, production, and operation of the *Call of Duty* Products to avoid increasing the likelihood of causing injury to minors, and through them, to others.

684. The Activision Defendants owed a heightened duty of care because they intended to provide the *Call of Duty* Products to minors, or chose to willfully ignore that minors were using those products, and were therefore required to consider in the design of the *Call of Duty* Products

that adolescents' brains are not fully developed, which results in a diminished capacity to make responsible decisions to avoid addiction and to eschew violent behaviors.

685. The Activision Defendants were negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution in design, production, and operation of the *Call of Duty* Products.

686. The Activision Defendants were negligent in failing to conduct adequate testing and failing to allow independent researchers to adequately study the influence of *Call of Duty* on young, male shooters, especially mass shooters.

687. Upon information and belief, the Activision Defendants knew of the effect that their *Call of Duty* Products have had on mass shooters and intentionally avoided such testing and research.

688. The Activision Defendants could have but to this day have failed to implement safety measures that would mitigate, reduce, and/or eliminate the above-described hazards.

689. As a direct and proximate result of the Activision Defendants' negligence, the Shooter carried out the May 24, 2022 shooting at Robb Elementary School.

690. As a direct and proximate result of the Activision Defendants' negligence, Plaintiffs suffered emotional distress, physical harm and/or death, and pecuniary loss, all of which were foreseeable.

691. The Activision Defendants' conduct was carried on with a willful and conscious disregard for the safety of Plaintiffs and others. The Activision Defendants knew that firearms were being glamorized and marketed directly to minors via their franchise and knew the risks associated with such conduct, yet chose to ignore those risks, downplay any safety issues in public statements, conceal knowledge relating to the *Call of Duty* Products and associated harms, fail to warn minors and their parents, and impede or delay implementation of feasible product safety features.

692. The Activision Defendants' decision to prioritize profits over life, safety, and health is outrageous and justifies an award of exemplary damages in such a sum that will serve to deter the Activision Defendants from similar conduct in the future.

693. The Activision Defendants are further liable to Plaintiffs for punitive damages based upon their willful and wanton failure to warn of known dangers of the *Call of Duty* Products, which were deliberately marketed and sold to minor users despite knowing that users and/or the public would be seriously harmed.

694. The Activision Defendants are further liable to Plaintiffs for punitive damages based upon the willful and wanton failure to warn of known dangers of the *Call of Duty* Products, which deliberately marketed and promoted specific assault weapons and assault weapon parts to users, including minors, despite knowing that users and/or the public would be seriously harmed.

695. Plaintiffs demand judgment against each Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**SIXTH CAUSE OF ACTION:**
**NEGLIGENT FAILURE TO WARN**
**(ALL PLAINTIFFS AGAINST ACTIVISION DEFENDANTS**
**AND DOES 1 THROUGH 50, INCLUSIVE)**

696. Plaintiffs reallege and incorporate by reference each of the preceding and succeeding paragraphs as though fully set forth herein.

697. The Activision Defendants are responsible for the design, manufacture, production, operation, and marketing of the *Call of Duty* Products.

698. The Activision Defendants knew or reasonably should have known of the previously described risks posed by the *Call of Duty* Products.

699. The Activision Defendants also knew or reasonably should have known that ordinary users of their products, including pre-teens, teens, and young adults, would not appreciate those dangers.

700. The Activision Defendants had a duty to exercise ordinary care in the design, marketing, and sale of their products, including a duty to warn users and, in the case of minor users, to warn their parents about the many hazards they knew to be present, but not obvious.

701. The Activision Defendants breached their duty by failing to warn users or their parents of these risks.

702. As a result of these dangerous and defective design attributes of the *Call of Duty* Products, the Shooter, while still a minor, was desensitized to violence and killing, including the use of firearms to kill; habituated to violence and killing, including the use of firearms to kill; and trained in how to use firearms to kill, including mass killing, and did so on May 24, 2022.

703. As a result of these dangerous and defective design attributes of the *Call of Duty* Products, Daniel Defense weapons, including the DDM4V7 assault rifle and the RIS II rail system, were marketed, promoted, glorified, and associated with mass killing, which directly influenced the Shooter in choosing a Daniel Defense assault rifle for his attack on May 24, 2022.

704. The Activision Defendants' negligence was a direct and proximate cause of the May 24, 2022 mass shooting.

705. As a direct and proximate result of the Activision Defendants' negligence, Plaintiffs suffered emotional distress, physical harm and/or death, and pecuniary loss.

706. The Activision Defendants' conduct was performed with a willful and conscious disregard for the safety of their users and the public. The Activision Defendants knew or should have known about the risks of radicalization, weapon fetishizing, and violence associated with their products, yet they chose to ignore those risks, downplay any safety issues in public statements,

conceal knowledge relating to the *Call of Duty* Products and associated hazards, fail to warn minors, their parents, and the public, and impede or delay implementation of feasible product safety features.

707. The Activision Defendants' decision to prioritize profits over public safety is outrageous and justifies an award of exemplary damages in such a sum that will serve to deter the Activision Defendants from similar conduct in the future.

708. Plaintiffs demand judgment against each Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**SEVENTH CAUSE OF ACTION:**
**UNJUST ENRICHMENT**
**(ALL PLAINTIFFS AGAINST THE ACTIVISION DEFENDANTS AND DOES 1 THROUGH 50, INCLUSIVE)**

709. Plaintiffs reallege and incorporate by reference each of the preceding and succeeding paragraphs as though fully set forth herein.

710. The Activision Defendants' profits are directly tied to the intensity of user engagement on their platforms. A user's engagement is maximized by exposure to increasingly addictive content. The Activision Defendants knew or reasonably should have known that their products create and increase risks as previously alleged.

711. The Activision Defendants benefited materially from marketing firearms to minors through the *Call of Duty* franchise.

712. It would be unjust and inequitable for the Activision Defendants to retain revenues they earned through such wrongful and inequitable conduct when that conduct harmed Plaintiffs so profoundly.

713. The profits the Activision Defendants reaped from providing material assistance in the marketing of firearms to minors, including the Shooter, came at the expense of the Shooter's victims, including Plaintiffs.

714. Plaintiffs are entitled to restitution.

715. Plaintiffs demand judgment against each Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**EIGHTH CAUSE OF ACTION:**
**VIOLATION OF UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200**
**(ALL PLAINTIFFS AGAINST ACTIVISION DEFENDANTS**
**AND DOES 1 THROUGH 50, INCLUSIVE)**

716. Plaintiffs reallege and incorporate by reference each of the preceding and succeeding paragraphs as though fully set forth herein.

717. As previously alleged, the Activision Defendants are in the business of creating, designing, producing, marketing, and selling the *Call of Duty* franchise, from which they profit.

718. The Activision Defendants engaged in unfair business acts and/or practices, in that they committed acts and/or practices that offended established public policy and/or were immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers in the following ways:

a. Promoting and selling *Call of Duty* Products to minor users, when they were not appropriate for minors;

b. Knowingly disregarding a pattern of use of the *Call of Duty* Products by minors;

c. Using addictive features to promote and sell the *Call of Duty* Products;

d. Knowingly, and/or negligently allowing for the circumvention of age-verification measures, parental controls, and other restrictions designed to prevent minors' use of the *Call of Duty* Products;

e. Failing to design and/or implement effective age-verification measures for the *Call of Duty* Products;

f. Desensitizing minor users to the use of firearms to kill, and thereby increasing the risk of illegal firearms use, including for assaultive purposes and/or to commit a mass shooting;

g. Habituating minor users to the use of firearms to kill, and thereby increasing the risk of illegal firearms use, including for assaultive purposes and/or to commit a mass shooting;

h. Training minor users in how to use firearms to kill, and thereby increasing the risk of illegal firearms use, including for assaultive purposes and/or to commit a mass shooting;

i. Exploiting the dopamine reward system and other similar tactics to reward users of the *Call of Duty* franchise for killing and thereby condition users, including minors, to associate killing with dopamine, rewards, and/or pleasure;

j. Employing a hyper-realistic and violent simulation/video game to market assault weapons to users of the *Call of Duty* franchise, including minors;

k. Negligently using replicas or near-replicas of real-life assault weapons and assault weapon parts in the *Call of Duty* franchise;

l. Knowingly and/or negligently exposing users of the *Call of Duty* franchise, including minors, to specific assault weapon brands and models;

m. Continuing to use replicas or near-replicas of real-life assault weapons and assault weapon parts in the *Call of Duty* franchise despite actual or constructive knowledge that multiple mass shooters had been trained on *Call of Duty* products and committed their assaults with weapons that are the same or similar as those that appear in the *Call of Duty* franchise;

n. Enabling and assisting firearms manufacturers, including Daniel Defense, to market their weapons to minors over the Internet, in violation of statutes such as the Privacy Rights for California Minors in the Digital World Act, Cal. Bus. & Prof. § 22580 (prohibiting "[a]n operator of an Internet Web site, online service, online application or mobile application directed to minors" from marketing, inter alia, "[f]irearms or handguns" and "[a]mmunition or reloaded ammunition");

o. Enabling and assisting firearms manufacturers, including Daniel Defense, to market their weapons to minors and increasing the risk of illegal and attempted illegal sales to minors in violation of statutes such as Cal. Penal Code § 27505 and/or attempted illegal offers to sell or sales to minors in violation of Texas Penal Code § 46.06; and

p. Enabling and assisting firearms manufacturers, including Daniel Defense, to market their weapons to minors and increasing the risk of illegal and attempted illegal sales to minors in violation of statutes such as Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, the California Unfair Competition Law (UCL), Cal. Bus. &

Prof. Code § 17200, and the Children's Online Privacy Protection Act, 15 U.S.C. §§ 6501-6505.

719. The Activision Defendants engaged in these unfair business acts and/or practices in order to gain advantage against business competitors, including the creators and developers of video games that do not rely on these acts and/or practices.

720. The Activision Defendants engaged in unfair business acts and/or practices in that they committed acts and/or practices for which the gravity of the harm to Plaintiffs and other consumers and foreseeable victims outweighed any utility of the Activision Defendants' conduct.

721. Mass shootings have devastated an untold number of American families and communities, conditioned an entire generation to view attacks by lone gunmen as an inevitable part of life, transformed schools from safe spaces of learning into sites of terror and mass death, and imbued Americans with a perpetual sense of fear and dread. The gravity of the harm posed by these attacks utterly outweighs the utility of the Activision Defendant's conduct.

722. The Activision Defendants engaged in unfair business acts and/or practices in that they committed acts and/or practices that offended legislatively declared policy, as previously alleged.

723. The Activision Defendants engaged in unfair business acts and/or practices in that they committed acts and/or practices that caused substantial injury that was not outweighed by any countervailing benefits and that could not have been reasonably avoided by consumers and other foreseeable victims themselves.

724. The Activision Defendant's actions have caused substantial injury to Plaintiffs and to all the other victims of the Shooter's attack on Robb Elementary School and their actions will cause injury to the public in the future via future mass shootings.

725. Plaintiffs suffered nontrivial monetary losses, including medical and funeral expenses, as a result of the Activision Defendants' unfair practices alleged herein.

726. Plaintiffs seek nonrestitutionary disgorgement of such measure of the Activision Defendants' profits derived from such wrongful conduct as is just, to be distributed via a fluid recovery fund in accordance with each of the Plaintiffs' damages.

727. In connection with this claim, Plaintiffs seek attorneys' fees pursuant to section 1021.5 of the California Code of Civil Procedure.

728. Plaintiffs demand judgment against each Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**NINTH CAUSE OF ACTION:
NEGLIGENCE
(ALL PLAINTIFFS AGAINST META DEFENDANTS
AND DOES 1 THROUGH 50, INCLUSIVE)**

729. Plaintiffs reallege and incorporate by reference each of the preceding and succeeding paragraphs as though fully set forth herein.

730. At all relevant times, the Meta Defendants owed Plaintiffs a duty to exercise reasonable care in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of their on-line social media business Instagram, so as not to create an unreasonable risk of harm to any person, including Plaintiffs.

731. The Meta Defendants are responsible not only for the result of their willful acts, but also for injuries occasioned to Plaintiffs by their want of ordinary care and/or skill in the management of their property or person. *See*, *e.g.*, Cal. Civ. Code § 1714(a).

732. The Meta Defendants knew or should have known that illegal, unlawful, and wrongful marketing of firearms to minors was or would be committed by firearms manufacturers such as Daniel Defense, increasing the risk of illegal firearm use and mass shootings.

733. Sales and marketing of firearms to minors, including promotion of firearms for illegal and assaultive purposes, is illegal, unlawful and/or wrongful, especially in light of the following statutes:

a. Privacy Rights for California Minors in the Digital World Act, Cal. Bus. & Prof. § 22580 (prohibiting "[a]n operator of an Internet Web site, online service, online application or mobile application directed to minors" from marketing, inter alia, "[f]irearms or handguns" and "[a]mmunition or reloaded ammunition");

b. Cal. Penal Code § 27505 (prohibiting sales of firearms to minors);

c. Texas Penal Code § 46.06 (prohibiting offers to sell firearms to minors);

d. Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 (prohibiting unfair commercial conduct);

e. California Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 Act (same); and

f. Children's Online Privacy Protection Act, 15 U.S.C. §§ 6501-6505.

734. Although the sale and marketing of firearms to minors is illegal, unlawful and/or wrongful, the Meta Defendants chose to maintain marketing of firearms as part of the Instagram platform, in part because they knew such content was enticing and attractive to minors and because it drove engagement on the platform, all of which makes Instagram more attractive to advertisers and benefits their bottom line. At the same time, the Meta Defendants wished to convey the false impression that Instagram was a safe and healthy space for minors to parents, law makers, regulators, and the public.

735. The Meta Defendants therefore created policies concerning the marketing of firearms that supposedly restricted firearms marketing on Instagram. In fact, the Meta Defendants intended that those policies would guide firearms manufacturers in crafting firearms marketing content, which would be channeled to minors through Instagram. And they did.

736. Further, the Meta Defendants knew or should have known that their express or implied representation to users, including parents, that Instagram is a safe and appropriate site for

minors, when in fact it delivers inappropriate and illegal content to minors, including firearms marketing and advertisements, violates the California False Advertising Law (FAL), Cal. Bus. & Prof. Code § 17500 *et seq.*, which prohibits, inter alia, "any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

737. As previously alleged, firearms manufacturers followed the Meta Defendants' guidance, leveraging Instagram as a key access point to minors. The firearms manufacturers' content developed in response to the Meta Defendants' guidance is content that the Meta Defendants participated in creating and developing, and their conduct as alleged in this Complaint materially contributed to the illegal, unlawful, and wrongful nature of that content.

738. As previously alleged, Daniel Defense was particularly adept and effective at following the Meta Defendants' guidance to channel its firearms marketing to minors via Instagram. The Daniel Defense firearms marketing on Instagram as previously alleged and described was co-created and developed by the Meta Defendants and Instagram.

739. The Daniel Defense firearms marketing co-created and developed by the Meta Defendants and channeled to minors, including the Shooter, via Instagram unreasonably increased the risk of harm to others by inciting and encouraging the use of Daniel Defense firearms, including the DDM4V7, for illegal and assaultive purposes, including killing.

740. The Daniel Defense firearms marketing co-created and developed by the Meta Defendants and channeled to minors, including the Shooter, via Instagram unreasonably increased the risk of harm to others because it targeted troubled adolescents with aggressive, violent, and sexualized advertisements that in some cases promoted and/or celebrated criminal activity.

741. The Daniel Defense firearms marketing co-created and developed by the Meta Defendants and channeled to minors, including the Shooter, via Instagram unreasonably increased the risk of harm to others because it leveraged Instagram's addictive platform to do so.

742. The Daniel Defense firearms marketing co-created and developed by the Meta Defendants and channeled to minors, including the Shooter, via Instagram unreasonably increased the risk of harm to others because of the radicalizing nature of Instagram's algorithmic selection of content. Upon information and belief, the troubled adolescent for whom Instagram's algorithm selected a Daniel Defense post was also flooded by the same Instagram algorithm with other incitements to violence.

743. The Meta Defendants knew or should have known of all of these risks.

744. One or more of the Meta Defendants' actions alleged above increased the likelihood that the May 24, 2022 shooting would occur, amplified the lethality of the assault, and/or increased the risk that Plaintiffs would be shot and seriously injured or killed.

745. One or more of the Meta Defendants' actions alleged above was a direct and proximate cause of the May 24, 2022 shooting.

746. As a direct and proximate result of the Meta Defendants' negligence, Plaintiffs suffered emotional distress, physical harm and/or death, and pecuniary loss.

747. The Meta Defendants' conduct was performed with a willful and conscious disregard for the safety of their users and the public. The Meta Defendants knew or should have known about the risks of radicalization, weapon fetishizing, and violence associated with their products, yet they chose to ignore those risks, downplay any safety issues in public statements, conceal knowledge relating to their products and associated hazards, fail to warn minors, their parents, law makers, regulators, and the public, and impede or delay implementation of feasible product safety features.

748. The Meta Defendants' decision to prioritize profits over public safety is outrageous and justifies an award of exemplary damages in such a sum that will serve to deter the Meta Defendants from similar conduct in the future.

749. Plaintiffs demand judgment against each Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**TENTH CAUSE OF ACTION:**
**GROSS NEGLIGENCE**
**(ALL PLAINTIFFS AGAINST META DEFENDANTS**
**AND DOES 1 THROUGH 50, INCLUSIVE)**

750. Plaintiffs reallege and incorporate by reference each of the preceding and succeeding paragraphs as though fully set forth therein.

751. The Meta Defendants acted with gross negligence in that they disregarded extreme risks that they knew or should have known could result in extreme harm.

752. As a direct and proximate result of the Meta Defendants' gross negligence, Plaintiffs were harmed. The Meta Defendants' breach(es) increased the likelihood that the May 24, 2022 shooting would occur, amplified the lethality of the assault, and increased the risk that victims, including Plaintiffs, would be shot and seriously injured or killed.

753. The Meta Defendants' breach of one or more of their duties was a substantial factor in causing harms and injuries to the Plaintiffs.

754. As a direct and proximate result of the Meta Defendants' negligence, Plaintiffs suffered emotional distress, physical harm and/or death, and pecuniary loss.

755. The Meta Defendants' conduct was performed with a willful and conscious disregard for the safety of their users and the public. The Meta Defendants knew or should have known about the risks of radicalization, weapon fetishizing, and violence associated with their products, yet they chose to ignore those risks, downplay any safety issues in public statements, conceal knowledge

relating to their products and associated hazards, fail to warn minors, their parents, law makers, regulators, and the public, and impede or delay implementation of feasible product safety features.

756. The Meta Defendants' decision to prioritize profits over public safety is outrageous and justifies an award of exemplary damages in such a sum that will serve to deter the Meta Defendants from similar conduct in the future.

757. Plaintiffs demand judgment against each Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## ELEVENTH CAUSE OF ACTION: STRICT PRODUCT LIABILITY – DESIGN DEFECT (ALL PLAINTIFFS AGAINST META DEFENDANTS AND DOES 1 THROUGH 50, INCLUSIVE)

758. Plaintiffs reallege and incorporate by reference each of the preceding and succeeding paragraphs as though fully set forth herein.

759. The Meta Defendants design and distribute Instagram.

760. The Meta Defendants designed Instagram with the following defects:

a. Features that take advantage of the chemical reward system of minors' brains to create addictive engagement, compulsive and/or prolonged use, and additional mental and physical harms. Such features include, but are not limited to, intermittent variable rewards, endless feeds of content, algorithmically-selected content that users do not request, and the absence of effective limitations on total usage time and/or usage during school hours and late at night.

b. Features that facilitate the radicalization of minors. Such features include recommendation algorithms that affirmatively connect minors with dangerous, violent, and illegal content and amplify extreme, violent, and otherwise radicalizing content in order to keep minors engaged.

c. Features that make Instagram readily accessible to minors, while enabling to conceal their Instagram activity from parents and adults in their home. Such features include, but are not limited to, the use of ineffective age-verification and parental monitoring protocols, as well as the ability to create multiple accounts.

d. Features that facilitate interactions between firearms companies and minors. Such features include, but are not limited to, policies that provided firearms companies

with a blueprint for engaging in marketing and advertising conduct that reached minors directly through "organic posts" and influencer content, as well as ineffective filters for minors.

761. These defects in Instagram's design existed prior to the release of Instagram to the public, and there was no substantial change to Instagram before it was distributed to the Shooter.

762. At all relevant times, a high probability existed that, as designed, Instagram posed an unreasonable risk of injury.

763. Safer designs exist, through which any and all of the above-described risks and dangers would be reduced, but the Meta Defendants chose to ignore or disregard these safer designs, or purposefully chose to implement and maintain their defective design to attain higher profits. Such safer designs include, but are not limited to:

a. Implementing age detection and verification systems to keep underage users off Instagram;

b. Turning off or slowing recommendation algorithms;

c. Redesigning recommendation algorithms to limit rather than promote addictive engagement;

d. Redesigning recommendation algorithms to not amplify extreme, violent, and radicalizing content;

e. Implementing parental controls and/or notifications;

f. Blocking use during certain times of day (*e.g.*, during school hours or late at night);

g. Limiting total access time across each day, week, and/or month;

h. Beginning and ending a user's "Feed";

i. Reducing or eliminating the use of intermittent variable rewards;

j. Limiting the timing and clustering of notifications used to lure back users;

k. Closing policy loopholes that allow firearms companies to direct advertising and marketing conduct to minors;

l. Limiting or blocking interactions between minors and accounts that are operated by users who are not their family members or other minors;

m. Limiting or blocking interactions between minors and accounts operated by commercial entities;

n. Reducing or eliminating the use of ephemeral content;

o. Removing barriers to the deactivation and deletion of accounts;

p. Disabling or limiting private chat functions for minors; and

q. Disabling or limiting interactive features (e.g., “Likes” and “View Counts”) for minors.

764. The Shooter began using Instagram as a minor and, as a result, lacked a mature ability to discern the destructive and dangerous attributes of Instagram as previously described.

765. At all relevant times, Instagram was defective and unreasonably dangerous because it contained numerous design defects that are not necessary for the utility provided to the user but are unreasonably dangerous, particularly for minors, and implemented solely to increase profits.

766. Instagram is defective and not reasonably safe because there was a substantial likelihood that it would cause harm and it was feasible to design it in a safer manner.

767. The foreseeable risks of harm posed by Instagram’s design could have been reduced or avoided by the adoption of the safer designs alleged herein. The omission of any or all of these safer design renders Instagram not reasonably safe. If the design defects in Instagram were known and/or fully understood at the time of design and distribution, a reasonable person would conclude that the utility of Instagram did not outweigh the risk inherent in designing it in that manner.

768. The design of Instagram was also defective because Instagram did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way. Minors are among the ordinary users of Instagram. Minors do not expect Instagram to be psychologically and neurologically addictive, harmful, and radicalizing when Instagram is used in its intended manner.

769. There is a substantial likelihood that Instagram—as currently designed, distributed, and operated by the Meta Defendants—will cause injury both to a significant number of individual users and the public. The risk of such injuries occurring can be substantially reduced through implementation of the safer design alleged herein, which will not adversely impact the functionality of Instagram or unreasonably impact their price.

770. As a result of these dangerous and defective design attributes of Instagram, the Shooter became addicted to Instagram, experienced a deterioration in his mental health, was radicalized, including by becoming desensitized to violence and killing, became connected with Daniel Defense, purchased a firearm from Daniel Defense, and used that firearm to carry out a mass shooting on May 24, 2022.

771. As a result of these dangerous and defective design attributes of Instagram, Plaintiffs suffered emotional distress, physical harm and/or death, and pecuniary loss.

772. Plaintiffs' physical, emotional, and economic injuries were reasonably foreseeable to the Meta Defendants at the time of Instagram's development, design, and distribution.

773. The Meta Defendants are further liable to Plaintiffs for punitive damages based upon the willful and wanton design of its product that was intentionally marketed and sold to underage users, whom it knew would be seriously harmed through use of their products. The Meta Defendants' conduct, as described above, was intentional, willful, wanton, reckless, malicious, oppressive, extreme, and outrageous, and displayed an entire want of care and a conscious and depraved indifference to the consequences of its conduct, including to the health, safety, and welfare of its users and foreseeable victims.

774. Plaintiffs expressly disclaim any and all claims seeking to hold the Meta Defendants liable as the publisher or speaker of content posted by third parties. Rather, Plaintiffs seek to hold the Meta Defendants liable for their own acts and omissions. Plaintiffs' claims arise from the Meta

Defendants' status as designers and marketers of a social media product—Instagram—that is not reasonably safe and is unreasonably dangerous for its intended use, as well as their own statements and actions.

775. Plaintiffs demand judgment against each Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**TWELFTH CAUSE OF ACTION:**
**STRICT PRODUCT LIABILITY – FAILURE TO WARN**
**(ALL PLAINTIFFS AGAINST META DEFENDANTS**
**AND DOES 1 THROUGH 50, INCLUSIVE)**

776. Plaintiffs reallege and incorporate by reference each of the preceding and succeeding paragraphs as though fully set forth herein.

777. Instagram is defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by this product could have been reduced or avoided by the provision of reasonable instructions or warnings by the Meta Defendants and the omission of the instructions or warnings renders their products not reasonably safe.

778. A high probability existed that, as designed, Instagram posed a likelihood of causing injury to minors, and through them, to others, as previously alleged.

779. Instagram is defective and not reasonably safe because it contains no adequate warning to minor users or parents regarding these risks to minors, and through them, to others.

780. As previously alleged, the Meta Defendants had actual knowledge of these product hazards.

781. At all relevant times, it was feasible for the Meta Defendants to provide warnings and to make other product related modifications that would prevent many of these hazards at negligible cost.

782. The Meta Defendants knew or should have known about these hazards, knew or should have known that its users and their parents would not be able to safely use their products without warnings, and failed to provide warnings that were adequate to make Instagram reasonably safe during ordinary and foreseeable use by minors.

783. As a result of these dangerous and defective design attributes of Instagram, the Shooter became addicted to Instagram, experienced a deterioration in his mental health, was radicalized, including by becoming desensitized to violence and killing, became connected with Daniel Defense, purchased a firearm from Daniel Defense, and used that firearm to carry out a mass shooting on May 24, 2022.

784. As a result of the Meta Defendants' failure to warn, Plaintiffs have suffered emotional distress, physical harm and/or death, and pecuniary loss.

785. Plaintiffs demand judgment against each Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## THIRTEENTH CAUSE OF ACTION: PRODUCT LIABILITY – NEGLIGENCE (ALL PLAINTIFFS AGAINST META DEFENDANTS AND DOES 1 THROUGH 50, INCLUSIVE)

786. Plaintiffs reallege and incorporate by reference each of the preceding and succeeding paragraphs as though fully set forth herein.

787. A high probability existed that, as designed, Instagram posed a likelihood of causing injury to minors, and through them, to others, as previously alleged.

788. At all relevant times, the Meta Defendants had a duty to exercise reasonable care and caution to design and operate Instagram to avoid increasing the likelihood of causing injury to minors, and through them, to others.

789. The Meta Defendants owed a heightened duty because they intended to provide Instagram to minors and were required to consider in the design of Instagram that adolescents' brains are not fully developed which results in a diminished capacity to make responsible decisions to avoid addiction and to eschew violent behaviors.

790. The Meta Defendants were negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution in the design and operation of Instagram.

791. The Meta Defendants breached their duty of care by designing and distributing Instagram with the defects previously alleged.

792. The Meta Defendants know or should know that product features of Instagram as previously alleged cause significant risks to their minor users.

793. The Meta Defendants have intentionally designed Instagram to frustrate the exercise of parental responsibility.

794. The Meta Defendants' advertising profits are directly tied to the quantity of its users' online time and engagement, and its product features are designed to maximize the time users spend using the product through product designs that addict them to the platform.

795. It is feasible for the Meta Defendants to make Instagram less addictive to minor users or to otherwise restrict minor users' access. Instead, the Meta Defendants have developed and continue to develop its highly addictive Instagram product so that it is more accessible to minors.

796. It is highly foreseeable that the addictive use of Instagram by minors will lead some minors to become addicted to Instagram, experience deterioration of their mental health, become radicalized, including by becoming desensitized to violence and killing, be exposed to marketing and advertising conduct by firearms companies, and commit extreme and violent acts with firearms.

797. The Meta Defendants were negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the influence of social media

products, including Instagram, on young, male shooters, especially mass shooters. On information and belief, the Meta Defendants knew of the powerful effect social media products such as Instagram have had on mass shooters, and intentionally avoided such testing and research.

798. The Meta Defendants could have but to this day have failed to implement safety measures that would mitigate, reduce, and/or eliminate the above-described hazards.

799. As a direct and proximate result of the Meta Defendants' negligence, the Shooter carried out the May 24, 2022 shooting.

800. As a direct and proximate result of the Meta Defendants' negligence, Plaintiffs suffered emotional distress, physical harm and/or death, and pecuniary loss, all of which were foreseeable.

801. The Meta Defendants' conduct was carried on with a willful and conscious disregard for the safety of Plaintiffs and others. The Meta Defendants knew that firearms manufacturers were marketing to minors via their product, and of the risks associated with such conduct, yet chose to ignore those risks, downplay any safety issues in public statements, conceal knowledge relating to its product and associated harms, fail to warn minors and their parents, and impede or delay implementation of feasible product safety features. The Meta Defendants' decision to prioritize profits over life, safety and health is outrageous and justifies an award of exemplary damages in such a sum that will serve to deter the Meta Defendants from similar conduct in the future.

802. The Meta Defendants are further liable to Plaintiffs for punitive damages based upon their willful and wanton failure to warn of known dangers of Instagram, which was deliberately marketed and distributed to minor users, whom they knew would be seriously harmed through the use of Instagram, and through those minors, to others.

803. Plaintiffs demand judgment against each Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**FOURTEENTH CAUSE OF ACTION:**
**NEGLIGENT FAILURE TO WARN**
**(ALL PLAINTIFFS AGAINST META DEFENDANTS AND DOES 1 THROUGH 50, INCLUSIVE)**

804. Plaintiffs reallege and incorporate by reference each of the preceding and succeeding paragraphs as though fully set forth herein.

805. The Meta Defendants are responsible for the design, manufacture, and marketing of Instagram.

806. The Meta Defendants knew or reasonably should have known of the previously described risks posed by Instagram.

807. The Meta Defendants also knew or reasonably should have known that ordinary users of their products, including pre-teens, teens, and young adults, would not appreciate those dangers.

808. The Meta Defendants had a duty to exercise ordinary care in the design, marketing, and sale of Instagram, including a duty to warn users and, in the case of minor users, to warn their parents about the many hazards they knew to be present, but not obvious.

809. The Meta Defendants breached their duty by failing to warn users or their parents of these risks.

810. As a result of these dangerous and defective design attributes of Instagram, the Shooter became addicted to Instagram, experienced a deterioration in his mental health, was radicalized, including by becoming desensitized to violence and killing, became connected with Daniel Defense, purchased a firearm from Daniel Defense, and used that firearm to carry out a mass shooting on May 24, 2022.

811. The Meta Defendants' negligence was a direct and proximate cause of the May 24, 2022 mass shooting.

812. As a direct and proximate result of the Meta Defendants' negligence, Plaintiffs suffered emotional distress, physical harm and/or death, and pecuniary loss.

813. The Meta Defendants' conduct was performed with a willful and conscious disregard for the safety of their users and the public. The Meta Defendants knew or should have known about the risks of radicalization, weapon fetishization, and violence associated with Instagram, yet they chose to ignore those risks, downplay any safety issues in public statements, conceal knowledge relating to Instagram and associated hazards, fail to warn minors, their parents, and the public, and impede or delay implementation of feasible product safety features.

814. The Meta Defendants' decision to prioritize profits over public safety is outrageous and justifies an award of exemplary damages in such a sum that will serve to deter Meta Defendants from similar conduct in the future.

815. Plaintiffs demand judgment against each Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## FIFTEENTH CAUSE OF ACTION: UNJUST ENRICHMENT (ALL PLAINTIFFS AGAINST THE META DEFENDANTS AND DOES 1 THROUGH 50, INCLUSIVE)

816. Plaintiffs reallege each of the allegations in the preceding and succeeding paragraphs as though fully set forth herein.

817. The Meta Defendants' profits are directly tied to the intensity of user engagement on their platforms. A user's engagement is maximized by exposure to increasingly addictive content. The Meta Defendants knew or reasonably should have known that their products create and increase risks as previously alleged.

818. The Meta Defendants benefited materially from their co-creation and development of firearms marketing content as previously alleged.

819. It would be unjust and inequitable for the Meta Defendants to retain revenues they earned through such inequitable and dangerous conduct when that conduct harmed Plaintiffs so profoundly.

820. The profits the Meta Defendants reaped from their co-creation and development of firearms marketing content unjustly enrich the Meta Defendants, to Plaintiffs' detriment.

821. The Plaintiffs are entitled to restitution.

822. Plaintiffs demand judgment against each Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**SIXTEENTH CAUSE OF ACTION:**
**VIOLATION OF UNFAIR COMPETITION LAW, CAL. BUS. & PROF. CODE § 17200**
**(ALL PLAINTIFFS AGAINST META DEFENDANTS**
**AND DOES 1 THROUGH 50, INCLUSIVE)**

823. Plaintiffs reallege and incorporate by reference each of the preceding and succeeding paragraphs as though forth set fully herein.

824. As previously alleged, the Meta Defendants are in the business of designing, making and promoting Instagram.

825. The Meta Defendants engaged in unfair business acts and/or practices in that the conduct and practices previously alleged were acts and/or practices that offended established public policy and/or were immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

826. Sales and marketing of firearms to minors, including promotion of firearms for illegal and assaultive purposes, is illegal, unlawful and/or wrongful, especially in light of the following statutes:

a. Privacy Rights for California Minors in the Digital World Act, Cal. Bus. & Prof. § 22580 (prohibiting "[a]n operator of an Internet Web site, online service, online application or mobile application directed to minors" from marketing, inter alia, "[f]irearms or handguns" and "[a]mmunition or reloaded ammunition");

b. Cal. Penal Code § 27505 (prohibiting sales of firearms to minors);

c. Texas Penal Code § 46.06 (prohibiting offers to sell firearms to minors);

d. Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 (prohibiting unfair commercial conduct);

e. California Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 Act (same); and

f. Children's Online Privacy Protection Act, 15 U.S.C. §§ 6501-6505.

827. Although the sale and marketing of firearms to minors is illegal, unlawful and/or wrongful, the Meta Defendants chose to maintain marketing of firearms as part of the Instagram platform, in part because they knew such content was enticing and attractive to minors and because it drove engagement on the platform, all of which makes Instagram more attractive to advertisers and benefits their bottom line. At the same time, the Meta Defendants wished to convey the false impression that Instagram was a safe and healthy space for minors to parents, law makers, regulators, and the public.

828. The Meta Defendants therefore created policies concerning the marketing of firearms that supposedly restricted firearms marketing on Instagram. In fact, the Meta Defendants intended that those policies would guide firearms manufacturers to craft firearms marketing content, which would be channeled to minors through Instagram. And they did.

829. Further, the Meta Defendants knew or should have known that their express or implied representation to users, including parents, that Instagram is a safe and appropriate site for minors, when in fact it delivers inappropriate and illegal content to minors, including firearms marketing and advertisements, violates the California False Advertising Law (FAL), Cal. Bus. & Prof. Code § 17500 *et seq.*, which prohibits, inter alia, "any statement . . . which is untrue or

misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

830. As previously alleged, firearms manufacturers followed the Meta Defendants' guidance, leveraging Instagram as a key access point to minors. The firearms manufacturers' content developed in response to the Meta Defendants' guidance is content that the Meta Defendants participated in creating and developing, and their conduct as alleged in this Complaint materially contributed to the illegal, unlawful, and wrongful nature of that content.

831. As previously alleged, Daniel Defense was particularly adept and effective at following the Meta Defendants' guidance to channel its firearms marketing to minors via Instagram. The Daniel Defense firearms marketing on Instagram previously alleged and described was co-created and developed by the Meta Defendants.

832. The Daniel Defense firearms marketing co-created and developed by the Meta Defendants and channeled to minors, including the Shooter, via Instagram unreasonably increased the risk of harm to others by inciting and encouraging the use of Daniel Defense firearms, including the DDM4V7, for illegal and assaultive purposes, including killing.

833. The Daniel Defense firearms marketing co-created and developed by the Meta Defendants and channeled to minors, including the Shooter, via Instagram unreasonably increased the risk of harm to others because it targeted troubled adolescents with aggressive, violent, and sexualized advertisements that in some cases promoted and/or celebrated criminal activity.

834. The Daniel Defense firearms marketing co-created and developed by the Meta Defendants and channeled to minors, including the Shooter, via Instagram unreasonably increased the risk of harm to others because it leveraged Instagram's addictive platform to do so.

835. The Daniel Defense firearms marketing co-created and developed by the Meta Defendants and channeled to minors, including the Shooter, via Instagram unreasonably increased

the risk of harm to others because of the radicalizing nature of Instagram's algorithmic selection of content. On information and belief, the troubled adolescent for whom Instagram's algorithm selected a Daniel Defense post was also flooded by the same Instagram algorithm with other incitements to violence.

836. The Meta Defendants knew or should have known that illegal, unlawful, and wrongful marketing of firearms to minors was or would be committed by firearms manufacturers such as Daniel Defense, increasing the risk of shootings and mass shootings.

837. The Meta Defendants engaged in these unfair business acts and/or practices in order to gain advantage against business competitors.

838. The Meta Defendants engaged in unfair business acts and/or practices in that they committed acts and/or practices for which the gravity of the harm to Plaintiffs and other consumers and foreseeable victims outweighed any utility of the Meta Defendants' conduct.

839. Mass shootings have devastated an untold number of American families and communities, conditioned an entire generation to view attacks by lone gunmen as an inevitable part of life, transformed schools from safe spaces of learning into sites of terror and mass death, and imbued Americans with a perpetual sense of fear and dread. The gravity of the harm posed by these attacks utterly outweighs the utility of the Meta Defendants' conduct.

840. The Meta Defendants engaged in unfair business acts and/or practices in that they committed acts and/or practices that offended legislatively declared policy, as previously alleged.

841. The Meta Defendants engaged in unfair business acts and/or practices in that they committed acts and/or practices that caused substantial injury that was not outweighed by any countervailing benefits and that could not have been reasonably avoided by consumers and other foreseeable victims themselves.

842. One or more of the Meta Defendants' actions alleged above increased the likelihood that the May 24, 2022 shooting would occur, amplified the lethality of the assault, and/or increased the risk that Plaintiffs would be shot and seriously injured or killed.

843. One or more of the Meta Defendants' actions alleged above was a direct and proximate cause of the May 24, 2022 mass shooting.

844. Plaintiffs suffered nontrivial monetary losses, including medical and funeral expenses, as a result of the Meta Defendants' unfair practices alleged herein.

845. Plaintiffs seek nonrestitutionary disgorgement of such measure of the Meta Defendants' profits derived from such wrongful conduct as is just, to be distributed via a fluid recovery fund in accord with each Plaintiffs' damages.

846. In connection with this claim, plaintiffs seek attorneys' fees pursuant to section 1021.5 of the California Code of Civil Procedure.

847. Plaintiffs demand judgment against each Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## SEVENTEENTH CAUSE OF ACTION:
## AIDING AND ABETTING
## (ALL PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 1 THROUGH 50, INCLUSIVE, EXCEPT NOMINAL DEFENDANTS)

848. Plaintiffs reallege and incorporate by reference each preceding and succeeding paragraph as though fully set forth herein.

849. Sales and marketing of firearms to minors, including promotion of firearms for illegal and assaultive purposes, is illegal, unlawful and/or wrongful, especially in light of the following statutes:

a. Privacy Rights for California Minors in the Digital World Act, Cal. Bus. & Prof. § 22580 (prohibiting "[a]n operator of an Internet Web site, online service, online

application or mobile application directed to minors" from marketing, inter alia, "[f]irearms or handguns" and "[a]mmunition or reloaded ammunition");

b. Cal. Penal Code § 27505 (prohibiting sales of firearms to minors);

c. Texas Penal Code § 46.06 (prohibiting offers to sell firearms to minors);

d. Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 (prohibiting unfair commercial conduct);

e. California Unfair Competition Law (UCL), Cal. Bus. & Prof. Code § 17200 Act (same); and

f. Children's Online Privacy Protection Act, 15 U.S.C. §§ 6501-6505.

850. Daniel Defense engages in illegal, unlawful, and wrongful marketing of firearms to minors and illegal offers to sell firearms to minors.

851. The Activision Defendants aid and abet Daniel Defense's illegal, unlawful, and wrongful marketing of firearms to minors and illegal offers to sell firearms to minors as previously alleged.

852. The Meta Defendants aid and abet Daniel Defense's illegal, unlawful, and wrongful marketing of firearms to minors and illegal offers to sell firearms to minors as previously alleged.

853. As previously alleged, the Activision Defendants' actions materially contribute to Daniel Defense's illegal, unlawful, and wrongful marketing of firearms to minors and illegal offers to sell firearms to minors.

854. As previously alleged, the Meta Defendants' actions materially contribute to Daniel Defense's illegal, unlawful, and wrongful marketing of firearms to minors and illegal offers to sell firearms to minors.

855. The Activision Defendants knew that the result of their conduct would result in the illegal, unlawful, and wrongful marketing of firearms to minors and illegal offers to sell firearms to minors and intended that result.

856. The Meta Defendants knew that the result of their conduct would result in the illegal, unlawful, and wrongful marketing of firearms to minors and illegal offers to sell firearms to minors and intended that result.

857. As a direct and proximate result of Daniel Defense's illegal, unlawful, and wrongful marketing of firearms to minors and illegal offers to sell firearms to minors, as aided and abetted by the Meta Defendants and/or the Activision Defendants, Plaintiffs suffered emotional distress, physical harm and/or death, and pecuniary loss.

858. The Meta Defendants' conduct was performed with a willful and conscious disregard for the safety of their users and the public.

859. The Meta Defendants' decision to prioritize profits over public safety is outrageous and justifies an award of exemplary damages in such a sum that will serve to deter the Meta Defendants from similar conduct in the future.

860. The Activision Defendants' conduct was performed with a willful and conscious disregard for the safety of their users and the public.

861. The Activision Defendants' decision to prioritize profits over public safety is outrageous and justifies an award of exemplary damages in such a sum that will serve to deter the Meta Defendants from similar conduct in the future.

862. Plaintiffs demand judgment against each Defendant for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## EIGHTEENTH CAUSE OF ACTION:
## WRONGFUL DEATH
## (WRONGFUL DEATH PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 1 THROUGH 50, INCLUSIVE, EXCEPT NOMINAL DEFENDANTS)

863. Plaintiffs reallege and incorporate by reference each of the preceding and succeeding paragraphs as though fully set forth herein.

864. This Cause of Action is asserted by and on behalf of Wrongful Death Plaintiffs bringing their actions as heirs and beneficiaries of Decedents as duly-appointed representatives of the estates of Decedents or as successor-in-interests.

865. As a direct and proximate result of the conduct of each of the Defendants and/or their products as alleged, Decedents suffered wrongful death, and Wrongful Death Plaintiffs suing as heirs and beneficiaries or estate representatives of Decedents seek damages therefor, including loss of financial support, loss of society, funeral expenses, estate administration expenses, and noneconomic damages including pain and suffering, and where applicable punitive damages.

866. Wrongful Death Plaintiffs demand judgment against each of the Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**NINETEENTH CAUSE OF ACTION:**
**SURVIVAL ACTION**
**(SUCCESSOR-IN-INTEREST PLAINTIFFS AGAINST ALL DEFENDANTS AND DOES 1 THROUGH 50, INCLUSIVE, EXCEPT NOMINAL DEFENDANTS)**

867. Plaintiffs reallege and incorporate by reference each of the preceding and succeeding paragraphs as though fully set forth herein.

868. On or about May 24, 2022, after the foregoing causes of action arose in their favor, the Successor-in-Interest Plaintiffs' Decedents, who would have been the plaintiffs in this action if they had lived, passed away.

869. This Cause of Action is asserted by and on behalf of surviving heirs and successors-in-interest of the Decedents pursuant to California Code of Civil Procedure section 377.11 and section 377.30.

870. As a direct and proximate result of the conduct of each of the Defendants and/or their products as alleged, Decedents suffered bodily injury resulting in pre-death pain and suffering, disability, disfigurement, mental anguish, emotional distress, loss of capacity of the enjoyment of

life, a shortened life expectancy, loss of earnings, and loss of ability to earn. Plaintiffs suing as heirs and beneficiaries or estate representatives seek damages for these injuries to their respective Decedents, including where applicable punitive damages.

871. Successor-in-Interest Plaintiffs demand judgment against each of the Defendants for compensatory, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against each of the Defendants, jointly and severally, and as appropriate to each cause of action alleged and the standing of Plaintiffs as follows:

1. Past, present and future general damages, the exact amount of which has yet to be ascertained, in an amount which will conform to proof at time of trial, to compensate Plaintiffs for injuries sustained as a result of each Defendant's conduct and/or their products as alleged, including but not limited to physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations, and medical treatments;
2. Past, present, and future economic and special damages according to proof at the time of trial;
3. Loss of earnings and impaired earning capacity according to proof at the time of trial;
4. Medical expenses, past and future, according to proof at the time of trial;
5. Funeral expenses and other special damages according to proof at the time of trial;
6. Punitive or exemplary damages according to proof at the time of trial;
7. All damages available for wrongful death and survival;
8. Exemplary and punitive damages in an amount in excess of the jurisdictional limits;
9. Attorneys' fees;

10. For costs of suit incurred herein;

11. Pre-judgment and post-judgment interest as provided by law; and

12. For such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial on all issues so triable.

Dated: November 22, 2024

KOSKOFF KOSKOFF & BIEDER, PC

By:

Katherine Mesner-Hage, Esq.
Attorneys for Plaintiffs