# EXHIBIT D

FILED
Superior Court of California
County of Los Angeles
09/05/2025
David W. Slayton, Executive Officer / Clerk of Court
By: E. Muñoz Deputy

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF LOS ANGELES**

| | |
|---|---|
| VERONICA MATA, et al.,<br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC., et al.,<br>Defendants. | Nos. 24SMCV02494 and 24SMCV02498<br><br>**RULING ON SUBMITTED MATTERS**<br><br>Hon. William F. Highberger<br>Department 10, Spring Street Courthouse |
| ARNULFO REYES, et al.,<br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC., et al.,<br>Defendants. | |

## I. INTRODUCTION AND SUMMARY OF RULING

The key pleading challenges which are addressed in this ruling are:

1. **Demurrer by "Meta" Defendants to *Mata* Complaint: Sustained without leave to amend.**
2. **Demurrer bv "Meta" Defendants to *Reyes* Complaint: Sustained without leave to amend.**
3. **Anti-SLAPP Motion by "Meta" Defendants to *Mata* Complaint: Denied without attorney fees to either side.**
4. **Anti-SLAPP Motion by "Meta" Defendants to *Reyes* Complaint: Denied without attorney fees to either side.**
5. **Anti-SLAPP Motion by "Activision" Defendants to *Mata* Complaint: Denied without prejudice to presenting legal merits challenge via Demurrer or Motion for Judgment on the Pleadings[1] and without attorney fees to either side.**
6. **Anti-SLAPP Motion by "Activision" Defendants to *Reyes* Complaint: Denied without prejudice to presenting legal merits challenge via Demurrer or Motion for Judgment on the Pleadings and without attorney fees to either side.**

There are motions collateral to the above which were fully briefed and submitted without oral argument:

7. *Mata* Plaintiffs' Motion to File Supplemental Memorandum and Supplemental Declaration in Opposition to Meta Anti-SLAPP Motion: Granted by this ruling.
8. Joinder in No. 7 by *Reyes* Plaintiffs: Granted by this ruling.
9. *Mata* Plaintiffs' Motion to Take Specified Discovery from Meta: Denied by this ruling for reasons explained later.
10. *Reyes* Plaintiffs' Motion to Take Specified Discovery from Meta: Denied by this ruling for reasons explained later.

Further, there were a number of evidentiary objections and requests for judicial notice filed in connection with the pleading challenges. Since the Court believes the core questions are resolved by application of common law principles regarding proximate cause and superseding cause, there is no need for an analysis of the competing offers of facts in connection with the Anti-

---

[1] As a technical matter, the Court does not reach the merits of the Plaintiffs' claims in both cases against Activision since it did not bring a Demurrer in tandem to its Anti-SLAPP Motion. Since the predicates for application of the Anti-SLAPP motion are found lacking here, there is no proper basis to address the merits.

SLAPP motions, for which reasons all evidentiary objections are overruled as moot. The requests for judicial notice by Meta are unopposed and granted.

At the Court's request, several short briefs, primarily lists of citations, were provided after oral argument, though the parties did take liberties to add editorial comment.

## II. UNDERLYING EVENT GIVING RISE TO CLAIMS

As set forth in great detail in the Complaints filed in each action (which are close to identical), on May 24, 2022, Salvador Ramos (hereinafter the "Shooter") used a Daniel Defense DDM4V7 assault rifle bought a few days earlier on his eighteenth birthday to kill many of the Plaintiffs' decedents (nineteen fourth grade students and two teachers) and to injure many of the other Plaintiffs herein (a total of seventeen others were wounded) at a mass shooting at Robb Elementary School in Uvalde, Texas. The misery suffered by the various Plaintiffs through the loss of their children and injuries suffered by the survivor Plaintiffs is set forth in great detail in the carefully drafted and quite thorough pleadings. An overarching theme is that the defendants named are liable in tort for these losses.

## III. PROCEDURAL HISTORY OF CASES

These mass tort cases, with scores of co-plaintiffs in the *Mata* docket and nineteen co-plaintiffs in the *Reyes* docket, were filed in West District based on defendant Activision's principal place of business in Santa Monica, California. *See Mata* Compl. ¶ 35; *Reyes* Compl. ¶ 34.[2] There are two groups of defendants for analytical purposes: Activision Blizzard, Inc. and its

[2]The *Mata* Civil Cover Sheet asserted venue within the County was based on "8. Location wherein defendant/respondent functions wholly." The *Reyes* Civil Cover Sheet asserted venue within the County was based on "4. Location where bodily injury, death or damage occurred."

affiliates, subsidiaries, and parent Microsoft Corporation, hereinafter collectively "Activision," and Meta Platforms, Inc. and its subsidiary Instagram, LLC, hereinafter "Meta."[3] On August 13, 2024, the *Mata* case was declared Complex and assigned to Judge Stuart Rice. After a recusal by Judge Rice, the case was reassigned to Judge William F. Highberger on August 21, 2024. The *Reyes* case was transferred from West District to Judge Highberger by grant of a Notice of Related Case by Judge Highberger on October 3, 2024.

Initial Status Conferences were jointly held in the newly related cases on October 16, 2024. Plaintiffs in *Mata* were given leave to file an Amended Complaint with additional plaintiffs. The parties' proposed briefing schedule for pleading challenges via demurrer and Anti-SLAPP motions pursuant to Code of Civil Procedure section 425.16 was adopted by the Court. Due to dislocations suffered by certain of Plaintiffs' counsel due to the Palisades Fire (a dislocation also burdening the Court) and a further problem for certain of Plaintiffs' counsel due to a family medical emergency, the briefing schedule was extended such that reply briefs were eventually filed on April 25, 2025, for an anticipated hearing on May 13, 2025, per a stipulation filed in *Mata* on April 14, 2025. Due to further complications and scheduling challenges, the motions were heard on July 18, 2025, and August 19, 2025. The Activision motions were submitted July 18. The Meta motions were submitted August 19.

## IV. CAUSES OF ACTION ORIGINALLY PLED

As filed in each of the two dockets, Plaintiffs filed eight (8) causes of action against Activision and the same eight causes of action, separately pled, against Meta[4] and an additional

---

[3]Certain natural persons are also named as nominal defendants in *Mata* for wrongful death claims where they have not chosen to participate as co-plaintiffs.

[4]As previously noted, references to Activision and Meta are inclusive of all named parties affiliated with either entity. For convenience, Activision and Meta are each referred to hereinafter in the singular.

three causes of action pled jointly against both Activision and Meta. The eight (8) theories separately pled against the two groups of defendants are:

1) Negligence
2) Gross Negligence
3) Strict Product Liability—Design Defect
4) Strict Product Liability—Failure to Warn
5) Product Liability—Negligence
6) Negligent Failure to Warn
7) Unjust Enrichment
8) UCL Business & Professions Code § 17200

The three theories pled against all defendants as joint tortfeasors are:

9) Aiding and Abetting Daniel Defense's illegal marketing of firearms
10) Wrongful Death
11) Survival Action

## V. REMAINING CAUSES OF ACTION

Activision chose to limit its pleading challenge to an Anti-SLAPP motion, which does challenge the validity of each of the claims in each of the two complaints.[5] Meta filed both a demurrer and an Anti-SLAPP motion. Activision's challenge, by its nature, went beyond the four corners of the complaint to include new factual material which Activision felt would support its merits attack on the pleading. Meta made a "pure" pleading challenge via its demurrer and then added an Anti-SLAPP motion (presumably to support the potentially available fee request if it were to prevail on such motion), but it did **not** seek to expand the record with new factual material supporting the Anti-SLAPP motion. That Anti-SLAPP motion therefore does not add any new material to the analysis of the merits of the pleading as to such defendant.

[5]For analytical purposes the claims in each of the two complaints are pled with identical language and rise or fall without distinction between the two dockets. Hereinafter the pleadings will be referenced in the singular.

In the course of briefing the pleading challenges and as clarified at oral argument, Plaintiffs in both cases did not contest the challenges to certain causes of action (using the same numbering as above):

3) Strict Product Liability—Design Defect
4) Strict Product Liability—Failure to Warn
5) Product Liability—Negligence
7) Unjust Enrichment
8) UCL Business & Professions Code § 17200

While the parties dickered a bit at argument as to the nature of the alleged joint liability for "aiding and abetting" Daniel Defense, it became clear at argument that Daniel Defense is considered by Plaintiffs to be a joint tortfeasor with Activision and Meta for the negligent conduct of Daniel Defense, such that any liability for Activision or Meta depends on application of common-law negligence theories to the challenged conduct of Daniel Defense and the resulting consequences on which liability is premised. Similarly, claims for wrongful death and survivor are all predicated on theories of negligence in the context of these pleading assertions.

Simply put, the legal merits of the many Plaintiffs' claims rise or fall based on the application of traditional common-law theories of proximate cause and its close cousin, superseding cause.

While the parties started their written and oral arguments with extended discourses regarding—in the case of Meta—Section 230 of the Communications Decency Act, 47 U.S.C. § 230, and—in the case of both Defendants—the First Amendment to the United States Constitution and its California Constitution analog, the Court does not need to address those legal attacks on Plaintiffs' claims since the application of basic tort law principles to the facts alleged provides a more than sufficient basis to determine that Plaintiffs' efforts to impose tort liability on these Defendants for the harm suffered by Plaintiffs and their decedents is

incompatible with settled legal principles. Therefore, the Court declines the invitation to address Section 230 or the First Amendment as unneeded surplusage.

## VI. ANALYSIS OF DEMURRER BY META

The heart of the analysis of the merits of this case is framed by this demurrer. The consequences of what happened in Uvalde on May 24, 2022, when the Shooter took twenty-one lives and shot seventeen additional persons without killing them and created resulting emotional harm for many more innocent persons, are horrific. The pleadings here describe a combination of many inputs which had to coalesce before the bad acts causing death and injury occurred: the Shooter's horrible home life, his failures in school, school and society's failure to provide counseling or other services to him in response to signals of a troubled youth, his easy access to purchase firearms and ammunition, and the failure of Uvalde police to actively respond to first reports of the rampage.[6] That these events were tragic and created great harm does not, however, substitute for engaging in classical analysis of the circumstances under which one party owes a duty to another party for events which occurred without any advance contractual or other special relationship.

Here, there was no pre-existing special relationship between Plaintiffs and Activision, and cases arising out of special relationships thus have no relevance. This is also not a landlord premises liability case.

There are two separate questions to be addressed under the common law of negligence: (a) causation and (b) duty. Both are lacking here as a matter of law.

---

[6] *See Mata* Am. Compl. ¶¶ 19, 23, 510-33, 543, 545, 577-81, 626-27; *Reyes* Am. Compl. ¶¶ 18, 24, 476-99, 510, 512, 543-47, 562-63 (noting these several inputs to the resulting massacre).

As a preliminary matter, the Court would note that the analytical approach to the causation and duty analyses as distilled by the RESTATEMENT OF TORTS, published by the American Law Institute, changed to some degree as between the RESTATEMENT OF TORTS, SECOND (hereinafter "RESTATEMENT 2D"), published starting in 1965, and the RESTATEMENT (THIRD) OF TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM (hereinafter "RESTATEMENT 3D"), published in 2010 and 2012 (with drafts in circulation before then). California courts routinely cited to the RESTATEMENT 2D after its publication,[7] and they have similarly cited the RESTATEMENT 3D, particularly its definition of "duty" at section 7,[8] since its publication.

The RESTATEMENT 3D, at sections 29–36, used "scope of liability" analysis to replace the concepts of "proximate cause," "substantial cause," and "superseding cause" discussed at sections 430–53 in the RESTATEMENT 2D, but it is not clear that "proximate cause," as a concept, has been extinguished from the California common law as articulated by the appellate courts. The court expressly engaged in "proximate cause" analysis in 2018 to affirm a defense judgment based on "intervening forces operating independent of defendant's conduct," then cited and quoted in full from the RESTATEMENT 2D section 442 (discussed below). *See Novak v. Continental Tire North America*, 22 Cal. App. 5th 189, 197 (2018). The current version of CACI 443 "Affirmative Defenses—Causation: Intentional Tort/Criminal Act as Superseding Cause" cites favorably to RESTATEMENT 2D section 448 by citation and quotation from *Kane v. Hartford Accident & Indemnity Co.*, 98 Cal. App. 3d 350, 360 (1979). See also current CACI 432 "Affirmative Defense–Causation: Third-Party Conduct as Superseding Cause," citing favorably to the

[7] *See, e.g.*, *Pamela L. v. Farmer*, 112 Cal. App. 3d 206, 210 (1980).
[8] *See Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764, 771 n.2, 773 n.3 (2011).

RESTATEMENT 2D sections 440 and 442–455. Plaintiffs themselves on the issue of causation cite favorably to the RESTATEMENT 2D in their Opposition at page 29, lines 7–9.

The bottom line is that reliance on the RESTATEMENT 3D as a statement of current California law appears justified, but reliance on provisions in the RESTATEMENT 2D which have not been expressly disaffirmed as inconsistent with the RESTATEMENT 3D is also legitimate. More generally, abstract statements of the law in either RESTATEMENT are not as useful as legal rulings by California appellate courts or other persuasive tribunals in the context of actual disputes. For this reason, the Court will rely primarily on case rulings and not on concepts articulated only in the RESTATEMENTS.

**A. Causation**

Plaintiffs' theory of causation fails as a matter of law. They allege "[u]pon information and belief, Instagram exposed the Shooter to Daniel Defense's aggressive, combat-fetishizing, and unlawful marketing on the platform—all before he turned 18." *Mata* Am. Compl. ¶ 550; *see also Reyes* Am. Compl. ¶ 517. For purposes of ruling on the pleading challenge, the Court will disregard the limiting language used by careful plaintiffs' counsel and assume what is surmised to have happened is what is alleged to have happened. This is still not good enough as a matter of law.

The Court's analysis will start with cases which are most on point factually, i.e., cases involving computer apps and social media. The first case of note was affirmance of a ruling on a demurrer for a defendant after the appellate court expressly applied proximate cause concepts to affirm dismissal. *See Modisette v. Apple Inc.*, 30 Cal. App. 5th 136, 154 (2018). Recognizing that causation analysis involves both factual and legal issues, the Court absolved defendant of legal liability as a matter of law for lack of legal causation. *Modisette* provides a clear example of when

a software developer's conduct is too far removed from a litigant's injury to require the defendant to pay damages. In that case, a young family traveling by car was struck by another motorist's vehicle, leaving one family member dead and the others injured. *See id*. at 140. The other motorist had been distracted while driving because he was using Apple's FaceTime feature while driving and using his Apple iPhone 6 Plus. *See id.* The family sued Apple, alleging that it had failed to implement a safe alternative design that would have automatically prevented drivers from using FaceTime while traveling at highway speeds. *See id*. The trial court sustained Apple's demurrer without leave to amend for failure to establish causation. *See id*. at 141.

The appellate affirmance speaks with reasons equally applicable here:

> "To simply say, however, that the defendant's conduct was a necessary antecedent of the injury does not resolve the question of whether the defendant should be liable." (*PPG Industries, Inc. v. Transamerica Ins. Co.* (1999) 20 Cal.4th 310, 315 (*PPG Industries*).) As with the test for duty in negligence actions, "[t]he second aspect of proximate cause 'focuses on public policy considerations. Because the purported [factual] causes of an event may be traced back to the dawn of humanity, the law has imposed additional "limitations on liability other than simple causality." . . . "These additional limitations are related not only to the degree of connection between the conduct and the injury, but also with public policy." . . . **Thus, "proximate cause 'is ordinarily concerned, not with the fact of causation, but with the various considerations of policy that limit an actor's responsibility for the consequences of his conduct.'"""** (*State Hospitals*, *supra*, 61 Cal.4th at p. 353, citations omitted; see also *Romito v. Red Plastic Co.* (1995) 38 Cal.App.4th 59, 69–70.) Both Witkin and the Restatement of Torts frame this aspect of proximate cause as "scope of liability." (See 6 Witkin, Summary of Cal. Law (11th ed. 2017) Torts, §§ 1331, 1336; Rest.3d Torts, § 29.) **The extent or scope of a defendant's liability is a question of law.** (*Mosley v. Arden Farms Co.* (1945) 26 Cal.2d 213, 222 [157 P.2d 372] (conc. opn. of Traynor, J.) (Mosley); see also PPG Industries, supra, at pp. 315–316.)
>
> "'**As a matter of practical necessity, legal responsibility must be limited to those causes which are so close to the result, or of such significance as causes, that the law is justified in making the defendant pay.**'" (*Kumaraperu v. Feldsted* (2015) 237 Cal.App.4th 60, 68 (*Kumaraperu*).) Although Apple's manufacture of the iPhone 6 Plus without the lockout technology was a necessary antecedent of the Modisettes' injuries (as was the police activity that slowed traffic on the interstate that day), those injuries were not a result of Apple's conduct. Rather, Wilhelm

> caused the Modisettes' injuries when he crashed into their car while he willingly diverted his attention from the highway.

*Modisette*, 30 Cal. App. 5th at 153-54 (bold emphasis added).

Similarly, even when assuming Meta's alleged promotion and enhancement of firearms content on Instagram is a "necessary antecedent" to Plaintiffs' injuries, those injuries were a result of the perpetrator's willful decisions to purchase a firearm, take it to Robb Elementary School, and use it to attack and murder the students, faculty, and staff of the school. *See id.* at 154-55; *see also Meta* Am. Compl. ¶¶ 25-26, 578-81, 615-21; *Reyes* Am. Compl. ¶¶ 24-25, 544-47, 551-57. The perpetrator is the proximate cause of Plaintiffs' injuries. Under *Modisette*, Meta's conduct, even if it is a contributing factor, or even a necessary antecedent, is too far attenuated from the loss that, as a matter of law, it would not be just to hold Meta liable for Plaintiffs' injuries.

The Ninth Circuit reached a similar conclusion in *Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018). As in *Modisette*, the ruling was made on a pleading challenge, not after discovery, not on a summary judgment motion, and not after trial. In that case, the plaintiffs were family members of two men killed by members of the ISIS terrorist group in Jordan. *See id*. at 741-42. The plaintiffs alleged that Twitter provided material support to ISIS by allowing it to use Twitter accounts and Twitter messaging services to spread its message, recruit members, and raise funds, and sued under the Anti-Terrorism Act, 18 U.S.C. § 2333(a). *See id*. at 742-43. The Ninth Circuit found insufficient pleading of proximate causation because the complaint alleged, at most, "that Twitter's alleged provision of material support to ISIS facilitated the organization's growth and ability to plan and execute terrorist acts." *Id*. at 749-50. The pleadings did not "articulate any connection between Twitter's provision of this aid and" the injuries complained of because

"[t]here are no facts indicating that [the ISIS perpetrator's] attack was in any way impacted, helped by, or the result of ISIS's presence on the social network." *Id.* at 750.

The *Fields* court also noted that "[c]ommunication services and equipment are highly interconnected with modern economic and social life, such that the provision of these services and equipment to terrorists could be expected to cause ripples of harm to flow far beyond the defendant's misconduct." *Id.* at 749. Here, while Plaintiffs copiously allege that the perpetrator of the Uvalde school shooting viewed firearms content on Instagram, there are no facts indicating that the attack was impacted, helped by, or the result of the material the perpetrator saw on social media.

Yet another case points to the same conclusion when the premise of causation is social media content. The above quoted remarks in *Fields* were incorporated into the Sixth Circuit's decision in *Crosby v. Twitter, Inc.*, 921 F.3d 617 (6th Cir. 2019). In *Crosby*, victims and family members of victims of the June 2016 Pulse Night Club shooting in Orlando, Florida, sued social media companies alleging that ISIS used their "social media platforms to post propaganda and 'virtually recruit' Americans to commit terrorist attacks[,]" including the perpetrator of the Pulse Night Club shooting. *Id.* at 619; *see also id.* at 620-21. There was "not a sufficient link between Defendants' conduct (of allegedly providing social media platforms to ISIS) and [the *Crosby* plaintiffs'] injuries suffered at the Pulse Night Club" when the "only allegation that connects [the Orlando preparator] and [the social media defendants] is that, at some point before the Pulse Night Club shooting, [the Orlando perpetrator] viewed online content from ISIS and became 'self-radicalized.'" *Id.* at 624-25. The Sixth Circuit described the connection between the social media platforms' conduct and the plaintiffs' injuries as "tenuous . . . at best." *Id.* at 625. Citing the *Fields* discussion of "ripples of harm," the court concluded that "without more," a social media

company does not "proximately cause all these potential ripples" and thus "[t]he [ISIS] content [on Twitter] did not compel [the Orlando perpetrator's] actions." *Id.*

Like in *Fields* and *Crosby*, Meta's algorithm and posting policies may have allowed provocative firearms content to reach minors like the Uvalde perpetrator. Such content may have influenced the Uvalde perpetrator to commit murder. But these are ripples of harm that are only tenuously connected to Plaintiffs' injuries. The conclusion that the Orlando perpetrator was not compelled by ISIS content on social media to commit the crimes he committed—even though the content allegedly caused him to become "self-radicalized"—supports the same conclusion here: there are no allegations that the Uvalde shooter's exposure to firearms content on Instagram compelled him to commit murder, so his exposure to firearms content on social media would only cause a "ripple of harm" flowing "far beyond" Meta's alleged misconduct. *See id.* Meta thus did not proximately cause the injuries to Plaintiffs.

The Sixth Circuit observed that to hold social media platforms liable under circumstances like those in *Crosby* or this case would make them "liable for seemingly endless acts of modern violence simply because the individual viewed relevant social media content before deciding to commit the violence." *Id.* A social media platform does not "proximately cause everything that an individual may do after viewing this endless content" on social media feeds and cannot be expected to "foresee how every viewer will react to third party content on" a social media platform, "especially . . . where independent criminal acts, like [the Orlando perpetrator's], are involved." *Id.*

Plaintiffs argue that the test is different because "'California has definitively adopted the substantial factor test of the Restatement Second of Torts for cause-in-fact determinations. . . . [T]he "substantial factor test subsumes the "but for" test.' *E.g., South Coast Framing, Inc. v.*

*Workers' Comp. Appeals Bd.*, 61 Cal. 4th 291, 298 (2015)." Opp'n at 29:7-10. Plaintiffs ignore the statement in their cited case that "[l]egal causation in tort law has traditionally required two elements: cause in fact **and** proximate cause." *Id.* at 298 (bold emphasis added). The discussion here concerns Plaintiffs' failure to show that their injuries were proximately caused by Meta, or—to use RESTATEMENT 3D verbiage—come within the "scope of liability." Nevertheless, the substantial factor test favored by Plaintiffs requires "that the contribution of the individual cause be more than negligible or theoretical." *Id.* As discussed, Meta's alleged contribution is so attenuated from Plaintiffs' harm that it is only negligible or theoretical.

Before moving on to duty, it is important to consider how the nature of the Shooter's conduct impacts this "scope of duty" or "proximate cause" analysis. For these purposes, the Court relies on the recent decision in *Novak*, *supra,* 22 Cal. App. 5th at 197, which cited and quoted the RESTATEMENT 2D's black-letter law discussion of "**Considerations Important in Determining Whether an Intervening Force is a Superseding Cause**" in section 442, which states:

> **The following considerations are of importance in determining whether an intervening force is a superseding cause of harm to another:**
> **(a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;**
> **(b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;**
> **(c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;**
> **(d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;**
> **(e) the fact that the intervening force is due to an act of a third person which is wrongful toward the other and as such subjects the third person to liability to him;**
> **(f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.**

Considerations (b), (d), (e), and (f)—particularly (f)—argue strongly in favor of reaching the conclusion that a homicidal gun spree by a deranged person is a superseding cause, such that Meta's alleged responsibility for the outcome is terminated by this event. While Plaintiffs make great efforts to plead that mass shootings are now normal, foreseeable events in the human experience in the United States at this time, the Court is of the view that they remain "extraordinary" events for purposes of legal analysis under consideration (b). The actions of the Shooter were an intervening force which occurred solely due to the Shooter's acts—i.e., consideration (d)—there was no second finger on the trigger apart from the Shooter's. That the Shooter's conduct was "wrongful" towards the victims and itself is sufficient to charge the Shooter with civil and criminal liability for purposes of consideration (e) is beyond dispute. Finally, and most importantly, the commission of a mass homicide has such a high degree of "culpability" for purposes of consideration (f) that the actions and inactions of other co-contributors to the outcome—including Meta, the Shooter's parents, his school, and the Uvalde police—do not create liability for such third parties. In view of these basic jurisprudential considerations which should have continuing validity whether or not the rubric is "proximate cause" or "scope of liability," it is not surprising that Plaintiffs have been unable to cite any case imposing liability on a non-criminal alleged contributor to death or bodily injury when the primary actor was a homicidal person engaged in a senseless massacre.

**B. Duty**

As previously noted, published California authority states that section 7 of the RESTATEMENT 3D is, with certain limitations, a correct reflection of California law. *See Cabral*,

51 Cal. 4th at 771 n.2, 773 n.3. Those two footnotes bear quotation in full to set the stage for this analysis (with bold emphasis added):

> 2. California law accords in this respect with that of American jurisdictions generally as reflected in recently published portions of the Restatement Third of Torts. Section 7 of the Restatement's summary of personal injury liability states: "(a) An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm. [¶] **(b) In exceptional cases, when an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases, a court may decide that the defendant has no duty or that the ordinary duty of reasonable care requires modification."** (Rest.3d Torts, Liability for Physical and Emotional Harm, § 7 (2010).) **One exception to the accord is that while California law considers foreseeability of injury a major factor in determining duty, the Restatement, as just quoted, would consider only "an articulated countervailing principle or policy," as distinct from foreseeability.** (Ibid.; see id., com. j, p. 82 ["The extent of foreseeable risk depends on the specific facts of the case and cannot be usefully assessed for a category of cases; small changes in the facts may make a dramatic change in how much risk is foreseeable. Thus, . . . courts should leave such determinations to juries unless no reasonable person could differ on the matter."].)

> 3. Again, **California law accords with the Restatement view. "No-duty rules are appropriate only when a court can promulgate relatively clear, categorical, bright-line rules of law applicable to a general class of cases."** (Rest.3d Torts, Liability for Physical and Emotional Harm, § 7, com. a, p. 78.) **"Sometimes reasonable minds cannot differ about whether an actor exercised reasonable care . . . . In such cases, courts take the question of negligence away from the jury and determine that the party was or was not negligent as a matter of law.** . . . [¶] In other situations, reasonable minds could differ about the application of the negligence standard to a particular category of recurring facts, but under the rubric of duty courts render a judgment about that category of cases. . . . **In conducting its [duty] analysis, the court may take into account factors that might escape the jury's attention in a particular case, such as the overall social impact of imposing a significant precautionary obligation on a class of actors. These cases are properly decided as duty or no-duty cases.** When no such categorical considerations apply and reasonable minds could differ about the competing risks and burdens or the foreseeability of the risks in a specific case, however, courts should not use duty and no-duty determinations to substitute their evaluation for that of the factfinder." (Id., com. i, pp. 81–82, citation omitted.)

The assessment of whether a duty is owed in the context of negligence is clearly a legal question for the court, not a fact question for the jury. *See Artiglio v. Corning Inc.*, 18 Cal. 4th 604, 614 (1998); *Parsons v. Crown Disposal Co.*, 15 Cal. 4th 456, 472 (1997). As previously noted, it is undisputed that there was no contractual relationship between Plaintiffs and Meta and no special relationship, such as a school, common carrier, or the like. Meta was also not a landowner owing generalized duties to all who might come upon its land by invitation, trespass or otherwise. Those are all situations where a duty to limit risk to another person exists under California law.

Rather, Meta was hosting—for profit—a social media site open to all comers from around the planet, and the Shooter was but one of millions of users. Plaintiffs were in no particular relationship with Meta such that Meta should be particularly concerned with their welfare any more than the welfare of the rest of humanity. Plaintiffs' theory of duty, as presented by this pleading, has Meta owing a legal duty to every person in the United States and likely every person on the planet since there is no geographic limitation to its theory of liability. Plaintiffs' theory would work equally well if the harm arose in Sandy Hook, Connecticut; Columbine, Colorado; Minneapolis, Minnesota; Pittsburgh, Pennsylvania; Bakersfield, California; Carlsbad, New Mexico; or Bangor, Maine. This is expecting too much in terms of what duties the common law is willing to place on parties lacking a prior relationship with a plaintiff by contract or other circumstances, such as ownership of specific land or custodial duties held by a school or otherwise. Plaintiffs' theory creates limitless liability, which is inconsistent with the need for the common law to promote stable and predictable legal relations, including those imposed by tort.

"As a general rule, one owes no duty to control the conduct of another, nor to warn those endangered by such conduct." *Davidson v. City of Westminster*, 32 Cal. 3d 197, 203 (1982);

*Regents of University of California v. Superior Court*, 4 Cal. 5th 607, 619 (2018). There are exceptions when there is a special relationship between the defendant and third person that imposes on the defendant a duty to control the third person's conduct, or a special relationship between the defendant and plaintiff. *See Davidson*, 32 Cal. 3d at 203.

Plaintiffs argue there is no need to consider a special relationship because "Meta is liable for its **affirmative acts** that created and increased the risk of harm[.]" Opp'n at 27 (bold emphasis added). Plaintiffs' authority presents no support for this proposition when the harm they suffered was caused by the acts of a third person. They rely on *Hacala v. Bird Rides, Inc.*, wherein the operator of a scooter rental service could be held liable for injuries suffered by a pedestrian who tripped on a scooter negligently placed on the sidewalk by an unknown renter. *See* 90 Cal. App. 5th 292, 299-300 (2023). *Hacala* is readily distinguishable from this case because the scooter that caused the injury was alleged to be owned by the defendant rental company, *see id.* at 300-01, 310-12, which under statutory law is responsible "for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person[.]" Civ. Code § 1714(a). Plaintiffs do not allege that Meta's "person" (i.e., its physical body, which as a corporate entity it does not have) or any of its property is responsible for Plaintiffs' injuries. Plaintiffs have not alleged a cognizable duty. This theory once again stretches the bounds of tort law in pursuit of recovery from a solvent respondent when the primary culprit is dead and judgment proof.

### C. Teachings from Cases Most on Point Factually to These Allegations

The analysis of causation and duty above supports a conclusion that there is no possible liability as a matter of law and a legal conclusion so clear that it is appropriate for ruling on demurrer. This conclusion is further supported by a focused inquiry on how other published

authorities from California and elsewhere handle tort claims arising out of arguably similar circumstances, including other mass-shooting events and other situations where egregious intentional criminal conduct is a necessary part of the "but-for" causation string connecting the civil tort defendant to the injuries in question. The extreme criminality of the Shooter's conduct is highly relevant to a reasoned legal analysis and not some incidental fact. The cases favoring Meta's position are many. The cases favoring Plaintiffs' position are essentially nil.

Consider the following California precedents finding no liability upon defendants who allegedly "set the stage" for aggravated criminal action by a third party or for a decedent's suicide:

- *Bill v. Superior Court*, 137 Cal. App. 3d 1002 (1982) (movie producer not liable to patron shot by fellow patron near theater after viewing movie which allegedly stimulated shooter to act).
- *C.I. v. San Bernardino City Unified School District*, 82 Cal. App. 5th 974 (2022) (no liability for school district to students who were present when estranged husband killed his wife on campus in their presence).
- *Colonial Van & Storage, Inc. v. Superior Court*, 76 Cal. App. 5th 487 (2022) (no liability by employer to employee and business invitee where shooting of them occurred while attending off-site meeting in another employee's home).
- *Delgado v. American Multi-Cinema, Inc.*, 72 Cal. App. 4th 1403 (1999) (no liability by movie theater for fatal shooting of plaintiffs' child by thirteen-year-old customer following attendance at R-rated film screening, decided on demurrer).
- *Gonzalez v. Dernington*, 56 Cal. 2d 130 (1961) (no liability for sale of gasoline in open container to arsonists who used such fuel to set fire).
- *Hooks v. Southern California Permanente Medical Group*, 107 Cal. App. 3d 435 (1980) (no liability for wrongful death by throat slashing by midwife of mother delivering baby when midwife not employed by defendant at time of delivery/homicide even though defendant allegedly had reason to know of midwife's aberrant behavior).
- *Lopez v. McDonald's Corp.*, 193 Cal. App. 3d 495, 504 (1987) (fast-food restaurant's duties to patrons hurt and killed in high crime area did not include anticipation of "once-in-a-lifetime massacres").
- *McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989 (1988) (no liability to decedent's parents for suicidal death following minor's listening to "Suicide Solution," sold by defendant).
- *Thai v. Stang*, 214 Cal. App. 3d 1264 (1989) (no liability to plaintiff shot by drive-by shooting at defendant's roller rink due to alleged lack of adequate security).
- *Wiener v. Southcoast Childcare Centers, Inc.*, 32 Cal. 4th 1138 (2004) (no liability to

plaintiffs for the decedent children's death at child care center where driver intentionally drove through fence onto playground).

The following cases from other jurisdictions, while not controlling, demonstrate how loath courts are to share tort liability for homicidal massacres on others whose roles were prior and distinct from the actual fatal shots:

- *James v. Meow Media, Inc.*, 300 F.3d 683, 700 (6th Cir. 2002), *cert. denied*, 537 U.S. 1159 (2003) (mass shooting at school not attributable to video game makers because "the idiosyncratic nature of [the shooter's] reaction to the defendants' media would likely compel us to hold that his action constitutes a superseding cause").
- *Sanders v. Acclaim Entertainment, Inc.*, 188 F. Supp. 2d 1264 (D. Colo. 2002) (claim that video games trained shooters at Columbine not viable as shooters' behavior "was not a normal response to dissemination of movies and videos" such that shooters' "intentional violent acts were the superseding cause" of harm).
- *Yakubowicz v. Paramount Pictures Corp.*, 404 Mass. 624 (1989) (diluted version of *Bill*: no liability to plaintiff whose decedent was shot dead some miles from movie theater by a third-party who had seen defendant's allegedly violent movie).

Put up against this substantial body of law, the following two cases—one cited by Plaintiffs and one cited by Meta—are arguably on point:

- *Soto v. Bushmaster Firearms International, LLC*, 331 Conn. 53 (2019), *cert. denied*, 140 S. Ct. 513 (2019) (dismissal of negligence claim for wrongful death at Sandy Hook affirmed, only "one narrow legal theory," a statutory claim under Connecticut Unfair Trade Practices Act ("CUTPA") allowed to proceed).
- *Byers v. Edmondson*, 712 So. 2d 681,689-90 (La. Ct. App. 1998), *cert. denied*, 526 U.S. 1005 (1999) (cited by Defendants, not Plaintiffs, and holding that on the equivalent of a demurrer a claim by person shot as part of armed robbery can proceed against film producers for making *Natural Born Killers*, a violent film, because defendant allegedly intended to incite viewers to violence, an allegation not made here).

Neither citation supports a ruling for Plaintiffs. This is not a case under the CUPTA, as in *Soto*. Unlike *Byers*, there are no incitement arguments made here by Plaintiffs, doubtless because

that would raise Section 230 issues immediately. As to other citations by Plaintiffs, the Court takes no notice of unpublished trial court decisions. Further, the trial court decision in the Buffalo, New York, mass shooting case cited by Plaintiffs has since been reversed, as appropriately disclosed to the Court by Plaintiffs via a message board posting on July 30, 2025, but that makes it another authority supporting Meta's general position, particularly its Section 230 arguments. *See Patterson v. Meta Platforms, Inc.*, 2025 N.Y. App. Div. LEXIS 4403 (July 25, 2025).

The opioid case cited by Plaintiffs—*City & County of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610 (N.D. Cal. 2020)—is not on point as there is no intentional murderer involved in the chain of causation.

Put simply, there are no citable cases on point that have been brought to this Court's attention which support Plaintiffs' position that they can proceed in the face of this legal challenge. The actions of the Shooter were so central to what happened as compared to the alleged contribution of Meta to the chain of causation that it put Meta beyond the "scope of liability" and insulated from liability by reason of considerations of proximate cause. Further, on these allegations, Meta owed no affirmative duty to act for the protection of these Plaintiffs any more than it had a duty to act as to the rest of humanity. That Meta may be doing things hurtful to humanity for its own profit is not the question and not a substitute for reasoned legal analysis. No form of pleading amendment can overcome this core problem.

There is no reason to put Plaintiffs to the trouble of depositions and other expensive, sensitive, and possibly tedious discovery just to get to the same conclusion months or years from now. The Court is confident this is a legally correct decision, but a collateral benefit of making this ruling at this early stage of the proceeding is that Plaintiffs will have a right to test their theory with the Court of Appeal in short order.

## VII. ANALYSIS OF ANTI-SLAPP MOTION BY ACTIVISION

A defendant moving under Code of Civil Procedure section 425.16 needs to show that the claim challenged comes within the statute's terms, which described "a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances." Code Civ. Proc. § 425.16(a). Having stated the act's general purposes, the Legislature next defines the class of claims which can be challenged by such a motion: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." *Id.* § 425.16(b)(1). Since one then needs to better understand what kinds of activity are specially protected examples of free speech and public petitioning, the statute has three specific examples, followed by a "catch-all" provision:

> As used in this section, "act in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue" includes: (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

*Id.* § 425.16(e).

Read in context, the catch-all is not meant to protect any and every defamation suit from coverage and even less likely to cover a personal injury action where the theory of causation depends, as here, on the contents of a defendant's video game. There are legal standards for how

the "catch-all" under section 425.16(e) should be applied, but moving party conveniently failed to address them because they do not favor Activision's position. The controlling case is *FilmOn.com Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133 (2019). Applying the case-law under section 425.16 as it existed, the motion had been granted by the trial court and affirmed by the Court of Appeal, but the Supreme Court reversed, clarifying how the catch-all should be applied:

> The anti-SLAPP law was enacted "to **protect nonprofit corporations and common citizens** 'from large corporate entities and trade associations' in petitioning government." (*USA Waste of California, Inc. v. City of Irwindale* (2010) 184 Cal.App.4th 53, 66.) Attempting to protect against "lawsuits brought primarily to chill" the exercise of speech and petition rights, the Legislature embedded context into the statutory preamble, "declar[ing] that it is in the public interest to encourage continued participation in matters of public significance." (§ 425.16, subd. (a).)
>
> In the paradigmatic SLAPP suit, **a well-funded developer limits free expression by imposing litigation costs on citizens who protest, write letters, and distribute flyers in opposition to a local project.** (See Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1296 (1997–1998 Reg. Sess.) as amended June 23, 1997, pp. 2–3; Barker, Common-Law and Statutory Solutions to the Problem of SLAPPs (1993) 26 Loyola L.A. L.Rev. 395, 396.) Identifying the problem as one involving particular litigants, their motivations, and the effects of litigation, the Assembly Committee on Judiciary observed that approximately 25 percent of SLAPP suits "relate to development and zoning," while 20 percent "arise out of complaints against public officials and employees." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1296, supra, p. 3.)
>
> ***
>
> Admittedly, the catchall provision contains no similar contextual references to help courts discern the type of conduct and speech to protect. (See § 425.16, subd. (e)(4) ["any other conduct in furtherance of the exercise of the constitutional right . . . of free speech in connection with a public issue or an issue of public interest"].) But we interpret statutory language within its context, and in light of its structure, analogous provisions, and any other appropriate indicia of its purpose. (See *Poole v. Orange County Fire Authority* (2015) 61 Cal.4th 1378, 1385 [reading the statutory language in the context of its neighboring provisions]; *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 ["[T]he words must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible."].) Nothing in subdivision (e)(4) or other portions of the statute supports

the conclusion that subdivision (e)(4) is the only subdivision where contextual information is excluded from consideration in discerning the type of conduct and speech worthy of procedural protection.

**Indeed, that the language of the provision refers to "*other* conduct in furtherance" supports the inference that this provision encompasses conduct and speech similar to what is referenced in** section 425.16, subdivision (e)(1) through (3). (§ 425.16, subd. (e)(4), italics added; see *International Federation of Professional & Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 Cal.4th 319, 342 [explaining that where a statute lists a series of specific categories followed by a catchall category, the catchall is """restricted to those things that are similar to those which are enumerated specifically"""].)

***

So within the framework of section 425.16, subdivision (e)(4), **a court must consider the context as well as the content of a statement in determining whether that statement furthers the exercise of constitutional speech rights in connection with a matter of public interest.** Having established this principle, we now turn to analyzing how context should feature in a court's analysis under the catchall provision, and to applying that framework to the facts of this case.

Our courts have ably distilled the characteristics of "a public issue or an issue of public interest." (§ 425.16, subd. (e)(4); see *Rivero v. American Federation of State, County, and Municipal Employees, AFL-CIO* (2003) 105 Cal.App.4th 913, 919–924 (*Rivero*) [describing three nonexclusive categories of public interest]; *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132–1133 (*Weinberg*) [describing additional attributes of protected conduct].) But they have struggled—understandably—to articulate the requisite nexus between the challenged statements and the asserted issue of public interest—to give meaning, in other words, to the "in connection with" requirement. (§ 425.16, subd. (e)(4).)

Most often, courts strive to discern what the challenged speech is really "about"—a narrow, largely private dispute, for example, or the asserted issue of public interest. (See *Bikkina v. Mahadevan* (2015) 241 Cal.App.4th 70, 85 [193 Cal. Rptr. 3d 499] [defendant's speech was "about falsified data and plagiarism in two scientific papers, not about global warming"]; *World Financial Group, Inc. v. HBW Ins. & Financial Services, Inc.* (2009) 172 Cal.App.4th 1561, 1572 [defendants' attempts to solicit competitor's agents and customers were not "about" the public issues of "'workforce mobility and free competition'" or "'the pursuit of lawful employment'"]; *Mann v. Quality Old Time Service, Inc.* (2004) 120 Cal.App.4th 90, 111 [15 Cal. Rptr. 3d 215] [defendants' statements "were not about pollution or potential public health and safety issues in general, but about [the plaintiffs'] specific business practices"].) This focus on discerning a single topic of speech is less than satisfying; if the social media era has taught us anything, it is that speech is rarely "about" any single issue.

> **The inquiry under the catchall provision instead calls for a two-part analysis rooted in the statute's purpose and internal logic. First, we ask what "public issue or . . . issue of public interest" the speech in question implicates—a question we answer by looking to the content of the speech. (§ 425.16, subd. (e)(4).) Second, we ask what functional relationship exists between the speech and the public conversation about some matter of public interest.**

*FilmOn.com Inc.*, 7 Cal. 5th at 143-44, 149-50 (bold emphasis added). Plaintiffs rightfully criticize Activision for failing to acknowledge the centrality of *FilmOn.com Inc.* to the analysis while in its opening brief, citing only to earlier decisions from lower courts. The Court is no more persuaded by Activision's Reply, again citing to cases before 2019, the year when *FilmOn.com Inc.* was issued, and to a post-2019 decision involving a reality show, not a video game.

Activision describes its product in its moving papers (at page 13) as follows:

> *Call of Duty* is an award-winning military video game franchise. (Declaration of Patrick Kelly (Kelly Decl.) ¶¶ 5–7.) The games generally include two modes: campaign and multiplayer. (*Id.* ¶ 10.) Campaigns are linear, cinematic stories in which players engage in various missions to progress through an interactive storyline, like the protagonist in a literary work. (*Id.* ¶¶ 11–12.) Each campaign has an original plot, characters, dialogue, and musical soundtrack, and the stories explore well-trod literary themes, like sacrifice, defense of others, the moral complexities of war, and fighting against seemingly insurmountable odds. (*Id.* ¶¶ 7, 11–12.) In multi-player mode, players both compete against one another and work cooperatively to achieve common goals. (*Id.* ¶ 14.) Before beginning a multiplayer game, a player selects from an array of custom characters—each of whom has elaborate costumes and detailed physical features—and an environment, called a "map," that is meticulously designed by a team of artists. (*Ibid.*)

But as noted by Plaintiffs in their Opposition (at page 22), the Court does not have to accept moving party's framing of the issue. *See Geiser v. Kuhns*, 13 Cal. 5th 1238, 1253 (2022). Rather, the Court "should take the position of a reasonable, objective observer" to determine whether "a reasonable inference can be drawn that the challenged activity implicates a public

issue." *Id.* at 1254. As noted by Plaintiffs, the gravamen of their claims against Activision are not that it somehow promotes the Second Amendment of the United States Constitution with its products or their content. Rather, their claims are focused on "the copious evidence of Activision's marketing conduct," and the references to the content of *Call of Duty* are merely "evidentiary support or context for the claim." Opp'n at 22. For the very reason that Plaintiffs were consciously steering around likely First Amendment problems with their negligence claims, they structured their negligence claims to leverage off the alleged marketing activity of Activision, not the content of *Call of Duty*, as such. The gun-promoting and violence-promoting characteristics of *Call of Duty* are context only, not the gravamen of the claim.

The Court agrees with Plaintiffs' conclusions that these allegations do not satisfy either the first or second step of the currently applicable test given to us by *FilmOn.com Inc.* The earlier cases cited by Activision for a contrary holding are not persuasive as a correct statement of current law. More generally, the Anti-SLAPP law was not enacted to give a party in the posture of Activision the opportunity to make plaintiffs in the posture of these plaintiffs pay defense legal fees for bringing a claim for wrongful death and negligence.

Since the Activision motion fails at the starting gate, the Court does not directly address the merits of the pending claims against Activision. That will have to occur in the context of future motion practice.

## VIII. ANALYSIS OF ANTI-SLAPP MOTION BY META

As noted above at greater length regarding the Activision Anti-SLAPP motion, there is a two-step process for determining if the statute applies to the challenged claims. Like Activision, Meta relies on Code of Civil Procedure section 425.16(e)(4) for coverage, but it also invokes

section 425.16(e)(3), albeit without actually citing this subsection. The analysis above as to section 425.16(e)(4) is, of course, equally applicable here and will not be repeated. Additional commentary re section 425.16(e)(3) will be provided.

Meta describes its challenged service, Instagram, as follows in its memorandum at pages 5-6:

> Instagram is a public forum because it is a publicly accessible website. (See *Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 41 fn. 4 ["Web sites accessible to the public . . . are 'public forums' for purposes of the anti-SLAPP statute.'"]; *Cross v. Facebook, Inc.* (2017) 14 Cal.App.5th 190, 199 ["Facebook's website and the Facebook pages at issue are 'public forums[.]'"].) Plaintiffs' claims arise from two forms of protected activity.

As noted previously, the Court and Plaintiffs do not need to accept Defendant/Moving Party's framing of the issue presented. Plaintiffs' response on this issue is fully persuasive, for which reason Plaintiffs' Opposition is quoted verbatim at pages 17-18 (with footnotes omitted and bold emphasis added):

> It is Meta's burden to establish that these provisions apply to the plaintiffs' claims. See *Rand Res., LLC v. City of Carson*, 6 Cal. 5th 610, 626 (2019). Specifically, after identifying the allegations and claims that it argues are protected (which, again, Meta failed properly to do), Meta must demonstrate that "the conduct by which plaintiff claims to have been injured falls within one of the four categories described [in section 425.16], and that the plaintiff's claims in fact arise from that conduct." *Rand Resources, LLC,* 6 Cal. 5th at 620 (emphasis in original). In addressing the "arise from" requirement, the Supreme Court has explained that **"a claim is not subject to a motion to strike simply because it contests an action or decision that was arrived at following speech or petitioning activity. . . . Rather, a claim may be struck only if the speech or petitioning activity itself is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted."** *Park v. Bd. of Trustees of California State Univ.*, 2 Cal. 5th 1057, 1060 (2017) (emphasis in original). Accordingly, "[t]he mere fact that an action was filed after protected activity took place does not mean the action arose from that activity for the purposes of the anti-

> SLAPP statute . . . [because] suit may be in response to or in retaliation for protected activity without necessarily arising from it . . . . Instead, **the focus is on determining what "the defendant's activity [is] that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning.**" *Id.* at 1063 (emphasis added).
>
> Here, Meta's "activity . . . that gives rise to [its] asserted liability" includes **(1) using its algorithm to encourage and enhance the wrongful and unlawful nature of Daniel Defense's advertisements, (2) conspiring with Daniel Defense to advertise firearms to minors for violence and criminal assaults, and (3) aiding and abetting Daniel Defense in advertising firearms to minors for violence and criminal assaults.** Meta cannot establish that "that activity constitutes protected speech or petitioning." *Park*, 2 Cal. 5th at 1063.
>
> First, that activity is not protected under § 425.16(e)(3), which would require Meta to establish that the plaintiffs' claims "arise from" "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest." *Id.* Although it is Meta's burden to do so, **it has not identified any "written or oral statement or writing" it is alleged to have made, let alone one "made in a public forum in connection with an issue of public interest," and from which the plaintiffs' claims "arise." § 425.16(e)(3). The plaintiffs' claims arise from, among other things, Meta's conduct in using its algorithm and aiding and abetting and conspiring with Daniel Defense.**
>
> Second, Meta cannot establish that these claims arise from any activity protected under § 425.16(e)(4), which would require establishing that the claims "arise from" "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." *Id.* **Meta's use of an algorithm that encourages and rewards violent and criminal firearms advertisements purely for profit (and not because Meta has any opinions about the value or appropriateness of firearms content), is not speech.** See *Bonni,* 11 Cal. 5th at 1021

For the very reason that Plaintiffs were consciously steering around likely Section 230 and First Amendment problems with their negligence claims, they structured their negligence claims to leverage off the alleged pernicious algorithm powering Instagram's website, not the content of "soft" gun advertising, as such. The challenged conduct of Meta giving rise to these claims thus does not come within the coverage of the Anti-SLAPP statute, for which reason the motion must be denied. More generally, the Anti-SLAPP law was not enacted to give a party in the posture of

Meta the opportunity to make plaintiffs in the posture of these plaintiffs pay defense legal fees for bringing a claim for wrongful death and negligence. Since Meta prevailed on the demurrer, one cannot, however, say that this motion was frivolous or solely intended to cause delay.

Since the motion is denied, there is no need for Plaintiffs to get a continuance of the motion for discovery or to get the requested discovery.

## IX. CONCLUSION AND NEXT STEPS

Meta is entitled to entry of judgment on its successful demurrer, including its allowable costs. Meta is ordered to serve and file a [Proposed] Judgment by September 24, 2025. Meta's Anti-SLAPP motion is denied, but the Court finds that it was not "frivolous or . . . solely intended to cause unnecessary delay," for which reason no fees or costs are awarded to Plaintiffs.

Activision's Anti-SLAPP motion is denied, but the Court finds that it was not "frivolous or . . . solely intended to cause unnecessary delay," for which reason no fees or costs are awarded to Plaintiffs. Activision can notice a demurrer or motion for judgment on the pleadings for hearing.

**IT IS SO ORDERED.**

Dated: September 5, 2025

William F. Highberger / Judge

HON. WILLIAM F. HIGHBERGER
JUDGE OF THE SUPERIOR COURT