Serena M. Orloff, State Bar No. 260888
LEHOTSKY COHN LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
serena@lehotskycohn.com

*Attorney for Amicus Curiae NetChoice*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

**In re Tumbler Ridge Shooting**

Lead Case No. 3:26-cv-03701-JSC

**NETCHOICE'S UNOPPOSED MOTION FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS (ECF 85)**

The Honorable Jacqueline Scott Corley

Date: tbd

Time: tbd

Location: Courtroom 8, 19th Floor

## NOTICE OF MOTION

PLEASE TAKE NOTICE that as soon as the matter may be heard, before the Honorable Jacqueline Scott Corley, of the United States District Court for the Northern District of California, in Courtroom 8, on the 19th floor of the Phillip Burton Federal Building, 450 Golden Gate Avenue, San Francisco, CA 94102, NetChoice will and hereby does respectfully move for leave to file the proposed amicus curiae brief, attached hereto as Exhibit A, in support of Defendants' Motion to Dismiss (ECF 85), set to be heard on February 11, 2027, at 10:00 a.m. PT. NetChoice's counsel conferred with Plaintiffs' counsel. Plaintiffs do *not* oppose the relief requested in this motion. A proposed order is included with this motion.

**Intent to submit motion without hearing.** NetChoice respectfully requests that the Court decide this motion without oral argument, in accordance with Civil Local Rule 7-1(b).

## RELIEF SOUGHT

NetChoice respectfully requests leave to appear as amicus curiae and file a brief in support of Defendants' Motion to Dismiss (ECF 85).

## ISSUE PRESENTED

The issue presented is whether the Court should grant NetChoice leave to file the accompanying proposed amicus brief.

## CORPORATE DISCLOSURE STATEMENT

NetChoice certifies that it has no parent corporation and that no publicly held company owns 10% or more of its stock.

No counsel for any party authored the accompanying brief in whole or in part, and no entity or person, aside from amicus curiae, its members, or its counsel, made any monetary contribution intended to fund the preparation or submission of the brief. Although Defendant OpenAI is a NetChoice member, OpenAI did not contribute money that was intended to fund preparing or submitting the brief.

## IDENTITY AND INTEREST OF AMICUS CURIAE

Amicus has a substantial interest in this case because it raises important questions about how courts should address claims against developers of generative artificial intelligence services.

These questions could significantly affect expressive and informational innovation in the digital economy and society writ large.

NetChoice is a national trade association of online businesses that share the goal of promoting free enterprise and free expression on the internet. A list of NetChoice's members is available at https://perma.cc/9SMA-AXXB. NetChoice fights to ensure the internet remains innovative and free. Toward those ends, NetChoice engages in litigation, amicus curiae work, and political advocacy. NetChoice defends expressive technologies from lawsuits or regulations that violate the First Amendment.

The First Amendment implications of this case extend beyond one user and one set of generative AI outputs. The Constitution ensures that every stage of the speech process receives the First Amendment's protections. These protections apply to creating speech, distributing it, and receiving it. Imposing liability for any of those stages in the speech process threatens free expression and free thought. NetChoice submits this amicus brief to explain the First Amendment interests that all Americans have in continued access to useful generative AI services.

**ARGUMENT**

This case concerns the First Amendment's age-old protections and their application to a novel and evolving technology: generative AI. In just the last few years, generative AI has gone from an obscure novelty available to a handful of researchers to a key way that many millions of Americans look for information and create speech. For users, generative AI services offer an immediately accessible way of finding, engaging with, and creating protected First Amendment speech, ideas, and information. Users request information, creative assistance, or analytical insights. And generative AI systems respond by synthesizing information and generating text, code, translations, or other content tailored to users' expressive needs. This interactive process mirrors traditional forms of expression like research assistance, editorial feedback, and collaborative writing.

To be sure, as in other speech contexts, the First Amendment does not necessarily protect generative AI outputs from liability in every circumstance. After all, a printing press or television studio can be used to create or disseminate unprotected speech for which courts can impose

liability. But liability for defamatory material, for instance, conveyed via a pamphlet or cable news show must comport with the First Amendment's protections for *others'* use of those media of expression. Such liability should not threaten other people's ability to report the news or create a protest sign. *E.g.*, *United States v. Alvarez*, 567 U.S. 709, 719-20 (2012) (plurality op.) ("The requirements of a knowing falsehood or reckless disregard for the truth as the condition for recovery in certain defamation cases *exists to allow more speech, not less*." (emphasis added)).

The First Amendment's technologically neutral rules should apply the same way here. There is a risk that imposing liability for any given output or based on any single user's experience threatens the productive use of generative AI for all. Faced with possible liability every time similar output is generated, providers will predictably change, restrict, or withdraw features across the whole service. As a result, even one adverse judgment could have an outsized effect on millions of users' speech interests. The Supreme Court identified decades ago that just one private entity's "self-censorship" can become "a censorship affecting the whole public." *Smith v. California*, 361 U.S. 147, 154 (1959).

The brief will help the Court resolve Defendants' motion by explaining two ways in which the claims and requests for relief in this case implicate First Amendment interests held by *other* generative AI users.

*First*, generative AI users have a First Amendment right to *access* information. People use generative AI for varied information-seeking reasons: as a search engine, to summarize or contextualize complex documents, or to help visualize data and concepts.

*Second*, generative AI users have a First Amendment right to access tools used to *create* speech. People use generative AI to aid in their own speech, as a brainstorming partner, editor, first drafter, or designer. Generative AI can help draft blog posts, write computer code, translate documents, generate marketing copy, create educational materials, grade papers, and analyze complex datasets.

The claims in this case have potentially broad consequences for the First Amendment rights of all American generative AI users. The Court should take those consequences into account in resolving this case.

## CONCLUSION

NetChoice respectfully requests leave to file the accompanying proposed amicus brief.

Dated: November 23, 2026

Respectfully submitted,

/s/ *Serena M. Orloff*
Serena M. Orloff, State Bar No. 260888
LEHOTSKY COHN LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
serena@lehotskycohn.com

*Attorney for Amicus Curiae NetChoice*