DANIEL S. ALTER (SBN NY2472264)
Email: danielalter@broadfieldlaw.com
BROADFIELD USA LLP
488 Madison Ave., 22nd Floor
New York, NY 10022-5704
Telephone: (212) 390-1256
*Admission Pro Hac Vice Pending

JOHN C. STASER (SBN 294643)
Email: jstaser@troygould.com
TROYGOULD PC
1801 Century Park East, 16th Floor
Los Angeles, CA 90067-2367
Telephone: (310) 553-4441
Facsimile: (310) 201-4746

Attorneys for Amicus Curiae
Chamber for Progress

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| In Re: Tumble Ridge Shooting Litigation<br><br>MARK STACEY, individually, and as successor-in-interest to decedent SHANNDA AVIUGANA-DURAND, ,<br><br>Plaintiff,<br><br>v.<br><br>SAMUEL ALTMAN, an individual; OPENAI FOUNDATION, a Delaware corporation; OPENAI OPCO, LLC, a Delaware limited liability company; and OPENAI GROUP PBC, a Delaware public benefit corporation, ,<br><br>Defendants. | Case No. 3:26-cv-03701-JSC<br>(<br>Related to Case No. :<br><br>3:26−cv−03702−JSC<br>3:26−cv−03703−JSC<br>3:26−cv−03704−JSC<br>3:26−cv−03705−JSC<br>3:26−cv−03706−JSC<br>3:26−cv−03707−JSC<br>3:26−cv−09342−JSC<br>3:26−cv−09343−JSC<br>3:26−cv−09344−JSC<br>3:26−cv−09345−JSC<br>3:26−cv−09346−JSC<br>3:26−cv−09347−JSC<br>3:26−cv−09348−JSC<br>3:26−cv−09349−JSC<br>3:26−cv−09350−JSC |

His Majesty the King in Right of the Province of British Columbia; and Board of Education of School District No. 59 (Peace River South),

Plaintiffs,

v.

SAMUEL ALTMAN, an individual; OPENAI FOUNDATION, a Delaware corporation; OPENAI OPCO, LLC, a Delaware limited liability company; and OPENAI GROUP PBC, a Delaware public benefit corporation, ,,

Defendants.

---

Dow Jones & Company, Inc.,

Applicant for Intervention.

---

AND RELATED CASES.

3:26−cv−09351−JSC
3:26−cv−09352−JSC
3:26−cv−09353−JSC
3:26−cv−09354−JSC
3:26−cv−09355−JSC
3:26−cv−09356−JSC
3:26−cv−09357−JSC
3:26−cv−09358−JSC
3:26−cv−09359−JSC
3:26−cv−09360−JSC
3:26−cv−09362−JSC
3:26−cv−09363−JSC
3:26−cv−09366−JSC
3:26−cv−09367−JSC
3:26−cv−09368−JSC
3:26−cv−09369−JSC
3:26−cv−09370−JSC
3:26−cv−09372−JSC
3:26−cv−09373−JSC
3:26−cv−09377−JSC
3:26−cv−09378−JSC
3:26−cv−10743−JSC
3:26−cv−12820−JSC
3:26−cv−12823−JSC
3:26−cv−12826−JSC)

**STATEMENT OF INTEREST OF AMICUS CURIAE**

Judge Jacqueline Scott Corley

Complaint Filed: April 29, 2026

Chamber of Progress is a technology-industry coalition devoted to a progressive society, economy, workforce, and consumer climate (the "Chamber"). It supports public policies that promote innovation and economic growth, protect internet freedom and free expression, and help ensure that the benefits of technological progress are broadly shared. The Chamber is supported by corporate partners, but those partners do not sit on its board, do not vote on or veto its positions, and may disagree with positions the organization takes. The Chamber does not speak for any individual partner company.

A paradigm shift in expressive technologies often raises complex and important issues in American law. Policies governing communications can significantly boost or stunt important

developments in political activity, entertainment, and education – just to name a few cultural pillars that draw strength from the open exchange of ideas. Thus, among other scientific advances, the arrivals of motion pictures, television, and the Internet have all engendered regulatory challenges for rulemaking bodies to resolve, in part, by building upon prior experiences.

We are undergoing that sort of transformation now. The recent advent of artificial intelligence ("AI") has revolutionized the science of data sharing, and this case poses concomitant legal questions, to wit: (1) are the communications generated between AI chatbots and their users shielded by the First Amendment; and (2) if so, what is the scope of that constitutional protection?

Those weighty concerns arise here in a calamitous tort case. In 2026, a deranged young woman viciously attacked the middle school in Tumbler Ridge, British Columbia. She walked onto the campus during a school day and opened fire on students, faculty and staff. Her rampage killed a staff member and several children, wounded many more people, and immeasurably traumatized an entire community. Before the shooting, the killer had repeatedly communicated about her plans with a commercial AI chatbot known as ChatGPT.

In these related cases, His Majesty the King in Right of the Province of British Columbia, the Board of Education of School District No 59, and Mark Stacey (collectively "plaintiffs") seek to hold the OpenAI Foundation, its affiliated companies, and its creator Samuel Altman (collectively, "OpenAI") – the designers and operators of ChatGPT – liable in damages. Their claims are all based on theories of negligence or strict products liability (the "Tort Claims"). But the litigation is far more complicated than that superficial description might suggest. To the extent plaintiffs seek damages because the substance of ChatGPT's responses allegedly encouraged the user's violence, their claims ask the Court to impose liability for the communicative effects of expression. Pleading that theory as negligence or strict products liability does not eliminate the First Amendment inquiry.

The cases could proceed in one of two ways. The Court might dismiss them on state-law grounds alone, never reaching the federal constitutional questions implicated by the circumstances. But if the Court does move forward to resolve plaintiffs' tort actions, there will be a battery of serious First Amendment considerations with which to contend. The Chamber therefore respectfully submits this brief, *amicus curiae*, to assist the Court in reckoning with the free-speech concerns embedded in that challenge.

## ARGUMENT

### POINT I

### THE TORT CLAIMS DISCRIMINATE AGAINST AI CHABOT COMMUNICATIONS ON THE BASIS OF CONTENT

It is important to view this case within a dynamic context. Contemporary mechanisms for sharing information are in rapid flux, and, as always, the law must play catch up. In similar situations, the Supreme Court has consistently instructed that the judiciary take a cautious, incremental approach when placing constitutional constraints on developing technologies. *See Tik Tok Inc. v. Garland*, 604 U.S. 56, 62 (2025). The "dizzying transformation" of the digital world continuously delivers "novel services" that "make our lives better[] and make them worse," and which "create unparalleled opportunities and unprecedented dangers." *Moody v. NetChoice, LLC*, 603 U.S. 707, 716 (2024). And because we are experiencing a scientific "revolution of historic proportions, . . . courts must be conscious what they say today might be obsolete tomorrow." *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017); *see also Tik Tok*, 604 U.S. at 62 (when applying "established legal rules" to "totally new problems" posed by technological progress, courts "should take care not to embarrass the future" (cleaned up)).

Yet "whatever the challenges of applying the Constitution to ever-advancing technology, the basic principles of freedom of speech and the press, like the First Amendment's command, do not vary." *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 790 (2011) (cleaned up). That

assurance holds even though "[n]ew technologies, all too soon, can become instruments used to commit serious crimes." *Packingham*, 582 U.S. at 107.

**A. The Tort Claims Directly Target Expression**

Plaintiffs seek damages from OpenAI because ChatGPT communicated numerous *messages* to a deranged person that allegedly provoked her to commit mass murder. In plaintiffs' own words, ChatGPT engaged in "sadistic conversations"[1] with the killer that "guided a teenager through planning a mass shooting."[2] By plaintiffs' own description, then, those communications transmitted ideas, albeit violent ones.

Plaintiffs try in two similar ways, however, to characterize those messages as some kind of diminished form of discourse. First, plaintiffs contend that AI chatbots are "designed to simulate human conversation," and that when a chatbot converses with a user "there is no human on the other end that participates directly in the exchange."[3] Second, plaintiffs describe ChatGBT "as a mass-market consumer product"[4] that "is not a passive conduit for the speech of others,"[5] but rather a "defective product [that] generated the injurious content itself."[6] Both observations imply that the communications generated by ChatGPT somehow lack expressive substance because they are automated and "no third-party content lies in the causal chain between the defective design and the harm."[7]

---

[1] First Amended Complaint, *His Majesty the King in Right of the Province of British Columbia v. Altman*, Case No. 26-cv-10743-JSC (N.D. Ca.) ("Crown FAC"), ¶ 204.

[2] First Amended Complaint, *Stacey v. Altman*, Case No. 26-cv-03701-JSC (N.D. Ca.) "Stacey FAC"), ¶ 154.

[3] *Id.* at ¶ 154.

[4] Crown FAC, ¶ 143

[5] *Id.* at ¶ 211

[6] *Id.* at ¶ 251

[7] *Id.*

Still, without debating that proposition, plaintiffs' assumption falls short. It fails to acknowledge that the "First Amendment protects speech for the sake of both the speaker *and the recipient*." *Thunder Studios, Inc. v. Kazi*, 13 F.4th 736, 743 (9th Cir. 2021) (emphasis added), *cert. denied sub nom. David v. Kazel*, 142 S. Ct. 1674 (2022). As the Supreme Court has repeatedly stated, it "is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences." *Kleindienst v. Mandel*, 408 U.S. 753, 763 (1972) (internal quotation marks omitted). And specifically, because "the Constitution protects the right to receive information and ideas," chatbot *users* are legally entitled to receive AI generated messages – regardless of "their social worth." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).

That conclusion derives from basic constitutional precepts. "A fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham*, 582 U.S. at 104. AI chatbots are new participants in that invaluable exchange. They offer a forum in which users can "engage in a wide array of protected First Amendment activity on topics as diverse as human thought." *Id.* at 105 (internal quotation marks omitted). As such, they are indivisible from the very human expression that they prompt and are prompted by. *Cf. Moody*, 603 U.S. at 716 ("To the extent that social media platforms create expressive products, they receive First Amendment protection.").

**B. The Tort Claims Penalize Expression Based on Its Content**

In all but the rarest circumstances, the First Amendment guarantees that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 470 (2025) (internal quotation marks omitted). Speech excluded from that bedrock protection has been "confined to the few historic and traditional categories of expression long familiar to the bar," including "advocacy intended, and likely to incite imminent lawless action, obscenity, defamation, speech integral to criminal conduct, so-called

fighting words, child pornography, fraud, and true threats." *U.S. v. Alvarez*, 567 U.S. 709, 717 (2012) (cleaned up). Apart from those "narrow and well-understood exceptions," though, *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 643 (1994), content-based restrictions on speech "are presumptively unconstitutional," *Tik Tok*, 604 U.S. at 70 (internal quotation marks omitted); *see also U.S. v. Stevens*, 559 U.S. 460, 468 (2010) (same).

Such restrictions can take many forms, including a common law action for damages. *See, e.g., Snyder v. Phelps*, 562 U.S. 443, 450 (2011) (involving claims for "intentional infliction of emotional distress, intrusion upon seclusion, and civil conspiracy"); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 49 (1988) (involving claims for "libel, invasion of privacy, and intentional infliction of emotional distress"). "And while the common-law remedy is limited to damages, a liability award can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *Reigel v. Medtronic, Inc.*, 552 U.S. 312, 326 (2008) (internal quotation marks omitted). The Supreme Court acknowledged long ago that "the pall of fear and timidity imposed" by money judgments can have a dangerously censorial impact. *New York Times Co. v. Sullivan*, 376 U.S. 254, 278 (1964); *see also Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986) ("private suit for damages" can have "similar" chilling effect as "government's direct enforcement" of speech restriction). Specifically, to avoid that outcome, the First Amendment "can serve as a defense in state tort suits." *Snyder*, 562 U.S. at 451.

The defense exists because a court that imposes common-law liability exercises state power just as surely as a legislature that enacts a statute. It "matters not" that a rule of law "has been applied in a civil action and that it is common law only[.] . . . [The] test is not the form in which the state power has been applied but, whatever for, whether such power has in fact been exercised." *Sullivan*, 376 U.S. at 265. Thus, "[w]hat a State may not constitutionally bring about by means of a criminal statute is likewise beyond the reach of its civil law of libel." *Id,* at 277.

The same is true for every other tort. The Supreme Court has enforced that limit against claims for intentional infliction of emotional distress, *see Snyder*, 562 U.S. at 459; *Hustler*, 485 U.S. at 56, and against tort liability for businesses losses caused by a boycott, *see NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 916-17 (1982) ("the presence of activity protected by the First Amendment imposes restraints on the grounds that may give rise to damages liability").[8] And where the First Amendment applies, it can be an absolute bar, not just one more factor for the jury to weigh. *See Snyder*, 562 U.S. at 458-59 (First Amendment protection "cannot be overcome by a [subjective] jury finding").

Here, plaintiffs' have carefully pled their actions as targeting OpenAI's allegedly negligent *conduct* regarding a defective *product* but have avoided designating any expressive activity, *per se*, as underlying their claims. They are apparently attempting to separate – as best as possible – OpenAI's manufacturing and management operations from ChatGPT's substantive communications. Stated simply, for liability purposes, plaintiffs want to focus on OpenAI's alleged business misconduct, not the dialogue generated by its chatbot.

That effort collapses, however, under the weight of plaintiffs' own pleadings. They describe ChatGPT as "a *content*-generating product that manufactured *scenarios involving gun violence*."[9] They further claim that the chatbot's message "*validat[ed]* and *encourage[d]* violent planning."[10] But those allegations only show that plaintiffs liability theory, "on its face, discriminates based on content." *Turner Broadcasting Sys.*, 512 U.S. at 642-43; *see also James v. Meow Media, Inc.*, 300 F.3d 683, 695 (6th Cir. 2002) ("Although the defendants' products may be a mixture of expressive

---

8 The specific cause of action does not matter because "{the First Amendment is no word game" and the rights it protects "cannot be renamed away or their protections nullified by mere labels. *Chiles v. Salazar*, 607 U.S. 627, 645 (2026) (internal quotation marks omitted).

9 *Id.* at ¶ 211(emphasis added); *see also id.* 144 (ChatGPT "generated the *content at issue* (emphasis added)).

10 Stacey FAC, ¶ 257

and inert content, the plaintiffs' theory of liability isolates the expressive content of the defendants' products."), *cert. denied* 537 U.S. 1159 (2003). And by faulting ChatGPT for generating messages specifically in support of gun violence, plaintiffs go "even beyond mere content discrimination, to actual viewpoint discrimination," *RAV v. City of St. Paul*, 505 U.S. 377, 391 (1992), which is "an egregious form of content discrimination," *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

In any event, even "a facially content-neutral [restriction] is nonetheless treated as a content-based regulation of speech if it cannot be justified without reference to the content of the regulated speech." *Tik Tok, Inc.* 604 U.S. at 70 (internal quotation marks omitted). Again, the Tort Claims are justified *only* by reference to the violent communications allegedly generated by ChatGPT. Although the publicly accessible pleadings are extensively redacted, it is obvious from the available text that every asserted cause of action is firmly rooted in the subject and viewpoint of the chatbot's "sadistic conversations"[11] – communications that plaintiffs contend were "a substantial factor in maintaining, deepening, and normalizing [the killer's] violent thoughts and in moving her closer to committing the Tumbler Ridge attack."[12]

In short, but for the ideas expressed in those messages, there would be *no* Tort Claims. That observation should foreclose debate. By any "commonsense meaning of the phrase," the Tort Claims are "'content based.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). And "[b]ecause the plaintiffs' seek to attach tort liability to the communicative aspect" of ChatGPT, the Court should have "very little difficulty in holding that the First Amendment protects" AI generated messages "in the sense uniquely relevant to this lawsuit." *James*, 300 F.3d at 696 (content of video games that

---

[11] Crown FAC, ¶ 204

[12] Stacey FAC, ¶ 289

allegedly communicated "a disregard for human life and an endorsement of violence that persuaded" student to shoot and kill classmates was constitutionally protected expression).

**POINT II**

**THE COURT SHOULD APPLY STRICT SCRUTINY TO DETERMINE IF THE TORT CLAIMS ARE BARRED BY THE FIRST AMENDMENT**

The next step in the analysis is largely predetermined. Content-based restrictions on speech can be "justified only if they satisfy strict scrutiny" – that is, only if they are "the least restrictive means of achieving a compelling state interest." *Free Speech Coalition, Inc.*, 606 U.S. at 471 (internal quotation marks omitted); *see also Tik Tok Inc.*, 604 U.S. at 70 (same). "Strict scrutiny" has been described as "*unforgiving* because it is the standard for reviewing the direct targeting of fully protected speech." *Free Speech Coalition, Inc.*, 606 U.S. at 484 (emphasis added). As the most aggressive safeguard for free expression, strict scrutiny demands that the "chosen restriction on speech be 'actually necessary' to achieve its interest." *Alvarez*, 567 U.S. at 725 (quoting *Brown*, 564 U.S. at 799). It is therefore "rare that a regulation restricting speech because of its content will ever be permissible." *Id.* (internal quotation marks omitted); *see also Free Speech Coalition, Inc.*, 606 U.S. at 485 (strict scrutiny can stop content-based discrimination "if and only if, as a practical matter, it is fatal in fact absent truly extraordinary circumstances").

**A. The Tort Claims Do Not Survive Strict Scrutiny**

Whether the Torts Claims satisfy the first element of strict scrutiny, *i.e.*, serve a compelling state interest,[13] is not determinative here because they clearly founder on the second element. *See*

---

[13] There are several compelling state interests that plaintiffs might invoke in defense of the Tort For example, the state generally has a compelling interest in protecting the populace from criminal activity, *see Shall v. Martin,* 467 U.S. 253, 264 (1984), and specifically "in protecting the physical and psychological well-being of minors," *Sable Comms. of California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989). The state also "has a compelling interest in ensuring that victims of a crime are compensated by those who harm them," *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 118 (1991), as well as a "substantial interest in protecting its (Continued...)

*Dex Media West, Inc. v. City of* Seattle, 696 F.3d 952, 965-66 (9th Cir. 2012) (court "need not determine whether any or all of the [the proposed] interests are 'compelling'" because, "even if they are, the [law] is not the least restrictive means to further them"). On the face of plaintiffs' redacted pleadings alone, the Tort Claims are clearly not properly tailored to pass constitutional muster. They lack the tight connection between the injury averred and remedy sought that the First Amendment demands.[14]

When applying strict scrutiny, the Supreme Court has time and again instructed that "[i]t is not enough to show that the [law's] ends are compelling; the means must be carefully tailored to achieve those ends." *Sable Comms. of California*, 492 U.S. at 126; *see also Alvarez*, 567 U.S. at 725 ("to recite the . . . compelling interests is not to end the matter"). That standard is designed to makes exacting demands. For instance, and perhaps the most pertinent criterion here, strict scrutiny requires "a *direct causal link* between the restriction imposed and the injury to be prevented." *Alvarez*, 567 U.S. at 725 (emphasis added).

---

citizens from" from outrageous emotional abuse, *English v. General Elec. Co.*, 496 U.S. 72, 83 (1990). But none of those interests can overcome the Tort Claims' lack of close tailoring.

[14] Previously, courts analyzed tort cases involving the alleged impact of violent expression on individuals by applying the "incitement" standard articulated in *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) ("the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action"). Those cases usually failed because the violent or dangerous speech at issue was neither intended and/or did not create imminent harm. *See, e.g., Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1021 (5th Cir. 1987) (affirming judgment dismissing claim that article resulting in accidental death of teenager was not an incitement), *cert. denied* 485 U.S. 959 (1988); *Wilson v. Midway Games, Inc.*, 198 F. Supp.2d 167, 182 (D. Conn. 1992) (dismissing plaintiff's tort claims based on video game's alleged contribution to child's murder because challenged violent expression did not constitute incitement). One scholar has argued that the incitement standard should be inapplicable in these sorts of violent speech cases specifically because the speaker almost never has the intent to cause harm and any harm that ensues is almost never imminent. *See* Deana Pollard Sacks, *Constitutionalized Negligence*, 89 Wash. U. L. Rev. 1065, 1114-17 (2012) ("*Constitutionalized Negligence*"). She also concluded that the Supreme Court's "causation analysis" in *Brown* has made clear that "the incitement test is not the proper test for analyzing the constitutionality of regulating violent video games." *Id.* at 1117.

Nor will strict scrutiny tolerate speech-restrictive measures that are underinclusive, thereby leaving untouched much of the targeted problem at which they supposedly take aim. *See Reed*, 576 U.S. at 172; *Republican Party of Minnesota v. White*, 536 U.S. 765, 780 (2002). Similarly, it will not abide overbroad restrictions that suppress more speech than is necessary to achieve its intended goal – much like "burning a house to roast a pig." *Sable Comms. of California*, 492 U.S. at 131 (internal quotation marks omitted).

Through the lens of strict scrutiny, the Tort Claims and their judicial resolution exhibit both causal and underbreadth vulnerabilities.

### B. The Harms Alleged by the Tort Claims Are Likely Too Attenuated from the Communications Generated by ChatGPT

In the first instance, plaintiffs will have to prove that the communications between the killer and ChatGPT were the direct cause of the school shooting such that damages actions are "actually necessary to the solution." *Brown*, 564 U.S. at 799. No question, the case will require extensive factual development on that issue, but it will not be enough for plaintiffs to show that the violent communications at issue "might" have caused the harms they suffered. *Alvarez*, 567 U.S. at 726 (invalidating criminal statute where "link between the Government's interest in protecting the integrity of the military honors system and the Act's restriction on the false claims of liars" had not been shown). "[A]mbiguous proof will not suffice," *Brown*, 564 U.S. at 800, and "if the causal link is contingent and indirect," the Tort Claims should not survive strict scrutiny, *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 250 (2002).

*Brown* provides helpful guidance. There, the Court invalidated a state statute that imposed restrictions and labeling requirements on the sale or rental of violent video games to minors. *See Brown*, 564 U.S. at 789. Subjecting the statute to strict scrutiny, the Court concluded that the state's evidence was "not compelling" and failed "to show a connection between exposure to violent video games and harmful effects on children." *Id.* at 800. In rejecting the sufficiency of the psychological

research before it, the Court observed that it did "not prove that the violent video games *cause* minors to *act* aggressively," but was instead merely "based on correlation." *Id.* (internal quotation marks omitted).

*Ashcroft* is similarly instructive. There, Congress had criminalized the dissemination of virtual child pornography, that is, "sexually explicit images that appear to depict minors but were produced without using any real children." 535 U.S. at 239. The Government defended the statute, in part, by arguing that virtual child pornography could "lead to instances of child abuse." *Id.* at 250. The Court was unpersuaded, however, because the harm that the statute sought to avoid did "not necessarily follow from the speech, but depend[ed] upon some unqualified potential for subsequent criminal acts." *Id.*

The same can be said for the alleged relationship between AI generated messages and mass shootings. Because chatbot communications are not "intrinsically related" to physical assaults because they "record[] no crime and create[] no victims by [their] production," the close causal connection required by strict scrutiny is presumably absent. *Ashcroft*, 535 U.S. at 250 (internal quotation marks omitted). Besides, demonstrating that the judicial administration of private actions like the Tort Claims is an "'actual necessity'" in protecting the public from mentally unstable chatbot users, *Alvarez,* 567 U.S. at 725 (quoting *Brown*, 564 U.S. at 799), or even compensating their victims, would be an elusive goal – especially when legislators and regulators have yet to address the problems, *cf. id*. at 729 (striking statue criminalizing falsely presenting as recipient of military medal as unconstitutional where Government could establish online database identifying true recipients).

**C. The Tort Claims Are Underinclusive**

To survive strict scrutiny, the Tort Claims' adjudication must also overcome another considerable flaw. Their legal theories are fundamentally underinclusive. The media market offers

a substantial supply of books, movies, and songs that narrate stories of mass shootings from the disturbing perspectives of homicidal characters.[15] Plaintiffs were not obligated to sue every other source of violent media that the killer consumed. But having targeted only AI-generated content plaintiffs must show that AI-generated content, and not the other sources, caused the harm. Plaintiffs attempt to fill that causal gap by alleging that ChatGPT communications are intimately and uniquely engaging and manipulate users through "sycophancy."[16] Whether plaintiffs can legally distinguish the effect AI technology from that of other media, however, is at best doubtful. *See Minneapolis Star and Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 585 (1983) ("differential treatment, unless justified by some special characteristic of the [medium] suggests that the goal of the regulation is not unrelated to suppression of expression, and such a goal is presumptively unconstitutional").

Consider *Brown* again, where the Supreme Court held that the challenged age restriction on distributing violent video games failed strict scrutiny because it was "wildly underinclusive." 564 U.S. at 802. There, the regulation "singled out the purveyors of video games for disfavored treatment – at least when compared to booksellers, cartoonists, and movie producers." *Id.* The underinclusiveness followed from a failure of proof because the state could not show a "direct causal link" between video games and harm to minors. *Id.* at 799. The state therefore tried to justify the statute's age restrictions, claiming that video games are more "interactive" than other communications media and thereby more readily "enable participation in the violent action" by children. *Id.* at 798. Writing for the Court, Justice Scalia dismissed that rationale, reasoning that "all

---

[15] *See, e.g.,* Jim Shepard, *Project X*, Penguin Random House (2005); David J. Krajicek, *Mass Killers: Inside the Minds of Men Who Murder*, Arcturus Pub. (2019); NITRAM (Good Thing Productions 2021); ZERO DAY (Avatar Films 2002); FOSTER THE PEOPLE, *Pumped Up Kicks,* on Torches (EP, Startime*Columbia May 23, 2011); GREEN DAY, *Bang Bang*, on Revolution Radio (EP, Reprise Records Oct. 7, 2016).

[16] *See, e.g.*, Crown FAC, ¶¶ 97-106, 239-40; Stacey FAC, ¶¶ 191, 285-87

literature is interactive" and that any emotive distinction between violent video games and other forms of media, such as comic books and cartoons is "more a matter of degree than kind." *Id.*

**D. A Trial Cannot Supply the Tailoring that Strict Scrutiny Requires**

To determine the constitutionality of the Tort Claims, this Court would inevitably confront Justice Scalia's ontological question. Namely, as compared to other modes of communication, is the "interactive" nature of chatbot messages "more a matter of degree than kind?" *Brown*, 564 U.S. at 798. That inquiry is sure to be fact laden and highly complex, cutting across an array of scientific fields including computer science and human psychology. And if the answer is a matter of *kind*, the Court will need to consider further how, if at all, "analogies to old media, even if imperfect, can be useful" in any First Amendment analysis? *Moody*, 603 U.S. at 733.

That's a tall order. Given the technological intricacies at the heart of this case, it is likely that the "separation of legitimate speech from illegitimate speech calls for more sensitive tools than . . . supplied" by common-law adjudication. *Speiser v. Randall*, 357 U.S. 513, 525 (1958). Legislatures are "far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon an issue as complex and dynamic" as AI. *Turner Broadcasting Sys.*, 512 U.S. at 665-66 (internal quotation marks omitted). Add to that solid assumption that courts are also often unable to "determine with any degree of exactitude the precise restriction necessary to carry out [a law's] legitimate objectives," and that "the legislature is better equipped to make such empirical judgments." *Randall v. Sorrell*, 548 U.S. 230, 248 (2006).[17]

---

[17] In *James*, the Sixth Circuit offered relevant *dictum* on this point. The court considered if, in the context of a private tort suit, "it would be possible for a reviewing court to evaluate whether the proposed protective measures . . . would be narrowly tailored regulations" for counteracting the impact of violent video games on children. 300 F.3d at 697. The court ultimately concluded that it could not "adequately exercise [its] responsibilities to evaluate regulations of protected speech . . . that are imposed pursuant to a trial for tort liability." *Id.* It observed that, [c]rucial to the safeguard of strict scrutiny is that [courts] have a clear limitation, articulated in the legislative statute or an administrative regulation, to evaluate." *Id.* And it emphasized that "the regulation of protected speech [embodied in video games] should be directed in the first instance to the legislative and executive branches of state and federal governments, not courts." *Id.*

At a minimum, those familiar reservations about institutional competence should give the Court serious pause whether resolution of the Tort Claims by the Court can survive strict scrutiny. Stated slightly differently, those institutional challenges immediately pose the unavoidable and quite complicated question of just *how* to apply strict scrutiny in a damages action like this one. *Cf. Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974) (courts should "attempt[] to reconcile state law with a competing interest grounded in the constitutional command of the First Amendment"). The analytical methods developed to evaluate the constitutionality of statutes and regulations do not easily align with the same First Amendment concern (improperly chilled expression) arising in the litigation context.

Regarding negligence actions involving constitutionally protected speech – such as claims for harms allegedly inflicted by violent video games on children and third-party victims – one scholar has argued that courts can adjust evidentiary burdens to achieve narrow tailoring. *See Constitutionalized Negligence*, 89 Wash. U. L. Rev. at 1130 ("The prima facie evidentiary burdens must be raised significantly to meet First Amendment demands relative to fully protected speech that warrants narrow tailoring to constitutionalize negligence liability."); *cf. Braun v. Soldier of Fortune Magazine, Inc.*, 968 F.2d 1110, 1118-20 (1992) (sustaining, against First Amendment challenge, jury's verdict awarding personal injury damages for magazine's alleged negligent publication of commercial ad where jury's award rested on finding that ad, on its face, presented clear risk of substantial harm to public).

That said, when an actual violent-video-game tort action came before it, the Sixth Circuit rejected the idea that it would be possible "for reviewing courts to evaluate whether the proposed protective measures [presented to the jury] would be narrowly tailored regulations." *James*, 300 F.3d at 697. To illustrate one insuperable hurdle, the court asked rhetorically, "[w]ho would know what omission the jury relied upon to find the defendants liable?" *Id.* It also recognized that "there is no

room for evaluating the value of the speech itself" in the negligence calculus, which obviously leaves a big hole in any tailoring. *Id.*

As another means of protecting First Amendment interests, courts have long weighed a speaker's intent in deciding whether expression is constitutionally actionable. *See, e.g., Sullivan*, 376 U.S. at 726 (defamation claim by public official held actionable only if "statement was made with 'actual malice'"). The Supreme Court has explained that an "important tool" in preventing the suppression of protected speech "is to condition liability on the . . . showing of a culpable state of mind." *Counterman v. Colorado*, 600 U.S. 66, 75 (2023) (criminal "true threat" charge must, at a minimum, rest on proof of speaker's recklessness). The Court additionally observed that "by reducing an honest speaker's fear that he may accidentally or erroneously incur liability, a *mens rea* requirement provides breathing room for more valuable speech." *Id.* (cleaned up).

But it is questionable whether a *mens rea* requirement, alone, is sufficient to safeguard the category of speech at issue here. Courts have imposed intent thresholds as a means of protecting expression that might otherwise fall *outside* the First Amendment's purview, such as defamation, obscenity, and incitement to violence. As the Supreme Court has explained, "[t]hat kind of strategic protection features in our precedent concerning the prominent categories of *unprotected* speech." *Counterman*, 600 U.S. at 75 (internal quotation marks omitted and emphasis added).[18]

*Counterman* expressly recognizes, though, that an adjustable *mens rea* approach to tailoring restrictions on expression strikes an imperfect "balance" between "lessen[ing] chill of protected speech" and "mak[ing] prosecution of otherwise *proscribable, and often dangerous*, communications

---

[18] Justice Sotomayor has since interpreted *Counterman* as making clear that "the First Amendment bars the use of any objective standard like negligence for punishing speech." *McKesson v. Doe*, 144 S. Ct. 913, 914 (2024) (Statement of Justice Sotomayor respecting the denial of certiorari (internal quotation marks omitted)); *but see Gertz*, 418 U.S. at 347 (holding that, "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual"). If her understanding is correct, it would certainly have an important impact on at least several of the Tort Claims.

harder." 600 U.S. at 78 (emphasis added). And the Court's decision fully appreciates that the outcome of weighing "those two effects may play out differently in different contexts." *Id.* The challenge is "having much of what is important on both sides of the scale." *Id.* at 82 (footnote omitted).

The scale that a court uses in calibrating levels of intent to achieve a sufficient measure of "strategic protection" for speech that may fall short of constitutional immunity, however, may still be too imprecise to weigh the adequacy of safeguards for expression that *is* fully protected. *Counterman*, 600 U.S. at 75 (internal quotation marks omitted). Sensibly, "concerns about adequately evaluating the narrow tailoring of regulations wane if the underlying expression is completely unprotected." James, 300 F.3d at 697. That is not the case with chatbot-generated communications, which should enjoy the First Amendment's full protection.

The distinction makes perfect sense. *Mens rea* and evidentiary standards can be used to constrain lawful restrictions on *unprotected* speech – such as criminal and civil liability for defamation, obscenity, and true threats – from "bleedi[ing] over, either directly or through a chilling effect," onto expression that the First Amendment clearly embraces. *Counterman*, 600 U.S. at 81. It is a compromise approach that "is neither the most speech-protective nor the most sensitive to the dangers" of incitement and other extraconstitutional communications. *Id.* at 82. Rather, it is a speech-*maximizing* "balance" to shield any valuable expression hovering at the outer limits of the constitution's safe zone. *Id.*

The First Amendment concerns here originate from a very different place. The Tort Claims involve expression that falls squarely within the ambit of the First Amendment's safeguards. Any content-based restriction placed on that expression is therefore speech-*curtailing*, which is anathema to the goals of strict scrutiny. *See Paxton*, 606 U.S. at 484 ("Strict scrutiny is unforgiving because it is the standard for reviewing the direct targeting of fully protected speech.").

Considering "the substantial and expansive threats to free expression posed by content-based restrictions," the Supreme Court has emphatically "rejected as startling and dangerous a free-floating test for First Amendment coverage based on ad hoc balancing of relative social costs and benefits." *Alvarez*, 567 U.S. at 717 (cleaned up). That directive pinpoints the tension here. The "strategic protection" based on *mens rea* requirements that the Court has approved for cases primarily involving unprotected speech, *Counterman*, 600 U.S. at 75 (internal quotation marks omitted), seems very much like the "ad hoc balancing of social costs" that the Court has rejected in cases primarily involving protected speech, *Alvarez*, 567 at 717.

To adjudicate these cases, then, any court would have to thread a very tricky needle.

In short, although resolving the Tort Claims would demand strict scrutiny, there is presently no clear way for the Court to perform it. The absence of a settled analytical framework makes this case especially challenging and fraught with uncertainty. Circumspection should thus be the Court's guiding light, and constitutional avoidance its chosen doctrine. *See Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J. dissenting (courts "will not pass upon a constitutional question if there is also present some other ground upon which the case may be disposed of")).

## CONCLUSION

The First Amendment looms heavily over these cases. Perhaps more than any other constitutional guarantee, the right to free speech has propelled our society forward in matters of political freedom, cultural affluence, and technological primacy. When other laws encroach upon that entitlement, even for ostensibly defensible reasons, we should nevertheless demand a rigorous inquiry into the mechanics of the offending rule. In that effort, we ought to remember that courts are certainly not the only institutions of government capable of choosing between competing, vital interests. And even further, that sometimes courts are much less effective at making factually

nuanced determinations than are legislative or regulatory bodies, which are likewise charged with upholding the constitution.

For all these reasons, the Chamber respectfully requests that the Court consider the impact of the First Amendment on the judicial resolution of the Tort Claims.

Dated: November 23, 2026

BROADFIELD US LLP

By: */s/Daniel S. Alter*
Daniel S. Alter
Attorneys for Amicus Curiae
Chamber for Progress
*Admission Pro Hac Vice Pending

Dated: November 23, 2026

TROYGOULD PC

By: ______________________
John C. Staser
Attorneys for Amicus Curiae
Chamber for Progress